# EXHIBIT 2

**Exhibit A**

**EMED WEIGHT LOSS, LLC**

---

**TRANSACTION BONUS PLAN**

---

**ARTICLE I**
**PURPOSE OF THE PLAN**

This plan shall be known as the eMed Weight Loss, LLC Transaction Bonus Plan (the "Plan") and shall be effective as of the date of the Plan's adoption by the Compensation Committee of the Board (the "Effective Date").  The purpose of the Plan and the intention of eMed Weight Loss, LLC (the "Company") is to enable the Company Group to retain and award employees and other service providers of high competence by providing participating individuals with an opportunity to receive additional compensation based on the value of the Company as of the Settlement Date.

**ARTICLE II**
**DEFINITIONS**

For purposes of the Plan, capitalized terms used herein that are not otherwise defined shall have the meanings set forth below:

2.1    "Administrator" means the individual(s) appointed by the Compensation Committee of the Board from time to time to administer the Plan and to perform the functions set forth herein; provided that if no such committee has been appointed then the Administrator shall mean the Board.

2.2    "Award" means an award granted under the Plan entitling a Participant to receive a payment under specified circumstances, subject to the terms and conditions set forth in the Plan and in the Participant's Award Agreement.

2.3    "Award Agreement" means the written or electronic agreement setting forth the terms and conditions applicable to an Award, a general form of which is attached hereto as Exhibit A.

2.4    "Award Percentage" means the percentage of the Bonus Pool to which a Participant will be entitled pursuant to the grant of an Award under the Plan.  Award Percentages may be denominated in fractional percentages, provided that in no event may the aggregate Award Percentages for all outstanding Awards under the Plan at any given time exceed one hundred percent (100%).  To the extent that Awards granted under the Plan cause the aggregate Award Percentages for all outstanding Awards under the Plan to exceed one hundred percent (100%), the Award Percentages for outstanding Awards shall be reduced automatically (but not below zero) to the extent necessary to eliminate such excess.  Such reduction shall be applied to outstanding Awards based on the date of grant of such Awards, with Awards granted later in time being reduced first.  For Awards having the same date of grant, the Award Percentages for such Awards shall be reduced on a pro rata basis (but not below zero) prior to reducing the Award Percentages for Awards granted earlier in time.

2.5    "Board" means the Board of Directors of the Company (or similar governing body).

2.6    "Bonus Amount" means the amount payable to a Participant under the Plan in respect of an Award based upon the product of (x) the Participation Percentage multiplied by (y) the Bonus Pool.

2.7    "Bonus Pool" means the product of (x) ten percent (10%) multiplied by (y) the Measurement Value. A Participant's Award Percentage shall be multiplied by the Bonus Pool to determine the applicable Bonus Amount in respect of an Award.  Any portion of the Bonus Pool that is not allocated to outstanding Awards under the Plan as a result of the aggregate Award Percentages for all outstanding Awards at the time of a Sale Event being less than one hundred percent (100%) shall be retained by the Company for general corporate purposes.

2.8     "Cause" means, with respect to the termination of a Participant's employment or service with the Company Group, any of the following if committed directly or indirectly by the Participant: (i) the Participant's commission of, indictment for, or conviction or entry of a plea of guilty or *nolo contendere* to (A) any felony, or (B) any crime (whether or not a felony) involving moral turpitude, fraud, theft, breach of trust or other similar acts, whether of the United States or any state thereof or any similar foreign law to which the Participant may be subject, (ii) the Participant's breach of fiduciary duty or misconduct relating to the Company Group or the performance of the Participant's duties, (iii) the Participant's failure to (A) follow a reasonable and lawful directive of the Compensation Committee of the Board, the Chief Executive Officer of the Company or a supervising executive, or (B) comply with any written rules, regulations, policies or procedures of the Company Group, (iv) the Participant's violation of any applicable confidentiality, non-competition, non-solicitation, non-hire or similar restrictive covenants to which the Participant is a party with the Company Group, (v) the Participant's failure to perform the Participant's duties to the Company Group; or (vi) any violation or breach by a Participant of the terms or conditions of this Plan, the Award Agreement or any other agreement currently or hereafter in effect between the Company Group and the Participant. Cause, as defined above, is only overridden by a definition of Cause expressly set forth in an individual employment agreement between the Company Group and the Participant at the time of the grant of an Award and not a definition incorporated by reference from another policy or plan.

2.9     "Code" means the Internal Revenue Code of 1986, as amended.

2.10     "Company Group" means a group consisting of the Company and its direct and indirect subsidiaries and certain affiliated entities, as determined by the Administrator. The Administrator has unilateral authority to designate which entities shall be included in the Company Group, and to make changes to the composition of the Company Group from time to time, in its sole discretion.

2.11     "Covered Investments" means the aggregate dollar amount of all cash, property, equity, securities, working capital and other forms of consideration contributed to or invested in the Company Group and its affiliates or their employees or other service providers by the Preferred Investors for or in respect of their Equity Securities. For the sake of clarity, "Covered Investments" shall include all contributions and investments made by the Preferred Investors prior to, on or following the Effective Date.

2.12     "Equity Securities" means (i) units or other equity interests in the Company, (ii) obligations, evidences of indebtedness, or other securities or interests convertible or exchangeable into units of the Company or other equity interests in the Company, and (iii) warrants, options, or other rights to purchase or otherwise acquire units or other equity interests in the Company.

2.13     "Fair Market Value" means the fair market value of the applicable interest as determined by the Administrator, in its sole and absolute discretion.

2.14     "Grant Date" means the date of grant set forth in an Award Agreement.

2.15     "Immediate Family" means the Participant's children, stepchildren, grandchildren, parents, stepparents, grandparents, spouse, siblings (including half-brothers and half-sisters), in-laws (including all such relationships arising because of legal adoption) and any other Person required under applicable law to be accorded a status identical to any of the foregoing.

2.16    "Independent Third Party" means any individual or entity other than (a) a shareholder or equityholder of a member of the Company Group on the Effective Date; (b) a member of the Immediate Family of any shareholder or equityholder of a member of the Company Group; (c) a trust or estate of which one or more Persons described in clauses (a) and/or (b) are beneficiaries; (d) a corporation or other enterprise in which any one or more Persons, trusts or estates described in clauses (a), (b) and/or (c) own, in the aggregate, more than fifty percent (50%) of the outstanding equity securities entitled to vote for the election of the Board of Directors (or other governing body) or, in the case of an unincorporated enterprise, the right to receive at least a majority of the profits of such enterprise; or (e) any company which controls, is controlled by or which is under common control with any company described in (d).

2.17    "Marketable Securities" means equity securities, other than equity securities of the Company Group or of any entity into which such securities are converted in connection with a public offering, that (i) are freely traded without restriction of volume or manner of sale under Rule 144 of the Securities Act of 1933, (ii) are listed on any of the New York Stock Exchange, Nasdaq Stock Market or another public exchange reasonably acceptable to the Administrator, and (iii) have a sufficient daily trading volume to permit resales of such securities in such time period, volume and manner as the Administrator deems appropriate.

2.18    "Measurement Value" means (x) Net Proceeds minus (y) the Threshold Value.

2.19    "Net Proceeds" means, without duplication, as of the Settlement Date, (i) all cash (excluding management fees, sums due with respect to the Preferred Investor's and their affiliates' debt investments in the Company Group, and expense reimbursements and similar payments), (ii) all Marketable Securities, valued at the price used in connection with the Sale Event transaction, and (iii) solely to the extent that the Administrator elects to include non-cash amounts as Net Proceeds, the aggregate Fair Market Value of any non-cash proceeds, in each case, received by the holders of Equity Securities (as determined by the Administrator) with respect to or in exchange for Equity Securities (whether such payments are received from the Company or any third party) in connection with such Sale Event, determined after giving effect to any payments made or that may be payable hereunder; provided that "Net Proceeds" shall be reduced, as determined by the Administrator, by any debt paid off (or paid down) in connection with such Sale Event, debt incurred in connection with such Sale Event, and any investment banker fees, legal fees, and any other transaction costs and liabilities.  Any "Net Proceeds" that are deposited into an escrow account or subject to being held-back by the purchaser for distribution upon the occurrence or satisfaction of any event at the time of a Sale Event or are held in reserve will not be included in calculating "Net Proceeds" until such time as such amounts are paid in cash and released to the holders of Equity Securities; provided that such amounts will not be included in calculating "Net Proceeds" for purposes of this Plan to the extent they are released to the holders of Equity Securities more than five (5) years following the consummation of the Sale Event. All computations of Net Proceeds shall be made on a pro forma basis taking into account the payment of any entitlements under outstanding equity-based incentive awards of the Company (including Awards hereunder).

2.20    "Participant" means any employee or other service provider of the Company Group who is selected to participate in the Plan in accordance with Article IV hereof.

2.21    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

2.22    "Participation Percentage" means the percentage specified in an Award Agreement which will be used to calculate the Bonus Amount payable to a Participant in accordance with the terms of this Plan. The Participation Percentage does not represent or constitute issued and outstanding shares of stock (or any other equity rights) for any corporate or other purposes and does not confer on the Participant any right or interest as a holder of equity in the Company or any member of the Company Group, including any voting rights or the right to receive dividends.

2.23    "Preferred Investors" means the persons holding Series A and Series B  Preferred Units (or successor interest) in the Company.

2.24    "Sale Event" means the consummation of the first transaction following the Effective Date, whether in a single transaction or in a series of related transactions that are consummated contemporaneously (or consummated pursuant to contemporaneous agreements), with any Independent Third Party or group of related Independent Third Parties pursuant to which such Independent Third Party or group of related Independent Third Parties, directly or indirectly, (a) acquire (whether by merger, stock purchase, recapitalization, reorganization, redemption, issuance of capital stock or otherwise) more than eighty percent (80%) of the outstanding voting securities of the Company, or (b) acquire assets constituting all or substantially all of the assets of the Company on a consolidated basis; provided that in no event shall a Sale Event be deemed to include (i) any transaction effected solely for the purpose of changing, directly or indirectly, the form of organization or the organizational structure of the Company or transferring securities or assets of the Company to any Person (whether a corporation, limited liability company or otherwise) that is a wholly-owned subsidiary of, parent of, equity interest holder of, or is controlled by or under the common control of any Person described in this clause (i) that does not directly or indirectly change the ownership of the Company, or (ii) a transaction following which the holders of voting equity securities of the Company prior to such transaction continue to own at least twenty percent (20%) of the voting equity securities of the Company or the buyer after such transaction.  Notwithstanding the foregoing, a "Sale Event" shall not be deemed to have occurred for purposes of the Plan unless such transaction or series of related transactions also constitutes a "change in control event" with respect to the Company for purposes of Code Section 409A.

2.25    "Settlement Date" means the date of consummation of a Sale Event.

2.26    "Threshold Value" means the product of (x) two (2.0) multiplied by (y) the Covered Investments.

**ARTICLE III**
**ADMINISTRATION**

3.1    General.  The Plan shall be administered by the Administrator.  Subject to the provisions of the Plan, the Administrator shall be authorized to (a) select Participants, (b) determine the Participation Percentage(s) granted under an Award, (c) determine the Bonus Pool and the Bonus Amounts (and all inputs related thereto), (d) determine the conditions and restrictions, if any, subject to which an Award or the Bonus Amount will be made, (e) certify that the conditions and restrictions applicable to an Award or the Bonus Amount have been met, (f) determine the Net Proceeds (and all inputs related thereto), (g) interpret the Plan, and (h) adopt, amend, or rescind such rules and regulations, and make such other determinations, for carrying out the Plan as it may deem appropriate.  Decisions of the Administrator on all matters relating to the Plan shall be in the Administrator's sole discretion and shall be conclusive and binding upon the Participants, the Company and all other Persons to whom rights to receive payments hereunder have been transferred in accordance with Section 5.2 hereof.  The validity, construction and effect of the Plan and the rules and regulations relating to the Plan shall be determined in accordance with applicable federal and state laws, rules and regulations promulgated pursuant thereto.

3.2    Plan Expenses.  The expenses of the Plan shall be borne by the Company.

3.3    Unfunded Arrangement.  The Company shall not be required to establish any special or separate fund or make any other segregation of assets to assure the payment of any amount under the Plan.  The Plan shall be "unfunded" for all purposes, and Awards hereunder shall be paid out of the general assets of the Company as and when Awards are payable under the Plan.  All Participants shall be solely unsecured general creditors of the Company.  If the Company decides in its sole discretion to establish any advance accrued reserve on its books against the future expense of the Awards payable hereunder, or if the Company decides in its sole discretion to fund a trust from which Plan benefits may be paid from time to time, such reserve or trust shall not under any circumstance be deemed to be an asset of the Plan.

3.4    Delegation.  The Administrator may, to the extent permissible by applicable law, delegate any of its authority hereunder to such Persons as it deems appropriate.

3.5    Accounts and Records.  The Administrator shall maintain such accounts and records regarding the fiscal and other transactions of the Plan and such other data as may be required to carry out its functions under the Plan and to comply with all applicable laws.

3.6     Retention of Professional Assistance.  The Administrator may employ such legal counsel, accountants and other Persons as may be required in carrying out its duties in connection with the Plan.

## ARTICLE IV
## PARTICIPATION; GRANT AND PAYMENT OF AWARDS

4.1     Participation.  Participation in the Plan shall be limited to those Participants selected by the Administrator from time to time, and no employee or service provider of the Company Group shall have any right to be selected as a Participant.  Nothing in the Plan shall interfere with or limit in any way any right of the Company or any member of the Company Group to terminate any Participant's employment or service at any time and for any reason (or no reason), nor confer upon any Participant any right to continued employment or service with the Company or any member of the Company Group for any period of time or to continue such Participant's present (or any other) rate of compensation.  No Participant who is granted an Award under the Plan shall have any right to a grant of future Awards under the Plan.  By accepting any payment under the Plan, each Participant and each Person claiming under or through such Participant shall be conclusively deemed to have indicated such Person's acceptance and ratification of, and consent to, any action taken under the Plan by the Company and/or the Administrator.  Subject to the terms and conditions of the Plan, determinations made by the Administrator under the Plan need not be uniform and may be made selectively among eligible individuals under the Plan, whether or not such individuals are similarly situated.

4.2     Grant of Awards.  The Administrator shall determine the Participants to whom Awards under the Plan are granted.  Awards granted under the Plan shall contain a Participation Percentage and shall represent the right to receive a payment in respect of the Bonus Pool on the Settlement Date, subject to the terms and conditions set forth herein and in the applicable Award Agreement.

4.3     Determination of Payout; Time and Form of Payment.  The amount of each Participant's Bonus Amount shall be determined by the Administrator on or as soon as administratively practicable following the Settlement Date.  Subject to the provisions of this Article IV, the Bonus Amount shall be payable in cash in a single lump sum within sixty (60) days following the Settlement Date provided, however, with respect to any portion of an Bonus Amount payable hereunder attributable to any non-cash proceeds, such portion of the Bonus Amount may, in the sole discretion of the Administrator, be paid in the same form as such non-cash proceeds would be payable to the Company's equityholders in the Sale Event, with the amount payable to the Participant to be based on the value (as determined by the Administrator) that would otherwise have been payable with respect to such portion of the Bonus Amount; provided, further that, to the extent that any portion of the Net Proceeds is deposited into an escrow account or is subject to being held back by the purchaser for distribution upon the occurrence or non-occurrence of any event or the satisfaction of certain conditions following the Sale Event, the applicable portion of the Bonus Amount shall be paid to the Participant at the same time and on the same basis as the Net Proceeds are paid to the Company's equityholders in the Sale Event, subject to the requirements and limitations of Treasury Regulation §1.409A-3(i)(5)(iv)(A).

4.4     Termination of Employment.  Unless otherwise determined by the Administrator or as set forth in an Award Agreement, in the event of a Participant's termination of employment for any reason prior to the Settlement Date, the Participant's entire Award shall terminate, expire and be forfeited upon the date of the Participant's termination of employment with no right to payment hereunder; provided that if a Participant's employment or service is terminated by the Company without Cause in the six (6) month period immediately preceding the Settlement Date, the Participant shall be deemed employed as of the Sale Event and eligible for payment of such Participant's applicable Bonus Amount.

4.5     Changes.

(a)     The existence of the Plan and the Awards granted hereunder shall not affect in any way the right or power of the Administrator, the Compensation Committee of the Board or the equityholders of the Company to make or authorize (i) any adjustment, recapitalization, reorganization or other change in the Company Group's capital structure or its business, (ii) any merger or consolidation of the Company Group or any affiliate, (iii) any issuance of bonds, debentures, preferred or prior preference stock ahead of or affecting the equity securities of the Company Group, (iv) the dissolution or liquidation of the Company Group or any affiliate, (v)

any sale or transfer of all or part of the assets or business of the Company Group or any affiliate, or (vi) any other corporate act or proceeding.

(b)      If there shall occur any change in the capital structure of the Company Group by reason of any stock split, reverse stock split, stock dividend, subdivision, combination or reclassification of shares, any recapitalization, any merger, any consolidation, any spin off, any reorganization or any partial or complete liquidation, or any other corporate transaction or event having an effect similar to any of the foregoing (a "Corporate Event"), then (i) the Participation Percentage, (ii) Net Proceed thresholds, and (iii) such other terms, provisions and conditions set forth in the Plan or an Award Agreement may, in the discretion of the Administrator, be appropriately adjusted.  In addition, if there shall occur any change in the capital structure or the business of the Company Group that is not a Corporate Event (an "Other Extraordinary Event"), including by reason of any extraordinary dividend or distribution (whether cash or equity), any conversion, any adjustment, any issuance of any class of securities convertible or exercisable into, or exercisable for, any class of equity, or any sale or transfer of all or substantially all of the Company Group's assets or business, then the Administrator, in its sole discretion, may adjust any Award in the same manner as a Corporate Event and make such other adjustments to the Plan. Any adjustment pursuant to this Section 4.5 shall be made in such manner as the Administrator may, in its sole discretion, deem appropriate and equitable to prevent dilution or enlargement of the rights granted to, or available for, Participants under the Plan.  Any such adjustment determined by the Administrator shall be final, binding and conclusive on the Company and all Participants and their respective heirs, executors, administrators, successors and permitted assigns.  Except as expressly provided in this Section 4.5 or in the applicable Award Agreement, a Participant shall have no rights by reason of any Corporate Event or any Other Extraordinary Event.

4.6      Restrictive Covenants.  By accepting an Award, a Participant acknowledges and agrees to the provisions, conditions and covenants set forth on Annex I hereto. Annex I shall be deemed incorporated by reference into each Award Agreement as if fully set forth therein, and by execution of an Award Agreement a Participant shall be subject to and bound by Annex I. Without limiting the foregoing, in partial consideration for the grant of an Award under the Plan, a Participant's rights with respect to any Bonus Amount under the Plan shall be conditioned on the Participant's continued compliance with any non-competition, non-solicitation or other restrictive covenants that may be contained in any employment agreement, restrictive covenants agreement or other agreement between a member of the Company Group and the Participant, whether entered into prior to, on or following the Effective Date.  In addition to any means at law or equity available to enforce such restrictive covenants (including injunctive relief), the Participant may, in the sole discretion of the Administrator, be required, upon a breach of any such restrictive covenant, to forfeit the Participant's rights with respect to any Award hereunder.

4.7      Confidentiality.  By accepting an Award, each Participant acknowledges and agrees that the terms and conditions of this Plan and any Award hereunder shall remain strictly confidential and each Participant hereby agrees not to disclose the terms and conditions of this Plan or any Award to any Person (including a Participant's Participation Percentage), other than Immediate Family, legal advisors or personal tax or financial advisors who, in each case, maintain the confidentiality of the Plan and the Participant's Award and keep such terms and conditions confidential. A Participant shall be strictly liable for any impermissible disclosure made by a Person to whom Participant has disclosed confidential information.

4.8      Permitted Disclosures.  Nothing in any agreement with the Company Group shall prohibit or impede a Participant from communicating, cooperating or filing a complaint with any U.S. federal, state or local governmental or law enforcement branch, agency or entity (collectively, a "Governmental Entity") with respect to possible violations of any U.S. federal, state or local law or regulation, or otherwise making disclosures to any Governmental Entity, in each case, that are protected under the whistleblower provisions of any such law or regulation, provided that in each case such communications and disclosures are consistent with applicable law. By accepting an Award, each Participant represents that such Participant understands and acknowledges that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Each Participant understands and acknowledges further that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret

information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

4.9     Release.  Upon acceptance of any Bonus Amount in respect of any Award hereunder, the Participant shall be deemed, absent manifest error or bad faith by the Administrator, to have (i) accepted all aspects of the calculation of the Bonus Amount, and (ii) unconditionally released and discharged the Company Group and any and all of the Company Group's parent entities and their respective members, partners, subsidiaries, affiliates, successors and assigns and any and all of its and their past and present officers, directors, managers, partners, agents, employees and representatives from any and all claims in connection with, or in any manner related to or arising under, the Plan with respect to any Award hereunder, including the determination of such Bonus Amount and any other matter associated therewith. In addition, as a condition to the receipt of the Bonus Amount, upon the Settlement Date, the Participant will be required to execute a full and general release agreement in a form provided by the Company. All parties released under this Section 4.9 are intended to be third-party beneficiaries of this Section 4.9, and this Section 4.9 may be enforced by each of them in accordance with the terms hereof in respect of the rights granted to such released parties hereunder.

4.10     Compliance.  As a condition to receiving any payment in respect of an Award granted hereunder, a Participant shall be required to actively and satisfactorily cooperate and consult with and provide all reasonable assistance to the Company Group and any of their officers, employees or representatives through the Settlement Date.  In addition, as a condition to receiving any payment in respect of an Award granted hereunder, a Participant shall be required to provide any requested or required W-9 information (or similar information).

4.11     No Rights as an Equityholder.  Nothing in the Plan shall be construed to give a Participant any rights or entitlements as a stockholder or equityholder of any member of the Company Group, including with respect to any dividends or distributions made by the Company Group or the right to inspect the Company's books and records, financial statements and/or capitalization.  A Participant shall have no right to vote on or consent to any matter presented to the shareholders or equityholders of any member of the Company Group, to receive any financial or other information concerning the Company (or any member of the Company Group) or to exercise any other rights commonly attributed to ownership of stock in a corporation (or other equity interest in any other form of entity).  No member of the Company Group or any of their respective officers, directors, managers, shareholders, partners, equity holders, employees or agents shall have any duty or obligation to affirmatively disclose to a Participant, and no Participant shall at any time have any right to be advised of, any information, material or otherwise, or any transaction that may result in payment in respect of an Award, or have any right to approve or agree to any potential Sale Event, or any other transaction that may result in payment in respect of an Award.

4.12     Expiration.  Notwithstanding anything set forth herein to the contrary, this Plan and all Award Agreements shall terminate and expire and all Participants shall forfeit all rights under this Plan and in their Award Agreement in the event a Sale Event is not consummated on or prior to December 31, 2031.

**ARTICLE V**
**MISCELLANEOUS**

5.1     Successors.  For purposes of the Plan, the Company shall include any and all successors or assignees, whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of the business or assets of the Company, and such successors and assignees shall perform the Company's obligations under the Plan in the same manner and to the same extent that the Company would be required to perform if no such succession or assignment had taken place.  In the event that the surviving company in any transaction to which the Company is a party is a subsidiary of another company, subject to Section 4.5, the ultimate parent company of such surviving company shall cause the surviving company to perform the obligations of the Company under the Plan in the same manner and to the same extent that the Company would be required to perform such obligations if no such succession or assignment had taken place.  In such event, the term "Company," as used in the Plan, shall mean the Company, as hereinbefore defined, and any successor or assignee (including the ultimate parent company) to the business or assets thereof, which by reason hereof becomes bound by the terms and provisions of the Plan.

5.2     <u>Nontransferability</u>.  No Award or right to receive payment under the Plan may be transferred other than by will or the laws of descent and distribution; <u>provided</u> that, with the consent of the Administrator, a Participant may transfer, without consideration, an Award to one or more members of his or her Immediate Family, to a trust established for the exclusive benefit of one or more members of his or her Immediate Family, to a partnership in which all the partners are members of his or her Immediate Family, or to a limited liability company in which all the members are members of his or her Immediate Family; <u>provided</u>, further, that, regardless of such transfer, the restrictive covenants and terms of the Plan shall remain applicable to the Participant and any such Immediate Family, and any such trust, partnership and limited liability company, shall agree to be and shall be bound by the terms of the Plan, and by the terms and provisions of the applicable Award Agreement and any other agreements covering the transferred Awards.  Any transfer or attempted transfer of an Award or a right to receive payment under the Plan contrary to this Section 5.2 shall be void.  In the event of an attempted transfer by a Participant of an Award or a right to receive payment pursuant to the Plan contrary to this Section 5.2 hereof, the Administrator may, in its sole discretion, terminate such Award or right.

5.3     <u>Withholding Taxes</u>.  The Company Group shall be entitled, if necessary or desirable, to withhold from any amount due and payable by the Company Group to any Participant (or secure payment from such Participant in lieu of withholding) the amount of any withholding or other tax due from the Company Group with respect to any amount payable to such Participant under the Plan.

5.4     <u>Amendment and Termination of the Plan</u>.  The Compensation Committee of the Board reserves the right to amend or terminate, in whole or in part, any or all of the provisions of the Plan by action of the Compensation Committee of the Board (or a duly authorized committee thereof) at any time. Notwithstanding the foregoing, unless otherwise required by law or done to maintain compliance with applicable law, no amendment may be made to the Plan that materially diminishes the vested rights or vested benefits of a Participant as of such date without the consent of such Participant.

5.5     <u>Severability</u>.  The provisions of the Plan shall be deemed severable.  The invalidity or unenforceability of any provision of the Plan in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of the Plan in such jurisdiction or the validity, legality or enforceability of any provision of the Plan in any other jurisdiction, it being intended that all provisions of the Plan shall be enforceable to the fullest extent permitted by applicable law.

5.6     <u>Titles and Headings</u>.  The headings and titles used in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

5.7     <u>No Liability</u>.  None of the Company or any member of the Company Group, or any of their respective officers, directors, managers, members, partners, equityholders, employees or agents shall have any liability or obligation whatsoever, in damages or otherwise, to any Participant or any other Person (a) for any act or omission in connection with the Plan, any Award or any payment in respect of an Award, (b) as a result of any amendment, modification, alteration or termination of the Plan or an Award permitted hereby, or (c) to compensate any Participant or any other Person with respect to or as a result of any amendment, modification, alteration or termination of the Plan or an Award permitted hereby.  No fiduciary duties are imposed or shall be deemed to be imposed upon the Company, any member of the Company Group, the Administrator, the Compensation Committee of the Board, or any of the officers, directors, managers, members, partners, equityholders, employees or agents of the Company or any member of the Company Group as a result of the creation or administration of the Plan.

5.8     <u>Indemnification</u>.  In addition to such other rights of indemnification as they may have as members of the Compensation Committee of the Board, the members of the Administrator and the Compensation Committee of the Board (and their designees) shall be indemnified by the Company against all costs and expenses reasonably incurred by them in connection with any action, suit or proceeding to which they or any of them may be party by reason of any action taken or failure to act under or in connection with the Plan or any right granted hereunder, and against all amounts paid by them in settlement thereof (<u>provided</u> that such settlement is approved by independent legal counsel selected by the Company) or paid by them in satisfaction of a judgment in any such action, suit or proceeding; <u>provided</u> that any such Compensation Committee of the Board or Administrator member (or designee) shall be entitled to the indemnification rights set forth in this Section 5.8 only if such

member has acted in good faith and in a manner that such member reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such conduct was unlawful; and provided, further, that upon the institution of any such action, suit or proceeding, a Compensation Committee of the Board or Administrator member (or designee) shall give the Company written notice thereof and an opportunity, at its own expense, to handle and defend the same before such Compensation Committee of the Board or Administrator member (or designee) undertakes to handle and defend it on such Compensation Committee of the Board or Administrator member's (or designee's) own behalf.

5.9     Data Privacy.   As a condition of receipt of any Award, each Participant explicitly and unambiguously consents to the collection, use, and transfer, in electronic or other form, of personal data as described in this Section by and among, as applicable, the Company Group and its respective affiliates (the "Covered Group") for the exclusive purpose of implementing, administering, and managing this Plan and Awards and the Participant's participation in this Plan. In furtherance of such implementation, administration, and management, the Covered Group may hold certain personal information about a Participant with respect to one or more Awards under the Plan, including the Participant's name, home address, telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, job title(s), information regarding any securities of the Covered Group or any of its affiliates, and details of all Awards (the "Data"). In addition to transferring the Data amongst themselves as necessary for the purpose of implementation, administration, and management of this Plan and Awards and the Participant's participation in this Plan, the Covered Group may transfer the Data to any third parties assisting the Covered Group in the implementation, administration, and management of this Plan and Awards and the Participant's participation in this Plan. Recipients of the Data may be located in the Participant's country or elsewhere, and the Participant's country and any given recipient's country may have different data privacy laws and protections. By accepting an Award, each Participant authorizes such recipients to receive, possess, use, retain, and transfer the Data, in electronic or other form, for the purposes of assisting the Covered Group in the implementation, administration, and management of this Plan and Awards and the Participant's participation in this Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Covered Group or the Participant may elect to deposit any equity securities (if any). The Data related to a Participant will be held only as long as is necessary to implement, administer, and manage this Plan and Awards and the Participant's participation in this Plan and as may be required pursuant to applicable law. A Participant may, at any time, view the Data held by the Covered Group with respect to such Participant, request additional information about the storage and processing of the Data with respect to such Participant, recommend any necessary corrections to the Data with respect to the Participant, or refuse or withdraw the consents herein in writing, in any case without cost, by contacting his or her local human resources representative. The Company may cancel the Participant's eligibility to participate in this Plan, and in the Administrator's discretion, the Participant may forfeit any outstanding Awards if the Participant refuses or withdraws the consents described herein. For more information on the consequences of refusal to consent or withdrawal of consent, Participants may contact their local human resources representative.

5.10     Governing Law.  The Plan shall be governed by the laws of the State of Delaware, without giving effect to any choice of law provisions that might otherwise refer construction or interpretation of the Plan to the substantive laws of another jurisdiction. The Plan is not intended to be subject to the Employee Retirement Income Security Act of 1974, as amended (ERISA).

5.11     Jurisdiction; Waiver of Jury Trial.  Any suit, action or proceeding with respect to the Plan or any Award Agreement, or any judgment entered by any court of competent jurisdiction in respect thereof, shall be resolved only in the courts of the State of Delaware or the United States District Court for the District of Delaware and the appellate courts having jurisdiction of appeals in such courts.  In that context, and without limiting the generality of the foregoing, the Company and each Participant shall irrevocably and unconditionally (a) submit in any proceeding relating to the Plan or any Award Agreement, or for the recognition and enforcement of any judgment in respect thereof (a "Proceeding"), to the exclusive jurisdiction of the courts of the State of Delaware, the court of the United States of America for the District of Delaware, and appellate courts having jurisdiction of appeals from any of the foregoing, and agree that all claims in respect of any such Proceeding shall be heard and determined in such Delaware State court or, to the extent permitted by law, in such federal court, (b) consent that any such Proceeding may and shall be brought in such courts and waives any objection that the Company and each Participant may now or thereafter have to the venue or jurisdiction of any such Proceeding in any such court or that such Proceeding was brought in an inconvenient court and agree not to plead or claim the same, (c) WAIVE ALL

RIGHT TO TRIAL BY JURY IN ANY PROCEEDING (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE PLAN OR ANY AWARD AGREEMENT, (d) agree that service of process in any such Proceeding may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party, in the case of a Participant, at the Participant's address shown in the books and records of the Company or, in the case of the Company, at the Company's principal offices, attention Board of Directors, and (e) agree that nothing in the Plan shall affect the right to effect service of process in any other manner permitted by the laws of the State of Delaware.

5.12    Costs of Legal or Equitable Action. If a Participant shall bring any legal or equitable action against the Company Group by reason of being or having been a Participant, or if it is necessary for the Company Group to bring any legal or equitable action under this Plan against a Participant or any Person claiming an interest by or through a Participant, the results of which shall be adverse in any manner to the Participant or to the Person claiming an interest by or through such Participant, the Company Group shall be entitled to reimbursement of any costs it incurs in defending or bringing such action, including attorney's fees.

5.13    Other Benefits.  Awards under the Plan are special incentives and shall not be taken into account in computing the amount of salary or compensation for purposes of determining any bonus, incentive, pension, retirement, death or other benefit under any other bonus, incentive, pension, retirement, insurance or other employee benefit plan of the Company, unless such plan or agreement expressly provides otherwise.

5.14    Code Section 280G.  Notwithstanding any other provision of this Plan or an Award Agreement to the contrary, in the event that any payment that is either received by a Participant or paid by the Company Group on a Participant's behalf or any property, or any other benefit provided to a Participant under this Plan or under any other plan, arrangement or agreement with the Company Group or any other Person whose payments or benefits are treated as contingent on a change of ownership or control of the Company (or in the ownership of a substantial portion of the assets of the Company) or any Person affiliated with the Company or such Person (collectively, the "Company Payments"), will be subject to the tax (the "Excise Tax") imposed by Section 4999 of the Code (and any similar tax that may hereafter be imposed by any taxing authority), the Company Payments will be automatically reduced to an amount that equals the product of 2.99 multiplied by such Participant's "base amount" (as determined in accordance with Section 280G of the Code and the treasury regulations thereunder), such that the Participant will not be subject to the Excise Tax. Such reduction shall first be applied to any Company Payment payable to a Participant under this Plan, with any further reduction of the Company Payments to be made in the following order: (i) any cash severance payable by reference to the Participant's base salary or annual bonus; (ii) any other cash amount payable to the Participant; (iii) any benefit valued as a "parachute payment;" and (iv) acceleration of vesting of any equity award.

5.15    Code Section 409A.  The Plan is intended to comply with Section 409A of the Code or an exemption thereunder and shall be construed and administered in accordance with Section 409A of the Code. Notwithstanding the foregoing, the Company Group makes no representations that the payments and benefits provided under the Plan comply with Section 409A of the Code and in no event shall the Company Group (or any officer, employee director, consultant, agent, or representative of the Company Group) be liable for any portion of any taxes, penalties, interest, or other liabilities, damages or expenses that may be incurred by a Participant on account of non-compliance with Section 409A of the Code. A termination of employment shall not be deemed to have occurred for purposes of any provision of this Plan providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Plan, references to a "termination," "termination of employment" or like terms shall mean "separation from service."  For purposes of Section 409A of the Code, each installment payment provided under the Plan shall be treated as a separate payment. Notwithstanding any other provision of the Plan, if any payment or benefit provided to a Participant in connection with the Participant's termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code and the Participant is determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i) of the Code, then such payment or benefit shall not be paid until the first payroll date to occur following the six (6)-month anniversary of the Employment Separation Date or, if earlier, on the Participant's death (the "Specified Employee Payment Date"). The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid to the

Participant in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

5.16    <u>References</u>.  The use of the term "this Plan" and/or the words "herein", "hereof", "hereunder" and other similar compounds of the word "here" shall refer to this entire instrument (and any agreement supplemental to this instrument) and not merely to any particular article, section, paragraph, provision or item.  Unless something in the subject matter or the context is inconsistent therewith, references herein to articles, sections and paragraphs are to articles, sections and paragraphs of this Plan.  Whenever in this Plan the word "including" and "include" is used, it shall be deemed to be for purposes of identifying only one or more of the possible alternatives, and the entire provision in which such word appears shall be read as if the phrase "including without limitation" were actually used in the text.  The titles, headings or captions contained in this Plan are for convenience of reference only and in no way define, limit, extend, or describe the scope of this Plan or the intent of any of the provisions hereof.  As used in this Plan, the words Administrator, Compensation Committee of the Board and Participant and the pronoun used in designation thereof shall be construed to include the plural as well as the singular number, and the masculine, feminine, and/or neuter gender, as appropriate to the designation of the party or parties to which such words refer.

*       *       *       *       *

**EMED WEIGHT LOSS, LLC**

---

**TRANSACTION BONUS PLAN**

---

**AWARD AGREEMENT**

**Date of Grant**: _____, 20\_\_\_\_

 [*Insert Name of Participant*]
*Via Email*

Dear [*Insert Name of Participant*]:

The purpose of this award agreement (this "Award Agreement") is to inform you that you have been granted an award (the "Award") under the eMed Weight Loss, LLC (the "Company") Transaction Bonus Plan (the "Plan). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto under the Plan. The Award Percentage for your Award will be [●]%.

Your Bonus Amount is directly tied to the equity value of the Company. Specifically, your Bonus Amount will be determined based on the Net Proceeds on the Settlement Date, subject to your continued employment with the Company on the Settlement Date.

This Award Agreement and the Award hereunder are subject in all respects to the terms and conditions of the Plan. If and to the extent that this Award Agreement conflicts or is inconsistent with the terms and conditions of the Plan, the Plan shall govern and control. The Plan and this Award Agreement contain the entire understanding between you and the Company with respect to the subject matter hereof and supersede any and all prior agreements between you and the Company with respect thereto.

**EMED WEIGHT LOSS, LLC**

By:_____

Name:_____

Title:_____

**ACKNOWLEDGEMENT**

I hereby acknowledge that (i) I have received and reviewed a copy of the Plan, and (ii) this Award Agreement, the Award and my participation in the Plan are subject in all respects to the terms and conditions of the Plan. BY SIGNING BELOW, IN ADDITION TO AGREEING TO THE TERMS OF THE PLAN, I EXPRESSLY ACKNOWLEDGE AND AGREE TO BE BOUND BY THE TERMS OF THE RESTRICTIVE COVENANTS AGREEMENT ATTACHED TO THE PLAN AS ANNEX I, WHICH IS HEREBY INCORPORATED HEREIN BY REFERENCE AS IF FULLY SET FORTH HEREIN.

Signed:_____     Dated:_____, 20\_\_

Print Name:_____

**EMED WEIGHT LOSS, LLC**

**TRANSACTION BONUS PLAN**

**SPOUSAL CONSENT**

I, the undersigned spouse of Participant, hereby acknowledge and agree that I have read the eMed Weight Loss, LLC Plan (the "Plan") and each Award Agreement issued thereunder and/or each award or right subject to the terms of the Plan (collectively, the "Covered Agreements") and that I fully understand their contents. I am aware that the Covered Agreements provide for the forfeiture of my spouse's rights and interests under the Covered Agreements under certain circumstances and/or impose other restrictions on the awards provided thereunder (including, without limitation, restrictions on transfer). I agree that my spouse's interests under the Covered Agreements are subject to these restrictions and any interest that I may have in any award or under the Covered Agreements shall be irrevocably bound by these agreements and further, that my community property interest, if any, shall be similarly bound by this instrument.

I am aware that the tax, legal, financial and other matters contained in the Covered Agreements are complex and I am free to seek advice with respect thereto from independent counsel. I have either sought such advice or determined after carefully reviewing the Covered Agreements that I will waive such right.

I hereby irrevocably constitute and appoint Participant, who is my spouse, as my true and lawful attorney and proxy in my name, place and stead to sign, make, execute, acknowledge, deliver, file and record all documents which may be required, and to manage, vote, act and make all decisions with respect to (whether necessary, incidental, convenient or otherwise), any and all awards or rights granted or issued under the Covered Agreements in which I now have or hereafter acquire any interest in (including but not limited to the right, without my further signature, consent or knowledge, to exercise amendments and modifications of and to terminate the aforementioned Covered Agreements and to dispose of any and all such awards and rights), with all powers the undersigned spouse would possess if personally present, it being expressly understood and intended by me that the foregoing power of attorney and proxy is coupled with an interest; and this power of attorney is a durable power of attorney and will not be affected by my disability, incapacity or death, or the dissolution of marriage and this proxy will not terminate without consent of Participant and the Company.

Par _____
*Wendi Mader*
_____
Signature

Wendi      Mader
_____
Printed Name
          8/10/2024
Date:_____

Spouse of Participant:

_____
Signature

_____
Printed Name

Date:_____

ANNEX I

**RESTRICTIVE COVENANTS AGREEMENT**

This Restrictive Covenants Agreement (the "Agreement") is made and entered into by and between eMed Weight Loss, LLC and its affiliates (collectively, the "Company") and the undersigned Participant ("Participant"). Any capitalized terms used in this Agreement but not defined herein shall have the same meaning ascribed to them in the Transaction Bonus Plan ("Plan").

By accepting participation in the Plan, Participant acknowledges and agrees that, in addition to other good and valuable consideration, Participant is expressly being provided access to benefits, training and/or trade secrets and other confidential information of the Company and its customers, suppliers, vendors or affiliates to which Participant would not have access but for Participant's ongoing relationship with the Company. In consideration of the foregoing, Participant recognizes, acknowledges and agrees as follows:

1.      **Confidential Information**. For purposes of this Agreement, "Confidential Information" shall include the Company's trade secrets as defined under Florida law, as well as any other information or material which is not generally known to the public, and which (a) is generated, collected by or utilized in the operations of the Company's business and relates to the actual or anticipated business, research or development of the Company; or (b) is suggested by or results from any task assigned to Participant by the Company or work performed by Participant for or on behalf of the Company.

Confidential Information shall not be considered generally known to the public if Participant or others improperly reveal such information to the public without the Company's express written consent and/or in violation of an obligation of confidentiality owed to the Company. Examples of Confidential Information include, but are not limited to, all customer, client, advertiser and vendor lists, budget information, contents of any database, contracts, product  productivity standards, research and development work, software, business plans, projections, market research, perceptual studies, strategic plans, marketing information, financial information (including financial statements), sales information, training manuals, employee lists and compensation of employees, and all other competitively sensitive information with respect to the Company, whether or not it is in tangible form, and including without limitation any of the foregoing contained or described on paper or in computer software or other storage devices, as the same may exist from time to time.

2.      **Acknowledgements**. Participant recognizes and acknowledges each of the following:

(a)  The Company has invested significant time and money in developing its Confidential Information. Provided that Participant agrees to the terms of this Agreement, the Company will afford Participant access to Confidential Information to the extent that the Company deems Participant's access to Confidential Information is necessary for the continued performance of Participant's duties. Absent Participant's ongoing relationship with the Company, Participant would not have had any access to Confidential Information. Further, though Participant may from time to time assist in developing such Confidential Information, it will remain the sole property of the Company.

(b)  The Company has expended substantial time, effort, funds and expertise in acquiring and maintaining each of its customers, including without limitation, its advertisers and subscribers. The Company's close relationship with its customers is important and valuable to the continued financial success of the Company. As a  result  of  Participant's  o n g o i n g  employment with the Company, Participant may become personally acquainted with the customers that do business with the Company. Absent Participant's ongoing relationship with the Company, Participant would not have had contact with these customers on behalf of the Company. Furthermore, unless Participant agrees to the terms of this Agreement, the Company will not allow  Participant to further develop the Company's relationships with its customers.

(c)     The legitimate and protectable interests of the Company and such covenants are ancillary to the ongoing employment relationship of the parties.

(d)     Participant's obligations under this Agreement are in addition to any and all  obligations concerning the same subject matter arising under any applicable law including, without limitation, common law relating to fiduciary duties and common law and statutory law relating to trade secrets.

3.     **<u>Non-Disclosure</u>.**

(a)     Participant will not, without the Company's prior written permission, directly or indirectly, utilize or disclose any Confidential Information for any purpose other than for a legitimate Company business purpose either during or after Participant's employment or relationship with the Company ends. This non-disclosure obligation shall continue for as long as such matters remain Confidential Information.

(b)     This Agreement shall not prevent Participant from revealing evidence of criminal wrongdoing to law enforcement or prohibit Participant from divulging Confidential Information by order of court or agency of competent jurisdiction. However, Participant shall promptly inform the Company of any such situations and shall take such reasonable steps to prevent disclosure of Confidential Information until the Company has been informed of such requested disclosure and the Company has had an opportunity to respond to the court or agency.

4.     **<u>Return of Confidential Information and Other Property</u>**. Participant agrees to deliver promptly to the Company on termination of the Participant's employment with the Company, or at any time that the Company may so request, all of the Company's property including, but not limited to, (i) cellular telephones, computers, printers, key cards, documents or other tangible property of the Company, and (ii) all Confidential Information (and all copies thereof) relating to the Company's business which the Participant may then possess or have under the Participant's control. Participant shall not retain in Participant's possession or control any copies of such information or property.

5.     **<u>Non-Competition</u>**. During the duration of Participant's employment with the Company and for one (1) year period following the termination of Participant's employment with the Company for any or no reason, Participant will not, and Participant will cause his or her Affiliates to not, directly or indirectly, alone or in conjunction with any other person or entity, own, manage, operate or control or participate in the ownership, management, operation or control of, or become associated, as an employee, director, officer, advisor, agent, consultant, principal, partner, member or independent contractor with or lender to, any person or entity engaged in or aiding others to engage in business competitive with the Company, located anywhere in the United States of America.

6.     **<u>Non-Solicitation</u>**. During the period of time that Participant is employed by the Company and the twelve (12) month period immediately following termination of Participant's employment, for any reason, Participant shall not, on Participant's own behalf or on behalf of any other individual or entity, without the prior written consent of the Company: (a) hire, recruit, solicit or otherwise attempt to employ or retain, any person who is or was an employee of the Company within the twelve (12) month period immediately preceding the termination of Participant's employment; or (b) solicit the sale of any products or services that are similar to or competitive with products or services offered by, manufactured by, designed by, or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services and with whom Participant had direct contact or about whom Participant learned Confidential Information at any time during the last twelve (12) months of Participant's employment with Company.

7.  **Ownership of Inventions**. For purposes of this Agreement, "<u>Inventions</u>" shall mean all software programs, source or object code, improvements, formulas, developments, ideas, processes, techniques, know-how, data, and discoveries, whether protectable by patent or copyright, conceived or reduced to practice by Participant while in the Company's employ, either solely or jointly with others, and whether or not during regular working hours, and conceived or reduced to practice by Participant within one year of the termination of Participant's employment with the Company that resulted from Participant's work with the Company.

(a)  Participant acknowledges and agrees that all Inventions shall be the Company's sole and exclusive property to the maximum extent permitted by law. Participant shall disclose all Inventions promptly and fully to the Company. Participant further acknowledges and agrees that to the extent relevant, this Agreement constitutes a "work for hire agreement" under the United States Copyright Act of 1976, as amended (<u>17 U.S.C. § 101</u> et. seq.) ("Copyright Act"), and that any copyrightable work ("Work") constitutes a "work made for hire" under the Copyright Act such that the Company is the copyright owner of the Work. To the extent that any portion of the Work is held not to be a "work made for hire" under the Copyright Act, the Participant hereby irrevocably assigns to the Company all right, title and interest in such Work. Additionally, to the extent that any Invention is held not to be the exclusive property of the Company, and except as excluded in Section 7(c) below, Participant hereby agrees to and hereby grants and assigns to the Company all of Participant's right, title and interest in and to all Company Inventions. Participant shall at the request of the Company (but without additional compensation from the Company) execute any and all papers or instruments necessary and perform all lawful acts that the Company deems reasonably necessary or desirable to evidence the Company's rights in any Inventions or Work.

(b)  Concurrent with Participant's execution of this Agreement, Participant shall attach a list and brief description of all inventions and discoveries, if any, made or conceived by Participant prior to Participant's employment with the Company and that are to be excluded from this Agreement. If no such list is attached at the time of execution of this Agreement, it shall be conclusively presumed that Participant has waived any right he may have to any such invention or discovery which relates to the Company's business.

8.  **Attorneys' Fees**. In the event any legal proceeding is initiated by any party against any other party to enforce, interpret or otherwise obtain relief in connection with this Agreement (the "<u>Proceeding</u>"), the judge or tribunal in such Proceeding shall, upon request, declare a "Prevailing Party" in the Proceeding, and the Prevailing Party shall be entitled to recover from the other party all reasonable costs and expenses, including actual attorneys' fees and experts' fees, relating to or arising out of such Proceeding.

9.  **Applicable Law**. This Agreement shall be construed, interpreted, and enforced, and its validity and enforceability determined, strictly in accordance with the laws of the State of North Carolina without applying its conflicts of laws principles.

10.  **Exclusive Jurisdiction/Venue**. Any and all lawsuits, legal actions or proceedings against either party arising out of this Agreement will be brought in North Carolina state court located in Durham, North Carolina or the federal court of competent jurisdiction sitting in Durham, North Carolina, and each party shall submit to and accept the exclusive jurisdiction of such court for the purpose of such suit, legal action or proceeding. Each party irrevocably waives any objection it may have now or any time in the future to this choice of venue and further waives any claim that any suit, legal action or proceeding brought in any such court has been brought in an inappropriate forum. Participant shall stipulate in any proceeding that this Agreement is to be considered for all purposes to have been executed and delivered within the geographic boundaries of the State of North Carolina.

11.  **Assignability**. The rights herein may be assigned by the Company and shall bind and inure to the benefit of the Company's successors, assigns, heirs and representatives. If the Company makes any assignment of the rights herein, Participant agrees that this Agreement shall remain binding upon Participant in any event.

12.    **Survival**. Participant's obligations set forth in this Agreement shall survive the termination of the Participant's employment with the Company.

13.    **No Waiver**. No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

14.    **At-Will Employment**. Participant's employment with the Company is at-will and this Agreement does not constitute a contract of employment and does not imply that Participant's employment will continue for any specific period of time. Nothing in this Agreement shall be construed to alter Participant's at-will employment status, or interfere in any way with the Participant's right or the right of the Company to terminate Participant's employment at any time, with or without cause.

(a)    Section 7(a) of this Agreement regarding assignment of right, title and interest do not apply to Inventions for which no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on Participant's own time, unless (i) the Inventions relate either to the business of the Company, or to the Company's actual or demonstrably anticipated research or development, or (ii) the Inventions result from any work directly or indirectly performed by the Participant for the Company.

15.    **Remedies and Injunctive Relief**. If the Participant commits a breach or threatens to breach any of the provisions of Sections 3 through 7 hereof, the Company shall have the right and remedy to have the provisions of this Agreement specifically enforced by injunction or otherwise by any court having jurisdiction, it being acknowledged and agreed that any such breach will cause irreparable injury to the Company in addition to money damage and that money damages alone will not provide a complete or adequate remedy to the Company; it being further agreed that such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to the Company under law, in equity or pursuant to this Agreement.

16.    **Severability; Modification.**

(a)    If, at the time of enforcement of this Agreement, a court holds that the duration, geographical area or scope of activity restrictions stated herein are unreasonable under circumstances then existing or impose a greater restraint than is necessary to protect the goodwill and other business interests of the Company, Participant agrees that the maximum duration, scope or area reasonable under such circumstances will be substituted for the stated duration, scope or area and that the court will be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law, in all cases giving effect to the intent of the parties that the restrictions contained herein be given effect to the broadest extent possible.

(b)    Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under applicable law, and incapable of being modified, such invalidity, illegality or unenforceability will not affect any other provision, but this Agreement will be reformed, construed and enforced as if such invalid, illegal or unenforceable provision had never been contained herein.

17.    **Extension of Term of Covenants Following Violation**. The period during which the prohibitions of Sections 5 and 6 of this Agreement are in effect shall be extended by any period or periods during which the Participant is in violation of Sections 5 and 6.

18.    **Non-Disparagement**. Subject to Section 3(b) of this Agreement, Participant shall not disparage the Company, its officers, directors, administrators, representatives, employees, contractors, consultants or customers and will not engage in any communications or other conduct which might interfere with the relationship

between the Company and its current, former, or prospective employees, contractors, consultants, customers, suppliers, regulatory entities, and/or any other persons or entities.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the last day and year set forth below.

PARTICIPANT:                                COMPANY:

Signature: _Wendi Mader_                    Signature: _____

Printed Name: _Wendi        Mader_          Printed Name: _____

Date: _8/10/2024_____         Title: _____

                                            Date: _____