**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

WENDI MADER,

      Plaintiff,                           CASE NO.: 1:26-CV-23258-BB

      v.                                JURY TRIAL DEMANDED

EMED, LLC,
EMED POPULATION HEALTH, INC.,
f/k/a EMED POPULATION HEALTH, LLC,
f/k/a EMED WEIGHT LOSS, LLC,
MICHAEL FERRO, and
JUSTIN DEARBORN,

      Defendants.

_____/

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, WENDI MADER ("Plaintiff" or "Ms. Mader"), by and through her undersigned counsel, hereby complains of Defendants, EMED, LLC, EMED POPULATION HEALTH, INC., f/k/a EMED POPULATION HEALTH, LLC, f/k/a EMED WEIGHT LOSS, LLC (collectively, the "eMed Defendants" or the "Company"), MICHAEL FERRO ("Ferro"), and JUSTIN DEARBORN ("Dearborn") (collectively, "Defendants"), and alleges as follows:

**NATURE OF THE ACTION**

1.     This case is about a female healthcare executive, Plaintiff Wendi Mader, who was subjected to relentless sex-based discrimination and retaliation and was defrauded of tens of millions of dollars in promised compensation by Defendants. Ms. Mader was recruited to serve as Chief Executive Officer of Defendants' weight management subsidiary, relocated her life and career to Miami, and within her first twelve months secured a $100 million institutional investment that drove a $2 billion enterprise valuation. In return, Defendants subjected Ms. Mader to pervasive misogynistic abuse, stripped her of her title, fraudulently eliminated her contractual rights to

1

compensation that she was entitled to, and terminated her less than a week after she asserted her legal rights. Defendants replaced Ms. Mader as Chief Executive Officer with Linda Yaccarino, the former Chief Executive Officer of X Corp. (formerly Twitter, Inc.), for whom Defendant Ferro had directed Ms. Mader to illegally procure prescription medications outside of required clinical protocols, which Ms. Mader opposed.

2.      Throughout her employment, Defendants subjected Ms. Mader to egregious and relentless sex-based discrimination, sexual harassment, and retaliation for opposing Defendants' unlawful employment practices, including: (1) making degrading and humiliating comments about Ms. Mader on the basis of her sex and her appearance, including that she "wasn't hot or pretty but not too ugly," and instructing her that she needed to "be more of a bitch," reducing her worth as Chief Executive Officer to her physical appearance and diminishing her authority on the basis of her gender; (2) fostering a work environment rife with misogyny and contempt toward women, including Defendant Ferro's routine use of the word "cunt" to demean female professionals and openly evaluating female employees based on their physical appearance; (3) unilaterally stripping Ms. Mader of her title and duties while publicly humiliating her in front of her own subordinates; (4) fraudulently promising Ms. Mader substantial equity compensation, only to engineer a bad-faith corporate restructuring to eliminate those rights after Ms. Mader's contributions made them valuable; and (5) unlawfully terminating Ms. Mader's employment in retaliation for opposing Defendants' unlawful conduct and asserting her legal rights.

3.      Ms. Mader brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"); the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 ("FCRA"); the Miami-Dade County Human Rights Ordinance, Miami-Dade County Code ch. 11A, art. IV ("MDHRO"); the Florida Private Sector Whistleblower Act, Fla. Stat. § 448.101; and Florida and Delaware common law.

2

**PARTIES**

4.      Plaintiff, Wendi Mader ("Ms. Mader"), is an individual currently residing in the State of Kansas. At all times material to this action, Ms. Mader resided in Miami-Dade County, Florida, and performed her duties at Defendants' offices located at 990 Biscayne Blvd., Suite 1501, Miami, Florida 33132.

5.      Defendant eMed, LLC is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business at 990 Biscayne Blvd., Suite 1501, Miami, Florida 33132.

6.      At all relevant times, Defendant eMed, LLC was Plaintiff's joint and/or sole employer within the meaning of 42 U.S.C. § 2000e(b), § 760.02(7), Florida Statutes, and § 11A-25, Code of Miami-Dade County, and is therefore jointly and severally liable for the claims alleged herein. Defendant eMed, LLC exercised ultimate ownership and operational control over all eMed-related entities and controlled the terms and conditions of Ms. Mader's employment without regard to which subsidiary or associated entity employed her at the time.

7.      eMed Enterprise, LLC is, upon information and belief, a division, operating label, or alter ego of Defendant eMed, LLC, or alternatively, an affiliated entity that in fact operated as an instrumentality of Defendant eMed, LLC. As an alter ego and instrumentality of Defendant eMed, LLC, all obligations arising under the eMed Enterprise, LLC designation are attributable to Defendant eMed, LLC.

8.      eMed Weight Loss, LLC is a Delaware limited liability company that conducted business in the State of Florida, with its principal place of business at 990 Biscayne Blvd., Suite 1501, Miami, Florida 33132. Defendant eMed Population Health, Inc. was formerly known as and conducted business as eMed Weight Loss, LLC from approximately August 2024 through

3

approximately September 2024. Defendant eMed Population Health, Inc. and eMed Weight Loss, LLC are the same legal entity.

9. eMed Population Health, LLC is a Delaware limited liability company that conducted business in the State of Florida, with its principal place of business at 990 Biscayne Blvd., Suite 1501, Miami, Florida 33132. Defendant eMed Population Health, Inc. was formerly known as and conducted business as eMed Population Health, LLC from approximately September 2024 through approximately June 2025. Defendant eMed Population Health, Inc. and eMed Population Health, LLC are the same legal entity.

10. Defendant eMed Population Health, Inc. (f/k/a eMed Population Health, LLC, f/k/a eMed Weight Loss, LLC) is a Delaware corporation conducting business in the State of Florida, with its principal place of business at 990 Biscayne Blvd., Suite 1501, Miami, Florida 33132.

11. At all relevant times, Defendant eMed Population Health, Inc., under its current and former names, was Plaintiff's joint and/or sole employer within the meaning of 42 U.S.C. § 2000e(b), § 760.02(7), Florida Statutes, and § 11A-25, Code of Miami-Dade County, and is therefore jointly and severally liable for the claims alleged herein.

12. Defendant eMed Population Health, Inc. exercised direct control over Ms. Mader's employment, including, for example, issuing Ms. Mader's operative offer of employment, employing Ms. Mader as Chief Executive Officer, and issuing the letter terminating Ms. Mader's employment. Defendant eMed Population Health, Inc. assumed all debts, liabilities, and obligations arising under its prior names, maintained complete continuity of operations, workforce, supervisory personnel, and facilities throughout each transition, and had actual notice of Ms. Mader's claims. Defendants represented to the Equal Employment Opportunity Commission that these entities are one and the same.

4

13.     Defendant Michael Ferro ("Ferro") is an individual male residing in Palm Beach County, Florida, and the founder and controlling equity holder of the eMed Defendants.

14.     At all relevant times, Defendant Ferro held supervisory authority over Ms. Mader, including the power to direct her work, control her client and investor interactions, determine her compensation, and effectuate her termination. Defendant Ferro personally engaged in the discriminatory, harassing, and retaliatory conduct described in this Complaint, and personally directed and participated in the tortious conduct giving rise to the claims alleged herein.

15.     At all relevant times, Defendant Ferro held a position of such high authority within the eMed Defendants that Ferro's actions and directives represented the actions of the organization itself. Defendant Ferro had the authority to act on behalf of all eMed-related entities, to make and enforce company policies, and to direct all material operational, financial, and personnel decisions. Defendant Ferro personally authorized or directed every executive hiring, termination, compensation decision, and corporate restructuring across the eMed Defendants and operated with unilateral authority, without oversight from any independent board of directors, executive committee, or governance body.

16.     Defendant Justin Dearborn ("Dearborn") is an individual male residing in Cook County, Illinois, who served as Executive Chairman of the eMed Defendants.

17.     At all relevant times, Defendant Dearborn held supervisory authority over Ms. Mader, including the power to direct her work, approve her compensation, and effectuate her termination. Dearborn exercised direct authority over Ms. Mader's day-to-day responsibilities, participated in executive decisions affecting her role and reporting structure, and personally authorized material employment and compensation decisions across the eMed Defendants. Dearborn personally participated in the tortious conduct giving rise to the claims alleged herein.

18.     At all relevant times, Defendants eMed, LLC and eMed Population Health, Inc. were Plaintiff's joint and/or sole employer within the meaning of 42 U.S.C. § 2000e(b), § 760.02(7), Florida Statutes, and § 11A-25, Code of Miami-Dade County, and are therefore jointly and severally liable for the claims alleged herein. Defendants were collectively vested with operational control and decision-making authority over all employees of the eMed Defendants, including Ms. Mader.

19.     The eMed Defendants collectively acted in the interest of an employer towards Ms. Mader, including but not limited to determining her compensation and benefits, supervising her day-to-day work and interactions with clients, controlling the terms and conditions of her employment, and maintaining the authority to hire, discipline, and terminate her.

20.     The eMed Defendants maintained shared ownership over common resources, including common human resources and payroll systems, common corporate management personnel, and a shared principal office located at 990 Biscayne Blvd., Suite 1501, Miami, Florida 33132. The eMed Defendants utilized the same legal and financial infrastructure and held themselves out to employees, clients, and investors as a single enterprise. Defendants transferred Ms. Mader's employment across eMed entities on multiple occasions without any change to her supervisors, duties, office, or working conditions.

21.     At all relevant times, the eMed Defendants collectively employed more than the statutory minimum number of employees required to constitute covered employers under Title VII, the FCRA, and the MDHRO.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367. This action is authorized and instituted pursuant to 42 U.S.C. § 2000e-5(f).

6

23.     This Court further has jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity of citizenship exists between Plaintiff, as a citizen of Kansas, and Defendant eMed, LLC, as a citizen of Florida through its sole member, Defendant Ferro; Defendant eMed Population Health, Inc. (f/k/a eMed Population Health, LLC, f/k/a eMed Weight Loss, LLC), as a citizen of Delaware and Florida; Defendant Ferro, as a citizen of Florida; and Defendant Dearborn, as a citizen of Illinois.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices alleged herein were committed within the jurisdiction of the United States District Court for the Southern District of Florida. Defendants were and are located in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this District.

25.     Ms. Mader's employment with the eMed Defendants was performed in Miami-Dade County, Florida. Ms. Mader relocated her life and career to Miami, Florida at Defendants' direction. Defendants' offices located at 990 Biscayne Blvd., Suite 1501, Miami, Florida 33132 served as Ms. Mader's primary work location. Ms. Mader's offers of employment were extended and accepted in Florida, her compensation was paid from Florida, and all acts and omissions giving rise to the claims alleged herein occurred in Florida.

26.     This Court has personal jurisdiction over Defendant Ferro, as Defendant Ferro is domiciled in the State of Florida.

27.     This Court has personal jurisdiction over Defendant Dearborn pursuant to Fla. Stat. § 48.193(1)(a)(1), as Defendant Dearborn personally operated, conducted, and carried on business in the State of Florida by serving as Executive Chairman of the eMed Defendants and by regularly traveling to and directing operations from Defendants' Miami offices.

7

28.     This Court further has personal jurisdiction over Defendant Dearborn pursuant to Fla. Stat. § 48.193(1)(a)(2), as Defendant Dearborn personally committed tortious acts within the State of Florida, including participating in the fraudulent inducement, conspiracy, and retaliatory conduct alleged herein. Defendant Dearborn's contacts with Florida were not solely in a representative corporate capacity but were personal acts undertaken in furtherance of his own interests, as alleged herein. Defendant Dearborn purposefully availed himself of the privilege of conducting activities within this State through his regular physical presence at Defendants' Miami offices and his direct participation in the conduct alleged herein.

## ADMINISTRATIVE PREREQUISITES

29.     Ms. Mader has complied with all administrative requirements to file this action.

30.     On or about September 11, 2025, Ms. Mader timely dual-filed a charge of discrimination (Charge No. 510-2025-12598) against Defendant eMed, LLC with the Equal Employment Opportunity Commission ("EEOC"), the Florida Commission on Human Relations ("FCHR"), and the Miami-Dade Commission on Human Rights ("MDCHR").

31.     On or about September 11, 2025, Ms. Mader timely dual-filed a charge of discrimination (Charge No. 510-2025-12602) against eMed Weight Loss, LLC, now known as Defendant eMed Population Health, Inc., with the EEOC, the FCHR, and the MDCHR.

32.     On or about September 11, 2025, Ms. Mader timely dual-filed a charge of discrimination (Charge No. 510-2025-12601) against eMed Population Health, LLC, now known as Defendant eMed Population Health, Inc., with the EEOC, the FCHR, and the MDCHR.

33.     On or about September 11, 2025, Ms. Mader timely dual-filed a charge of discrimination (Charge No. 510-2025-12599) against Defendant eMed Population Health, Inc. with the EEOC, the FCHR, and the MDCHR.

34.     On March 25, 2026, the EEOC issued Ms. Mader's Notices of Right to Sue with respect to Charge Nos. 510-2025-12598, 510-2025-12599, 510-2025-12601, and 510-2025-12602, against each respective Defendant.

35.     On April 13, 2026, the MDCHR issued Ms. Mader's Notices of Right to Sue with respect to Charge Nos. 510-2025-12598, 510-2025-12599, 510-2025-12601, and 510-2025-12602 against each respective Defendant.

36.     Ms. Mader is timely commencing this action within ninety (90) days of receipt of the EEOC's Notice of Right to Sue and the MDCHR's Notice of Right to Sue.

37.     Ms. Mader is commencing this action more than one hundred eighty (180) days following the filing of the charges of discrimination.

## FACTUAL ALLEGATIONS

38.     At all relevant times, Ms. Mader was an individual female and was therefore a member of a protected class based on her sex and gender.

39.     At all relevant times, Defendants operated a digital healthcare enterprise offering virtual clinical care, prescription management, and GLP-1-based weight management services under the "eMed" brand. Defendants operated through multiple corporate entities sharing a single principal place of business, a unified leadership team, and a centralized human resources function administered without regard to which entity nominally employed any given individual.

40.     During her employment with Defendants, Ms. Mader was subjected to egregious sex discrimination, sexual harassment, and unlawful retaliation.

41.     Defendants' discriminatory and retaliatory conduct towards Ms. Mader included, but was not limited to: (1) subjecting Ms. Mader to extreme misogynistic verbal abuse and gender-based slurs, including Defendant Ferro's routine use of the word "cunt" to degrade women in the workplace; (2) explicitly demeaning Ms. Mader by reducing her value as a CEO to a crude

9

assessment of her sexual attractiveness; (3) publicly humiliating her before her team in her absence; (4) systematically impeding her executive authority and denying her the resources necessary to succeed; (5) demanding she engage in illegal clinical practices to procure prescription medications for Defendant Ferro's personal associates, and retaliating against her when she objected; (6) fraudulently stripping her of tens of millions of dollars in contractual compensation that she was entitled to, by engineering a bad-faith corporate restructuring executed days after the investment she built closed; and (7) unlawfully terminating Ms. Mader's employment in retaliation for asserting her legal rights.

### A. Defendants' Recruitment and Fraudulent Inducement of Ms. Mader

42. Beginning in or around 2023, Defendant Michael Ferro ("Ferro"), an individual male, the founder and controlling equity holder of the eMed Defendants, personally recruited Ms. Mader based on her extensive industry experience, commercial relationships, and executive credibility in the healthcare and wellness sectors, which Defendants needed to attract institutional investors and credibility for their weight management platform. Ms. Mader agreed to leave her position at her prior employer and join Defendants in or around March 2024, and formally commenced her employment on or about June 28, 2024.

43. On or around June 26, 2024, Ms. Mader accepted an offer of employment issued on behalf of eMed Enterprise, LLC, which, as alleged herein, Defendants held out as a separate employer, but which operated as an alter ego of Defendant eMed, LLC, for the position of Executive Vice President, Marketing and Enterprise Partnerships. As a material inducement to her acceptance of that offer and her departure from prior employment, Defendants promised Ms. Mader 500,000 equity units in the entity designated as eMed Enterprise, LLC, stating in the June 26, 2024 offer of employment that she "will be awarded 500,000 units of eMed Enterprise, LLC" and would be "directly responsible for creating sustained enterprise value for that eMed entity."

10

44.      Kenneth Finneran ("Finneran"), an individual male employed by Defendants as Chief Human Resources Officer, executed the June 26, 2024, offer letter on Defendants' behalf.

45.      On or around June 26, 2024, as a condition to her employment with Defendants, Ms. Mader was required to and did, in fact, execute a Proprietary Interests Protection Agreement ("PIPA") with eMed, LLC, eMed Labs, LLC, and its affiliates. The offer letter extending Ms. Mader's initial position with eMed Enterprise, LLC expressly provided that "this offer letter is contingent upon your signing of a Proprietary Interests Protection Agreement."

46.      The PIPA, which governs Ms. Mader's employment obligations, restrictions, and conduct throughout and following her employment with the eMed Defendants, provides that it "shall be construed, interpreted, and enforced, and its validity and enforceability determined, strictly in accordance with the laws of the State of Florida without applying its conflicts of laws principles." The PIPA further designates exclusive jurisdiction and venue in "Florida state court located in Miami Dade County, Florida or the federal court of competent jurisdiction sitting in Miami Dade County, Florida."

47.      In their July 28, 2025, termination letter, Defendants invoked the PIPA as a basis for Ms. Mader's for-cause termination, stating that "any associated breaches of confidentiality, fiduciary duties, or obligations under the PIPA, constitute independent and sufficient grounds for the immediate termination of Ms. Mader for cause." Defendants further stated that these alleged violations "amount to breach of contract, breach of fiduciary duty, and potential misappropriation claims under Florida's trade secret laws." Defendants executed the PIPA and subsequently relied upon its terms to effectuate Ms. Mader's termination.

48.      In their Position Statement to the Equal Employment Opportunity Commission, Defendants cited specific provisions of the PIPA to justify Ms. Mader's for-cause termination, invoked Ms. Mader's alleged PIPA violations as the basis for the $75,000 relocation clawback

demand, and asserted that Ms. Mader's subsequent employment with a competitor constitutes an ongoing breach of the PIPA's restrictive covenants for which Defendants intend to seek all applicable relief.

49. On or around August 8, 2024, shortly after commencing her initial employment, Defendants extended a superseding offer of employment to Ms. Mader, elevating her to the role of Chief Executive Officer of Defendant eMed Population Health, Inc., at the time doing business as eMed Weight Loss, LLC, at an annual base salary of $400,000 and a $75,000 relocation allowance. Ms. Mader accepted the superseding offer and the forfeiture of her previously promised 500,000 equity units in eMed Enterprise, LLC. Ms. Mader accepted that forfeiture because Defendants presented the Transaction Bonus Plan, described below, as the material replacement for the equity she was relinquishing.

50. As a material inducement for Ms. Mader to accept the CEO role, forfeit her previously promised equity, relocate her life and career to Miami, Florida, and commit to building and leading Defendants' weight loss and population health division, Defendants attached to and incorporated into the August 8, 2024 offer of employment the eMed Weight Loss, LLC Transaction Bonus Plan (the "Transaction Bonus Plan" or "TBP").

51. The Transaction Bonus Plan explicitly provided Ms. Mader a ten percent participation interest in the Net Proceeds of any qualifying Sale Event as defined therein. The plan was governed by Delaware law. Given the eMed Defendants' investor pipeline and the transactions Defendants represented were imminent, the Plan carried immense potential value, reasonably estimated in the tens of millions of dollars.

52. Although the offer letter referred to the attached Plan document as a draft, the offer letter itself specified Ms. Mader's Participation Percentage at ten percent and conferred a binding right to participate. Defendants further confirmed the Plan's operative status by requiring Ms.

Mader's spouse to execute a Spousal Consent waiving marital property rights under the Plan on the same date.

53.     Defendants presented the Transaction Bonus Plan as a significant and material term of Ms. Mader's compensation as Chief Executive Officer, both incorporated into and inseparable from the August 8, 2024, offer of employment and the terms and conditions of Ms. Mader's employment. Ms. Mader would not have accepted the CEO position, relocated to Miami, or surrendered her prior professional commitments had Defendants not promised her the Transaction Bonus Plan.

54.     In her role as Chief Executive Officer, Ms. Mader reported to Justin Dearborn ("Dearborn"), an individual male residing in Cook County, Illinois, who served as Executive Chairman of the eMed Defendants and who joined the organization in or around September 2024.

55.     At all relevant times, Ms. Mader was considered an exemplary employee with a consistent record of positive performance.

56.     Upon assuming the CEO role in or around August 2024, Ms. Mader identified severe operational deficiencies within the weight loss division and implemented a comprehensive strategy to build a clinically viable and commercially scalable weight management business.

57.     Shortly after assuming the CEO role, Ms. Mader designed and launched a new product, securing the eMed Defendants' first commercial customer by January 2025.

58.     Ms. Mader's industry credibility, executive leadership, and sustained performance were the direct and proximate cause of Defendants securing a $100,000,000 Series A strategic investment from Aon Investments Holdco LLC ("Aon"). The Aon transaction closed on or about April 30, 2025, and resulted in an enterprise valuation of approximately $2 billion for the business unit Ms. Mader had built.

59.     Ms. Mader substantially performed all duties under the August 8, 2024, offer of employment, delivering the precise market positioning and investor relationships she had been recruited to produce.

**B. Defendant Ferro's Pervasive Sexual Harassment and Sex-Based Discrimination**

60.     Throughout Ms. Mader's tenure as Chief Executive Officer, Defendant Ferro subjected her to a pattern of demeaning, abusive, and sex-based conduct that no male executive in her position would have been required to endure, and that created a working environment that was hostile, threatening, and discriminatory on the basis of sex.

61.     Defendant Ferro routinely weaponized severe misogynistic language to degrade female employees throughout Ms. Mader's tenure from August 2024 through July 2025. Defendant Ferro frequently deployed the word "cunt" during professional workplace meetings, in the presence of Ms. Mader and other female employees, as a term of absolute contempt directed exclusively at women and designed to demean female professionals.

62.     When confronted about his use of the misogynistic slur, Defendant Ferro dismissed any concern by stating that he also frequently used the word "dick" in the workplace and was therefore "balanced." Defendant Ferro's response demonstrated that he understood his language was a gender-based attack targeted at women on the basis of their sex and chose to continue using the discriminatory remark.

63.     In addition to the demeaning and discriminatory language Defendant Ferro directed at Ms. Mader and women generally, Defendant Ferro personally judged Ms. Mader on her sexual attractiveness and expressed those judgments directly to her. Shortly after she assumed the Chief Executive Officer role, Defendant Ferro told Ms. Mader that she "wasn't hot or pretty, but not too ugly to sell to prospects and work with customers," making clear that in the eyes of the eMed Defendants' founder, her worth as Chief Executive Officer was not measured by her qualifications,

her leadership, or the results she delivered, but by whether Defendant Ferro found her sufficiently sexually attractive.

64.     Defendant Ferro's crude, discriminatory remarks also included persistent commentary about Ms. Mader's daily physical appearance and dress. By way of example, Defendant Ferro informed Ms. Mader that she looked "like a soccer mom" and that she was "always too buttoned up," criticizing her appearance and clothing as being insufficiently attractive and sexually appealing to Defendant Ferro. No male executive was subjected to equivalent scrutiny of his physical presentation or manner of dress.

65.     Ms. Mader found Defendant Ferro's routine use of misogynistic slurs in the workplace, his persistent commentary on her physical appearance and sexual attractiveness, and his scrutiny of her manner of dress to be deeply degrading, demoralizing, and humiliating. Being subjected to this conduct by the founder and controlling owner of her employer made Ms. Mader feel demeaned, disrespected, and reduced to her physical appearance in a workplace she had been recruited to lead.

66.     Not only did Defendant Ferro subject Ms. Mader to sexualized and gender-based commentary regarding her appearance and attractiveness, but his discriminatory conduct also extended to mocking and humiliating Ms. Mader when she failed to conform to his gender stereotypes of how a female executive should conduct herself. Defendant Ferro regularly stated that Ms. Mader needed to "be more of a bitch," demanding that she abandon her own professional demeanor and conform to a demeaning, gender-based caricature of female authority as a condition of being taken seriously by the eMed Defendants' founder.

67.     Defendant Ferro further disparaged Ms. Mader as "too nice" and stated that she did not have "a spine," perpetuating the stereotype that a woman like Ms. Mader in a position of

15

executive authority is inherently weak, emotional, and incapable of commanding respect or performing her duties as Chief Executive Officer.

68.     Defendant Ferro's sex-based contempt for Ms. Mader's leadership was persistent, recurring, and calculated to undermine her standing as Chief Executive Officer. Ms. Mader found this commentary to be profoundly demeaning as a woman and as an executive, and it made her feel diminished, inferior, and stripped of the professional standing she had spent her career building.

69.     Defendant Ferro's objectifying and sexualized commentary was not limited to Ms. Mader and extended to other women in the workplace. In describing a female director employed by the eMed Defendants, Defendant Ferro remarked that she "looks beat up now," implying that she was no longer physically attractive to him, but that she was "young and cute" and "would do what it takes to get the deal done," implying that the female employee would engage in sexual acts to secure business for the eMed Defendants. Defendant Ferro routinely evaluated female employees based on their physical appearance and perceived sexual desirability, rendering the environment pervasively hostile for any woman in the company.

70.     Beyond Defendant Ferro's discriminatory and demeaning remarks, Defendant Ferro exercised his power as the eMed Defendants' controlling owner to conduct a deliberate campaign to undermine Ms. Mader's ability to lead. Despite her title as Chief Executive Officer, Defendant Ferro systematically ignored and denied her requests for budget approvals, employee raises, bonuses, and sales incentive plan authorizations, while monitoring her calendar and inserting himself into client meetings even when clients had explicitly requested he not attend, requiring Ms. Mader and her team to engage in repeated damage control. Defendants simultaneously expanded incentive compensation programs for male executives during this same period, as described herein.

16

71.     Defendant Ferro's campaign to undermine Ms. Mader only escalated over time. On or about June 12, 2025, while Ms. Mader was absent, Defendant Ferro joined a scheduled Aon client meeting attended by Ms. Mader's direct reports. Defendant Ferro stripped Ms. Mader of her authority over the $100 million account she had personally originated and built, announced to her subordinates that she would no longer be permitted to attend Aon meetings, instructed her team to cease executing her directives, and told her subordinates that she had been over promising. Multiple employees contacted Ms. Mader directly afterward, expressing shock at the professional humiliation Defendant Ferro had inflicted upon her in front of her own team.

72.     Defendant Ferro's campaign to undermine Ms. Mader extended to empowering subordinates to circumvent her chain of command. On or about June 25, 2025, Ms. Mader's direct report and Director of Marketing informed Ms. Mader that another executive had been meeting directly with the Director's subordinate to reassign roles, had posted a Vice President job opening, and had authorized new hires, all without informing either the Director or Ms. Mader.

73.     Despite the hostile, discriminatory, and demeaning treatment she endured, Ms. Mader maintained her professionalism. She continued to report to work, executed her duties as Chief Executive Officer, and successfully drove the eMed Defendants toward the $100 million Aon investment, delivering massive corporate value even as the company's founder continuously sought to humiliate her.

74.     Defendant Ferro's conduct toward Ms. Mader is consistent with the documented sexual harassment allegations other female professionals have made against Defendant Ferro. In 2018, two women publicly alleged that Defendant Ferro sexually harassed them in separate incidents. One alleged that Defendant Ferro lured her to a corporate apartment under the pretense of a business meeting and forcefully attempted to kiss her. The other alleged that Defendant Ferro groped her breast during a private dinner in his hotel suite. *See, e.g.*, Kristen Bellstrom & Beth

Kowitt, *Former Tronc Chairman and Investor Michael Ferro Accused of Inappropriate Advances by Two Women*, Fortune (Mar. 19, 2018), https://fortune.com/2018/03/19/tronc-chairman-michael-ferro-allegations/.

75. The eMed Defendants possessed actual and constructive knowledge of this severe and pervasive abuse. By maintaining Defendant Ferro in a position of unchecked ultimate authority and willfully failing to implement any safeguards to protect their female executives, Defendants actively ratified Defendant Ferro's discriminatory and harassing conduct and subjected Ms. Mader to a pervasively hostile and discriminatory environment.

76. Defendant Ferro, as the chief equity holder and Founder of the eMed Defendants, was of such high rank within the organization that he functioned as the organization's proxy, with the authority to speak for and bind the company in all material respects. Accordingly, the eMed Defendants are strictly liable for Defendant Ferro's discriminatory conduct.

77. Ms. Mader had no meaningful opportunity to seek redress for the pervasive sex discrimination and harassment she endured. Defendant Ferro, the individual who routinely subjected Ms. Mader to unlawful discrimination, owned and controlled the eMed Defendants and, as a result, had complete control over any internal reporting process, making any complaint futile.

78. Notably, Defendants marketed a women's health brand under the name "SheMed" and hired several female executives to lead the initiative, yet Defendants fostered a misogynistic culture within the eMed Defendants rife with discriminatory comments and conduct directed at women, including the routine use of severe misogynistic slurs directed at women in the workplace, reducing Ms. Mader's value as Chief Executive Officer to a crude assessment of her physical appearance, and demanding that Ms. Mader conform to gender stereotypes in how she conducted herself as a female executive. Defendant Ferro personally made or directed the decisions to demote Ms. Mader, eliminate her Transaction Bonus Plan, and terminate her employment.

79. No similarly situated male executive was subjected to the discriminatory treatment directed at Ms. Mader on the basis of her sex. By means of example, Defendants did not subject similarly situated male executives, including but not limited to Doug Mee, an individual employed by the eMed Defendants as Chief Financial Officer, Justin Dearborn, an individual employed by the eMed Defendants as Executive Chairman, and Kenneth Finneran, an individual employed by the eMed Defendants as Chief Human Resources Officer, to: (1) the routine use of misogynistic slurs, including the word "cunt," to demean and degrade them during professional workplace meetings; (2) explicit commentary judging their sexual attractiveness, scrutinizing their physical appearance and manner of dress, or evaluating their worth as executives based on their physical desirability; (3) demands that they conform to gender-based stereotypes about how they should conduct themselves as executives, including being instructed to "be more of a bitch," disparaged as "too nice," or told they did not have "a spine"; (4) the removal of their job responsibilities and public humiliation designed to undermine their executive authority and credibility in the presence of their subordinates; (5) demotion from their positions and the elimination of their negotiated compensation; or (6) unlawful termination from their employment under false pretenses, among others.

80. As a direct result of Defendants' pervasive discriminatory and harassing conduct, Ms. Mader suffered severe professional harm, including but not limited to material damage to her professional reputation, career trajectory, and standing in her industry, the erosion of her credibility and professional relationships with colleagues and subordinates, and the impairment of her advancement opportunities. Defendants compounded this harm by publicly maligning Ms. Mader's professional record and character in connection with her termination. As a result of Defendants' conduct, Ms. Mader's personal life was also severely impacted. Ms. Mader's sense of self-worth, confidence, and professional identity were deeply and enduringly diminished, causing her

19

profound humiliation, embarrassment, and emotional distress that extended well beyond the workplace.

### C. Defendants' Unlawful Prescription Directives and Ms. Mader's Protected Opposition

81.    In addition to the pervasive sex-based harassment, Defendant Ferro and Defendant Dearborn repeatedly directed Ms. Mader to procure GLP-1 prescription medications for personal associates and high-profile individuals who had not completed the required clinical intake process and were not medically eligible to receive those medications.

82.    Defendants' directives required deliberately subverting the mandatory clinical protocols and standards of care required under applicable state and federal medical regulations, including Fla. Stat. § 456.47, which establishes that telehealth providers must practice at the same standard of care as in-person providers and requires a documented clinical evaluation sufficient to diagnose and treat the patient before any prescription is issued, and Fla. Stat. § 458.331(1)(q), which prohibits a physician from prescribing or dispensing a legend drug other than in the course of the physician's professional practice.

83.    As early as February 2024, Ms. Mader raised concerns directly to Defendant Ferro regarding the prescribing of GLP-1 medications through the eMed Defendants' platform to individuals who were not medically eligible to receive them, including an individual whose body mass index fell below the minimum threshold required for GLP-1 medication eligibility under applicable prescribing guidelines.

84.    Defendant Ferro, acting on behalf of the eMed Defendants, directed Ms. Mader to procure federally regulated injectable prescription medications for individuals with whom no prescriber-patient relationship had been established, for whom no medical necessity had been determined, and in circumstances that were outside the course of professional medical practice under Florida law. Among others, Defendant Ferro directed Ms. Mader to obtain GLP-1 receptor

agonist medications for Linda Yaccarino ("Yaccarino"), an individual female who at the time served as Chief Executive Officer of X Corp. (formerly Twitter, Inc.) and who later became Chief Executive Officer of eMed Population Health, Inc. and Ms. Mader's replacement.

85.     Ms. Mader was pressured and coerced to assist in procuring the prescription medication for Yaccarino despite Yaccarino not having undergone the standard and required medical diagnostics, not having completed the mandatory clinical intake evaluation, and not having been deemed medically eligible to receive the medication by a licensed physician.

86.     Defendants' pressure to circumvent clinical protocols for the benefit of Defendant Ferro's personal associates was persistent and widespread. Ms. Mader opposed Defendants' unlawful conduct and raised her objections to Defendant Ferro and Defendant Dearborn on multiple occasions throughout her employment. By way of example, during the week of May 5, 2025, Ms. Mader met with Defendant Dearborn and John Permenter, an individual male employed by the eMed Defendants as Head of Product. During that meeting, Ms. Mader raised her objections to Defendant Ferro's directive to procure GLP-1 medications for individuals who were not medically eligible, and Defendant Dearborn and Permenter agreed that the directive could not lawfully be carried out.

87.     Despite this, on or about May 11, 2025, Defendant Dearborn communicated to Ms. Mader that an individual who did not qualify for a GLP-1 prescription nonetheless wanted one, and that Defendants needed to "figure out how to prescribe them." The following day, Defendant Dearborn confirmed that employees were "working to solve the Linda problem," acknowledging that providing Yaccarino with the requested medication was not possible through the required clinical channels.

88.     Defendants' directives resulted in the unlawful procurement of GLP-1 medications for individuals who were not medically eligible to receive them. On or about February 24, 2025, a

21

senior eMed employee reported internally that a senior Aon stakeholder and key figure in the Aon investment relationship had been prescribed a GLP-1 medication in circumstances where she should not have been. Defendant Dearborn responded that the situation was "about as bad as it gets." The same exchange revealed that eMed's clinical partner had also improperly prescribed a GLP-1 to Doug Mee, an eMed executive. Defendants were aware that their clinical processes were producing improper prescriptions to company insiders and continued to pressure staff to bypass the required intake protocols for additional individuals..

89.     Defendants unlawfully procured GLP-1 medications for at least three individuals during this period, including Linda Yaccarino, Douglas Mee, and the Aon stakeholder described above, despite those individuals not being medically eligible to receive them. Defendants' procurement of these medications was in violation of the prescribing standards required under applicable state and federal law.

90.     Ms. Mader engaged in legally protected activity by objecting to and opposing Defendants' unlawful directives on multiple occasions, including but not limited to raising her concerns directly to Defendant Ferro in February 2024 as described above and objecting during the meeting with Defendant Dearborn and Permenter during the week of May 5, 2025, in which Defendant Dearborn and Permenter agreed with Ms. Mader's concerns. In direct retaliation for her protected opposition, Defendants, led by Defendant Ferro, subjected Ms. Mader to an increasingly severe retaliatory hostile work environment to punish her for speaking up and objecting to their unlawful directives.

**D. Defendants' Retaliatory Demotion and Unlawful Termination of Ms. Mader**

91.     In reality, Defendant Ferro made the compensation promises described above with no intention of honoring them. Defendant Dearborn, upon joining the eMed Defendants in or around September 2024, adopted and furthered these representations with knowledge that

22

Defendants did not intend to honor them. Defendants' intent was to use Ms. Mader's industry credibility and executive relationships to secure institutional investment and drive the eMed Defendants' valuation, and then to strip her of the compensation that investment would have triggered before she could collect it.

92.     Despite Ms. Mader's performance and the extraordinary value she created, Defendant Ferro and Defendant Dearborn excluded her from deal discussions and investor communications, claimed credit for the Aon relationship and its results, and treated her as peripheral to an enterprise she had materially built.

93.     While Defendants were preparing to eliminate Ms. Mader's Transaction Bonus Plan under the pretext of a corporate restructuring, they were simultaneously expanding incentive compensation programs for other executives. Defendant Dearborn personally drafted the 2025 Annual Incentive Plan for eMed Population Health in or around November 2024, and on or about June 5, 2025, Defendants circulated retention bonus recommendations exclusively for male employees, seeking significant financial commitments to retain male staff during the same period in which Defendants were falsely characterizing Ms. Mader's Transaction Bonus Plan as a draft that was never adopted.

94.     On or about June 28, 2025, following the closing of the Aon investment, Defendants converted eMed Population Health, LLC into a Delaware C corporation named eMed Population Health, Inc., purportedly to support a subsequent $300 million equity raise. Pursuant to Delaware law, Defendants' conversion of eMed Population Health, LLC effected a continuation of the same legal entity, and eMed Population Health, Inc. assumed by operation of law all contractual obligations of its predecessor, including all obligations owed to Ms. Mader under the August 8, 2024, offer of employment and the Transaction Bonus Plan.

95.     Defendants did not disclose to Ms. Mader, in advance of the conversion, that the Transaction Bonus Plan would not transfer to the converted entity or that her compensation rights would be restructured. Defendants structured and executed the conversion with the specific intent of extinguishing Ms. Mader's Transaction Bonus Plan before the larger anticipated transaction, and the financial benefits it would have generated for her, could be realized.

96.     On or about July 9, 2025, following the conversion, Defendants presented Ms. Mader with a "Change of Position and Entity Offer Letter." Defendants' letter unilaterally stripped Ms. Mader of her title as Chief Executive Officer, relegated her to the subordinate title of President, and restructured her reporting relationship so that she no longer reported to Defendant Ferro and Defendant Dearborn, but instead reported to Dr. Patrice Harris ("Dr. Harris"), an individual female who served as Co-Founder and Chief Executive Officer of eMed, LLC and who Defendants installed above Ms. Mader without prior notice or consultation.

97.     Defendants targeted Ms. Mader on the basis of her sex and gender and in retaliation for her opposition to Defendants' unlawful employment practices. Defendants did not consult with Ms. Mader or provide her prior notice before stripping her of her title and duties.

98.     The July 9, 2025, letter also explicitly eliminated Ms. Mader's ten percent participation interest in the Transaction Bonus Plan. In its place, Defendants attempted to substitute a vague, undefined grant of 500,000 stock options under an equity incentive plan that did not yet exist and whose economic value was entirely speculative.

99.     The July 9, 2025, offer letter required Ms. Mader, as a condition of continued employment, to forfeit and relinquish her contractual rights under the Transaction Bonus Plan, and by its terms superseded all prior understandings, negotiations, and agreements. Defendants intentionally structured the July 9, 2025, offer to eliminate Ms. Mader's contractual compensation rights under the guise of a lateral reassignment.

24

100. Defendants did not obtain Ms. Mader's agreement to any of these changes. Defendants presented the changes as final and non-negotiable. Defendants' simultaneous elimination of Ms. Mader's CEO title, her Transaction Bonus Plan, and her direct reporting authority constituted a material demotion in compensation, authority, and professional standing driven by Defendant Ferro's personal malice, misogyny, and retaliatory intent to punish Ms. Mader for opposing his unlawful GLP-1 directives and for asserting her rights.

101. In furtherance of this scheme, Defendants invoked the Transaction Bonus Plan's definitional carve-out for internal restructurings to falsely declare that the conversion of the employing entity did not constitute a Sale Event, thereby providing a manufactured justification to extinguish Ms. Mader's participation interest. Defendants weaponized the corporate conversion to claim a break in legal continuity to void their contractual obligations to Ms. Mader, while simultaneously representing to the Equal Employment Opportunity Commission that eMed Weight Loss, LLC and eMed Population Health, Inc. were the same legal entity to avoid liability for Ms. Mader's statutory discrimination claims.

102. In the alternative, to the extent any contractual condition, including the adoption of the Transaction Bonus Plan by a Compensation Committee, the selection of Ms. Mader as a participant, or the occurrence of a qualifying Sale Event, was not satisfied, Defendants' own conduct prevented each such condition from occurring. Defendants controlled whether a Compensation Committee was constituted, whether the Plan was presented for adoption, and whether a qualifying Sale Event was permitted to occur, and Defendants may not rely on the non-occurrence of conditions that Defendants themselves prevented.

103. Ms. Mader did not execute the July 9, 2025, revised offer of employment. She continued to report to work and fulfill her duties as Chief Executive Officer.

25

104. On or around July 10, 2025, Ms. Mader expressly objected to the demotion from her position, which materially diminished the terms and conditions of her employment. In that communication, Ms. Mader stated that the proposed changes represented a "material downgrade in responsibility and authority" and that she could not accept "ambiguity in place of hard-earned and previously agreed-upon compensation." Ms. Mader's objection was communicated in the direct context of, and inseparable from, Defendant Ferro's ongoing campaign of sex-based harassment and Defendants' simultaneous decision to strip their female Chief Executive Officer of her title, authority, and compensation while expanding incentive programs exclusively for male executives.

105. In response to Ms. Mader's objection, Defendants failed to take any meaningful corrective action and instead escalated their retaliation.

106. On or around July 22, 2025, during a business meeting regarding the Gallagher account, Defendant Ferro confronted Ms. Mader and told her on multiple occasions that she "just needs to be more of a bitch." Ms. Mader was humiliated and degraded by Defendant Ferro's demeaning, gender-based conduct, which occurred in front of colleagues and reinforced Defendant Ferro's persistent pattern of reducing Ms. Mader's professional authority to a crude gender stereotype.

107. On July 22, 2025, Ms. Mader sent written correspondence to Defendants through her counsel, notifying Defendants that she had retained legal representation and asserting her legal rights.

108. Later that evening, Defendant Ferro called Ms. Mader's personal cell phone and subjected her to a thirty-nine minute phone call in which he threatened Ms. Mader and repeatedly demeaned her. During this call, Defendant Ferro questioned why Ms. Mader had retained legal representation and asserted her legal rights, mocked her professional background and

qualifications, and explicitly threatened her employment, stating that he could fire her at any time. Defendant Ferro concluded the call by demanding that Ms. Mader decide whether she was going to be "in or out."

109. Over the weekend of July 26 and 27, 2025, Defendant Dearborn and Jeffrey Schumm ("Schumm"), an individual male employed as Defendants' General Counsel, contacted Ms. Mader and her counsel multiple times and implored Ms. Mader to remain with the company and continue in her role. At no point during these discussions did Defendants allege that Ms. Mader had engaged in any misconduct or had violated any company policy.

110. During these communications, Ms. Mader and her counsel explicitly informed Defendant Dearborn and Schumm of Ms. Mader's legal claims for sex discrimination, hostile work environment, and retaliation under Title VII, the FCRA, and the MDHRO.

111. Defendants had actual knowledge of Ms. Mader's opposition to sex-based discrimination and her assertion of her legal rights prior to terminating her employment.

112. Ms. Mader's opposition to Defendants' unlawful conduct constituted protected activity under Title VII, the FCRA, and the MDHRO. Specifically, Ms. Mader engaged in protected activity when she objected to the discriminatory demotion and elimination of her compensation on July 10, 2025, when she asserted her legal rights through counsel on July 22, 2025, and when she and her counsel explicitly informed Defendants of her claims for sex-based discrimination and retaliation during the July 26 and 27, 2025 communications with Defendant Dearborn and Schumm.

113. When Ms. Mader declined to withdraw her legal claims and refused to continue working under Defendants' ongoing discriminatory and retaliatory conduct, Defendants terminated her employment.

27

114. On July 28, 2025, Defendants issued a false and pretextual letter claiming that Ms. Mader was being terminated for cause. Finneran signed the letter on behalf of "eMed" without identifying which corporate entity was terminating Ms. Mader's employment, consistent with Defendants' failure to observe corporate formalities throughout her tenure.

115. Defendants explicitly acknowledged Ms. Mader's protected activities in the July 28, 2025, termination letter, stating that "the suggestion that the role change was retaliatory or motivated by discriminatory animus is categorically false, defamatory, and unsupported by any contemporaneous record."

116. Among the false and pretextual statements in the termination letter, Defendants claimed that Ms. Mader had violated company policies by forwarding emails from her company email account. Defendants based these claims on a forensic analysis of Ms. Mader's company email account that Defendants had commissioned on or about July 23, 2025, days before Defendants' discussions with Ms. Mader imploring her to remain with the company, making clear that Defendants had commissioned the review solely for the purpose of manufacturing a pretextual basis for retaliatory action in the event Ms. Mader did not agree to withdraw her claims.

117. The pretextual nature of Defendants' stated basis for termination is further demonstrated by the fact that the Acceptable Use Policy on which Defendants relied, identified internally as "BAB.POL.042," originated from Babylon Health, a United Kingdom-based healthcare company that eMed acquired in or around August 2023, and by its own terms applied to staff under the direct control of eMed UK, not to Defendants' United States-based employees. That Defendants would invoke an inapplicable policy from a defunct foreign subsidiary to justify terminating their Chief Executive Officer underscores the manufactured character of the entire for-cause designation.

118. In addition to Defendants' retaliatory termination of Ms. Mader's employment, Defendants demanded immediate repayment of the seventy-five-thousand-dollar ($75,000) relocation allowance. This demand was part of Defendants' ongoing campaign of retaliation and was intended to inflict additional financial harm upon Ms. Mader for asserting her legal rights.

119. In their course of conduct, Defendants falsely alleged that Ms. Mader had engaged in a "pattern of disloyal, harmful and contract-breaching behavior that no company can tolerate from a senior executive," yet days prior had repeatedly urged Ms. Mader to remain in her role with the company. Defendants targeted Ms. Mader solely because she had asserted her legal rights and opposed Defendants' unlawful and demeaning conduct toward her as an individual female. Defendants' purported basis for termination was entirely pretextual. The true reasons for Ms. Mader's termination were her sex and gender, her protected opposition to sex-based discrimination and a hostile work environment, her objection to and opposition of Defendant Ferro's unlawful directives, and her assertion of her legal rights.

120. The events described above are just some of the examples of unlawful discrimination and retaliation that Defendants subjected Ms. Mader to on a continuous and ongoing basis throughout her employment.

121. Defendants unlawfully discriminated against Ms. Mader because of her sex and gender.

122. Defendants retaliated against Ms. Mader for engaging in protected activity, including her objections to discriminatory treatment, her objection to and opposition of Defendant Ferro's unlawful directives, and her assertion of her legal rights.

123. Defendants defrauded Ms. Mader by inducing her employment and continued performance through material misrepresentations regarding compensation that they never intended to honor.

124.    Defendants violated Title VII, the FCRA, the MDHRO, and Florida and Delaware common law by subjecting Ms. Mader to a hostile work environment, disparate treatment, retaliation, and fraudulent inducement.

125.    Defendants exhibited a continuous practice of discrimination, and Ms. Mader therefore asserts all applicable claims herein under the continuing violations doctrine.

126.    As a result of the acts and conduct complained of herein, Ms. Mader has suffered and will continue to suffer the loss of income, salary, bonuses, benefits, and other compensation which her employment entailed, including the full value of the Transaction Bonus Plan to which she was entitled. Ms. Mader has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Ms. Mader has further experienced severe emotional and physical distress as a direct and proximate result of Defendants' conduct.

127.    As a result of Defendants' actions, Ms. Mader felt extremely humiliated, degraded, and emotionally distressed.

128.    Defendants are liable for violating Ms. Mader's personal dignity and for depriving her of her civil right to pursue equal employment opportunity free from discrimination, harassment, and retaliation.

**COUNT I**
**42 U.S.C. § 2000e-2**
**Title VII Discrimination**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

129.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

130.    Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

131. Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

132. Ms. Mader was an individual female and was therefore a member of a protected class.

133. Ms. Mader was qualified for her position, as she consistently maintained a record of satisfactory job performance and fulfilled the executive responsibilities for which Defendants recruited her.

134. The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

135. Defendants subjected Ms. Mader to discriminatory treatment on the basis of her sex, including but not limited to: (1) making targeted sexist and discriminatory remarks toward Ms. Mader, including that she "wasn't hot or pretty but not too ugly to sell," that she looked "like a soccer mom," and that she was "always too buttoned up," and demanding that she needed to be "more of a bitch," disparaging her as "too nice," and stating she did not have "a spine"; (2) deliberately impeding Ms. Mader's executive authority and her ability to perform her role, including denying her the resources, budget approvals, and staffing decisions necessary to execute her duties, while subjecting her to degrading, gender-based humiliation in front of her own subordinates and expanding incentive programs exclusively for male executives; (3) demoting Ms. Mader from Chief Executive Officer and stripping her of her job responsibilities on the basis of her gender; (4) denying Ms. Mader the same terms, conditions, and privileges of employment

31

afforded to similarly situated male executives; (5) repudiating her contractually promised ten percent participation interest in the Transaction Bonus Plan and replacing her earned compensation with undefined stock options under a plan that did not yet exist; and (6) terminating Ms. Mader's employment under false pretenses in retaliation for asserting her legal rights.

136.    Defendants targeted Ms. Mader because of her sex.

137.    No similarly situated male executive was subjected to the demeaning sex-based treatment directed at Ms. Mader, stripped of negotiated compensation following a successful transaction he led, demoted without consent after delivering the precise result for which he was recruited, or terminated on a pretextual basis within days of asserting his legal rights. Similarly situated male employees were not subjected to the same discriminatory treatment that Defendants subjected Ms. Mader to. To the contrary, Defendants recommended and pursued retention bonuses exclusively for male employees during the same period in which they eliminated Ms. Mader's contractual compensation.

138.    The discriminatory actions of the Defendants against Ms. Mader, as described and set forth above, constitute an adverse employment action for the purposes of Title VII.

139.    In subjecting Ms. Mader to adverse employment actions, Defendants intentionally discriminated against Ms. Mader with respect to the compensation, terms, conditions, or privileges of her employment.

140.    Even if Defendants could assert legitimate reasons for the adverse actions taken against Ms. Mader, her protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Mader explicitly reserves the right to pursue a mixed-motive theory against Defendants.

141.    As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of Title VII, Ms. Mader has suffered and will continue to suffer financial and

32

economic damages in the form of lost wages (front and back pay) and lost benefits, including the loss of her multi-million dollar Transaction Bonus Plan.

142. Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

143. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

144. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under Title VII, warranting the imposition of punitive damages, in addition to compensatory damages.

145. Defendants' conduct deprived Ms. Mader of her rights under Title VII.

146. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT II
### § 760.10(1), Fla. Stat.
### FCRA Discrimination
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

147. Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

148. The FCRA prohibits employment discrimination against an individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's sex. § 760.10(1)(a), Fla. Stat.

149. Ms. Mader was a member of a protected class under the FCRA, as she was a female.

150. The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

151. Ms. Mader was a qualified individual under the FCRA, as she consistently maintained a record of satisfactory job performance and fulfilled the executive responsibilities for which Defendants recruited her.

152. Defendants subjected Ms. Mader to discriminatory treatment on the basis of her sex, including but not limited to: (1) making targeted sexist and discriminatory remarks toward Ms. Mader, including that she "wasn't hot or pretty but not too ugly to sell," that she looked "like a soccer mom," and that she was "always too buttoned up," and demanding that she needed to be "more of a bitch," disparaging her as "too nice," and stating she did not have "a spine"; (2) deliberately impeding Ms. Mader's executive authority and her ability to perform her role, including denying her the resources, budget approvals, and staffing decisions necessary to execute her duties, while subjecting her to degrading, gender-based humiliation in front of her own subordinates and expanding incentive programs exclusively for male executives; (3) demoting Ms. Mader from Chief Executive Officer and stripping her of her job responsibilities on the basis of her gender; (4) denying Ms. Mader the same terms, conditions, and privileges of employment afforded to similarly situated male executives; (5) repudiating her contractually promised ten percent participation interest in the Transaction Bonus Plan and replacing her earned compensation with undefined stock options under a plan that did not yet exist; and (6) terminating Ms. Mader's employment under false pretenses in retaliation for asserting her legal rights.

153. Defendants targeted Ms. Mader on the basis of her protected class status.

154. No similarly situated male executive was subjected to the demeaning sex-based treatment directed at Ms. Mader, stripped of negotiated compensation following a successful transaction he led, demoted without consent after delivering the precise result for which he was recruited, or terminated on a pretextual basis within days of asserting his legal rights. Similarly situated male employees were not subjected to the same discriminatory treatment that Defendants

34

subjected Ms. Mader to. To the contrary, Defendants recommended and pursued retention bonuses exclusively for male employees during the same period in which they eliminated Ms. Mader's contractual compensation.

155. The discriminatory actions of the Defendants against Ms. Mader, as described and set forth above, constitute an adverse employment action for purposes of the FCRA.

156. In subjecting Ms. Mader to adverse employment actions, Defendants intentionally discriminated against Ms. Mader with respect to the compensation, terms, conditions, or privileges of her employment.

157. Even if Defendants could assert legitimate reasons for the adverse actions taken against Ms. Mader, her protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Mader explicitly reserves the right to pursue a mixed-motive theory against Defendants.

158. As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of the FCRA, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

159. Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

160. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

161. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

162. Defendants' conduct deprived Ms. Mader of her rights under the FCRA.

163.    Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT III
### § 11A-26(1), Code of Miami-Dade County
### MDHRO Discrimination
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

164.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

165.    The MDHRO prohibits discrimination with respect to the training, hire, tenure, promotion, transfer, terms, conditions, wages, benefits, or privileges of employment, or in any other matter related to employment because of an individual's sex. Miami-Dade County, Fla., Code, ch. 11A, art. IV, § 11A-26.

166.    Ms. Mader was a member of a protected class under the MDHRO, as she was a female.

167.    The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

168.    Ms. Mader was a qualified individual under the MDHRO, as she consistently maintained a record of satisfactory job performance and fulfilled the executive responsibilities for which Defendants recruited her.

169.    Defendants discriminated against Ms. Mader on the basis of her sex.

170.    Defendants' discriminatory conduct included, but was not limited to: (1) making targeted sexist and discriminatory remarks toward Ms. Mader, including that she "wasn't hot or pretty but not too ugly to sell," that she looked "like a soccer mom," and that she was "always too buttoned up," and demanding that she needed to be "more of a bitch," disparaging her as "too nice," and stating she did not have "a spine"; (2) deliberately impeding Ms. Mader's executive

36

authority and her ability to perform her role, including denying her the resources, budget approvals, and staffing decisions necessary to execute her duties, while subjecting her to degrading, gender-based humiliation in front of her own subordinates and expanding incentive programs exclusively for male executives; (3) demoting Ms. Mader from Chief Executive Officer and stripping her of her job responsibilities on the basis of her gender; (4) denying Ms. Mader the same terms, conditions, and privileges of employment afforded to similarly situated male executives; (5) repudiating her contractually promised ten percent participation interest in the Transaction Bonus Plan and replacing her earned compensation with undefined stock options under a plan that did not yet exist; and (6) terminating Ms. Mader's employment under false pretenses in retaliation for asserting her legal rights.

171. Defendants targeted Ms. Mader on the basis of her protected class status.

172. No similarly situated male executive was subjected to the demeaning sex-based treatment directed at Ms. Mader, stripped of negotiated compensation following a successful transaction he led, demoted without consent after delivering the precise result for which he was recruited, or terminated on a pretextual basis within days of asserting his legal rights. Similarly situated male employees were not subjected to the same discriminatory treatment that Defendants subjected Ms. Mader to. To the contrary, Defendants recommended and pursued retention bonuses exclusively for male employees during the same period in which they eliminated Ms. Mader's contractual compensation.

173. The discriminatory actions of the Defendants against Ms. Mader, as described and set forth above, constitute an adverse employment action for purposes of the MDHRO.

174. In subjecting Ms. Mader to adverse employment actions, Defendants intentionally discriminated against Ms. Mader with respect to the compensation, terms, conditions, or privileges of her employment.

175. Even if Defendants could assert legitimate reasons for the adverse actions taken against Ms. Mader, her protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Mader explicitly reserves the right to pursue a mixed-motive theory against Defendants.

176. As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of the MDHRO, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

177. Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

178. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

179. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under the MDHRO, warranting the imposition of punitive damages in addition to compensatory damages.

180. Defendants' conduct deprived Ms. Mader of her rights under the MDHRO.

181. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT IV**
**42 U.S.C. § 2000e-2**
**Title VII Hostile Work Environment**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

182. Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

183. Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his

38

compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

184.     Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

185.     Ms. Mader was an individual female and was therefore a member of a protected class.

186.     During her employment, Ms. Mader was subjected to severe, pervasive, and unwelcome harassment by Defendants.

187.     The harassment directed toward Ms. Mader was based on her sex.

188.     Defendants' discriminatory conduct was severe and pervasive enough to make any reasonable person believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, and abusive.

189.     Defendants' severe and pervasive conduct included, but was not limited to: (1) Defendant Ferro routinely using the word "cunt" to demean women during workplace meetings, and dismissing any concern by claiming he was "balanced" because he also used the word "dick," demonstrating his awareness that the language was targeted at women on the basis of their sex; (2) making targeted sexist and discriminatory remarks toward Ms. Mader, including that she "wasn't hot or pretty but not too ugly to sell," that she looked "like a soccer mom," and that she was "always too buttoned up," judging her worth as Chief Executive Officer by her sexual attractiveness, physical appearance, and manner of dress; (3) demanding on multiple occasions that Ms. Mader needed to be "more of a bitch," disparaging her as "too nice," and stating that she did not have "a spine," perpetuating the stereotype that a woman in a position of executive

39

authority is inherently weak and incapable of commanding respect; (4) degrading and humiliating Ms. Mader before her own subordinates in her absence, stripping her of authority over the account she had originated and built; (5) making objectifying and sexualized remarks about other female employees, including commenting that a female director "looks beat up now" but was "young and cute" and "would do what it takes to get the deal done"; (6) deliberately impeding Ms. Mader's executive authority and denying her the resources, budget approvals, and staffing decisions necessary to perform her role as Chief Executive Officer, while expanding incentive programs exclusively for male executives; and (7) subjecting Ms. Mader to a 39-minute retaliatory phone call on July 22, 2025, in which Defendant Ferro demeaned her professional background, explicitly threatened her employment, and demanded she decide whether she was "in or out."

190.    Defendants targeted Ms. Mader because of her sex.

191.    No similarly situated male executive was subjected to the demeaning sex-based treatment directed at Ms. Mader, stripped of negotiated compensation following a successful transaction he led, demoted without consent after delivering the precise result for which he was recruited, or terminated on a pretextual basis within days of asserting his legal rights. Similarly situated male employees were not subjected to the same discriminatory treatment that Defendants subjected Ms. Mader to. To the contrary, Defendants recommended and pursued retention bonuses exclusively for male employees during the same period in which they eliminated Ms. Mader's contractual compensation.

192.    Defendant Ferro, as the chief equity holder and Founder of the eMed Defendants, was of such high rank within the organization that he functioned as the organization's proxy, with the authority to speak for and bind the company in all material respects. Accordingly, the eMed Defendants are strictly liable for Defendant Ferro's discriminatory conduct.

40

193.   Defendants' discriminatory conduct toward Ms. Mader negatively impacted both her professional life and her personal life, making her feel isolated, demeaned, embarrassed, and ashamed.

194.   Ms. Mader experienced Defendants' conduct as creating a hostile, intimidating, and abusive working environment, and any reasonable person in Ms. Mader's position would have perceived the environment the same way.

195.   As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of Title VII, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

196.   Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

197.   Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

198.   Even if Defendants could assert legitimate reasons for the hostile work environment conditions, Ms. Mader's protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Mader explicitly reserves the right to pursue a mixed-motive theory against Defendants.

199.   Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

200.   Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT V
## § 760.10(1), Fla. Stat.
### FCRA Hostile Work Environment
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

201.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

202.    The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex. § 760.10(1), Fla. Stat.

203.    Ms. Mader was an individual female and was therefore a member of a protected class under the FCRA.

204.    During her employment, Ms. Mader was subjected to severe, pervasive, and unwelcome harassment by Defendants.

205.    The harassment directed toward Ms. Mader was based on her sex.

206.    Defendants' discriminatory conduct was severe and pervasive enough to make any reasonable person believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, and abusive.

207.    Defendants' severe and pervasive conduct included, but was not limited to: (1) Defendant Ferro routinely using the word "cunt" to demean women during workplace meetings, and dismissing any concern by claiming he was "balanced" because he also used the word "dick," demonstrating his awareness that the language was targeted at women on the basis of their sex; (2) making targeted sexist and discriminatory remarks toward Ms. Mader, including that she "wasn't hot or pretty but not too ugly to sell," that she looked "like a soccer mom," and that she was "always too buttoned up," judging her worth as Chief Executive Officer by her sexual attractiveness, physical appearance, and manner of dress; (3) demanding on multiple occasions that Ms. Mader needed to be "more of a bitch," disparaging her as "too nice," and stating that she

42

did not have "a spine," perpetuating the stereotype that a woman in a position of executive authority is inherently weak and incapable of commanding respect; (4) degrading and humiliating Ms. Mader before her own subordinates in her absence, stripping her of authority over the account she had originated and built; (5) making objectifying and sexualized remarks about other female employees, including commenting that a female director "looks beat up now" but was "young and cute" and "would do what it takes to get the deal done"; (6) deliberately impeding Ms. Mader's executive authority and denying her the resources, budget approvals, and staffing decisions necessary to perform her role as Chief Executive Officer, while expanding incentive programs exclusively for male executives; and (7) subjecting Ms. Mader to a 39-minute retaliatory phone call on July 22, 2025, in which Defendant Ferro demeaned her professional background, explicitly threatened her employment, and demanded she decide whether she was "in or out."

208.    Defendants targeted Ms. Mader because of her sex.

209.    No similarly situated male executive was subjected to the demeaning sex-based treatment directed at Ms. Mader, stripped of negotiated compensation following a successful transaction he led, demoted without consent after delivering the precise result for which he was recruited, or terminated on a pretextual basis within days of asserting his legal rights. Similarly situated male employees were not subjected to the same discriminatory treatment that Defendants subjected Ms. Mader to. To the contrary, Defendants recommended and pursued retention bonuses exclusively for male employees during the same period in which they eliminated Ms. Mader's contractual compensation.

210.    Defendant Ferro, as the chief equity holder and Founder of the eMed Defendants, was of such high rank within the organization that he functioned as the organization's proxy, with the authority to speak for and bind the company in all material respects. Accordingly, the eMed Defendants are strictly liable for Defendant Ferro's discriminatory conduct.

43

211. Defendants' discriminatory conduct toward Ms. Mader negatively impacted both her professional life and her personal life, making her feel isolated, demeaned, embarrassed, and ashamed.

212. Ms. Mader experienced Defendants' conduct as creating a hostile, intimidating, and abusive working environment, and any reasonable person in Ms. Mader's position would have perceived the environment the same way.

213. As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the FCRA, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

214. Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

215. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

216. Even if Defendants could assert legitimate reasons for the hostile work environment conditions, Ms. Mader's protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Mader explicitly reserves the right to pursue a mixed-motive theory against Defendants.

217. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

218. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

44

## COUNT VI
## § 11A-26(1), Code of Miami-Dade County
## MDHRO Hostile Work Environment
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

219.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

220.    The MDHRO prohibits discrimination with respect to the training, hire, tenure, promotion, transfer, terms, conditions, wages, benefits, or privileges of employment, or in any other matter related to employment because of an individual's sex. Miami-Dade County, Fla., Code, ch. 11A, art. IV, § 11A-26.

221.    Ms. Mader was an individual female and was therefore a member of a protected class under the MDHRO.

222.    During her employment, Ms. Mader was subjected to severe, pervasive, and unwelcome harassment by Defendants.

223.    The harassment directed toward Ms. Mader was based on her sex.

224.    Defendants' discriminatory conduct was severe and pervasive enough to make any reasonable person believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, and abusive.

225.    Defendants' severe and pervasive conduct included, but was not limited to: (1) Defendant Ferro routinely using the word "cunt" to demean women during workplace meetings, and dismissing any concern by claiming he was "balanced" because he also used the word "dick," demonstrating his awareness that the language was targeted at women on the basis of their sex; (2) making targeted sexist and discriminatory remarks toward Ms. Mader, including that she "wasn't hot or pretty but not too ugly to sell," that she looked "like a soccer mom," and that she was "always too buttoned up," judging her worth as Chief Executive Officer by her sexual

45

attractiveness, physical appearance, and manner of dress; (3) demanding on multiple occasions that Ms. Mader needed to be "more of a bitch," disparaging her as "too nice," and stating that she did not have "a spine," perpetuating the stereotype that a woman in a position of executive authority is inherently weak and incapable of commanding respect; (4) degrading and humiliating Ms. Mader before her own subordinates in her absence, stripping her of authority over the account she had originated and built; (5) making objectifying and sexualized remarks about other female employees, including commenting that a female director "looks beat up now" but was "young and cute" and "would do what it takes to get the deal done"; (6) deliberately impeding Ms. Mader's executive authority and denying her the resources, budget approvals, and staffing decisions necessary to perform her role as Chief Executive Officer, while expanding incentive programs exclusively for male executives; and (7) subjecting Ms. Mader to a 39-minute retaliatory phone call on July 22, 2025, in which Defendant Ferro demeaned her professional background, explicitly threatened her employment, and demanded she decide whether she was "in or out."

226. Defendants targeted Ms. Mader because of her sex.

227. No similarly situated male executive was subjected to the demeaning sex-based treatment directed at Ms. Mader, stripped of negotiated compensation following a successful transaction he led, demoted without consent after delivering the precise result for which he was recruited, or terminated on a pretextual basis within days of asserting his legal rights. Similarly situated male employees were not subjected to the same discriminatory treatment that Defendants subjected Ms. Mader to. To the contrary, Defendants recommended and pursued retention bonuses exclusively for male employees during the same period in which they eliminated Ms. Mader's contractual compensation.

228. Defendant Ferro, as the chief equity holder and Founder of the eMed Defendants, was of such high rank within the organization that he functioned as the organization's proxy, with

46

the authority to speak for and bind the company in all material respects. Accordingly, the eMed Defendants are strictly liable for Defendant Ferro's discriminatory conduct.

229. Defendants' discriminatory conduct toward Ms. Mader negatively impacted both her professional life and her personal life, making her feel isolated, demeaned, embarrassed, and ashamed.

230. Ms. Mader experienced Defendants' conduct as creating a hostile, intimidating, and abusive working environment, and any reasonable person in Ms. Mader's position would have perceived the environment the same way.

231. As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the MDHRO, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

232. Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

233. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

234. Even if Defendants could assert legitimate reasons for the hostile work environment conditions, Ms. Mader's protected class status, at a minimum, was a motivating factor for Defendants' discriminatory conduct and Ms. Mader explicitly reserves the right to pursue a mixed-motive theory against Defendants.

235. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under the MDHRO, warranting the imposition of punitive damages in addition to compensatory damages.

236. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

47

**COUNT VII**
**42 U.S.C. § 2000e-3**
**Title VII Retaliation**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

237.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

238.    Title VII prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding, or hearing related to an unlawful discriminatory practice. 42 U.S.C. § 2000e-3(a).

239.    Ms. Mader engaged in statutorily protected activity under Title VII when she opposed Defendants' unlawful employment practices, including but not limited to when Ms. Mader: (1) objected to the demotion and elimination of her contractually promised compensation on or around July 10, 2025; (2) asserted her legal rights through counsel on July 22, 2025; (3) together with her counsel, explicitly informed Defendant Dearborn and Schumm of Ms. Mader's claims for sex discrimination, hostile work environment, and retaliation under Title VII during the July 26 and 27, 2025 communications; and (4) opposed Defendants' directives to procure prescription medications in violation of applicable law, which directives were inextricably linked to the sex-based hostile work environment and retaliatory conduct described herein.

240.    In response to Ms. Mader's protected activities, Defendants retaliated against her through a series of materially adverse employment actions, including but not limited to: (1) stripping Ms. Mader of her title as Chief Executive Officer and demoting her to a subordinate position without her consent; (2) eliminating her ten percent participation interest in the Transaction Bonus Plan and substituting undefined, unvalued stock options; (3) removing Ms. Mader's job responsibilities and restructuring her reporting authority to subordinate her to a newly installed executive; (4) Defendant Ferro intimidating Ms. Mader and threatening her employment

48

on July 22, 2025, explicitly reminding her that he had the authority to terminate her at any time; (5) manufacturing a pretextual basis for Ms. Mader's termination by commissioning a forensic review of her company email account the day after Defendants were notified of Ms. Mader's legal claims; (6) denying Ms. Mader the same terms, conditions, and privileges of employment afforded to similarly situated male executives who had not engaged in protected activity; and (7) terminating Ms. Mader's employment on July 28, 2025, under false pretenses.

241.    Defendants took the above-mentioned materially adverse actions against Ms. Mader because of her protected activities. Ms. Mader's protected activity was the but-for cause of Defendants' adverse employment actions against her, as evidenced by the exceptionally close temporal proximity between her protected activity and her termination. The temporal proximity was a matter of days.

242.    Any reasonable employee in Ms. Mader's position would be dissuaded from opposing discriminatory conduct if they knew they would be subjected to the kind of treatment and pretextual termination that Ms. Mader was forced to endure.

243.    Defendants' alleged for-cause basis for terminating Ms. Mader is entirely pretextual. Defendants purportedly discovered the forwarded emails on July 23, 2025, yet over the weekend of July 26 and 27, 2025, Defendants' agents actively urged Ms. Mader to remain in her role. Defendants terminated Ms. Mader on July 28, 2025, only after she refused to withdraw her legal claims.

244.    As a direct and proximate result of the Defendants' retaliatory conduct in violation of Title VII, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits, including the loss of her multi-million dollar Transaction Bonus Plan.

245. Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

246. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

247. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

248. Defendants' conduct deprived Ms. Mader of her rights under Title VII.

249. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VIII**
**§ 760.10(7), Fla. Stat.**
**FCRA Retaliation**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

250. Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

251. The FCRA prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding, or hearing related to an unlawful discriminatory practice. § 760.10(7), Fla. Stat.

252. Ms. Mader engaged in protected activity under the FCRA when she opposed Defendants' unlawful employment practices, including but not limited to when Ms. Mader: (1) objected to the demotion and elimination of her contractually promised compensation on or around July 10, 2025; (2) asserted her legal rights through counsel on July 22, 2025; (3) together with her counsel, explicitly informed Defendant Dearborn and Schumm of Ms. Mader's claims for sex discrimination, hostile work environment, and retaliation under the FCRA during the July 26 and

27, 2025 communications; and (4) opposed Defendants' directives to procure prescription medications in violation of applicable law, which directives were inextricably linked to the sex-based hostile work environment and retaliatory conduct described herein.

253. In response to Ms. Mader's protected activities, Defendants retaliated against her through a series of materially adverse employment actions, including but not limited to: (1) stripping Ms. Mader of her title as Chief Executive Officer and demoting her to a subordinate position without her consent; (2) eliminating her ten percent participation interest in the Transaction Bonus Plan and substituting undefined, unvalued stock options; (3) removing Ms. Mader's job responsibilities and restructuring her reporting authority to subordinate her to a newly installed executive; (4) Defendant Ferro intimidating Ms. Mader and threatening her employment on July 22, 2025, explicitly reminding her that he had the authority to terminate her at any time; (5) manufacturing a pretextual basis for Ms. Mader's termination by commissioning a forensic review of her company email account the day after Defendants were notified of Ms. Mader's legal claims; (6) denying Ms. Mader the same terms, conditions, and privileges of employment afforded to similarly situated male executives who had not engaged in protected activity; and (7) terminating Ms. Mader's employment on July 28, 2025, under false pretenses.

254. Defendants took the above-mentioned materially adverse actions against Ms. Mader because of her protected activities. Ms. Mader's protected activity was the but-for cause of Defendants' adverse employment actions against her.

255. Any reasonable employee in Ms. Mader's position would be dissuaded from opposing discriminatory conduct if they knew they would be subjected to the kind of treatment that Ms. Mader was forced to endure.

256. Defendants' alleged for-cause basis for terminating Ms. Mader is entirely pretextual. Defendants purportedly discovered the forwarded emails on July 23, 2025, yet

repeatedly urged her to remain in her role over the weekend of July 26 and 27, 2025. Defendants only terminated her on July 28, 2025, after she refused to withdraw her legal claims.

257.    As a direct and proximate result of the Defendants' retaliatory conduct in violation of the FCRA, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

258.    Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

259.    Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

260.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

261.    Defendants' conduct deprived Ms. Mader of her rights under the FCRA.

262.    Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT IX
### § 11A-26(4), Code of Miami-Dade County
### MDHRO Retaliation
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

263.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

264.    The MDHRO prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has testified, assisted, or participated in any manner in an investigation, proceeding, or hearing related to an unlawful discriminatory practice. Miami-Dade County, Fla., Code, ch. 11A, art. IV, § 11A-26(4).

52

265.    Ms. Mader engaged in protected activity under the MDHRO when she opposed Defendants' unlawful employment practices, including but not limited to when Ms. Mader: (1) objected to the demotion and elimination of her contractually promised compensation on or around July 10, 2025; (2) asserted her legal rights through counsel on July 22, 2025; (3) together with her counsel, explicitly informed Defendant Dearborn and Schumm of Ms. Mader's claims for sex discrimination, hostile work environment, and retaliation under the MDHRO during the July 26 and 27, 2025 communications; and (4) opposed Defendants' directives to procure prescription medications in violation of applicable law, which directives were inextricably linked to the sex-based hostile work environment and retaliatory conduct described herein.

266.    In response to Ms. Mader's protected activities, Defendants retaliated against her through a series of materially adverse employment actions, including but not limited to: (1) stripping Ms. Mader of her title as Chief Executive Officer and demoting her to a subordinate position without her consent; (2) eliminating her ten percent participation interest in the Transaction Bonus Plan and substituting undefined, unvalued stock options; (3) removing Ms. Mader's job responsibilities and restructuring her reporting authority to subordinate her to a newly installed executive; (4) Defendant Ferro intimidating Ms. Mader and threatening her employment on July 22, 2025, explicitly reminding her that he had the authority to terminate her at any time; (5) manufacturing a pretextual basis for Ms. Mader's termination by commissioning a forensic review of her company email account the day after Defendants were notified of Ms. Mader's legal claims; (6) denying Ms. Mader the same terms, conditions, and privileges of employment afforded to similarly situated male executives who had not engaged in protected activity; and (7) terminating Ms. Mader's employment on July 28, 2025, under false pretenses.

267. Defendants took the above-mentioned materially adverse actions against Ms. Mader because of her protected activities. Ms. Mader's protected activity was the but-for cause of Defendants' adverse employment actions against her.

268. Any reasonable employee in Ms. Mader's position would be dissuaded from opposing sex-based discrimination if they knew they would be subjected to the kind of treatment that Ms. Mader was forced to endure.

269. Defendants' alleged for-cause basis for terminating Ms. Mader is entirely pretextual. Defendants purportedly discovered the forwarded emails on July 23, 2025, yet repeatedly urged her to remain in her role over the weekend of July 26 and 27, 2025. Defendants only terminated her on July 28, 2025, after she refused to withdraw her legal claims.

270. As a direct and proximate result of Defendants' retaliatory conduct in violation of the MDHRO, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.

271. Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

272. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

273. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under the MDHRO, warranting the imposition of punitive damages in addition to compensatory damages.

274. Defendants' conduct deprived Ms. Mader of her rights under the MDHRO.

275. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT X**
**Fla. Stat. § 448.102(3)**
**Florida Private Sector Whistleblower Act**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

276. Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

277. The Florida Private Sector Whistleblower Act ("FPWA") prohibits an employer from taking a retaliatory personnel action against an employee pursuant to § 448.102(3), Fla. Stat., when the employee "objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."

278. At all times material, Defendants' conduct in directing Ms. Mader to facilitate the procurement of GLP-1 receptor agonist medications, including semaglutide and tirzepatide, to individuals who had not undergone a documented clinical evaluation, had not completed required patient intake, and had not been assessed for clinical eligibility by a licensed physician, was in violation of one or more laws, rules, or regulations. These violations include, but are not limited to: (a) Fla. Stat. § 456.47(2)(a)-(b), (3): Requiring that a telehealth provider practice consistent with the prevailing professional standard of practice, conduct a patient evaluation sufficient to diagnose and treat the patient before issuing any prescription, and document telehealth services in the patient's medical record to the same standard required for in-person services; (b) Fla. Admin. Code R. 64B8-9.012, requiring that, prior to prescribing anti-obesity medications for medically assisted weight loss, an initial evaluation of the patient shall be conducted, including a physical and complete history, tests related to medical treatment for weight loss, and medical referrals as indicated, and requiring periodic re-evaluation; (c) Fla. Stat. § 458.331(1)(q): Prohibiting a physician from prescribing or dispensing a legend drug other than in the course of the physician's professional practice, which requires an individualized clinical evaluation sufficient to justify

treatment; (d) Fla. Stat. § 458.331(1)(m): Requiring that a physician maintain medical records that justify the course of treatment, including patient histories, examination results, test results, and records of drugs prescribed; (e) Fla. Stat. § 458.331(1)(g) and (nn): Prohibiting a physician from failing to perform any statutory or legal obligation and from violating any provision of chapter 458 or chapter 456 or any rules adopted pursuant thereto; and (f) 21 U.S.C. §§ 353(b)(1) and 331(a): Providing that a prescription drug shall be dispensed only upon a valid prescription from a licensed practitioner, and prohibiting the introduction into interstate commerce of a misbranded drug, where dispensing a prescription drug without a valid prescription renders the drug misbranded under the Federal Food, Drug, and Cosmetic Act.

279. Florida law requires the establishment of a prescriber-patient relationship, a clinical evaluation consistent with prevailing professional standards of practice, and a determination of medical necessity before a practitioner may issue any prescription. Defendants directed the procurement of prescription medications for individuals who had not satisfied any of the foregoing requirements, and Defendants' conduct fell outside the course of professional medical practice under Florida law.

280. The clinical bypass directives issued by Defendant Ferro and Defendant Dearborn constituted actual violations of these aforementioned laws, rules, and regulations. Prescribing medications to patients who have not undergone a clinically sufficient evaluation violates each of the above provisions and exposes the prescribing physician and the supervising entity to disciplinary action, civil liability, and potential criminal exposure under Florida law.

281. At all times material, Ms. Mader reasonably and in good faith believed that the directives issued by Defendant Ferro and Defendant Dearborn requiring her to facilitate the procurement of GLP-1 medications without appropriate clinical evaluation violated applicable federal and state prescribing regulations and telehealth practice standards. Defendants' directives

56

were, in fact, actual violations of the state and federal laws, rules, and regulations identified herein and Ms. Mader communicated these objections to the unlawful conduct Defendants' principals.

282.    Ms. Mader objected to, or refused to participate in, one or more activities, policies, or practices of Defendants which were in violation of the laws, rules, or regulations listed above, among others.

283.    Ms. Mader engaged in statutorily protected activity under § 448.102(3) by objecting to and opposing, on multiple occasions, Defendants' directives to bypass required clinical evaluation protocols and authorize or facilitate prescription issuance to patients who were not clinically eligible under applicable Florida law and federal regulations.

284.    Defendants' decision-makers and principals responsible for the adverse actions, including but not limited to Michael Ferro and Justin Dearborn, had actual knowledge of Ms. Mader's protected objections and opposition at the time of the termination. Specifically, Ms. Mader directly communicated her objections to Defendant Ferro and Defendant Dearborn, the same individuals who subsequently directed the retaliatory demotion and termination.

285.    In response to Ms. Mader's objections to Defendants' unlawful directives, Defendants took retaliatory personnel actions against Ms. Mader, including but not limited to: (1) stripping Ms. Mader of her title as Chief Executive Officer and demoting her to a subordinate position without her consent; (2) eliminating her ten percent participation interest in the Transaction Bonus Plan and substituting undefined, unvalued stock options; (3) removing Ms. Mader's job responsibilities and restructuring her reporting authority to subordinate her to a newly installed executive; (4) Defendant Ferro intimidating Ms. Mader and threatening her employment on July 22, 2025, explicitly reminding her that he had the authority to terminate her at any time; (5) manufacturing a pretextual basis for Ms. Mader's termination by commissioning a forensic

57

review of her company email account the day after Defendants were notified of Ms. Mader's legal claims; and (6) terminating Ms. Mader's employment on July 28, 2025 under false pretenses.

286. Defendants took the above-mentioned materially adverse actions against Ms. Mader because of her objections to Defendants' violation of a law, rule, or regulation.

287. A causal connection exists between Ms. Mader's protected activities and Defendants' adverse employment actions against her. This causal relationship is demonstrated by, among other things: (a) Ms. Mader's direct objections communicated to Defendant Ferro and Defendant Dearborn regarding the unlawful clinical bypass directives; (b) The escalating pattern of adverse employment actions following each instance of Ms. Mader's objection to Defendants' directives; (c) The hostility and retaliatory conduct directed toward Ms. Mader following Ms. Mader's objections, including the July 22, 2025 telephone call in which Defendant Ferro aggressively threatened her continued employment; and (d) The temporal proximity between Ms. Mader's protected objections and Defendants' decisions to strip her compensation, demote her, and terminate her employment.

288. Defendants' alleged bases for their adverse employment actions against Ms. Mader, specifically the purported for-cause termination based on forwarded emails, are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct. This pretext is further demonstrated by the fact that Defendants purportedly discovered the alleged cause on July 23, 2025, yet repeatedly urged Ms. Mader to remain in her role over the weekend of July 26 and 27, 2025, and terminated her only after she refused to withdraw her legal claims.

289. As a direct and proximate result of Defendants' retaliatory conduct in violation of the FPWA, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Mader has also suffered and

will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

290.    Defendants' conduct deprived Ms. Mader of her rights under the FPWA.

291.    Ms. Mader accordingly demands all relief available under Fla. Stat. § 448.103, including lost wages, back pay, front pay, compensatory damages, and reinstatement or front pay in lieu thereof.

292.    Ms. Mader further demands her attorneys' fees and costs pursuant to Fla. Stat. § 448.104.

**COUNT XI**
**42 U.S.C. § 2000e-3**
**Title VII Retaliatory Hostile Work Environment**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

293.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

294.    Title VII prohibits an employer from subjecting an employee to a hostile work environment in retaliation for an employee's protected activity.

295.    An employer violates Title VII when it subjects an employee to unwelcome harassment in retaliation for the employee's protected activity, where the harassment is sufficiently severe or pervasive to alter the terms and conditions of employment.

296.    Ms. Mader engaged in protected activity under Title VII, including but not limited to when Ms. Mader: (1) objected to the demotion and elimination of her contractually promised compensation on or around July 10, 2025; (2) asserted her legal rights through counsel on July 22, 2025; (3) together with her counsel, explicitly informed Defendant Dearborn and Schumm of Ms. Mader's claims for sex discrimination, hostile work environment, and retaliation during the July

59

26 and 27, 2025 communications; and (4) opposed Defendants' directives to procure prescription medications in violation of applicable law.

297.    Following Ms. Mader's protected activity, Defendants subjected Ms. Mader to severe and pervasive retaliatory harassment designed to punish her for opposing Defendants' unlawful conduct and to coerce her into withdrawing her legal claims. Defendants' retaliatory conduct included, but was not limited to: (1) demoting Ms. Mader from Chief Executive Officer and eliminating her contractual compensation rights; (2) removing Ms. Mader's job responsibilities and restructuring her reporting authority without her consent; (3) Defendant Ferro intimidating Ms. Mader and threatening her employment on July 22, 2025, explicitly reminding her that he had the authority to terminate her at any time; (4) Defendants demanding that Ms. Mader withdraw her legal claims and abandon her opposition to Defendants' unlawful employment practices; (5) manufacturing a pretextual basis for Ms. Mader's termination by commissioning a forensic review of her company email account the day after Defendants were notified of Ms. Mader's legal claims; and (6) terminating Ms. Mader's employment on July 28, 2025 under false pretenses.

298.    Ms. Mader's protected activity was the but-for cause of the retaliatory hostile work environment to which she was subjected. Each retaliatory act alleged herein directly followed and escalated in response to Ms. Mader's opposition to Defendants' unlawful conduct. The pattern is unmistakable: Defendants took no steps to demote Ms. Mader, eliminate her compensation, threaten her employment, investigate her conduct, or terminate her until after she opposed their discriminatory and unlawful practices, and the severity of Defendants' retaliation intensified with each successive act of opposition by Ms. Mader.

299.    Defendants' retaliatory conduct was sufficiently severe and pervasive to alter the terms and conditions of Ms. Mader's employment and create a working environment that was hostile, abusive, and intolerable.

300.    Ms. Mader subjectively perceived Defendants' retaliatory conduct as hostile, abusive, and threatening to her continued employment. Any reasonable employee in Ms. Mader's position, having been stripped of her title, demoted, threatened with termination by the controlling owner of her employer, subjected to a manufactured investigation, and ultimately fired within days of asserting her legal rights, would have perceived the environment in the same way and would have been dissuaded from engaging in protected activity.

301.    As a direct and proximate result of Defendants' retaliatory conduct in violation of Title VII, Ms. Mader has suffered and will continue to suffer financial and economic damages, emotional distress, mental anguish, loss of dignity, and other intangible damages.

302.    Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

303.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

304.    Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT XII
### § 760.10(7), Fla. Stat.
### FCRA Retaliatory Hostile Work Environment
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

305.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

306.    The FCRA prohibits retaliating against an employee who has opposed a discriminatory practice, which includes subjecting an employee to a retaliatory hostile work environment. § 760.10(7), Fla. Stat.

307. Ms. Mader engaged in protected activity under the FCRA, including but not limited to when Ms. Mader: (1) objected to the demotion and elimination of her contractually promised compensation on or around July 10, 2025; (2) asserted her legal rights through counsel on July 22, 2025; (3) together with her counsel, explicitly informed Defendant Dearborn and Schumm of Ms. Mader's claims for sex discrimination, hostile work environment, and retaliation during the July 26 and 27, 2025 communications; and (4) opposed Defendants' directives to procure prescription medications in violation of applicable law.

308. Following Ms. Mader's protected activity, Defendants subjected Ms. Mader to severe and pervasive retaliatory harassment designed to punish her for opposing Defendants' unlawful conduct and to coerce her into withdrawing her legal claims. Defendants' retaliatory conduct included, but was not limited to: (1) demoting Ms. Mader from Chief Executive Officer and eliminating her contractual compensation rights; (2) removing Ms. Mader's job responsibilities and restructuring her reporting authority without her consent; (3) Defendant Ferro intimidating Ms. Mader and threatening her employment on July 22, 2025, explicitly reminding her that he had the authority to terminate her at any time; (4) Defendants demanding that Ms. Mader withdraw her legal claims and abandon her opposition to Defendants' unlawful employment practices; (5) manufacturing a pretextual basis for Ms. Mader's termination by commissioning a forensic review of her company email account the day after Defendants were notified of Ms. Mader's legal claims; and (6) terminating Ms. Mader's employment on July 28, 2025 under false pretenses.

309. Ms. Mader's protected activity was the but-for cause of the retaliatory hostile work environment to which she was subjected. Each retaliatory act alleged herein directly followed and escalated in response to Ms. Mader's opposition to Defendants' unlawful conduct. The pattern is unmistakable: Defendants took no steps to demote Ms. Mader, eliminate her compensation, threaten her employment, investigate her conduct, or terminate her until after she opposed their

discriminatory and unlawful practices, and the severity of Defendants' retaliation intensified with each successive act of opposition by Ms. Mader.

310. Defendants' retaliatory conduct was sufficiently severe and pervasive to alter the terms and conditions of Ms. Mader's employment and create a working environment that was hostile, abusive, and intolerable.

311. Ms. Mader subjectively perceived Defendants' retaliatory conduct as hostile, abusive, and threatening to her continued employment. Any reasonable employee in Ms. Mader's position, having been stripped of her title, demoted, threatened with termination by the controlling owner of her employer, subjected to a manufactured investigation, and ultimately fired within days of asserting her legal rights, would have perceived the environment in the same way and would have been dissuaded from engaging in protected activity.

312. As a direct and proximate result of Defendants' retaliatory conduct in violation of the FCRA, Ms. Mader has suffered and will continue to suffer financial and economic damages, emotional distress, mental anguish, loss of dignity, and other intangible damages.

313. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

314. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

315. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

63

## COUNT XIII
### § 11A-26(4), Code of Miami-Dade County
### MDHRO Retaliatory Hostile Work Environment
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

316.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

317.    The MDHRO prohibits retaliating against an employee who has opposed a discriminatory practice, which includes subjecting an employee to a retaliatory hostile work environment. Miami-Dade County, Fla., Code, ch. 11A, art. IV, § 11A-26(4).

318.    Ms. Mader engaged in protected activity under the MDHRO, including but not limited to when Ms. Mader: (1) objected to the demotion and elimination of her contractually promised compensation on or around July 10, 2025; (2) asserted her legal rights through counsel on July 22, 2025; (3) together with her counsel, explicitly informed Defendant Dearborn and Schumm of Ms. Mader's claims for sex discrimination, hostile work environment, and retaliation during the July 26 and 27, 2025 communications; and (4) opposed Defendants' directives to procure prescription medications in violation of applicable law.

319.    Following Ms. Mader's protected activity, Defendants subjected Ms. Mader to severe and pervasive retaliatory harassment designed to punish her for opposing Defendants' unlawful conduct and to coerce her into withdrawing her legal claims. Defendants' retaliatory conduct included, but was not limited to: (1) demoting Ms. Mader from Chief Executive Officer and eliminating her contractual compensation rights; (2) removing Ms. Mader's job responsibilities and restructuring her reporting authority without her consent; (3) Defendant Ferro intimidating Ms. Mader and threatening her employment on July 22, 2025, explicitly reminding her that he had the authority to terminate her at any time; (4) Defendants demanding that Ms. Mader withdraw her legal claims and abandon her opposition to Defendants' unlawful employment practices; (5)

64

manufacturing a pretextual basis for Ms. Mader's termination by commissioning a forensic review of her company email account the day after Defendants were notified of Ms. Mader's legal claims; and (6) terminating Ms. Mader's employment on July 28, 2025 under false pretenses.

320. Ms. Mader's protected activity was the but-for cause of the retaliatory hostile work environment to which she was subjected. Each retaliatory act alleged herein directly followed and escalated in response to Ms. Mader's opposition to Defendants' unlawful conduct. The pattern is unmistakable: Defendants took no steps to demote Ms. Mader, eliminate her compensation, threaten her employment, investigate her conduct, or terminate her until after she opposed their discriminatory and unlawful practices, and the severity of Defendants' retaliation intensified with each successive act of opposition by Ms. Mader.

321. Defendants' retaliatory conduct was sufficiently severe and pervasive to alter the terms and conditions of Ms. Mader's employment and create a working environment that was hostile, abusive, and intolerable.

322. Ms. Mader subjectively perceived Defendants' retaliatory conduct as hostile, abusive, and threatening to her continued employment. Any reasonable employee in Ms. Mader's position, having been stripped of her title, demoted, threatened with termination by the controlling owner of her employer, subjected to a manufactured investigation, and ultimately fired within days of asserting her legal rights, would have perceived the environment in the same way and would have been dissuaded from engaging in protected activity.

323. As a direct and proximate result of Defendants' retaliatory conduct in violation of the MDHRO, Ms. Mader has suffered and will continue to suffer financial and economic damages, emotional distress, mental anguish, loss of dignity, and other intangible damages.

324. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

325.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights under the MDHRO, warranting the imposition of punitive damages in addition to compensatory damages.

326.     Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT XIV**
**Breach of Contract under Florida Law (Transaction Bonus Plan)**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

327.     Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

328.     Under Florida law, a cause of action for breach of contract requires the existence of a valid contract, a material breach of that contract, and resulting damages.

329.     On or about August 8, 2024, Ms. Mader and Defendant eMed Population Health, Inc., at the time doing business as eMed Weight Loss, LLC, entered into a valid, binding contract when Defendants extended an Offer of Employment that explicitly incorporated the eMed Weight Loss, LLC Transaction Bonus Plan as a material term of Ms. Mader's compensation. Under this contract, Ms. Mader was granted a ten percent (10%) participation interest in a Bonus Pool derived from the Net Proceeds of a qualifying Sale Event. The Transaction Bonus Plan was the primary compensation term governing Ms. Mader's employment and was the material inducement for Ms. Mader's acceptance of the CEO position, her forfeiture of previously promised equity, and her relocation to Miami.

330.     Throughout her employment, Ms. Mader performed her day-to-day job responsibilities in Miami-Dade County, Florida, and Defendants' Miami offices served as her primary work location.

331.    Ms. Mader's employment with the eMed Defendants was at all times subject to the PIPA, which Defendants required as a condition of Ms. Mader's employment and which designates exclusive jurisdiction and venue in Miami-Dade County, Florida, and provides that it shall be governed by the laws of the State of Florida. In their July 28, 2025, termination letter, Defendants invoked the PIPA and cited Florida's trade secret laws as the legal basis for Ms. Mader's for-cause termination.

332.    Defendant eMed Population Health, Inc., at the time doing business as eMed Weight Loss, LLC, was a Delaware limited liability company whose governance authority was vested in its Member/Manager, Defendant eMed, LLC, which was controlled by Defendant Ferro. Under the Plan's own terms, Defendant Ferro was the de facto Administrator, and his direction to issue the offer of employment incorporating the Plan and specifying Ms. Mader's ten percent Participation Percentage was the operative act granting her award.

333.    In the alternative, Defendants ratified the Transaction Bonus Plan through their conduct by, including but not limited to, presenting the Plan as a binding and material term of Ms. Mader's compensation; requiring Ms. Mader's spouse to execute a Spousal Consent waiving marital property rights under the Plan; accepting the benefits of Ms. Mader's performance as Chief Executive Officer for over twelve months in reliance on the Plan; and failing to disclaim, amend, or withdraw the Plan at any point until Ms. Mader's participation interest became worth tens of millions of dollars. Defendants may not accept the benefits of a contract they induced Ms. Mader to perform and then disavow that contract when performance is due.

334.    Ms. Mader substantially performed all obligations under the August 8, 2024, offer of employment and the Transaction Bonus Plan, including fulfilling the executive responsibilities for which Defendants recruited her.

67

335. The Transaction Bonus Plan defines a qualifying "Sale Event" as a transaction or series of related transactions with an Independent Third Party pursuant to which that party acquires either more than eighty percent (80%) of the outstanding voting securities of the Company, or assets constituting all or substantially all of the assets of the Company on a consolidated basis, provided the transaction also constitutes a change in control event under Internal Revenue Code Section 409A. The Plan expressly carves out transactions effected solely to change the form of organization or organizational structure without changing ownership.

336. The $100 million Aon investment established an enterprise valuation of approximately $2 billion, making a qualifying Sale Event effectively inevitable, as Defendants knew. Rather than allow that event to materialize and honor their contractual obligation, Defendants preemptively repudiated the Transaction Bonus Plan through the bad-faith corporate conversion on June 28, 2025, and the unilateral elimination of Ms. Mader's participation interest on July 9, 2025, before the qualifying transaction could occur.

337. Under Florida law, anticipatory repudiation occurs when a promisor, by words or voluntary affirmative act, repudiates the contract, renouncing the existing contractual duty, and a non-breaching party need not await the time fixed for performance before asserting her rights. Defendants' conduct constituted an anticipatory repudiation of the Transaction Bonus Plan, for which Ms. Mader is entitled to the full benefit of her bargain. In the alternative, the conversion itself constituted a breach of the Transaction Bonus Plan, as the Plan survived the conversion by operation of law and Defendants' unilateral elimination of Ms. Mader's participation interest on July 9, 2025, was itself a material breach regardless of whether a qualifying Sale Event had yet occurred.

338.    Under Florida law, a contracting party's exercise of discretion under a contractual amendment or termination provision must be exercised reasonably, in good faith, and consistently with the other party's reasonable expectations under the contract.

339.    To the extent Defendants invoke the Plan's reservation of the right to amend or terminate the Plan under Section 5.4 to extinguish Ms. Mader's ten percent participation interest and eliminate her contractual right to share in the proceeds of a qualifying Sale Event, Defendants exercised that discretion in bad faith and with the specific intent to deprive Ms. Mader of the compensation she had earned through her performance, after Defendants had accepted the full benefit of Ms. Mader's reliance on the Plan for over twelve months.

340.    Defendants' exercise of amendment or termination authority under these circumstances constituted an abuse of discretion and a breach of the Plan.

341.    Even assuming, *arguendo*, that the Plan was unsigned or had not yet been formally approved, Defendants ratified the Plan through their conduct. Defendant Ferro, as the controlling equity holder of the eMed Defendants with the authority to bind the entities to contractual obligations, directed the issuance of the August 8, 2024, offer of employment incorporating the Plan and specifying Ms. Mader's ten percent Participation Percentage.

342.    Defendants included the Plan as a material term of Ms. Mader's compensation, accepted Ms. Mader's performance in reliance on the Plan for over twelve months, required Ms. Mader's spouse to waive marital property rights under the Plan, and at no point during Ms. Mader's tenure informed her that the Plan was unadopted, inoperative, or unenforceable.

343.    Defendants' sustained course of conduct was wholly inconsistent with the Plan being an unadopted draft and constituted ratification as a matter of law.

344.    Defendant Ferro, as the controlling equity holder and sole decision-maker of the eMed Defendants, personally directed the issuance of the August 8, 2024, offer of employment

incorporating Ms. Mader's ten percent participation interest in the Transaction Bonus Plan as an express term of her compensation. No Compensation Committee was constituted at any time during Ms. Mader's employment, and Defendant Ferro's authorization and issuance of the offer letter incorporating the Plan constituted the operative corporate act adopting the Plan as to Ms. Mader.

345.    In the alternative, to the extent any condition to the effectiveness of the Transaction Bonus Plan, including its adoption by a Compensation Committee, Ms. Mader's formal selection as a participant, or the occurrence of a qualifying Sale Event, was not satisfied, Defendants' own conduct prevented each such condition from occurring. Defendants controlled whether a Compensation Committee was constituted, whether the Plan was presented for adoption, whether Ms. Mader was formally selected, and whether a qualifying Sale Event was permitted to materialize, and Defendants may not rely on the non-occurrence of conditions that Defendants themselves prevented or on their own failure to observe the corporate formalities necessary to satisfy those conditions.

346.    Defendants' fraudulent intent is further evidenced by their contradictory representations regarding Ms. Mader's equity compensation.

347.    Defendants affirmatively represented to Aon Investments Holdco LLC in the Series A Preferred Stock Purchase Agreement that all equity incentive offers made to corporate officers were accurately reflected in and consistent with the Company's board of directors' records. In stark contrast, Defendants later falsely claimed that the Transaction Bonus Plan was never properly authorized, approved, or adopted.

348.    Defendants' representation of the Plan as a valid equity obligation is irreconcilable with Defendants' subsequent disavowal of the Plan's existence and is evidence of Defendants' fraudulent intent.

70

349. In the alternative, to the extent the Aon investment is itself insufficient to constitute a qualifying Sale Event, the investment was the first transaction in a series of related transactions consummated pursuant to contemporaneous agreements. The Series A Preferred Stock Purchase Agreement, Certificate of Conversion, Certificate of Incorporation, Investors' Rights Agreement, Right of First Refusal and Co-Sale Agreement, and Voting Agreement were all executed as part of a single integrated transaction designed to support a subsequent $300 million equity raise. Defendants eliminated Ms. Mader's participation interest before that series could reach its consummation.

350. Defendants' conversion of eMed Population Health, LLC into eMed Population Health, Inc. was not solely a change to the form of the organization or the organizational structure without changing ownership as excluded by the Transaction Bonus Plan.

351. Defendants executed the conversion of eMed Population Health, LLC into eMed Population Health, Inc. as one component of an integrated transaction sequence that included the closing of a $100,000,000 Series A investment from Aon, the issuance of preferred equity to new institutional investors, and Defendants' stated intention to raise an additional $300,000,000 in equity capital.

352. Defendants' investment transaction with Aon fundamentally altered the ownership and capital structure of the eMed Defendants and was of such magnitude and purpose that it falls outside the Plan's exclusions.

353. eMed, LLC is liable for the foregoing claims. eMed, LLC exercised complete dominion and control over the terms of Ms. Mader's employment, including the agreements at issue, and the employing entity had no independent existence separate from eMed, LLC with respect to employment and compensation decisions. Alternatively, eMed, LLC is liable under the

71

closely related doctrine, as eMed, LLC received a direct benefit from Ms. Mader's employment and it was foreseeable that eMed, LLC would be bound by the obligations arising therefrom.

354.   Pursuant to Delaware statutory conversion law, Defendant eMed Population Health, Inc. is the legal successor to eMed Weight Loss, LLC, is deemed to be the same entity, and assumed by operation of law all contractual obligations owed to Ms. Mader.

355.   As a direct and proximate result of Defendants' material breach, Ms. Mader has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits, including the loss of her multi-million dollar Transaction Bonus payout.

356.   To the extent recoverable as consequential damages flowing from Defendants' breach, and as independently established by the tortious conduct accompanying the breach as alleged herein, Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

357.   Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

358.   Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT XV**
**Breach of Contract under Delaware Law (Transaction Bonus Plan)**
**(Pled in the Alternative)**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

359.   Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

360.   Ms. Mader maintains that her employment relationship and corresponding compensation rights are governed by Florida law pursuant to the overarching PIPA. However, to

the extent Defendants assert, or the Court determines, that Delaware law applies to the Transaction Bonus Plan, Ms. Mader pleads this Count in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)..

361.     Under Delaware law, a cause of action for breach of contract requires the existence of a valid and enforceable contract, the breach of an obligation imposed by that contract, and resultant damages to the plaintiff.

362.     A valid and enforceable contract existed between Ms. Mader and Defendant eMed Population Health, Inc., at the time doing business as eMed Weight Loss, LLC, which explicitly granted Ms. Mader a ten percent (10%) participation interest in a Bonus Pool triggered by a Sale Event.

363.     Defendant eMed Population Health, Inc., at the time doing business as eMed Weight Loss, LLC, was a Delaware limited liability company whose governance authority was vested in its Member/Manager, Defendant eMed, LLC, controlled by Defendant Ferro pursuant to Del. Code Ann. tit. 6, § 18-402. Defendant Ferro was the de facto Administrator under the Plan, and his authorization of Ms. Mader's offer of employment was the operative corporate act adopting her award.

364.     In the alternative, Defendants ratified the Plan by presenting it as a binding term of employment, requiring a Spousal Consent, and accepting the benefits of Ms. Mader's reliance for over twelve months without disclaimer. Having induced Ms. Mader's continued performance through the promise of the Plan, Defendants are estopped from disclaiming it after retaining the full benefit of that performance.

365.     Ms. Mader performed her obligations under the Transaction Bonus Plan, including fulfilling the executive responsibilities for which Defendants recruited her.

366.    Under Delaware law, anticipatory repudiation occurs when a party to a contract, by words or conduct, manifests a clear intent not to perform its contractual obligations before performance is due. Defendants manifested that intent with precision: days after converting the employing entity, they presented Ms. Mader with a document explicitly eliminating her 10% participation interest and substituting an undefined equity arrangement that did not yet exist. Defendants' July 9, 2025, letter was a unilateral declaration that the Transaction Bonus Plan would not be honored. Defendants designed the restructuring to ensure that no qualifying Sale Event would occur during Ms. Mader's tenure, rendering the Plan's Sale Event definition a mechanism for depriving Ms. Mader of her earned compensation rather than a legitimate contractual benchmark.

367.    Under Delaware law, a contracting party's exercise of discretion under a contractual amendment or termination provision must be exercised in good faith, and the implied covenant of good faith and fair dealing may not be eliminated by agreement.

368.    To the extent Defendants invoke the Plan's reservation of the right to amend or terminate the Plan under Section 5.4 to extinguish Ms. Mader's ten percent participation interest and eliminate her contractual right to share in the proceeds of a qualifying Sale Event, Defendants exercised that discretion for the sole purpose of eliminating Ms. Mader's participation interest after Ms. Mader's performance generated the value that made the interest worth tens of millions of dollars.

369.    Defendants' exercise of amendment or termination authority under these circumstances constituted an abuse of discretion and a breach of the Plan.

370.    Even assuming, *arguendo*, that the Plan was unsigned or had not yet been formally approved, Defendants ratified the Plan through their conduct. Defendant Ferro, as the controlling equity holder of the eMed Defendants with the authority to bind the entities to contractual

74

obligations, directed the issuance of the August 8, 2024, offer of employment incorporating the Plan and specifying Ms. Mader's ten percent Participation Percentage.

371.    Defendants included the Plan as a material term of Ms. Mader's compensation, accepted Ms. Mader's performance in reliance on the Plan for over twelve months, required Ms. Mader's spouse to waive marital property rights under the Plan, and at no point during Ms. Mader's tenure informed her that the Plan was unadopted, inoperative, or unenforceable.

372.    Defendants' sustained course of conduct was wholly inconsistent with the Plan being an unadopted draft and constituted ratification as a matter of law.

373.    Defendant Ferro, as the controlling equity holder and sole decision-maker of the eMed Defendants, personally directed the issuance of the August 8, 2024, offer of employment incorporating Ms. Mader's ten percent participation interest in the Transaction Bonus Plan as an express term of her compensation. No Compensation Committee was constituted at any time during Ms. Mader's employment, and Defendant Ferro's authorization and issuance of the offer letter incorporating the Plan constituted the operative corporate act adopting the Plan as to Ms. Mader.

374.    In the alternative, to the extent any condition to the effectiveness of the Transaction Bonus Plan, including its adoption by a Compensation Committee, Ms. Mader's formal selection as a participant, or the occurrence of a qualifying Sale Event, was not satisfied, Defendants' own conduct prevented each such condition from occurring. Defendants controlled whether a Compensation Committee was constituted, whether the Plan was presented for adoption, whether Ms. Mader was formally selected, and whether a qualifying Sale Event was permitted to materialize, and Defendants may not rely on the non-occurrence of conditions that Defendants themselves prevented or on their own failure to observe the corporate formalities necessary to satisfy those conditions.

375. Defendants' fraudulent intent is further evidenced by their contradictory representations regarding Ms. Mader's equity compensation.

376. Defendants affirmatively represented to Aon Investments Holdco LLC in the Series A Preferred Stock Purchase Agreement that all equity incentive offers made to corporate officers were accurately reflected in and consistent with the Company's board of directors' records. In stark contrast, Defendants later falsely claimed that the Transaction Bonus Plan was never properly authorized, approved, or adopted.

377. Defendants' representation of the Plan as a valid equity obligation is irreconcilable with Defendants' subsequent disavowal of the Plan's existence and is evidence of Defendants' fraudulent intent.

378. In the alternative, to the extent the Aon investment is itself insufficient to constitute a qualifying Sale Event, the investment was the first transaction in a series of related transactions consummated pursuant to contemporaneous agreements. The Series A Preferred Stock Purchase Agreement, Certificate of Conversion, Certificate of Incorporation, Investors' Rights Agreement, Right of First Refusal and Co-Sale Agreement, and Voting Agreement were all executed as part of a single integrated transaction designed to support a subsequent $300 million equity raise. Defendants eliminated Ms. Mader's participation interest before that series could reach its consummation.

379. Defendants' conversion of eMed Population Health, LLC into eMed Population Health, Inc. was not solely a change to the form of the organization or the organizational structure without changing ownership as excluded by the Transaction Bonus Plan.

380. Defendants executed the conversion of eMed Population Health, LLC into eMed Population Health, Inc. as one component of an integrated transaction sequence that included the closing of a $100,000,000 Series A investment from Aon, the issuance of preferred equity to new

institutional investors, and Defendants' stated intention to raise an additional $300,000,000 in equity capital.

381. Defendants' investment transaction with Aon fundamentally altered the ownership and capital structure of the eMed Defendants and was of such magnitude and purpose that it falls outside the Plan's exclusions.

382. eMed, LLC is liable for the foregoing claims. eMed, LLC exercised complete dominion and control over the terms of Ms. Mader's employment, including the agreements at issue, and the employing entity had no independent existence separate from eMed, LLC with respect to employment and compensation decisions. Alternatively, eMed, LLC is liable under the closely related doctrine, as eMed, LLC received a direct benefit from Ms. Mader's employment and it was foreseeable that eMed, LLC would be bound by the obligations arising therefrom.

383. As a direct and proximate result of Defendants' material breach, Ms. Mader has suffered and will continue to suffer severe financial and economic damages.

384. To the extent recoverable as consequential damages flowing from Defendants' breach, and as independently established by the tortious conduct accompanying the breach as alleged herein, Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

385. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

386. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT XVIII**
**Breach of Implied Covenant of Good Faith and Fair Dealing under Florida Law**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

387.   Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

388.   Under Florida law, a cause of action for breach of the implied covenant of good faith and fair dealing requires the existence of an express contract, a breach of a specific express contractual provision to which the implied covenant attaches, and that the defendant's actions contravened the reasonable expectations of the contracting parties, resulting in damages.

389.   An express contract existed between Ms. Mader and Defendants governing the terms of Ms. Mader's employment, compensation, and the conditions under which her employment could be terminated. Defendants breached the specific express provisions of the Transaction Bonus Plan governing the payout of the Bonus Pool, and the specific express provisions of the August 8, 2024, offer of employment governing the "for cause" termination standard and the relocation repayment obligation.

390.   The Transaction Bonus Plan expressly vested the Administrator with discretion to select participants and determine Bonus Amounts, and reserved the right to amend or terminate the Plan under Section 5.4. The August 8, 2024, offer of employment further vested Defendants with discretion to determine whether Ms. Mader's termination was "for cause," a determination that directly controls whether Ms. Mader is obligated to repay the $75,000 relocation allowance. These express contractual provisions conferred discretion on Defendants without defined standards governing how that discretion would be exercised, and Defendants exercised that discretion in a manner that was arbitrary, commercially unreasonable, and/or calculated to deprive Ms. Mader of the benefit of her bargain.

78

391.    Throughout her employment, Ms. Mader performed her day-to-day job responsibilities in Miami-Dade County, Florida, and Defendants' Miami offices served as her primary work location.

392.    Ms. Mader's employment with the eMed Defendants was at all times subject to the PIPA, which Defendants required as a condition of Ms. Mader's employment and which designates exclusive jurisdiction and venue in Miami-Dade County, Florida, and provides that it shall be governed by the laws of the State of Florida. In their July 28, 2025, termination letter, Defendants invoked the PIPA and cited Florida's trade secret laws as the legal basis for Ms. Mader's for-cause termination.

393.    Defendants' actions fundamentally contravened the reasonable expectations of the contracting parties. Defendants acted in bad faith by engineering a corporate restructuring specifically to evade the Sale Event classification and extinguish Ms. Mader's contractual compensation rights, and fabricated a for-cause termination based on emails they had previously ignored.

394.    As part of the Aon transaction, Defendant eMed, LLC was contractually required to transfer its assets into the post-conversion entity, concentrating the full value of the enterprise into the entity where Ms. Mader's ten percent participation interest resided. Defendants then eliminated that interest days later.

395.    As a direct and proximate result of Defendants' breach, Ms. Mader has suffered and will continue to suffer financial and economic damages. Defendant eMed Population Health, Inc. is liable for this breach as the statutory successor.

396.    eMed, LLC is liable for the foregoing claims. eMed, LLC exercised complete dominion and control over the terms of Ms. Mader's employment, including the agreements at issue, and the employing entity had no independent existence separate from eMed, LLC with

79

respect to employment and compensation decisions. Alternatively, eMed, LLC is liable under the closely related doctrine, as eMed, LLC received a direct benefit from Ms. Mader's employment and it was foreseeable that eMed, LLC would be bound by the obligations arising therefrom.

397.     To the extent recoverable as consequential damages flowing from Defendants' breach, and as independently established by the tortious conduct accompanying the breach as alleged herein, Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

398.     Defendants further breached the implied covenant of good faith and fair dealing by manufacturing a pretextual for-cause termination to trigger the $75,000 relocation clawback provision contained in Ms. Mader's offer letter. Defendants' assertion of this clawback demand served no legitimate business purpose and was calculated to inflict financial harm upon Ms. Mader in retaliation for the assertion of her legal rights.

399.     Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

400.     Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT XIX
**Breach of Implied Covenant of Good Faith and Fair Dealing under Delaware Law**
**(Pled in the Alternative)**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

401.     Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

402.     Under Delaware law, a cause of action for breach of the implied covenant requires a specific implied contractual obligation (a "gap" in the contract), a breach of that obligation by

the defendant failing to act reasonably to fulfill the parties' shared expectations, and resulting damages.

403.    The Transaction Bonus Plan contained a specific, implicit gap: the parties reasonably expected that Defendants would exercise administrative discretion in good faith and would refrain from engineering a corporate conversion to artificially redefine a qualifying transaction out of the Sale Event category. Had the parties anticipated Defendants' conduct at the time of contracting, they would have expressly prohibited the Administrator from using a corporate conversion to extinguish Ms. Mader's participation interest.

404.    The Transaction Bonus Plan expressly vested the Administrator with discretion to select participants, determine Bonus Amounts, and amend or terminate the Plan. These express contractual provisions conferred discretion on Defendants without defined standards governing how that discretion would be exercised. Under Delaware law, a party vested with contractual discretion is required to exercise that discretion reasonably and in a manner consistent with the parties' reasonable expectations. The implied covenant of good faith and fair dealing attaches to the exercise of such discretion as a matter of law and cannot be disclaimed, waived, or contractually eliminated.

405.    Defendants' invocation of the Plan's internal restructuring carve-out is irreconcilable with Defendants' simultaneous representation to regulators that the converting entities are 'one legal entity.' Defendants' assertion of a break in legal continuity to void Ms. Mader's compensation while claiming complete legal continuity to avoid statutory liability in a separate forum is itself evidence of bad faith.

406.    Defendants further demonstrated bad faith by eliminating Ms. Mader's participation interest in the same transaction sequence in which Defendant eMed, LLC was contractually required to transfer substantially all of its assets into the post-conversion entity.

81

Defendants concentrated the full economic value of the enterprise into the entity where Ms. Mader held a ten percent participation interest, and then eliminated that interest days after the investment closed.

407. The Administrator breached that implied obligation by acting in bad faith to exploit this gap, exercising its discretion maliciously to exclude the $100 million Aon deal to deprive Ms. Mader of the fruits of her agreement. Defendant eMed Population Health, Inc. is strictly liable for this breach.

408. eMed, LLC is liable for the foregoing claims. eMed, LLC exercised complete dominion and control over the terms of Ms. Mader's employment, including the agreements at issue, and the employing entity had no independent existence separate from eMed, LLC with respect to employment and compensation decisions. Alternatively, eMed, LLC is liable under the closely related doctrine, as eMed, LLC received a direct benefit from Ms. Mader's employment and it was foreseeable that eMed, LLC would be bound by the obligations arising therefrom.

409. As a direct and proximate result of Defendants' breach, Ms. Mader has suffered and will continue to suffer financial and economic damages.

410. To the extent recoverable as consequential damages flowing from Defendants' breach, and as independently established by the tortious conduct accompanying the breach as alleged herein, Ms. Mader has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages.

411. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT XX**
**Promissory Estoppel under Florida Law**
*As Against Defendant eMed, LLC and Defendant eMed Population Health, Inc.*

412. Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

413. To the extent Defendants successfully argue that the Transaction Bonus Plan was merely an unadopted draft that lacked the formal requisite elements of a binding contract, Ms. Mader pleads promissory estoppel in the alternative.

414. Under Florida law, a cause of action for promissory estoppel requires that the defendant made a representation or promise; the defendant reasonably should have expected the representation to induce action or forbearance by the plaintiff; the plaintiff reasonably relied on the representation and took action to her detriment; and injustice can be avoided only by enforcing the promise.

415. Throughout her employment, Ms. Mader performed her day-to-day job responsibilities in Miami-Dade County, Florida, and Defendants' Miami offices served as her primary work location.

416. Ms. Mader's employment with the eMed Defendants was at all times subject to the PIPA, which Defendants required as a condition of Ms. Mader's employment and which designates exclusive jurisdiction and venue in Miami-Dade County, Florida, and provides that it shall be governed by the laws of the State of Florida. In their July 28, 2025, termination letter, Defendants invoked the PIPA and cited Florida's trade secret laws as the legal basis for Ms. Mader's for-cause termination.

417. Defendants made a definite promise to Ms. Mader that she would receive a ten percent participation interest in the Net Proceeds of a qualifying Sale Event, as set forth in the August 8, 2024, offer of employment and the Transaction Bonus Plan incorporated therein. The

promise was specific as to its material terms, identifying the participation percentage, the triggering event, and the method of calculation.

418.   The promise conferred upon Ms. Mader a valuable contractual right to participate in the proceeds of a future qualifying transaction. That right had independent value from the moment it was conferred, regardless of whether the triggering condition had yet occurred.

419.   Defendants extinguished Ms. Mader's participation right through the July 9, 2025, Change of Position letter before the triggering condition could be satisfied, after Ms. Mader's performance had generated the very value that made her participation interest worth tens of millions of dollars.

420.   Defendants made this promise fully expecting it to induce Ms. Mader to accept the position of Chief Executive Officer, relocate her life and career to Miami, and commit to building Defendants' weight management division. In reliance on Defendants' promise, Ms. Mader accepted the CEO role, forfeited her previously promised 500,000 equity units in the entity designated as eMed Enterprise, LLC, relocated to Miami, and devoted over twelve months of executive performance to Defendants' enterprise.

421.   As a direct and proximate result of Defendants' breach of their promise, Ms. Mader has suffered substantial damages, including but not limited to the loss of the value of the Transaction Bonus Plan participation interest that Ms. Mader's performance directly generated, the forfeiture of her prior employment and equity, and the costs and disruption of her relocation to Miami, Florida.

422.   Injustice can be avoided only by enforcing Defendants' promise and awarding Ms. Mader the value of the 10% bonus pool. Defendant eMed Population Health, Inc. is liable for this equitable claim as the statutory successor.

423. eMed, LLC is liable for the foregoing claims. eMed, LLC exercised complete dominion and control over the terms of Ms. Mader's employment, including the agreements at issue, and the employing entity had no independent existence separate from eMed, LLC with respect to employment and compensation decisions. Alternatively, eMed, LLC is liable under the closely related doctrine, as eMed, LLC received a direct benefit from Ms. Mader's employment and it was foreseeable that eMed, LLC would be bound by the obligations arising therefrom.

424. As a direct and proximate result of her justifiable reliance, Ms. Mader has suffered and will continue to suffer financial and economic damages, emotional distress, and mental anguish.

425. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

426. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT XXII
### Fraudulent Inducement under Florida Law
*As Against Defendant Ferro, Defendant Dearborn, and Defendant eMed, LLC*

427. Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

428. Under Florida law, a cause of action for fraudulent inducement requires a false statement concerning a material fact, the representor's knowledge that the representation is false, an intention that the representation induce the plaintiff to act on it, and consequent injury sustained by the plaintiff acting in reliance on the representation. A promise of future action is actionable as fraud where the person making the promise did so with no intention of performing or with a positive intention not to perform at the time the promise was made.

85

429. Throughout her employment, Ms. Mader performed her day-to-day job responsibilities in Miami-Dade County, Florida, and Defendants' Miami offices served as her primary work location.

430. Ms. Mader's employment with the eMed Defendants was at all times subject to the PIPA, which Defendants required as a condition of Ms. Mader's employment and which designates exclusive jurisdiction and venue in Miami-Dade County, Florida, and provides that it shall be governed by the laws of the State of Florida. In their July 28, 2025, termination letter, Defendants invoked the PIPA and cited Florida's trade secret laws as the legal basis for Ms. Mader's for-cause termination.

431. On or about August 8, 2024, in Miami, Florida, Defendants, acting through Kenneth Finneran, Defendants' Chief Human Resources Officer, presented Ms. Mader with a written offer of employment that incorporated the Transaction Bonus Plan and a ten percent participation interest therein as a defined and material term of Ms. Mader's compensation as Chief Executive Officer. Defendant Ferro personally directed the issuance of this offer and personally authorized the inclusion of the Transaction Bonus Plan as a material term of Ms. Mader's compensation.

432. The Transaction Bonus Plan was attached to and integrated into the August 8, 2024, offer of employment as a material inducement for Ms. Mader to accept the CEO role, relocate her life and career to Miami, and commit to building Defendants' weight loss and population health division. In reliance on these representations, Ms. Mader accepted the position, forfeited her previously promised 500,000 equity units in the entity designated as eMed Enterprise, LLC, and relocated to Miami.

433. Defendants, including Defendant Ferro, reinforced these written representations through oral communications with Ms. Mader during the recruitment process in or around 2023 through August 2024, in which Defendants represented that Ms. Mader's participation interest in

the Transaction Bonus Plan was a significant and valuable component of her compensation and that Defendants intended to honor it.

434. Defendant Ferro knew these representations were false at the time they were made, or made them with reckless disregard for their truth. Defendant Ferro made the compensation promises set forth in the August 8, 2024, offer of employment with no intention of honoring them, intending instead to use Ms. Mader's industry credibility and executive relationships to secure institutional investment and then to extinguish her compensation rights before she could collect on them.

435. Defendant Dearborn, upon joining the eMed Defendants in or around September 2024, adopted and furthered these misrepresentations with knowledge that Defendants did not intend to honor them. Defendant Dearborn's specific participation in the fraudulent scheme included exercising direct supervisory authority over Ms. Mader with knowledge that her compensation had been procured through promises Defendants did not intend to honor, participating in compensation decisions affecting Ms. Mader's employment, personally drafting the 2025 Annual Incentive Plan expanding compensation programs for male executives during the same period in which Defendants were preparing to eliminate Ms. Mader's Transaction Bonus Plan, and actively participating in engineering the corporate conversion and the July 9, 2025 Change of Position letter that extinguished Ms. Mader's contractual rights.

436. Defendant Dearborn knew that Ms. Mader's employment and continued performance had been induced by the compensation promises set forth in the August 8, 2024, offer of employment and participated in the scheme to extinguish those promises with reckless disregard for Ms. Mader's rights.

437. Defendant eMed, LLC is liable for the foregoing fraudulent inducement. Defendant Ferro acted as an agent and controlling equity holder of Defendant eMed, LLC in directing the

issuance of the August 8, 2024, offer of employment and in personally authorizing the inclusion of the Transaction Bonus Plan. Defendant Ferro's representations were made within the scope of his authority and on behalf of Defendant eMed, LLC.

438.    Defendants' fraudulent intent is evidenced by the manner in which they extinguished Ms. Mader's compensation rights. Rather than honor Ms. Mader's ten percent participation interest in the Transaction Bonus Plan, Defendants eliminated it entirely and attempted to substitute 500,000 stock options under an equity incentive plan that did not yet exist, whose terms had not been defined, and whose economic value was entirely speculative and unquantifiable. Defendants did not offer Ms. Mader a comparable ten percent interest in the post-conversion entity or any compensation of equivalent value. The substitution of a defined ten percent participation interest in the Net Proceeds of a qualifying Sale Event with an undefined, unvalued grant of stock options in a plan that had not been created confirms that Defendants never intended to compensate Ms. Mader at the level they promised when they recruited her.

439.    The speed with which Defendants executed this scheme further evidences their fraudulent intent. Defendants closed the $100 million Aon investment on or about April 30, 2025, converted the employing entity on June 28, 2025, eliminated Ms. Mader's Transaction Bonus Plan on July 9, 2025, and terminated her employment on July 28, 2025, completing the entire sequence within ninety days of the investment closing and within thirty days of the conversion.

440.    Ms. Mader justifiably relied on these representations to her detriment, accepting the CEO position, relocating her life and career to Miami, and committing over twelve months of executive performance to Defendants' enterprise. Ms. Mader's reliance damages, including the forfeiture of her prior equity, the costs of her relocation, and the loss of alternative professional opportunities, are separate and distinct from any damages arising from the breach of the Transaction Bonus Plan itself.

88

441.    To the extent Defendants contend that the Transaction Bonus Plan's Sale Event definition was drawn so narrowly that no foreseeable transaction in the ordinary course of the eMed Defendants' business would ever qualify, those representations were material misrepresentations from inception. Defendants used the promise of a ten percent participation interest to recruit Ms. Mader, induce her reliance, and extract over twelve months of executive performance, despite knowing or believing at the time the promise was made that the Plan was structured in a manner that would prevent Ms. Mader from ever collecting on it. A compensation promise that Defendants designed to be uncollectible was not a good-faith term of employment. It was a mechanism to secure Ms. Mader's labor and industry credibility under false pretenses, and Defendants' subsequent conduct in eliminating the Plan at the precise moment its value was about to be realized confirms that Defendants never intended to honor it.

442.    Defendants' fraudulent intent is further evidenced by their contradictory representations regarding Ms. Mader's compensation. Defendants presented the Transaction Bonus Plan to Ms. Mader as a binding and material term of her compensation, and affirmatively represented to Aon in the Series A Preferred Stock Purchase Agreement that all equity incentive offers made to corporate officers were accurately reflected in and consistent with the Company's board of directors' records. In stark contrast, Defendants later claimed that the Plan was a draft that was never properly adopted. Defendants' contradictory representations to Ms. Mader, to Aon, and in subsequent proceedings are irreconcilable and evidence a deliberate scheme to induce Ms. Mader's performance through compensation promises Defendants never intended to honor.

443.    As a direct and proximate result of Defendants' fraudulent inducement, Ms. Mader has suffered and will continue to suffer financial and economic damages, emotional distress, mental anguish, loss of dignity, and other intangible damages.

444. Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

445. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights, warranting the imposition of punitive damages in addition to compensatory damages.

446. Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT XXIV
**Tortious Interference with Business Relationship under Florida Law**
*As Against Defendant Ferro and Defendant Dearborn*

447. Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

448. Under Florida law, a cause of action for tortious interference with a business relationship requires the existence of a business relationship or contract, the defendant's knowledge of the relationship, an intentional and unjustified interference with the relationship by the defendant, and damage to the plaintiff. A corporate officer is not immune from liability for tortious interference where the officer acts outside the scope of legitimate corporate authority, with malice, or to serve personal interests separate from the corporation's interests.

449. Throughout her employment, Ms. Mader performed her day-to-day job responsibilities in Miami-Dade County, Florida, and Defendants' Miami offices served as her primary work location.

450. Ms. Mader's employment with the eMed Defendants was at all times subject to the PIPA, which Defendants required as a condition of Ms. Mader's employment and which designates exclusive jurisdiction and venue in Miami-Dade County, Florida, and provides that it shall be governed by the laws of the State of Florida. In their July 28, 2025, termination letter, Defendants

invoked the PIPA and cited Florida's trade secret laws as the legal basis for Ms. Mader's for-cause termination.

451. Ms. Mader had a valid employment and compensation relationship with eMed Weight Loss, LLC, governed by the August 8, 2024, offer of employment. That relationship included an annual salary of $400,000, a $75,000 relocation allowance, and a ten percent (10%) participation interest in the Transaction Bonus Plan, the value of which, following the $100 million Aon investment, was worth tens of millions of dollars.

452. Defendant Ferro and Defendant Dearborn had actual knowledge of every material term of Ms. Mader's employment and compensation because Defendant Ferro personally directed Ms. Mader's recruitment, and both Defendant Ferro and Defendant Dearborn controlled the compensation decisions that governed her employment.

453. Defendant Ferro and Defendant Dearborn intentionally and unjustifiably interfered with Ms. Mader's employment and compensation relationship through a series of deliberate acts, including: personally directing the corporate conversion of eMed Population Health, LLC to eMed Population Health, Inc. on June 28, 2025, which served as the vehicle for extinguishing the Transaction Bonus Plan; personally directing Finneran to issue the July 9, 2025 Change of Position letter that stripped Ms. Mader of her CEO title and eliminated her 10% participation interest; personally calling Ms. Mader on July 22, 2025, to threaten her employment after Ms. Mader asserted her legal rights and retained legal representation; personally directing or approving the retention of a forensic expert on July 23, 2025, to identify post-hoc grounds for termination; and personally directing or approving the fabricated for-cause termination issued on July 28, 2025.

454. Defendant Ferro and Defendant Dearborn did not act in furtherance of any legitimate corporate interest. Defendant Ferro and Defendant Dearborn were motivated by personal malice toward Ms. Mader, by documented sex-based animus toward her as a woman, by

91

a personal desire to retaliate against Ms. Mader for objecting to and opposing Defendants' directives to bypass clinical protocols to procure GLP-1 medications for his personal associates, and by their personal financial interest in eliminating the Transaction Bonus Plan obligation, which directly increased the equity pool available to Defendant Ferro, Defendant Dearborn, and other insiders following the corporate conversion.

455.    Defendant Ferro's conduct toward Ms. Mader is consistent with a documented pattern of predatory and discriminatory behavior directed at female professionals that preceded his involvement with the eMed Defendants. These motivations were personal to Defendant Ferro and Defendant Dearborn and wholly unrelated to any legitimate business objective of eMed Weight Loss, LLC or any other eMed entity.

456.    As a direct and proximate result of Defendant Ferro's and Defendant Dearborn's intentional interference, Ms. Mader has suffered and will continue to suffer financial and economic damages, emotional distress, mental anguish, loss of dignity, and other intangible damages.

457.    Defendant Ferro and Defendant Dearborn's interference is further demonstrated by their role in manufacturing a pretextual for-cause termination to trigger a $75,000 relocation clawback demand against Ms. Mader. The assertion of this punitive financial demand against Ms. Mader, in the immediate aftermath of her retention of legal counsel, reflects personal malice and retaliatory intent wholly outside the scope of any legitimate corporate purpose or privilege.

458.    Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

459.    Defendant Ferro's and Defendant Dearborn's actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights, warranting the imposition of punitive damages in addition to compensatory damages.

460.    Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT XXV**
**Tortious Interference with Contract under Delaware Law**
**(Pled in the Alternative)**
*As Against Defendant Ferro and Defendant Dearborn*

461.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

462.    Under Delaware law, a cause of action for tortious interference with a contract requires that there was a contract about which the defendant knew, an intentional act that was a significant factor in causing the breach, the act was without justification, and it caused injury. Furthermore, to overcome the "Affiliate Privilege Doctrine," a plaintiff must show the corporate officer was not pursuing legitimate profit-seeking activities in good faith, but was motivated by a malicious or bad faith purpose.

463.    Defendant Ferro and Defendant Dearborn had actual knowledge of Ms. Mader's Transaction Bonus Plan and the ten percent participation interest it provided. Defendant Ferro and Defendant Dearborn intentionally engineered the July 2025 corporate restructuring specifically to extinguish Ms. Mader's contractual rights under the Transaction Bonus Plan. Defendant Ferro and Defendant Dearborn directed the conversion of the employing entity on June 28, 2025, directed the issuance of a revised offer letter on July 9, 2025, that explicitly eliminated Ms. Mader's participation interest, and directed the fabricated for-cause termination on July 28, 2025, to extinguish any remaining contractual obligations owed to Ms. Mader. Each of these acts was a significant factor in causing the breach of Ms. Mader's contractual rights.

464.    Defendant Ferro and Defendant Dearborn acted in bad faith and outside any legitimate profit-seeking activity. Defendant Ferro and Defendant Dearborn were motivated by

93

personal malice, sex-based animus, and retaliatory intent directed at Ms. Mader personally. Defendant Ferro's and Defendant Dearborn's conduct was driven by their desire to punish Ms. Mader for opposing his unlawful clinical directives and for asserting her employment rights, motivations wholly separate from any legitimate corporate purpose.

465.    As a direct and proximate result of Defendant Ferro's and Defendant Dearborn's intentional interference, Ms. Mader has suffered and will continue to suffer financial and economic damages, emotional distress, mental anguish, loss of dignity, and other intangible damages.

466.    Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

467.    Defendant Ferro's and Defendant Dearborn's actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights, warranting the imposition of punitive damages in addition to compensatory damages.

468.    Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT XXVI
**Civil Conspiracy under Florida Law**
*As Against Defendant Ferro, Defendant Dearborn, and Defendant eMed, LLC*

469.    Ms. Mader repeats and realleges Paragraphs 38 through 128, as if fully set forth herein.

470.    Under Florida law, a cause of action for civil conspiracy requires an agreement between two or more parties to do an unlawful act or to do a lawful act by unlawful means, the doing of some overt act in pursuance of the conspiracy, and damage to the plaintiff.

471.    Throughout her employment, Ms. Mader performed her day-to-day job responsibilities in Miami-Dade County, Florida, and Defendants' Miami offices served as her primary work location.

94

472.     Ms. Mader's employment with the eMed Defendants was at all times subject to the PIPA, which Defendants required as a condition of Ms. Mader's employment and which designates exclusive jurisdiction and venue in Miami-Dade County, Florida, and provides that it shall be governed by the laws of the State of Florida. In their July 28, 2025, termination letter, Defendants invoked the PIPA and cited Florida's trade secret laws as the legal basis for Ms. Mader's for-cause termination.

473.     Defendant Ferro and Defendant Dearborn reached an agreement, prior to or contemporaneously with the July 2025 restructuring, to use Ms. Mader's industry credibility and executive relationships to secure institutional investment for the eMed Defendants, and then to eliminate her contractual compensation before she could collect it. The existence of this agreement is evidenced by the coordinated sequence of acts that could not have occurred without advance planning between Defendant Ferro and Defendant Dearborn.

474.     In furtherance of this conspiracy, Defendant Ferro and Defendant Dearborn committed the following overt acts: (a) executing the corporate conversion of eMed Population Health, LLC to eMed Population Health, Inc. on June 28, 2025, structured to serve as the vehicle for extinguishing the Transaction Bonus Plan; (b) directing the issuance of the July 9, 2025 Change of Position letter that eliminated Ms. Mader's CEO title and her ten percent participation interest; (c) retaining a forensic expert on July 23, 2025, the day after Ms. Mader asserted her legal rights, to identify post-hoc grounds for termination; (d) simultaneously urging Ms. Mader to withdraw her claims over the weekend of July 26 and 27, 2025; and (e) issuing the fabricated for-cause termination on July 28, 2025, after Ms. Mader refused to capitulate.

475.     Defendant Ferro and Defendant Dearborn accomplished the object of the conspiracy through independently actionable unlawful means, including the fraudulent inducement alleged in Count XXII of this Complaint and the retaliatory termination of Ms. Mader's

95

employment in violation of Title VII, the FCRA, the MDHRO, and the FPWA as alleged in Counts VII through X of this Complaint.

476.    Defendant Ferro acted to serve personal interests that were wholly separate from, and adverse to, any legitimate corporate purpose of the eMed Defendants, including but not limited to: (a) sex-based discriminatory animus toward Ms. Mader, which was in violation of state and federal law, served no legitimate corporate purpose, and which motivated Defendant Ferro's sustained campaign to demean, marginalize, and ultimately terminate Ms. Mader's employment as Chief Executive Officer; (b) a direct personal financial interest, as the controlling equity holder of the eMed Defendants, in eliminating Ms. Mader's Transaction Bonus Plan to increase the equity pool available to Defendant Ferro individually in the post-conversion entity; (c) an interest in engaging in self-dealing by engineering the elimination of a corporate obligation owed to Ms. Mader for his own personal financial benefit, in disregard of the eMed Defendants' interest in retaining executive talent and preserving the contractual commitments upon which their business relationships depend; and (d) an interest in terminating Ms. Mader's employment and removing her from the organization due to her objection to and opposition of the unlawful procurement of prescription medications for Defendant Ferro's personal associates outside of required clinical protocols.

477.    None of Defendant Ferro's personal interests served a legitimate corporate purpose, and each was adverse to the eMed Defendants' interest in maintaining their contractual credibility and business relationships, preserving organizational stability and continuity of executive leadership at a critical stage of the eMed Defendants' growth, and ensuring compliance with applicable state and federal law. Defendant Ferro's personal interests were not merely incidental to the interests of the eMed Defendants but were in fact directly adverse to and in conflict with the eMed Defendants' legitimate corporate interests.

96

478.     Defendant Dearborn acted to serve personal interests that were wholly separate from, and adverse to, any legitimate corporate purpose of the eMed Defendants, including but not limited to: (a) a direct personal financial interest, as an individual equity stakeholder in the eMed Defendants, in eliminating Ms. Mader's Transaction Bonus Plan to increase the equity available to Defendant Dearborn individually in the post-conversion entity; (b) an interest in engaging in self-dealing by participating in the elimination of a corporate obligation owed to Ms. Mader for his own personal financial benefit, in disregard of the eMed Defendants' interest in preserving the contractual commitments upon which their business relationships depend; and (c) personal participation in inducing Ms. Mader's employment through compensation representations that Defendant Dearborn adopted and furthered with knowledge that Defendants did not intend to honor them.

479.     None of Defendant Dearborn's personal interests served a legitimate corporate purpose, and each was adverse to the eMed Defendants' interest in maintaining their contractual credibility and business relationships, preserving organizational stability and continuity of executive leadership at a critical stage of the eMed Defendants' growth, and ensuring compliance with applicable state and federal law. Defendant Dearborn's personal interests were not merely incidental to the interests of the eMed Defendants but were in fact directly adverse to and in conflict with the eMed Defendants' legitimate corporate interests.

480.     Each Defendant maintained a personal stake in the conspiracy's outcome that was separate from and adverse to the interests of the eMed Defendants. Each Defendant acted outside the scope of legitimate corporate authority by engineering a scheme to defraud the eMed Defendants' Chief Executive Officer of her contractual compensation rights for their own personal financial enrichment and, in Defendant Ferro's case, in furtherance of sex-based animus and unlawful retaliation.

97

481.    As a direct and proximate result of Defendants' civil conspiracy, Ms. Mader has suffered and will continue to suffer financial and economic damages, emotional distress, mental anguish, loss of dignity, and other intangible damages.

482.    Ms. Mader accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

483.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Mader's rights, warranting the imposition of punitive damages in addition to compensatory damages.

484.    Ms. Mader further requests that her attorney's fees and costs be awarded as permitted by law.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against Defendants for all damages suffered by Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, punitive damages, emotional distress damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendants' conduct in violation of Title VII, the FCRA, the MDHRO, the Florida Private Sector Whistleblower Act, and under the common law for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, fraudulent inducement, tortious interference, and civil conspiracy, and for such further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Kyle T. MacDonald*
Kyle T. MacDonald, Esq.
Florida Bar No.: 1038749

**MACDONALD LAW, PLLC**
420 SW 7th Street, Suite 1118
Miami, FL 33130
Tel: (786) 500-9675
Email: kyle@macdonaldemploymentlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 6th day of August, 2026, a true and correct copy of the foregoing document was served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Kyle T. MacDonald*
Kyle T. MacDonald, Esq.