**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

WENDI MADER,

Plaintiff,

v.

EMED, LLC
EMED POPULATION HEALTH, INC.,
f/k/a EMED POPULATION HEALTH,
LLC, f/k/a EMED WEIGHT LOSS, LLC;
MICHAEL FERRO; and
JUSTIN DEARBORN,

Defendants.

Case No.: 1:26-CV-23258-JTK

---

**DEFENDANTS' OMNIBUS MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....... 1

FACTUAL BACKGROUND ....... 4

ARGUMENT ....... 8

I. PLAINTIFF FAILS TO STATE CLAIMS FOR DISCRIMINATION OR RETALIATION UNDER TITLE VII, FCRA, OR MDHRO (COUNTS I–IX, XI–XIII). ....... 8

A. Plaintiff Fails to State Claims for Gender Discrimination (Counts I–III). ....... 8

B. Plaintiff Fails to State Claims for Hostile Work Environment (Counts IV–VI). ....... 10

C. Plaintiff Fails to State Claims for Retaliation (Counts VII–IX). ....... 14

D. Plaintiff Fails to State Claims for Retaliatory Hostile Work Environment (Counts XI, XII, and XIII). ....... 17

II. PLAINTIFF HAS NOT PLAUSIBLY ALLEGED A FPWA CLAIM (COUNT X). ....... 18

III. ANY CLAIMS "WITH RESPECT TO THE PLAN" CAN ONLY BE BROUGHT IN DELAWARE PURSUANT TO THE PLAN'S FORUM SELECTION CLAUSE (COUNTS XIV, XV, XVIII, XIX, XX, XXII, XXV). ....... 21

IV. PLAINTIFF FAILS TO ADEQUATELY ALLEGE THAT THE DRAFT PLAN WAS A CONTRACT OR WAS BREACHED (COUNTS XIV, XV). ....... 23

V. PLAINTIFF FAILS TO STATE CLAIMS FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNTS XVIII, XIX). ....... 26

VI. PLAINTIFF FAILS TO STATE A CLAIM FOR PROMISSORY ESTOPPEL (COUNT XX). ....... 27

VII. PLAINTIFF FAILS TO PLEAD FRAUDULENT INDUCEMENT (COUNT XXII). ....... 29

VIII. PLAINTIFF FAILS TO STATE CLAIMS FOR TORTIOUS INTERFERENCE (COUNTS XXIV–XXV). ....... 32

A. The Individual Defendants are Not Strangers to eMed's Relationships. ....... 32

B. Plaintiff Has No Underlying Contract that was Breached. ....... 33

C. Plaintiff Pleads No Legitimate Expectancy of the CEO Role or Continued Employment. ....... 33

IX. PLAINTIFF FAILS TO STATE A CIVIL CONSPIRACY CLAIM (COUNT XXVI). ....... 34

A. Plaintiff Pleads No Underlying Wrong or Unlawful Act. ....... 34

B. The Intra-Corporate Conspiracy Doctrine Bars Plaintiff's Conspiracy Claims. ....................35

CONCLUSION....................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr.*,
2019 WL 12304839 (S.D. Fla. Aug. 21, 2019)....27

*Advanced Mktg. Sys. Corp. v. ZK Yacht Sales*,
830 So. 2d 924 (Fla. 4th DCA 2002)....28

*Advanced Prot. Techs., Inc. v. Square D Co.*,
2005 WL 8185594 (M.D. Fla. Jan. 31, 2005)....29

*AIU Ins. Co. v. Philips Electronics No. Am. Corp.*,
2018 WL 367849 (Del. Ch. Jan. 11, 2018)....24

*Arafat v. Sch. Bd. of Broward Cnty*.,
549 F. App'x 872 (11th Cir. 2013)....9

*Bailey v. Tektronix, Inc.*,
2022 WL 4132881 (D. Del. Sept. 12, 2022), *aff'd*, 2025 WL 1341876 (3d Cir. May 8, 2025)....26, 27

*Baldwin v. Blue Cross/Blue Shield of Alabama*,
480 F.3d 1287 (11th Cir. 2007)....16

*Bardelas v. City of Doral*,
2021 WL 12313738 (S.D. Fla. Aug. 23, 2021)....11, 12

*Barreth v. Reyes I, Inc.*,
2020 WL 4370137 (M.D. Ga. Jul. 29, 2020)....12

*Bentley v. Bank of Am., N.A.*,
773 F. Supp. 2d 1367 (S.D. Fla. 2011)....33

*Black v. Reynolds*,
150 F. Supp. 3d 1273 (S.D. Ala. 2015), *aff'd,* 674 F. App'x 851 (11th Cir. 2016)....15

*Blash v. City of Hawkinsville*,
2018 WL 3150346 (M.D. Ga. June 27, 2018)....11, 13

*Bluesky Greenland Env't Sols., LLC v. Rentar Env't Sols., Inc.*,
2013 WL 12095168 (S.D. Fla. Apr. 19, 2013)....22

*Bridge Fin., Inc. v. J. Fischer & Assocs., Inc.*,
310 So. 3d 45 (Fla. 4th DCA 2020) ....................33

*Brooks v. Blue Cross and Blue Shield of Fla., Inc.*,
116 F.3d 1364 (11th Cir. 1997) ....................3

*Brown v. Railcrew Xpress LLC*,
2022 WL 22894863 (N.D. Ala. Feb. 15, 2022) ....................12

*Butterfield v. JetBlue Airways Corp.*,
2022 WL 291003 (11th Cir. Feb. 1, 2022) ....................20

*Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*,
2022 WL 2761720 (11th Cir. July 15, 2022)....................15

*Cambridge N. Point LLC v. Boston & Maine Corp.*,
2010 WL 2476424 (Del. Ch. June 17, 2010)....................24

*Carey v. Kirk*,
2026 WL 836688 (11th Cir. Mar. 26, 2026)....................35

*Casey v. Bank of Am., N.A.*,
2014 WL 12580515 (S.D. Fla. Mar. 12, 2014)....................27

*Clear Marine Ventures, Ltd. v. Brunswick Corp.*,
2009 WL 10667205 (S.D. Fla. Apr. 6, 2009) ....................31

*Colson v. Wal-Mart Stores, Inc.*,
2019 WL 5102173 (S.D. Fla. Oct. 11, 2019)....................8

*Commodores Ent. Corp. v. McClary*,
324 F. Supp. 3d 1245 (M.D. Fla. 2018), *aff'd,* 822 F. App'x 904 (11th Cir. 2020) ....................33

*Core Distribution v. World Trade Corp.*,
2026 WL 1251628 (S.D. Fla. May 7, 2026) ....................32, 33

*Costanza Y Cruz Medina v. Scottsdale Ins. Co.*,
2023 WL 11801301 (S.D. Fla. Mar. 7, 2023)....................30

*Crawford v. Carroll*,
529 F.3d 961 (11th Cir. 2008) ....................14

*Crawley-Kitzman v. Hernandez*,
324 So. 3d 968 (Fla. 3d DCA 2021) ....................34

*In re CVR Ref., LP Unitholder Litig.*,
2020 WL 506680 (Del. Ch. Jan. 31, 2020) ....................32, 33

*Davis v. Yellowpages.com LLC*,
2017 WL 11742750 (N.D. Ga. July 21, 2017)....................26

*Day v. Taylor*,
400 F.3d 1272 (11th Cir. 2005)....................23

*Debose v. Univ. of S. Fla.*,
178 F. Supp. 3d 1258 (M.D. Fla. 2016)....................34

*Dieckman v. Regency GP LP*,
2018 WL 1006558 (Del. Ch. 2018)....................33

*Dixon v. Allergan USA, Inc.*,
645 F. App'x 930 (11th Cir. 2016)....................30

*Doe v. Miami Gardens Square One, Inc.*,
2025 WL 81528 (S.D. Fla. Jan. 13, 2025)....................8

*Drisin v. Fla. Int'l Univ. Bd. of Trs.*,
2017 WL 3505299 (S.D. Fla. June 27, 2017)....................9

*Edward L. Nezelek, Inc. v. Sunbeam Television Corp.*,
413 So. 2d 51 (Fla. 3d DCA 1982)....................24

*Erickson v. Lakeland Regional Medical Ctr., Inc.*,
2022 WL 1487588 (M.D. Fla. May 11, 2022)....................17

*Escarra v. Regions Bank*,
353 F. App'x 401 (11th Cir. 2009)....................29

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998)....................11

*Fin. Healthcare Assocs., Inc. v. Pub. Health Tr. of Miami-Dade Cnty.*,
488 F. Supp. 2d 1231 (S.D. Fla. 2007)....................28

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*,
500 F.3d 1276 (11th Cir. 2007)....................10

*Fleming v. The Fla. Bar*,
994 F. Supp. 2d 1255 (N.D. Fla. 2014)....................10, 16

*Francois v. Hatami*,
565 F. Supp. 3d 1259 (S.D. Fla. 2021)....................34

*Fried v. Stiefel Laboratories, Inc.*,
2012 WL 4364300 (S.D. Fla. June 8, 2012)....................28

*Gerbier v. J.R. Eight, Inc.*,
2011 WL 13268707 (S.D. Fla. Aug. 12, 2011)....13

*Gessner v. S. Co.*,
2026 WL 1488160 (Fla. May 28, 2026)....2, 18

*Global Cap. P's v. Green Sapphire Holdings, Inc.*,
355 A.3d 120 (Del. Ch. 2026)....24

*Goldsmith v. Bagby Elevator Co.*,
513 F.3d 1261 (11th Cir. 2008)....14

*Grape Stars Int'l, Inc. v. nVentive, Inc.*,
2020 WL 4586123 (S.D. Fla. Aug. 10, 2020)....22

*Gregory v. Ga. Dep't of Human Res.*,
355 F.3d 1277 (11th Cir. 2004)....10

*Griffith v. Ga. Cyber Academy*,
2026 WL 1450484 (N.D. Ga. Jan. 30, 2026)....9

*Gulf Grp. Holdings, Inc. v. Coast Asset Mgmt. Corp.*,
516 F. Supp. 2d 1253 (S.D. Fla. 2007)....27

*Harper v. Blockbuster Ent. Corp.*,
139 F.3d 1385 (11th Cir. 1998)....8

*Harvey v. MD Now*,
2024 WL 6886986 (S.D. Fla. Mar. 4, 2024)....19, 20

*Haugabrook v. Cason*,
518 Fed. App'x. 803 (11th Cir. 2013)....10

*Hercules Cap., Inc. v. Gittleman*,
2018 WL 395489 (S.D. Fla. Jan. 12, 2018)....34

*Hogan v. City of Fort Walton Beach*,
817 F. App'x 717 (11th Cir. 2020)....35

*Ins. Concepts & Design, Inc. v. Healthplan Services, Inc.*,
785 So. 2d 1232 (Fla. 4th DCA 2001)....26

*Jenkins v. Miami Dade Cnty.*,
688 F. Supp. 3d 1240 (S.D. Fla. 2023)....14

*Jones v. Unity Behav. Health, LLC*,
2021 WL 5495578 (11th Cir. Nov. 23, 2021)....15

*Kanen v. BBQ Holdings, Inc.*,
2024 WL 5508197 (S.D. Fla. Nov. 8, 2024)....................30

*Kavanaugh v. Miami-Dade Cnty.*,
775 F. Supp. 2d 1361 (S.D. Fla. 2011)....................16

*Kuppinger v. JM.JZ Enterprises, Inc.*,
2022 WL 2341240 (S.D. Fla. May 9, 2022)....................24

*Lambert v. Alabama Dep't of Youth Servs.*,
150 F. App'x 990 (11th Cir. 2005)....................10

*Lapham v. Walgreen Co.*,
88 F.4th 879 (11th Cir. 2023)....................19

*Latrece Lockett v. Choice Hotels Int'l, Inc.*,
315 Fed. App'x. 862 (11th Cir. 2009)....................2

*Leonardi v. City of Hollywood*,
715 So. 2d 1007 (Fla. 4th DCA 1998)....................29

*Lingle v. Dion*,
776 So. 2d 1073 (Fla. 4th DCA 2001)....................21

*Llanso v. SHEDDF2-FL3, LLC*,
346 So. 3d 1221 (Fla. 3d DCA 2022)....................24

*Lorillard Tobacco Co. v. Alexander*,
123 So.3d 67 (Fla. 3d DCA 2013)....................34

*Luthra v. Univ. of Miami*,
822 F. Supp. 3d 1299 (S.D. Fla. 2026)....................8

*M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*,
982 F.3d 1333 (11th Cir. 2020)....................32, 33

*Mancinelli v. Davis*,
217 So. 3d 1034 (Fla. 4th DCA 2017)....................35

*Martinez v. Goodwill Indus. of S. Fla., Inc.*,
2011 WL 13217232 (S.D. Fla. Apr. 1, 2011)....................34

*Maunsell v. Am. Gen. Life & Acc. Ins. Co.*,
707 So. 2d 916 (Fla. 3d DCA 1998)....................31

*Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*,
761 So. 2d 306 (Fla. 2000)....................26

*McCoy v. Sandals Resorts Int'l, Ltd.*,
2019 WL 6130444 (S.D. Fla. Nov. 19, 2019)........22

*MCM Ent., Inc. v. Diaz World Trade Grp.*,
2024 WL 2833649 (S.D. Fla. Jan. 30, 2024)........31

*McQueen v. Ala. Dep't Transp.*,
769 F. App'x 816 (11th Cir. 2019)........9

*Med-Stop, Inc. v. Vandutch, Inc.*,
2025 WL 26731 (S.D. Fla. Jan. 3, 2025)........31

*Mendoza v. Borden, Inc.*,
195 F.3d 1238 (11th Cir. 1999)........11

*Mikov v. Village of Palm Springs*,
2025 WL 1312506 (S.D. Fla. Mar. 15, 2025)........13

*Mitchell v. Pope*,
189 F. App'x 911 (11th Cir. 2006)........13

*Monaghan v. Worldpay Inc.*,
955 F.3d 855 (11th Cir. 2020)........17

*Morrison v. Univ. of Miami*,
2016 WL 3129490 (S.D. Fla. Jan. 20, 2016)........35

*MRPC Christiana LLC v. Crown Bank*,
2017 WL 6606587 (Del. Super. Ct. Dec. 26, 2017)........26

*Mulhall v. Advance Security, Inc.*,
19 F.3d 586 (11th Cir. 1994)........10

*Myers v. 3073 Horseshoe Drive, LLC*,
2024 WL 4040834 (M.D. Fla. Sept. 4, 2024)........28

*Nat'l. Auto Lenders, Inc. v. SysLOCATE, Inc.*,
686 F.Supp.2d 1318 (S.D. Fla. 2010)........24

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002)........10

*Nview Health, Inc. v. David V.*,
2022 WL 16923585 (M.D. Fla. Nov. 14, 2022)........28

*Padilla v. Padilla*,
278 So. 3d 333 (Fla. 3d DCA 2019)........31

*Palacios v. Almod Diamonds, Ltd., Inc.*,
2024 WL 124870 (S.D. Fla. Jan. 11, 2024) ....................20

*Peacock Med. Lab, LLC v. UnitedHealth Grp., Inc.*,
2015 WL 2198470 (S.D. Fla. May 11, 2015) ....................28

*Perez v. Scottsdale Ins. Co.*,
2020 WL 607145 (S.D. Fla. Feb. 7, 2020) ....................31

*Ponte Vedra Gifts & Accessories Co., LLC v. APL Logistics Ltd*,
2016 WL 2854207 (M.D. Fla. May 16, 2016)....................23

*Radtka v. Wal-Mart Stores, Inc.*,
2019 WL 9075961 (S.D. Fla. Oct. 11, 2019)....................8

*Reeves v. C.H. Robinson Worldwide, Inc.*,
594 F.3d 798 (11th Cir. 2010) ....................11, 12

*Rorie v. Sch. Bd. of Palm Beach Cnty.*,
2022 WL 22996882 (S.D. Fla. Aug. 22, 2022)....................18

*Rorie v. Sch. Bd. of Palm Beach Cnty.*,
2024 WL 51008 (S.D. Fla. Jan. 4, 2024) ....................18

*Roth v. Sotera Health Co.*,
2024 WL 4260649 (Del. Ch. Sept. 23, 2024) ....................24

*Rowell v. Gestamp Alabama, LLC*,
2018 WL 4954071 (N.D. Ala. Oct. 12, 2018) ....................12

*Saintfleur v. Shulkin*,
2017 WL 11724910 (N.D. Ga. Dec. 19, 2017)....................14

*Santillana v. Fla. State Ct. Sys.*,
2010 WL 271433 (M.D. Fla. Jan. 15, 2010)....................35

*Sanz v. Am. Soc'y of Composers & Publishers*,
2019 WL 13237013 (S.D. Fla. Aug. 7, 2019)....................9, 10

*Schmidt v. Disney Parks, Experiences & Prods., Inc.*,
721 F. Supp. 3d 1314 (M.D. Fla. 2024), *aff'd* 2025 WL 1826050 (11th Cir. July 2, 2025)....................17

*Senter v. JPMorgan Chase Bank, N.A.*,
810 F. Supp. 2d 1339 (S.D. Fla. 2011) ....................26

*Servicios de Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Sys. Inc.*,
2007 WL 9706466 (S.D. Fla. June 19, 2007) ....................29

*SFM Holdings Ltd. v. Banc of Am. Secs., LLC*,
764 F.3d 1327 (11th Cir. 2014) ....................34

*SIG, Inc. v. AT & T Digital Life, Inc*.,
971 F. Supp. 2d 1178 (S.D. Fla. 2013) ....................33

*Singleton v. Pub. Health Tr. of Miami-Dade Cnty.*,
725 F. App'x 736 (11th Cir. 2018) ....................19

*Smart v. City of Miami Beach, Fla.*,
933 F. Supp. 2d 1366 (S.D. Fla. 2013), *aff'd* 567 F. App'x 820 (11th Cir. 2014) ....................2, 11

*SSAB Alabama, Inc. v. Kem-bonds, Inc.*,
2017 WL 6345809 (S.D. Ala. Dec. 12, 2017) ....................23

*Starks v. City of Miami Gardens*,
2024 WL 2721883 (S.D. Fla. May 28, 2024) ....................19

*State, Dep't of Fin. Servs. v. Peter R. Brown Const., Inc.*,
108 So. 3d 723 (Fla. 1st DCA 2013) ....................21

*Stump-Wolfe v. Wal-Mart Stores, Inc.*,
2019 WL 5102275 (S.D. Fla. Oct. 11, 2019)....................9

*Succar v. Dade Cnty. Sch. Bd.*,
229 F.3d 1343 (11th Cir. 2000) ....................13

*Teratech USA, Inc. v. Digital Beauty Grp., LLC*,
2021 WL 9566158 (S.D. Fla. Nov. 22, 2021)....................31

*Terry v. Carnival Corp.*,
2014 WL 11804563 (S.D. Fla. Feb. 12, 2014) ....................30

*Thompson v. City of Miami Beach*,
990 F. Supp. 2d 1335 (S.D. Fla. 2014) ....................11, 13

*Tillett v. BJ's Wholesale Club, Inc.*,
2010 WL 11507322 (M.D. Fla. July 30, 2010) ....................20

*Tonkyro v. Sec'y, Dep't of Veterans Affairs*,
2024 WL 2846356 (M.D. Fla. June 5, 2024)....................17

*Topp, Inc. v. Uniden Am. Corp.*,
513 F. Supp. 2d 1345 (S.D. Fla. 2007) ....................31

*TRG Holdings G & H, LLC v. Patel*,
2023 WL 3937428 (N.D. Ga. June 9, 2023)....................23

*Uppal v. Hosp. Corp. of Am.*,
482 F. App'x 394 (11th Cir. 2012) ....................8, 9, 16

*Usai v. Club Mgmt. Miami II, LLC*,
801 F. Supp. 3d 1295 (S.D. Fla. 2025) ....................11, 12

*Verna v. Pub. Health Tr. of Miami-Dade Cnty.*,
539 F. Supp. 2d 1340 (S.D. Fla. 2008) ....................15

*Videojet Techs. Inc. v. Garcia*,
2008 WL 2415042 (M.D. Fla. June 12, 2008)....................26

*Vill. Green Holding, LLC v. Holtzman*,
2018 WL 4849964 (Del. Ch. Oct. 5, 2018) ....................23

*Whirlpool Corp. v. Cabri*,
2022 WL 1421126 (D. Del. May 5, 2022)....................22

*Whiteside v. New S. Express, LLC*,
2025 WL 2797160 (N.D. Ala. Sept. 29, 2025) ....................12

*Windsor I, LLC v. CWCapital Asset Mgmt. LLC*,
238 A.3d 863 (Del. 2020) ....................29

*Wolicki-Gables v. Drs. Same Day Surgery Ctr., Ltd.*,
216 So. 3d 665 (Fla. 2d DCA 2017)....................21

*Zarrella v. Pac. Life Ins. Co.*,
755 F. Supp. 2d 1218 (S.D. Fla. 2010) ....................31

**Rules/Statutes**

42 U.S.C.A. § 2000e-3....................17

21 U.S.C. § 331(a) ....................21

21 U.S.C. §§ 353(b)(1) ....................21

Fed. R. Civ. P. 12(b)(6)....................1, 3

Fed. R. Civ. P. 12(f)....................21

Fla. Admin. Code R. 64B8-9.012 ....................20

Fla. Stat. 448.102(3)....................20

Fla. Stat. § 448.102(3)....................18, 20

Fla. Stat. § 456.47 ....................20

Fla. Stat. § 458.331(1)(q), (m), (g), (nn) ........................................................................ 21

Fla. Stat. § 458.336 ................................................................................................................ 21

Fla. Stat. §760.11(1) ............................................................................................................... 10

**Other Authorities**

13 Williston on Contracts § 38:7 (4th ed.) ........................................................................ 24

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants eMed, LLC, eMed Population Health, Inc. (together with eMed, LLC, the "eMed Defendants"), Michael Ferro, and Justin Dearborn move to dismiss Plaintiff's Amended Complaint with prejudice.

## PRELIMINARY STATEMENT

The Amended Complaint again fails to state a single viable claim. Though Plaintiff purports to assert 22 statutory, contractual, and common law claims,[1] her gripe can ultimately be distilled to the following: After executing a series of transactions that converted Plaintiff's former employer into a C-Corp and infused the company with over $100 million in equity, another woman—Linda Yaccarino, former CEO of X—was named CEO of the new entity instead of Plaintiff.[2] Though Plaintiff was an at-will employee whom the new organization, eMed Population Health, Inc., could freely terminate rather than finding a role, it instead offered her the prestigious role of President, an executive title accompanied by a proposed grant of significant stock options in the new entity, among other sizable remuneration.[3] Plaintiff refused that role and was subsequently terminated for cause.

Plaintiff now claims that she was discriminated against because she is a woman. However, she admits that another woman (with legitimate executive experience) was named CEO instead of her, so she cannot establish discrimination or retaliation on this basis. Her post-hoc allegations that eMed was a hostile work environment consist of a handful of off-color remarks by Defendant Ferro, most of which were not even directed at her. Title VII (and the state and local discrimination laws modeled after it) is not a "general civility code" and "simple teasing . . . offhand comments,

[1] Plaintiff abandoned four counts, but failed to properly renumber the remaining counts, so she asserts no Count XVI, XVII, XXI, or XXIII. The Amended Complaint skips these numbers.
[2] Am. Compl. ¶¶ 1, 94, 96.
[3] Am. Compl. ¶¶ 1, 96, 98.

and isolated incidents" like Plaintiff alleges "do not constitute a hostile work environment."[4]

Plaintiff also fails to adequately plead that she was terminated or suffered any adverse action in retaliation for any protected activity. The only potential "protected activity" she cites is communications between her attorney and eMed's general counsel on July 26-27, 2025, *after* she refused the President role, while attempting to negotiate her separation from the company. These communications were the first time Plaintiff suggested she had suffered discrimination,[5] and they occurred *after* Plaintiff learned she would not be CEO and *after* eMed commissioned the forensic investigation of her corporate email account.[6] Plaintiff's allegations do not plausibly establish that she was fired because of her attorney's reference to potential discrimination claims during the separation discussions, rather than based on eMed's stated rationale: she removed confidential and proprietary eMed information, a fact her Amended Complaint does not deny.[7]

Plaintiff's whistleblower allegations are conclusory and fail to establish that eMed violated any law or regulation, that she objected to any such violation, or that any such objection caused her termination or any other adverse action.[8] For example, she alleges that Defendants "agreed" that eMed could not procure GLP-1 agonists (a weight loss drug) for individuals whom she contends were "not medically eligible," and were "working to solve the [] problem."[9] Plaintiff is a businesswoman, not a licensed medical professional, and the facts alleged do not support her non-medical opinion that this individual or any other "did not qualify" for a prescription, much less that Defendants directed her (or anyone else) to illegally prescribe a GLP-1 agonist, or that

---

4 *Smart v. City of Miami Beach, Fla.*, 933 F. Supp. 2d 1366, 1378 (S.D. Fla. 2013), *aff'd* 567 F. App'x 820 (11th Cir. 2014) (quoting *Latrece Lockett v. Choice Hotels Int'l, Inc.,* 315 Fed. App'x. 862, 865 (11th Cir. 2009)).
5 Am. Compl. ¶ 112.
6 Am. Compl. ¶¶ 112, 116, 453.
7 Am. Compl. ¶ 112, 453.
8 *See Gessner v. S. Co*., 2026 WL 1488160, at *8 (Fla. May 28, 2026).
9 Am. Compl. ¶¶ 86-87.

any GLP-1 agonist was ever illegally prescribed or dispensed by the eMed Defendants. Plaintiff's laundry list of inapplicable statutes and regulations in support of her FPWA claim exposes her lack of understanding as to what conduct is actually prohibited in this context.

Plaintiff's remaining counts aver that she was deprived of bonus payments under an unadopted, unexecuted Transaction Bonus Plan (the "Draft Plan") drafted by the entity that employed her as CEO prior to the conversion, eMed Weight Loss, LLC. Her offer of employment for that role was accompanied by an unexecuted copy of the Draft Plan, which would have provided for bonuses to employees selected for participation *if* a "Sale Event," as defined, occurred.[10] The Draft Plan provided that it would be effective "as of the date of the Plan's adoption by the Compensation Committee of the Board," an event which never occurred. Ex. 2, Art. 1. Plaintiff cannot enforce the Draft Plan because it was not a binding agreement. But even if it were, its mandatory forum selection clause (Ex. 2, Art. 5.11) requires that "any suit, action, or proceeding with respect to the Plan or any Award Agreement. . . shall be resolved only in the courts of the State of Delaware or the United States District court for the District of Delaware[.]" Therefore, all claims "with respect to the Plan" (*i.e.*, Counts XIV, XV, XVIII, XIX, XX, XXII, and XXV) must be dismissed, as Plaintiff can only assert them in Delaware.

Further, the Draft Plan's definition of a Sale Event "expressly carves out transactions effected solely to change the form of organization or organizational structure without changing ownership," *i.e.*, the July 2025 corporate conversion, so no Sale Event ever occurred to trigger an entitlement to bonuses.[11] Therefore, Plaintiff cannot establish any breach based on her failure to

---

[10] True and correct copies of the employment letter transmitting the Draft Plan and the Draft Plan are attached hereto as **Exhibits 1 and 2**. *See Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal.").

[11] Am. Compl. ¶ 335-336, 393, 403.

receive a transaction bonus, even *if* she could establish the Draft Plan was a binding agreement, and even *if* these claims were properly before the Court.

In any event, her allegation that Defendants engineered a sophisticated $300 million-dollar transaction purely to deprive her of a hypothetical transaction bonus is facially implausible. Her attempts to recover bonuses that are unavailable to her in contract through conclusory, kitchen-sink equitable and tort claims fail and are belied by her own allegations concerning the Draft Plan.

The Amended Complaint should be dismissed with prejudice.

## <u>FACTUAL BACKGROUND</u>

eMed is a leading digital healthcare company specializing in supervised weight management services. Am. Compl. ¶ 39. Defendant Ferro is eMed, LLC's Co-Founder and holds equity in eMed, LLC. *Id.* ¶ 13. Defendant Dearborn is eMed, LLC's Executive Chairman. *Id.* ¶ 16.

### i. Overview of Plaintiff's Employment and the Draft Transaction Bonus Plan

Plaintiff joined eMed as Executive Vice President, Marketing and Enterprise Partnerships for eMed Enterprise, LLC on June 26, 2024. *Id.* ¶ 43. On August 8, 2024, eMed Weight Loss, LLC made Plaintiff a new offer of at-will employment, to serve as its CEO (the "August 2024 Employment Letter"). *Id.* ¶ 49. This offer referred to and attached an unexecuted draft "Transaction Bonus Plan" (the "Draft Plan"). *Id.* ¶¶ 50, 52; Exs. 1 and 2. The August 2024 Employment Letter stated, "You will be eligible to participate in the attached eMed Weight Loss LLC Transaction Bonus Plan [ ], **a draft** of which is attached." Ex. 1 ¶ 6 (emphasis added).

The Draft Plan states that it "shall be effective as of the date of the Plan's adoption by the Compensation Committee of the Board[.]" Ex. 2, Art. 1. Other key terms of the Draft Plan for purposes of this Motion include the following (Ex. 2; Am. Compl. ¶¶ 51-52, 101, 335, 339):

- Article 4.1 provides that "[p]articipation in the Plan shall be limited to those Participants selected by the Administrator from time to time, and no employee or service provider of the Company Group shall have any right to be selected as a Participant."

- Article 4.3 of the Plan provides for payments of Bonus Amounts to participants upon the Settlement Date, which is defined as the consummation of a "Sale Event."
- Article 2.24 defines qualifying "Sale Events" and excludes any transactions effected solely to change the Company's organizational form or structure without changing ownership.[12]
- Article 4.4 provides for forfeiture of any Bonus Amounts upon termination.
- Pursuant to Article 5.4, the Compensation Committee of the Board reserved the unfettered right "to amend or terminate, in whole or in part, any or all of the provisions of the Plan[.]"
- Article 5.11 contains a mandatory forum selection clause requiring all actions "with respect to the Plan or any Award Agreement" to be brought in Delaware.

Plaintiff accepted the employment offer set forth in the August 2024 Employment Letter. Am. Compl. ¶ 49. As CEO of eMed Weight Loss, LLC, she reported to Ferro and Dearborn (after he re-joined eMed in September 2024). *Id.* ¶¶ 14, 17.

In September 2024, Plaintiff's then-employer, eMed Weight Loss, LLC changed its name to eMed Population Health, LLC. *Id.* ¶¶ 8, 11. On June 28, 2025, that entity was restructured and converted into eMed Population Health, Inc., a Delaware C-corporation, to support a $300 million equity raise and position the Company for future growth (the "Conversion"[13]). *Id.* ¶ 94. This entity received a $100 million investment from Aon. *Id.* ¶ 336. The Conversion did not constitute a "Sale Event" under the Draft Plan because it changed the form and organizational structure of the company, without changing its ownership. *See id.* ¶¶ 101, 335-336.

Linda Yaccarino (a woman), former CEO of X, was ultimately named CEO of the post-

---

[12] "In no event shall a Sale Event be deemed to include (i) any transaction effected solely for the purpose of changing, directly or indirectly, the form of organization or the organizational structure of the Company or transferring securities or assets of the Company to any Person (whether a corporation, limited liability company or otherwise) that is a wholly-owned subsidiary of, parent of, equity interest holder of, or is controlled by or under the common control of any Person described in this clause (i) that does not directly or indirectly change the ownership of the Company, or (ii) a transaction following which the holders of voting equity securities of the Company prior to such transaction continue to own at least twenty percent (20%) of the voting equity securities of the Company or the buyer after such transaction." *Id.*

[13] The Conversion included the consolidation of holding company assets, facilities, intellectual property, and employees into a new C-Corp. Most of these assets predated Plaintiff's employment, and Defendants dispute that Plaintiff played any material role in the Conversion or attracting Aon investment.

Conversion entity. *Id.* ¶ 1. eMed had no obligation to find Plaintiff, an at-will employee, any role in the new entity. However, on July 9, 2025, eMed Population Health, Inc. presented Plaintiff with the Change of Position Letter, offering her the executive role of President, reporting to Dr. Patrice Harris, eMed's Co-Founder and CEO at that time, who was also the first black female president of the American Medical Association. *Id.* ¶ 96.[14] The Change of Position Letter included a proposed grant of 500,000 stock options, under a future incentive plan. *Id.* ¶ 86.

Plaintiff rejected the offer to serve as President. *Id.* ¶¶ 103-104. On July 22, 2025, Plaintiff's counsel sent a letter to defendants seeking "to negotiate a comprehensive separation agreement[.]" *Id.* ¶ 107; Ex. 3, Letter at 3.[15] On July 26-27, 2025, Plaintiff and her counsel engaged in discussions with eMed's General Counsel, during which Plaintiff alleges her counsel first informed Defendants of her allegations of discrimination and retaliation. Am. Compl. ¶ 112.

On July 23, 2025, eMed commissioned a forensic analysis of Plaintiff's corporate email account. This analysis revealed that Plaintiff had violated company policies by forwarding confidential and proprietary company information to her personal email. *Id.* ¶¶ 114-117, 256. Defendants terminated Plaintiff's employment for cause on July 28, 2025. *Id.* ¶ 114.

**ii. Plaintiff's Post-Hoc Discrimination Allegations**

Plaintiff never raised any discrimination concerns during the ordinary course of her employment (despite holding a leadership role, which gave her a natural platform to do so). *See generally* Am. Compl. Her present allegations of gender-based discrimination are that:

a) Ferro allegedly. . .

1) Used a derogatory sex-based term (not directed at Plaintiff) during team meetings. *Id.* ¶ 61.
2) Made three comments regarding Plaintiff's appearance. *Id.* ¶¶ 63-64.
3) Made three comments about Plaintiff's personality. *Id.* ¶¶ 66-67.

---

[14] https://www.ama-assn.org/about/authors-news-leadership-viewpoints/patrice-harris-md-ma.

[15] This letter is central to Plaintiff's retaliation claims, so Defendants attach a true and correct copy as **Exhibit 3.**

4) Made one comment about the appearance of another female director. *Id.* ¶ 69.

b) eMed Population Health, Inc., the post-Conversion entity, declined to hire Plaintiff as CEO and instead installed another woman, Linda Yaccarino, former CEO of X Corp. *Id.* ¶ 1.

c) eMed recommended retention bonuses exclusively for certain unspecified male employees. Plaintiff pleads no further details concerning these alleged recommendations. *Id.* ¶ 137.

**iii. Plaintiff's Retaliation Allegations**

Plaintiff alleges that she was retaliated against for "asserting her legal rights." Am. Compl. ¶ 107. On July 22, 2025, she sent a letter to eMed, objecting to the decision not to name her CEO of the new entity. *Id.* ¶¶ 41, 107; Ex. 3. That letter did not mention any act of discrimination or retaliation. *Id*. Plaintiff now alleges that on July 26-27, 2025, she and her counsel first "explicitly informed Defendants of her claims for sex-based discrimination and retaliation." *Id*. ¶ 112.

**iv. Plaintiff's Whistleblower Allegations**

Plaintiff alleges that Defendants procured GLP-1 medication for three individuals whom she claims were "not medically eligible to receive them." *Id.* ¶ 89. Plaintiff is not a licensed medical professional. She nevertheless alleges that "as early as February 2024" she "raised concerns" to Ferro regarding GLP-1 prescriptions. *Id.* ¶ 83. Plaintiff did not join eMed until **June** 2024. *Id.* ¶ 43. Plaintiff alleges no further particulars concerning this exchange or eMed's response.

Plaintiff also alleges that on May 5, 2025, she "raised her objections" to Ferro's alleged "directive" to procure GLP-1 medications to Dearborn and another eMed executive, and they "**agreed**" that the directive **could not** be carried out. *Id*. ¶ 86. Plaintiff further alleges that on May 11, 2025, Dearborn communicated to Plaintiff that "Defendants needed to 'figure out how to prescribe'" a GLP-1 agonist to a certain individual, and on May 12, 2025, confirmed that employees were "working to solve the [] problem." *Id*. ¶ 87.

# ARGUMENT

## I. PLAINTIFF FAILS TO STATE CLAIMS FOR DISCRIMINATION OR RETALIATION UNDER TITLE VII, FCRA, OR MDHRO (COUNTS I–IX, XI–XIII).

Claims under the FCRA and MDHRO, which are modeled after Title VII, are analyzed under the Title VII standard, with reference to federal opinions construing Title VII. *See, e.g.*, *Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998); *Luthra v. Univ. of Miami*, 822 F. Supp. 3d 1299, 1306 (S.D. Fla. 2026); *Doe v. Miami Gardens Square One, Inc.*, 2025 WL 81528, at *25–26 (S.D. Fla. Jan. 13, 2025). Defendants, therefore, brief these claims together. The federal, state, and local claims fail for the same reasons, including because: 1) another woman became CEO, and the Draft Plan was universally extinguished by the Conversion, so Plaintiff cannot establish disparate treatment; 2) the stray inappropriate comments she references were not severe or pervasive; 3) she fails to demonstrate any adverse action in retaliation for her separation negotiations with eMed, which was the first time she ever alleged she had been discriminated against and occurred *after* her "change of position." Am. Compl. ¶¶ 96, 112, 239, Ex. 3.

### A. Plaintiff Fails to State Claims for Gender Discrimination (Counts I–III).

To state a claim of disparate treatment, Plaintiff must allege facts showing that eMed treated her less favorably than similarly situated male employees because she is a woman. *See Uppal v. Hosp. Corp. of Am.*, 482 F. App'x 394, 396 (11th Cir. 2012). Instead, she alleges that Linda Yaccarino, another woman, was promoted to the role of CEO in the post-Conversion eMed Population Health, Inc., instead of Plaintiff. Am. Compl. ¶¶ 1, 84. This claim therefore fails as a matter of law. *See Uppal*, 482 F. App'x at 396 (affirming dismissal of disparate impact claim where plaintiff failed to describe how alleged comparator employees were outside her protected class); *Colson v. Wal-Mart Stores, Inc.*, 2019 WL 5102173, at *3 (S.D. Fla. Oct. 11, 2019) (dismissing gender discrimination claim based on conclusory allegations that plaintiff was denied

promotional opportunities based on gender); *Radtka v. Wal-Mart Stores, Inc.*, 2019 WL 9075961, at *3 (S.D. Fla. Oct. 11, 2019) (same); *Sanz v. Am. Soc'y of Composers & Publishers*, 2019 WL 13237013, at *4 (S.D. Fla. Aug. 7, 2019) (dismissing claim because employee failed to allege he was replaced by someone outside of his protected class); *Griffith v. Ga. Cyber Academy*, 2026 WL 1450484, at *6 (N.D. Ga. Jan. 30, 2026).

Plaintiff's vague and conclusory allegation that "Defendants recommended and pursued retention bonuses exclusively for male employees" (Am. Compl. ¶¶ 137, 154, 172) is devoid of sufficient factual matter to withstand dismissal. *See Uppal*, 482 F. App'x at 396. Here, Plaintiff pleads neither a valid comparator, nor direct evidence of discrimination, warranting dismissal. *See Arafat v. Sch. Bd. of Broward Cnty.*, 549 F. App'x 872, 874 (11th Cir. 2013) (affirming dismissal of complaint where plaintiff failed to sufficiently allege younger male comparators); *Drisin v. Fla. Int'l Univ. Bd. of Trs.*, 2017 WL 3505299, at *12 (S.D. Fla. June 27, 2017). Plaintiff does not allege any particulars concerning the alleged bonuses or the male employees involved that would allow the Court to reasonably infer that eMed acted with discriminatory intent (or at all). *See* Am. Compl. ¶¶ 137, 154, 172; *Stump-Wolfe v. Wal-Mart Stores, Inc.*, 2019 WL 5102275, at *3 (S.D. Fla. Oct. 11, 2019) (dismissing disparate treatment count based on conclusory allegations). The Eleventh Circuit has explained that a similarly situated comparator for purposes of a disparate treatment claim "will have engaged in the same basic conduct (or misconduct) as the plaintiff, ... will have been subject to the same employment policy, guideline, or rule as the plaintiff, ... will ordinarily [ ] have been under the jurisdiction of the same supervisor as the plaintiff, and ... will share the plaintiff's employment or disciplinary history[.]" *Sanz*, 2019 WL 13237013, at *4 (quoting *McQueen v. Ala. Dep't Transp.*, 769 F. App'x 816, 821–22 (11th Cir. 2019)). Plaintiff

alleges no such factual details concerning any male bonus candidate.[16] *See id*.

Further, Plaintiff's conclusory allegations concerning alleged bonuses to male employees fail for the additional reason that she did not raise this issue before the EEOC.[17] An employee must file a complaint with the EEOC before she can bring a discrimination suit. *See, e.g.*, Fla. Stat. §760.11(1); *Lambert v. Alabama Dep't of Youth Servs.*, 150 F. App'x 990, 993 (11th Cir. 2005). The scope of the EEOC's investigation of the charge of discrimination limits the scope of the claim that may be brought in court. *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994). "[N]ew acts of discrimination are inappropriate." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004).[18]

Meanwhile, Plaintiff's conclusory suggestion that she was deprived of a transaction bonus because of her gender is implausible on its face and refuted by the fact that *all* hypothetical participation interests in the Draft Plan were extinguished by the Conversion. *See* Am. Compl. ¶ 95. Plaintiff does not allege that any male employee was ever awarded participation interests under the Draft Plan, or that any such interests survived the Conversion.

### B. Plaintiff Fails to State Claims for Hostile Work Environment (Counts IV–VI).

Plaintiff fails to allege gender-based harassment that was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working

---

[16] *E.g.*, She does not allege that any of these male employees violated their confidentiality obligations under eMed policy by sending themselves proprietary information, as she did. Compl. ¶¶ 116–117.

[17] These Charges are attached as **Composite Exhibit 5**. These may be judicially noticed by the Court pursuant to Fed. R. Evd. 201(b)(2), and are appropriately attached and considered in connection with this Motion because they are referred to in Plaintiff's Complaint. *See* Am. Compl. ¶¶ 30–35; *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007).

[18] *See also Haugabrook v. Cason,* 518 Fed. App'x. 803, 809 (11th Cir. 2013) ("[E]ach instance of failure to promote or refusal to hire is a discrete act of discrimination that constitutes a 'separate actionable unlawful employment practice.'") (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)); *Fleming v. The Fla. Bar*, 994 F. Supp. 2d 1255, 1260–61 (N.D. Fla. 2014) (dismissing employee's discrimination charge where plaintiff claimed two denials of promotion but administrative charge cited one).

environment." *Thompson v. City of Miami Beach*, 990 F. Supp. 2d 1335, 1339, 1343 (S.D. Fla. 2014) (dismissing hostile work environment and retaliation claims). The Supreme Court has instructed that "the standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[O]ffhand comments[] and isolated incidents" like those Plaintiff alleges, "do not constitute a hostile work environment." *Smart*, 933 F. Supp. 2d at 1378; *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) ("Title VII does not prohibit profanity alone[.]"). Courts consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1246 (11th Cir. 1999).

Plaintiff's claims are premised entirely on verbal statements by Ferro that qualify as "mere offensive utterances," not actionable harassment. *See e.g., id.*; *Usai v. Club Mgmt. Miami II, LLC*, 801 F. Supp. 3d 1295, 1323–34 (S.D. Fla. 2025). She alleges no facts that would allow the Court to conclude that Ferro's alleged comments "affected her day-to-day employment." *See Blash v. City of Hawkinsville*, 2018 WL 3150346, at *7 (M.D. Ga. June 27, 2018) (dismissing hostile work environment claim). None of Ferro's remarks can be construed as physically threatening, and the Court need not accept Plaintiff's formulaic labeling of them as "humiliating" and "degrading." Am. Compl. ¶ 2. For example, in *Bardelas v. City of Doral*, 2021 WL 12313738, at *9 (S.D. Fla. Aug. 23, 2021), this Court dismissed a hostile work environment claim, holding that while certain commentary about plaintiff's appearance "may be considered offensive," it was "not physically

threatening" and did "not rise to the level of humiliating such that it can be qualified as objectively severe and pervasive harassment that alter the terms and conditions of employment."

Plaintiff focuses primarily on Ferro's "frequent" use of the c-word during work meetings. Am. Compl. ¶ 61. Plaintiff does not allege that he ever referred to her (or any other employee) by this term. *See id.* Rather, her allegations demonstrate only general profanity, which is insufficient to establish a hostile work environment. *See Reeves*, 594 F.3d at 809. For example, in *Usai*, 801 F. Supp. 3d at 1323–24, this Court recently dismissed a plaintiff's hostile work environment claims where she alleged that her supervisor called her an "ass face" and made "inappropriate comments to female employees generally." Plaintiff's formulaic assertion of "frequent disparaging comments" is insufficient to state a Title VII claim. *See Barreth v. Reyes I, Inc.*, 2020 WL 4370137, at *6 (M.D. Ga. Jul. 29, 2020).

Plaintiff's allegations that Ferro made isolated comments concerning her appearance and the appearance of a female director also cannot establish severe or pervasive harassment. *See id.; Bardelas*, 2021 WL 12313738, at *9; *Whiteside v. New S. Express, LLC*, 2025 WL 2797160, at *4 (N.D. Ala. Sept. 29, 2025) ("expressing curiosity regarding an employee's appearance simply does not amount to legally actionable sexual harassment under existing substantive law."); *Brown v. Railcrew Xpress LLC*, 2022 WL 22894863, at *3 (N.D. Ala. Feb. 15, 2022) (dismissing hostile work environment because "occasional abusive instances" in which coworkers commented on her appearance were "not severe or pervasive enough to be actionable under Title VII.").[19]

To the extent that saying Plaintiff "needed to be more of a bitch" can even be construed to relate to her gender (rather than her behavior), she alleges that this statement occurred around July

---

[19] *See also Rowell v. Gestamp Alabama, LLC*, 2018 WL 4954071, at *4 (N.D. Ala. Oct. 12, 2018) (dismissing hostile work environment claim and holding that "a few comments" about plaintiff's appearance and women being "hard-headed" as insufficient to qualify as severe or pervasive).

22, 2025, twelve days after she refused the role offered to her in the post-Conversion entity and less than a week before she was terminated, so it could not plausibly have interfered with her job performance (which was at an end), and she does not allege any manner in which this statement, or any other, impacted her work. *See* Am. Compl. ¶¶ 104, 106; *Succar v. Dade Cnty. Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000) ("plaintiff cannot turn a personal feud into a sex discrimination case."). This is exactly the kind of "mere offhand comment and isolated incident" that cannot support a hostile work environment. *Blash*, 2018 WL 3150346, at *8.

Courts in this circuit routinely dismiss hostile-work-environment claims based on sporadic offensive remarks, even where specifically targeted at the plaintiff. *See, id.*; *e.g., Thompson*, 990 F. Supp. 2d at 1341 (alleging plaintiff's supervisor called him n-word on multiple occasions); *Gerbier v. J.R. Eight, Inc.*, 2011 WL 13268707, at *3 (S.D. Fla. Aug. 12, 2011) (granting motion to dismiss hostile work environment claim where plaintiff alleged he was "continually called a 'negro'"). For example, in *Mikov v. Village of Palm Springs*, 2025 WL 1312506, at *6 (S.D. Fla. Mar. 15, 2025), this Court dismissed a hostile work environment claim alleging "about a dozen instances of offensive language lodged against him[,]" including calling him "old," a "pedophile" and a "faggot," and subjecting him to a "sexually explicit insult" on an "unspecified occasion." The Court highlighted the absence of any physical threats or intimidating language, which Plaintiff's Complaint also fails to allege. *Id.*; *see Mitchell v. Pope*, 189 F. App'x 911, 913–14 (11th Cir. 2006) (affirming summary judgment in favor of defendant on hostile work environment claim where most of 16 instances of alleged harassment involved "offensive utterances.").

Finally, Plaintiff cannot rely on any statements or conduct to support her discrimination claims that do not relate to her gender, such as alleged statements that she was "too nice," lacked "a spine," or had been "over promising;" denial of resources; removal from Aon meetings; or her

phone call with Ferro on July 22, 2025,[20] none of which is severe or pervasive, anyway. Am. Compl. ¶¶ 67, 71-72, 108, 135; *see Saintfleur v. Shulkin*, 2017 WL 11724910, at *3 (N.D. Ga. Dec. 19, 2017) (dismissing claim because plaintiff work environment not hostile based on sex).

### C. Plaintiff Fails to State Claims for Retaliation (Counts VII–IX).

To state claims for retaliation, Plaintiff must allege that: "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Jenkins v. Miami Dade Cnty.*, 688 F. Supp. 3d 1240, 1245 (S.D. Fla. 2023) (quoting *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)); *see also Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1277 (11th Cir. 2008).

Plaintiff contends that she engaged in protected activity through written correspondence with eMed on July 10, 2025 and July 22, 2025, and oral communications between eMed and her counsel on July 26-27, 2025. Am. Compl. ¶¶ 109-110, 112, 239, 252, 265. Plaintiff does not allege or attach the substance of the July 10th or July 22nd communications, so Defendants attach them here as **Exhibits 4 and 3**. Neither communication complains of, or asserts any right to be free from, gender discrimination. The July 10th email (Ex. 4) focuses solely on Plaintiff's opinion that the Change of Position did not fairly value her contributions and does not mention any discrimination or unlawful conduct, or threaten legal action. The July 22nd letter (Exhibit 3) vaguely mentions potentially "improper factors which give rise to further significant claims under both state and federal laws." *Id*. at 1–2. Neither communication qualifies as protected activity, as neither "explicitly or implicitly communicate[d] a belief that [eMed] was engaged in

[20] Plaintiff alleges that Ferro stated in this call that he could fire her anytime. That's true—she was an at-will employee. Am Compl. ¶ 108; Ex. 1 ¶ 9.

discrimination or harassment based on the plaintiff's sex." *See Black v. Reynolds*, 150 F. Supp. 3d 1273, 1281 (S.D. Ala. 2015), *aff'd,* 674 F. App'x 851 (11th Cir. 2016); *Jones v. Unity Behav. Health, LLC*, 2021 WL 5495578, at *2 (11th Cir. Nov. 23, 2021) ("alleged underpayment, without a connection to discrimination, isn't protected activity under Title VII."); *Verna v. Pub. Health Tr. of Miami-Dade Cnty.*, 539 F. Supp. 2d 1340, 1357–58 (S.D. Fla. 2008) (letter that failed to specifically complain of discrimination was not protected activity under FPWA).

Plaintiff's Amended Complaint adds allegations that the July 22nd letter was followed by discussions between her counsel and eMed's counsel, during which "her counsel explicitly informed Defendants of her claims for sex-based discrimination and retaliation[.]" Am. Compl. ¶ 112. This is the only potentially "protected activity" she alleges, and her allegations do not establish that she suffered any adverse employment action as a consequence. As purported "adverse actions" she alleges that Defendants: (i) offered her the role of President of eMed Population Health, Inc. on July 9, 2025; (ii) eliminated the Draft Plan on or before July 9, 2025; (iii) restructured her reporting relationship on July 9, 2025 so that she reported to Dr. Patrice Harris, instead of two men (Ferro and Dearborn); (iv) called her on July 22, 2025 to discuss her letter from that day; (v) performed a forensic review of Plaintiff's use of company email on July 23, 2025; and (vi) terminated her employment on July 28, 2025. Am. Compl. ¶¶ 96, 116, 240, 253, 266. Except for her termination, all of these events occurred ***prior*** to any protected activity, and therefore could not have been retaliatory. "If the alleged retaliatory conduct occurred before the . . . protected activity, the two events cannot be causally connected." *Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*, 2022 WL 2761720, at *3 (11th Cir. July 15, 2022). Indeed, the July 9, 2025 Change of Position letter and elimination of the Draft Plan as a result of the June 28, 2025 Conversion were the very reason for Plaintiff's July 10th, 22nd, and 26th-27th communications with

eMed. *See* Exs. 3-4; Am. Compl. ¶¶ 112, 239. Therefore, these actions could not have been "retaliatory"— they prompted her complaints, not the other way around. *See id.* For example, in *Uppal v. Hosp. Corp. of Am.*, 482 F. App'x 394, 397 (11th Cir. 2012), the Court affirmed dismissal of a retaliation claim because the plaintiff lost her emergency room privileges *prior* to complaining about alleged discrimination, which necessarily defeated causation.[21]

A phone call from your boss is not an adverse employment action. *See Kavanaugh v. Miami-Dade Cnty.*, 775 F. Supp. 2d 1361, 1370 (S.D. Fla. 2011) (verbal counseling was not an adverse action). As for the forensic investigation (initiated days before her July 26th-27th "protected activity"), Plaintiff failed to raise this issue before the EEOC and has not exhausted her administrative remedies. *See Fleming*, 994 F. Supp. 2d at 1260–61; Ex. 5. Further, it is implausible that this forensic investigation was retaliatory, instead of a prudent corporate response to a legal demand seeking separation from the company. Ex. 3 at 2.

Plaintiff's contention that she was terminated for asserting unspecified "rights," rather than because her employing entity and prior role ceased to exist after the Conversion, or because she expressly refused to accept and perform the role that eMed offered her, or because she forwarded proprietary information to her personal email account in violation of her contractual confidentiality obligations under corporate policy, is facially implausible and unsupported by the facts alleged. Am. Compl. ¶¶ 103-104, 116; *cf. Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301 (11th Cir. 2007) (holding that plaintiff could not establish discriminatory firing where she admitted she refused the alternative employment arrangements her employer offered). Plaintiff's

---

[21] Though this timing alone is dispositive, the Court also need not accept Plaintiff's conclusory characterization of the offer of the presidency as an "adverse action" or a "demotion" when Plaintiff's allegations make clear that her pre-conversion role of CEO of eMed United Population Health, LLC (*f/k/a* eMed Weight Loss, LLC) necessarily ceased to exist after the July 2025 conversion led to the creation of a distinct legal entity.

conclusory allegations that eMed's stated cause for terminating her was pretextual fail. *See Schmidt v. Disney Parks, Experiences & Prods., Inc.*, 721 F. Supp. 3d 1314, 1329 (M.D. Fla. 2024), *aff'd* 2025 WL 1826050 (11th Cir. July 2, 2025). For example, in *Schmidt*, the Court dismissed with prejudice the plaintiff's retaliatory firing claim because the allegations clearly demonstrated that his suspension and termination were related to his noncompliance with the company protocols. The court rejected his claims of pretext as speculative. *Id.*

Finally, Plaintiff's allegations regarding medical directives are obviously unrelated to her gender and cannot support claims under Title VII, the FCRA, or MDHRO. *See* 42 U.S.C.A. § 2000e-3; Am. Compl. ¶¶ 239, 252, 265.

**D. Plaintiff Fails to State Claims for Retaliatory Hostile Work Environment (Counts XI, XII, and XIII).**

To state a claim for retaliatory hostile work environment, plaintiff must allege that she: "(1) engaged in protected EEO activity; (2) suffered unwelcome harassment; (3) the harassment was based on protected activity; and (4) the harassment was materially adverse, meaning that it 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Tonkyro v. Sec'y, Dep't of Veterans Affairs*, 2024 WL 2846356, at *12 (M.D. Fla. June 5, 2024) (quoting *Monaghan v. Worldpay Inc.*, 955 F.3d 855, 862–63 (11th Cir. 2020)).

Here again, Plaintiff's claims fail because any purportedly adverse treatment occurred before the alleged protected activity. Am. Compl. ¶¶ 94, 96, 116, 296; *see Erickson v. Lakeland Regional Medical Ctr., Inc.*, 2022 WL 1487588, at *6 (M.D. Fla. May 11, 2022) (dismissing retaliatory hostile work environment claim where adverse actions occurred before plaintiff engaged in protected activity). Plaintiff's separation discussions with eMed during which she first alleged discrimination occurred on Saturday July 26 and Sunday July 27, 2025. She was terminated for cause the next day, based on findings from the forensic investigation. Am. Compl. ¶¶ 112, 116.

She could not possibly have experienced a retaliatory hostile work environment in 48 non-working hours, and she alleges no facts suggesting she did. The forensic investigation was initiated on July 23rd, *before* those weekend negotiations. Additionally, Plaintiff did not present the forensic investigation in her EEOC Charge and it therefore should not be considered here. *See* p. 10.

As noted (pp. 14-15), Plaintiff's July 22nd letter was silent on discrimination and therefore not protected activity. In any event, she alleges no materially adverse treatment over the next six days as a result of that letter that would dissuade a reasonable worker from making or reporting a charge of discrimination. *See Rorie v. Sch. Bd. of Palm Beach Cnty.*, 2022 WL 22996882, at *8 (S.D. Fla. Aug. 22, 2022) (employer's criticisms of employee and changes to his shifts were not materially adverse to state a retaliatory hostile work environment claim).[22] Am. Compl. ¶ 297.

## II. PLAINTIFF HAS NOT PLAUSIBLY ALLEGED A FPWA CLAIM (COUNT X).

The FPWA requires Plaintiff to show that she suffered an adverse employment action because she "objected to, or refused to participate in, any activity, policy, or practice of [eMed] which [was] in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3).[23] Plaintiff alleges that she was offered the role of President instead of CEO and ultimately terminated because she objected to a directive from Defendant Ferro to procure GLP-1 medication for an ineligible individual. Am. Compl. ¶ 84. She alleges in a conclusory fashion that "she raised concerns" to Ferro "as early as February 2024," but she was not employed by eMed until four months later (starting **June** 26, 2024). Am. Compl. ¶¶ 42, 83. She alleges no further facts concerning this

[22] *Reconsidered on other grounds Rorie v. Sch. Bd. of Palm Beach Cnty.*, 2024 WL 51008, at *13 n.12 (S.D. Fla. Jan. 4, 2024).

[23] The Florida Supreme Court recently resolved a circuit split to hold that a claim under the FPWA requires an *actual* legal violation, not just the plaintiff's reasonable, good faith belief that one occurred. *See Gessner v. S. Co.*, 2026 WL 1488160, at *8 (Fla. May 28, 2026). Plaintiffs allegations in paragraph 281 that she "reasonably and in good faith believed that the directives" violated applicable laws and regulations are inadequate and immaterial.

discussion, such as Ferro's reaction, to suggest that articulating "concerns" to Ferro was the but-for cause of eMed's decisions not to make her CEO of the post-Conversion entity and to terminate her in July 2025. *See Singleton v. Pub. Health Tr. of Miami-Dade Cnty.*, 725 F. App'x 736, 738 (11th Cir. 2018) (the temporal proximity between the objection and adverse action must be "very close" in the absence of other evidence of causation). *Harvey v. MD Now*, 2024 WL 6886986, at *10 (S.D. Fla. Mar. 4, 2024) (dismissing FPWA claim because allegations failed to establish causal link between protected activity and termination).[24]

Plaintiff also does not identify any manner in which she was "pressured [or] coerced to assist in procuring" medication for any individual. Am. Compl. ¶ 85. To the contrary, she alleges that when she discussed this subject with Dearborn and eMed's Head of Product on May 5, 2025, they "agreed that the directive could not lawfully be carried out." *Id*. ¶ 86. She does not allege that they instructed or pressured her to, nevertheless, carry out any purportedly unlawful directive.

Plaintiff further alleges that on May 11-12, 2025, Mr. Dearborn communicated that "Defendants" (*not* Plaintiff) "needed to 'figure out how to prescribe'" medication for "an individual who did not qualify," and that "employees were 'working to solve the [ ] problem.'" *Id.* ¶ 87. This statement cannot reasonably be conflated with a "directive[ ] to bypass clinical evaluation protocols." *Id*. ¶ 283. Indeed, it reflects eMed's acknowledgment that it *could not* simply disregard applicable requirements to issue the prescription. Further, Plaintiff does not allege that she objected to these statements or refused to help "solve the problem," so these allegations cannot support her whistleblower claim. *See Tillett v. BJ's Wholesale Club, Inc.*, 2010 WL 11507322, at *9 (M.D. Fla. July 30, 2010) (dismissing § 448.102(3) claim because plaintiff

[24] *See also Lapham v. Walgreen Co.*, 88 F.4th 879, 893 (11th Cir. 2023) ("the proper causation standard for [ ] FWA retaliation claims is but-for causation."); *accord Starks v. City of Miami Gardens*, 2024 WL 2721883, at *5 (S.D. Fla. May 28, 2024). Causation is further refuted by Defendants' stated reasons for terminating her: forensic investigation revealed she removed proprietary information. Am. Compl. ¶ 116.

failed to adequately allege he objected to or refused to participate in the alleged legal violation). These discussions also predated any "adverse" action. *Harvey*, 2024 WL 6886986, at *10.

Additionally, Plaintiff fails to adequately allege any actual legal or regulatory violation. *See Palacios v. Almod Diamonds, Ltd., Inc.,* 2024 WL 124870, at *3 (S.D. Fla. Jan. 11, 2024) (dismissing 448.102(3) claim because activities reported by plaintiff were inactionable); *Butterfield v. JetBlue Airways Corp.*, 2022 WL 291003, at *6 (11th Cir. Feb. 1, 2022) (affirming dismissal of 448.102(3) claim because pressuring employee to provide testimony did not establish a violation of witness tampering statute). Her allegations that three individuals who received GLP-1 medications were "not medically eligible" are overly conclusory, including because she does not tie their alleged "ineligibility" to any applicable law or regulation, or explain how that section was violated as to that individual. Am. Compl. ¶ 87-89. Her lack of specificity is especially problematic because Plaintiff is not a licensed medical professional and held a business, non-medical role at eMed. *Id*. ¶ 43. She was neither responsible for, nor capable of, determining who qualified for medication. As to two of the three individuals, she also does not allege that she was ever directed to participate in procuring them medication, or that she ever objected or refused to do so.

No statutory or code provision Plaintiff cites supports the existence of an actual legal or regulatory violation by eMed under the conclusory facts alleged (*See* Fla. Stat. § 448.102(3)):

- **Fla. Stat. § 456.47** requires telehealth providers to follow the same standard of care as in-person providers, and provides that medical history research and physical examination are not required if there is a sufficient alternative evaluation for diagnosis. Plaintiff does not specify any manner in which eMed provided telehealth services that deviated from the standard of care applicable to in-person providers; indeed, she does not allege that eMed provided telehealth services to the relevant individual(s), at all.

- **Fla. Admin. Code R. 64B8-9.012** sets forth standards of care for prescribing obesity drugs, and requires an "initial evaluation" before prescribing or dispensing weight loss drugs. This evaluation may be delegated to a physician assistant or registered nurse. Again, Plaintiff fails to adequately allege that eMed actually prescribed or dispensed any GLP-1 agonist to an individual who had not received and cleared the required evaluation.

- **Fla. Stat. § 458.336** enables the Board of Medicine to "adopt rules to establish practice guidelines for physicians to safely prescribe [ ] drugs used to treat obesity." Enabling statutes do not support private legal violations. *See State, Dep't of Fin. Servs. v. Peter R. Brown Const., Inc.*, 108 So. 3d 723, 726 (Fla. 1st DCA 2013); *see also Wolicki-Gables v. Drs. Same Day Surgery Ctr., Ltd.*, 216 So. 3d 665, 673 (Fla. 2d DCA 2017).

- **Fla. Stat. § 458.331(1)(q), (m), (g), (nn)** provide grounds for denial of a medical license or disciplinary action against a physician by the state medical board and department. "This statute merely describes actions on the part of a physician which would result in disciplinary proceedings[,]" and plaintiff identifies no physician involved in the alleged misconduct. *Lingle v. Dion*, 776 So. 2d 1073, 1077 (Fla. 4th DCA 2001) (holding that § 458.331 does not establish a cause of action or protect any individuals).

- **21 U.S.C. § 353(b)(1)** provides that specified drugs shall be dispensed only upon a licensed practitioner's written prescription or oral prescription that is promptly reduced to writing by the pharmacist. Plaintiff does not allege that any GLP-1 agonist was dispensed without a prescription; rather, she purports to question the prescription decisions, though she is not a licensed physician or pharmacist herself and does not adequately allege why any individual(s) were purportedly ineligible for medication. Am. Compl. ¶ 89.

- **21 U.S.C. § 331(a)** prohibits the introduction of adulterated or misbranded drugs into interstate commerce. Plaintiff alleges no facts suggesting that eMed adulterated or misbranded any GLP-1 agonist, much less that it caused any such drugs to cross state lines. She does not allege that any individual for whom eMed was working to procure medication was located outside of Florida.[25]

## III. ANY CLAIMS "WITH RESPECT TO THE PLAN" CAN ONLY BE BROUGHT IN DELAWARE PURSUANT TO THE PLAN'S FORUM SELECTION CLAUSE (COUNTS XIV, XV, XVIII, XIX, XX, XXII, XXV).

As argued *infra* (pp. 23-25), the Draft Plan was never adopted or agreed to, independently requiring dismissal with prejudice of all claims for relief under that document. However, should the Court find that Plaintiff has plausibly established that the Draft Plan constitutes an enforceable agreement between her and eMed Weight Loss, LLC, whom she alleges is eMed Population Health, Inc.'s predecessor (Am. Compl. ¶ 329), then Plaintiff is bound by its mandatory forum selection clause, and she must pursue her Plan-related claims in Delaware. Article 5.11 of the Draft

[25] To the extent this Count is not dismissed, Defendants alternatively move to strike the irrelevant sections as immaterial pursuant to Fed. R. Civ. P. 12(f). Plaintiff's difficulty in honing in on any law or regulation that was violated casts further doubt on her vague allegation that she actually objected to any conduct.

Plan provides that "[a]ny suit, action, or proceeding with respect to the Plan or any Award Agreement . . . shall be resolved *only* in the courts of the State of Delaware or the United States District Court for the District of Delaware . . . ."). Ex. 2, art. 5.11. Thus, Counts XIV, XV, XVIII, XIX, XX, XXII, and XXV for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, tortious interference, and fraudulent inducement, all of which seek relief "with respect to the Plan," should be dismissed pursuant to the doctrine of forum *non conveniens. See McCoy v. Sandals Resorts Int'l, Ltd.*, 2019 WL 6130444, at *4, 15 (S.D. Fla. Nov. 19, 2019) (dismissing action based on mandatory forum selection clause because "forum-selection clauses should control except in unusual cases."); *Grape Stars Int'l, Inc. v. nVentive, Inc.*, 2020 WL 4586123, at *7 (S.D. Fla. Aug. 10, 2020) (holding that where a clause refers to claims arising under or in connection with the contract, it includes related tort claims); *Bluesky Greenland Env't Sols., LLC v. Rentar Env't Sols., Inc.*, 2013 WL 12095168, at *5 (S.D. Fla. Apr. 19, 2013) (holding that equitable claims fell within the broad forum selection clause of distributor agreement); *Whirlpool Corp. v. Cabri*, 2022 WL 1421126, at *14 (D. Del. May 5, 2022) (holding that "broad" forum selection clause with identical language covering "[a]ny suit, action or proceeding with respect to the Plan or any Award Agreement" means "that the Clause covers more types of claims relating to the [ ] Plan than contract claims alone[.]").

Plaintiff's reference to a distinct forum selection clause contained in the Proprietary Interests Protection Agreement ("PIPA") (which she fails to attach or excerpt) cannot establish jurisdiction over claims for relief with respect to the Draft Plan; rather, the forum selection clause contained in the relevant agreement, pursuant to which she actually seeks relief, controls. Am. Compl. ¶ 46; *see Ponte Vedra Gifts & Accessories Co., LLC v. APL Logistics Ltd,* 2016 WL 2854207, at *3-4 (M.D. Fla. May 16, 2016) ("under ordinary contract principles" specific terms

control over general terms, and meaning and effect should be given to all terms; thus, forum selection clause contained in bill of lading controlled in shipment-related dispute, rather than distinct forum clause in service agreement which established the parties' general relationship).[26]

Defendants make their remaining dispositive arguments with respect to claims concerning the Draft Plan to the extent that this Court declines to dismiss those Counts pursuant to Article 5.11.

## IV. PLAINTIFF FAILS TO ADEQUATELY ALLEGE THAT THE DRAFT PLAN WAS A CONTRACT OR WAS BREACHED (COUNTS XIV, XV).

Plaintiff's breach of contract claims under the Draft Plan should be dismissed with prejudice because: (1) the Draft Plan was an unexecuted, unadopted *draft* agreement that Plaintiff does not allege was ever adopted (it was not), and (2) even *if* the Company had adopted the Draft Plan, and even *if* the Plan Administrator had selected Plaintiff to participate, no Sale Event occurred to trigger any potential right to a Bonus Amount under the Draft Plan's clear terms. Am. Compl. ¶¶ 102, 335-337, 349, 366; Ex. 2. § 2.24. Therefore, she alleges no contract and no breach.

The August 8, 2024 Employment Letter that made Plaintiff CEO of eMed Weight Loss, LLC provided that Plaintiff would be "**eligible** to participate in the attached eMed Weight Loss, LLC Transaction Bonus Plan (the "Plan"), a **draft** of which is attached."[27] A draft agreement is not binding; it is simply part of a negotiation. *Cambridge N. Point LLC v. Boston & Maine Corp.*,

---

[26] *See also TRG Holdings G & H, LLC v. Patel*, 2023 WL 3937428, at *8 (N.D. Ga. June 9, 2023) (enforcing forum selection clause contained in share purchase agreement, rather than employment agreement, where plaintiff alleged breach of share purchase agreement); *SSAB Alabama, Inc. v. Kem-bonds, Inc.*, 2017 WL 6345809, at *5 (S.D. Ala. Dec. 12, 2017) (rejecting plaintiff's position that forum selection clause in purchase orders between the parties should control over distinct forum selection clause in relevant contract); *Vill. Green Holding, LLC v. Holtzman*, 2018 WL 4849964, at *7 (Del. Ch. Oct. 5, 2018).

[27] Ex. 1 ¶ 6. Plaintiff failed to attach the Aug. 8, 2024 Employment Letter or the Transaction Bonus Plan to her Complaint, though she purports to seek contractual and other relief based on these documents, so Defendants attaches them to this Motion as Exhibits 1 and 2 respectively. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

2010 WL 2476424, at *12 (Del. Ch. June 17, 2010) ("[T]he March 6 Draft was just that—a draft, which by definition indicates that the exact terms of the agreement are evolving");[28] *Kuppinger v. JM.JZ Enterprises, Inc.*, 2022 WL 2341240, at *4 (S.D. Fla. May 9, 2022).

Further, "[w]hen the parties to a proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed." 13 Williston on Contracts § 38:7 (4th ed.); *e.g.*, *Roth v. Sotera Health Co.*, 2024 WL 4260649, at *10 (Del. Ch. Sept. 23, 2024); *Llanso v. SHEDDF2-FL3, LLC*, 346 So. 3d 1221, 1221 (Fla. 3d DCA 2022). The Draft Plan specified that it would not become effective until its "adoption by the Compensation Committee of the Board (the 'Effective Date')," an event which never occurred. *See* Ex. 2 at 1; Am. Compl. ¶¶ 373-374 (acknowledging that "no Compensation Committee was constituted at any time"); *Edward L. Nezelek, Inc. v. Sunbeam Television Corp.*, 413 So. 2d 51, 56 (Fla. 3d DCA 1982) ("conditions precedent must be at least generally averred in the pleadings"); *AIU Ins. Co. v. Philips Electronics No. Am. Corp.*, 2018 WL 367849, at *10 (Del. Ch. Jan. 11, 2018).

Plaintiff's attempt to argue that Defendants "ratified" the contract or accepted it by conduct fails. Am. Compl. ¶¶ 333, 341. First, the doctrine of ratification is inapplicable because it contemplates a scenario in which a principal or agent with proper authority ratifies a contract created by an agent without authority. *See, e.g.*, *Global Cap. P's v. Green Sapphire Holdings, Inc.*, 355 A.3d 120, 164-65 (Del. Ch. 2026); *Nat'l. Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F.Supp.2d 1318, 1323 (S.D. Fla. 2010). Plaintiff does not allege that any eMed agent lacking in

---

[28] The substantive law of Florida and Delaware are materially the same for purposes of the dispositive arguments Defendants raise in this Motion. In an abundance of caution, Defendants provide supporting case authorities from each state where Plaintiff purports to assert claims under the laws of both (though the Court should dismiss all claims "with respect to the Plan" without reaching their merits, pursuant article 5.11, *see supra pp.* 21-23).

authority purported to enter into the Draft Plan on its behalf, and only the "Compensation Committee of the Board" had the power to adopt or ratify the Draft Plan and make it effective. Ex. 2, Art. 1; Am. Compl. ¶¶ 353-354, 382. Nor does the conduct that Plaintiff points to as reflecting Defendants' "acceptance" of the Draft Plan—Plaintiff's spousal consent form (Am. Compl. ¶¶ 333, 364) and a representation to Aon in connection with the Conversion that employee equity offers were reflected in the company's records (Am. Compl. ¶¶ 52, 371, 376)—change the contingent and non-effective nature of the Draft Plan.

Even if Plaintiff could establish that the Draft Plan were a binding agreement, she fails to allege that it was breached. The Draft Plan provides for payment of a transaction bonus to plan participants only upon the consummation of a qualifying "Sale Event," which expressly excludes "transactions effected solely to change the form of organization or organizational structure without changing ownership." Am. Compl. ¶ 335; Ex. 2, art. 2.24. Plaintiff does not, and cannot, allege that the Conversion satisfied the Draft Plan's definition of a Sale Event. Am. Compl. ¶¶ 102, 335-337, 349, 366, 393, 419.[29] Rather, her allegations make clear that the Conversion was an excluded transaction under article 2.24, **not** a qualifying Sale Event. *Id*. Thus, she cannot establish that eMed Weight Loss, LLC breached the Draft Plan by failing to provide her with a transaction bonus.[30]

---

[29] Plaintiff also does not allege that the Plan Administrator ever selected her to participate in the Draft Plan. *See* Ex. 2, art. 4.1 ("[p]articipation in the Plan shall be limited to those Participants selected by the Administrator . . . and no employee or service provider of the Company Group shall have any right to be selected as a Participant.")

[30] After Defendants moved to dismiss the Complaint on this basis, Plaintiff added conclusory allegations suggesting that the Conversion should be considered a Sale Event, after all. *See* Am. Compl. ¶ 101. These allegations directly contradict her original allegations—as well as her current allegations that Defendants engineered the Conversion to avoid payment obligations under the Draft Plan—and her attempt to avoid dismissal by taking the opposite position in her Amended Complaint should be rejected. Compl. ¶¶ 89, 322-323; Am. Compl. ¶¶ 102, 335-337, 349, 366, 393, 419. "Numerous courts have recognized" that the court need not take allegations as true "where the plaintiff amends his complaint to respond to a motion to dismiss and directly contradicts the facts set forth in the original complaint or manipulates the allegations to avoid a dispositive defense." *See Davis v. Yellowpages.com LLC*, 2017 WL 11742750, at *4 (N.D. Ga. July 21, 2017).

Finally, article 5.10 of the Draft Plan (Ex. 2) provides that it "shall be governed by the laws of the State of Delaware," further requiring the dismissal of duplicative Count XIV under Florida law. The separate choice of law provision in the PIPA and the location of Plaintiff's employment do not allow her to avoid the application of Delaware law, as required by the Draft Plan. *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000); *Videojet Techs. Inc. v. Garcia*, 2008 WL 2415042, at *3 (M.D. Fla. June 12, 2008) ("when contracting parties indicate in the contract their intention as to the governing law, any dispute under the contract will be governed by such law as long as it is not against Florida's public policy").

## V. PLAINTIFF FAILS TO STATE CLAIMS FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNTS XVIII, XIX).

A claim for breach of the implied covenant must be tied to a particular term of an actual agreement. *See MRPC Christiana LLC v. Crown Bank*, 2017 WL 6606587, at *4 (Del. Super. Ct. Dec. 26, 2017); *Senter v. JPMorgan Chase Bank, N.A.*, 810 F. Supp. 2d 1339, 1361-62 (S.D. Fla. 2011) ("a proper pleading of breach of the covenant of good faith and fair dealing necessarily requires the pleading of a valid contract" and "cannot be maintained . . . in the absence of a breach of an express term of a contract."). Counts XVIII and XIX fail to the extent they are based on Plaintiff's non-receipt of a transaction bonus because the Draft Plan was an unadopted draft, not an enforceable agreement. *See* pp. 23-25, *supra*; Ex. 2, Art. 1.

Further, even if the Draft Plan were construed as a binding agreement, the implied covenant of good faith and fair dealing cannot modify or override express contract terms. *Bailey v. Tektronix, Inc.*, 2022 WL 4132881, at *7 (D. Del. Sept. 12, 2022), *aff'd*, 2025 WL 1341876 (3d Cir. May 8, 2025); *Ins. Concepts & Design, Inc. v. Healthplan Services, Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001) ("[T]he implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties."). Consequently, a good faith and fair dealing claim

"premised on the failure of defendants to pay money due under the contract . . . must fail because the express terms of the contract will control such a claim." *Bailey,* 2022 WL 4132881, at *7. Plaintiff's assertion that eMed Defendants breached the implied covenant by withholding compensation under the Draft Plan is negated by the express terms of the Draft Plan, which provides that Bonus Amounts are awarded to participants only in the event of a qualifying "Sale Event," and are forfeited upon termination. Ex. 2, Arts. 2.24, 4.4. No Sale Event occurred. Am. Compl. ¶¶ 101-102, 335-336. Further, pursuant to the August 8, 2024 Employment Letter, Plaintiff was an at-will employee, and could be freely terminated "at any time without cause." Ex. 1 ¶ 9.

Plaintiff's lumping together of allegations related to the hypothetical forfeiture of her relocation bonus under the Employment Agreement and her non-receipt of a transaction bonus under the Draft Plan is improper; these are distinct claims, premised on different terms of separate agreements, and distinct conduct, and must be asserted separately. *Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr.*, 2019 WL 12304839, at *7 (S.D. Fla. Aug. 21, 2019) (dismissing complaint that lumped together allegations regarding multiple breaches of different contracts). Plaintiff's allegations concerning the Draft Plan are governed by Delaware law (*see* Ex. 2 art. 5.10), requiring dismissal of duplicative Count XVIII under Florida law.

Further, Plaintiff has not actually repaid or been required to repay her relocation bonus, so she has no damages that could support a good faith and fair dealing claim on this basis. Am. Compl. ¶ 118. A mere demand does not suffice. *See Casey v. Bank of Am., N.A.*, 2014 WL 12580515, at *2 (S.D. Fla. Mar. 12, 2014); *cf. Gulf Grp. Holdings, Inc. v. Coast Asset Mgmt. Corp.*, 516 F. Supp. 2d 1253, 1268 (S.D. Fla. 2007) (demand for payment insufficient to trigger indemnification).

## VI. PLAINTIFF FAILS TO STATE A CLAIM FOR PROMISSORY ESTOPPEL (COUNT XX).

"[T]here can be no promissory estoppel unless the terms of the promise are definite in

relation to the remedy sought." *Fried v. Stiefel Laboratories, Inc.*, 2012 WL 4364300, at *10 (S.D. Fla. June 8, 2012). The only alleged promise Plaintiff identifies is the Draft Plan, itself. *See* Am. Compl. ¶ 417. Plaintiff cannot use promissory estoppel to vary and circumvent the express language of the Draft Plan and seek hypothetical transaction bonuses that were never available to her and which never would have accrued thereunder. *See* pp. *supra* 23-25; *Nview Health, Inc. v. David V.*, 2022 WL 16923585, at *18 (M.D. Fla. Nov. 14, 2022) (under Delaware law, promissory estoppel may not be based on alleged promises that contradict contract terms); *Fin. Healthcare Assocs., Inc. v. Pub. Health Tr. of Miami-Dade Cnty.*, 488 F. Supp. 2d 1231, 1237 (S.D. Fla. 2007) (dismissing promissory estoppel claim based on conflict between alleged oral promise and related contract). "Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract." *Myers v. 3073 Horseshoe Drive, LLC,* 2024 WL 4040834, at *2 (M.D. Fla. Sept. 4, 2024) (citing *Advanced Mktg. Sys. Corp. v. ZK Yacht Sales*, 830 So. 2d 924, 928 (Fla. 4th DCA 2002)).

As discussed *supra* (pp. 23-25), the Draft Plan did not guarantee Plaintiff any bonus payments—had it taken effect, she would have merely been *eligible* to participate at the Administrator's discretion, and if made a participant, would only receive a bonus in the event of a "Sale Event" and continued employment. Ex. 2 at Arts. 1, 4.1, 4.4; Am. Compl. ¶ 51. Further, the Draft Plan provided that it could be freely amended or terminated by the Compensation Committee. Ex. 2, Art. 5.4. Therefore, Plaintiff cannot establish a sufficiently definite promise of participation interests or bonus payments that may be enforced through promissory estoppel. *Peacock Med. Lab, LLC v. UnitedHealth Grp., Inc.*, 2015 WL 2198470, at *5 (S.D. Fla. May 11, 2015) (dismissing promissory estoppel claim because insurer's confirmation of coverage was not a definite promise to pay claims); *Advanced Prot. Techs., Inc. v. Square D Co.*, 2005 WL 8185594,

at *6 (M.D. Fla. Jan. 31, 2005) (dismissing promissory estoppel claim based on promise to either buy plaintiff's interest in joint venture or purchase plaintiff when joint venture ended).

The conditional nature of the Draft Plan also negates Plaintiff's allegations that she reasonably relied on it to her detriment. The Draft Plan made clear that a series of contingencies needed to occur before Plaintiff could hope to receive participation interests or bonus payments: it needed to be implemented and not be amended or terminated, the Administrator needed to select her for participation, she needed to remain employed, and a Sale Event needed to occur.[31] Courts routinely dismiss promissory estoppel claims where, as here, the alleged promises are conditional and subject to future events, which renders reliance objectively unreasonable. *Servicios de Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Sys. Inc.*, 2007 WL 9706466, at *4 (S.D. Fla. June 19, 2007) (dismissing promissory estoppel claim because reliance was "simply not reasonable in light of the indefinite and tentative nature of the promise").[32] It was objectively unreasonable for Plaintiff to make any employment, financial, or life decisions based on an expectancy of hypothetical bonus payments referenced in a draft document.

## VII. PLAINTIFF FAILS TO PLEAD FRAUDULENT INDUCEMENT (COUNT XXII).

Plaintiff alleges no false representation of material fact. Instead, she relies upon her receipt of the Draft Plan, which was attached to an employment offer transmitted by eMed's Vice President of Human Resources. Am. Compl. ¶ 432. She claims the Draft Plan induced her to accept the role of CEO in eMed Weight Loss and give up equity in another eMed entity. *Id*. The only

---

[31] Ex. 2, Arts. 1, 2.24, 4.1, 4.4, 5.4; Am. Compl. ¶ 419 (acknowledging non-satisfaction of "triggering condition").

[32] *See also Escarra v. Regions Bank*, 353 F. App'x 401, 403 (11th Cir. 2009) (at-will employee could not reasonably rely upon a salary guarantee that was subject to forfeiture on termination); *Leonardi v. City of Hollywood*, 715 So. 2d 1007, 1010 (Fla. 4th DCA 1998) (dismissing at will employee's promissory estoppel claim for wages); *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 877 (Del. 2020) (affirming dismissal of promissory estoppel claim because "a reasonable person would likely have understood that the offer and acceptance were subject to the credit committee's approval").

statements on which she alleges she relied (if any) are the written contents of the Draft Plan, itself (which she fails to identify or attach). Her vague, conclusory allegations that Ferro and Dearborn "reinforced," "adopted and furthered" these unspecified "misrepresentations" (Am. Compl. ¶¶ 433, 435) do not satisfy Rule 9(b)'s heightened pleading requirements for fraud, requiring dismissal of these Defendants. *See Kanen v. BBQ Holdings, Inc.*, 2024 WL 5508197, at *16 (S.D. Fla. Nov. 8, 2024) (dismissing fraudulent inducement claim where plaintiff alleged that he was misled by email transmitting relevant agreement, but did not attach or describe the email).[33]

Plaintiff identifies no aspect of the Draft Plan that was false. Her employment offer expressly referred to the Draft Plan as "a draft," and that draft stated that it would be effective "as of the date of the Plan's adoption[.]" Ex. 1 ¶ 6; Ex. 2, art. 1. In any event, Plaintiff does not claim that she was damaged because the Draft Plan was never implemented, but rather, because the Conversion was not a Sale Event and extinguished the Draft Plan. *See* Am. Compl. ¶¶ 435, 439.

To the extent Plaintiff contends that she detrimentally relied on a promise that she would receive a Bonus Payment under circumstances contrary to those specified in the Draft Plan (and she has not adequately alleged any such promise), her reliance was unreasonable as a matter of law, because the Draft Plan expressly foreclosed that possibility. *See, e.g., Terry v. Carnival Corp.*, 2014 WL 11804563, at *2 (S.D. Fla. Feb. 12, 2014) ("[r]eliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement").[34] Any purported reliance is rendered further unreasonable by

---

[33] *See Dixon v. Allergan USA, Inc.*, 645 F. App'x 930, 932 (11th Cir. 2016) (explaining 9(b)'s particularity requirements for fraud claims); *Costanza Y Cruz Medina v. Scottsdale Ins. Co.*, 2023 WL 11801301, at *3 (S.D. Fla. Mar. 7, 2023) (dismissing fraudulent inducement claim where statements alleged were either true or "bare, generalized allegations").

[34] *Accord Clear Marine Ventures, Ltd. v. Brunswick Corp.*, 2009 WL 10667205, at *2 (S.D. Fla. Apr. 6, 2009) ("[W]here the express language of a controlling written contract rebuts allegations of fraudulent inducement [ ] courts dismiss such actions at the pleading stage."); *Topp, Inc. v. Uniden Am. Corp.*, 513 F. Supp. 2d 1345, 1348 (S.D. Fla. 2007) (dismissing claim for fraud in the inducement based on an act that

the fact that the Draft Plan could be amended or terminated at any time. Ex. 2, Art. 5.4.

Further, promises of future action (*i.e*., to pay a bonus upon a Sale Event) typically cannot support claims for fraud in the inducement. *See, e.g., Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1224 (S.D. Fla. 2010) ("Fraud must be based on material fact, not on a promise or a prediction of future events.").[35] Plaintiff has not pled any specific facts to support an inference that eMed never intended to pay her a transaction bonus, or that would permit her to expect payment on any terms other than those specified in the Draft Plan, if adopted.

Finally, Plaintiff's fraudulent inducement claim is barred by the independent tort doctrine because it simply recasts her deficient breach of contract claims and seeks the same damages. *See, e.g.*, *Med-Stop, Inc. v. Vandutch, Inc.*, 2025 WL 26731, at *5–6 (S.D. Fla. Jan. 3, 2025) (dismissing fraudulent inducement claim because it was "inextricably intertwined with Defendants' performance on the contract."). The conduct and damages supporting a claim for fraudulent inducement must be distinct from that alleged in support of a related claim for breach of contract. *See, e.g., Perez v. Scottsdale Ins. Co.*, 2020 WL 607145, at *3 (S.D. Fla. Feb. 7, 2020). Contrary to this rule, Plaintiff fails to allege with particularity any statement she relied upon other than the same Draft Plan under which she attempts to assert breach of contract claims in Counts XIV and XV, and she seeks the same damages for her contract and fraud claims. *See id.* (dismissing fraudulent inducement claim where insured alleged no statement by insurer other than the policy terms) (Am. Compl. ¶¶ 355-357, 443).

---

was "clearly permitted by the contractual language."); *Padilla v. Padilla*, 278 So. 3d 333, 334 (Fla. 3d DCA 2019) (affirming dismissal of fraudulent inducement claim that was "expressly belied by the contract documents.").

[35] *Accord MCM Ent., Inc. v. Diaz World Trade Grp.*, 2024 WL 2833649, at *9 (S.D. Fla. Jan. 30, 2024); *Teratech USA, Inc. v. Digital Beauty Grp., LLC*, 2021 WL 9566158, at *4 (S.D. Fla. Nov. 22, 2021); *Maunsell v. Am. Gen. Life & Acc. Ins. Co.*, 707 So. 2d 916, 917 (Fla. 3d DCA 1998).

## VIII. PLAINTIFF FAILS TO STATE CLAIMS FOR TORTIOUS INTERFERENCE (COUNTS XXIV–XXV).

### A. The Individual Defendants are Not Strangers to eMed's Relationships.

Plaintiff's tortious interference claims fail at the outset because Ferro and Dearborn are not strangers to the alleged business and contractual relationships. Plaintiff alleges that Ferro is the "founder and controlling equity holder" of eMed, held supervisory authority over her employment, had the authority to "direct all material operational, financial, and personnel decisions" for eMed, and his "actions and directives represented the actions of the organization itself." Am. Compl. ¶¶ 13, 15. She alleges that Dearborn is the Executive Chairman of eMed and held "supervisory authority" over her, including the power to make decisions regarding her role, reporting structure, and compensation. *Id.* ¶ 17. The "interference" she alleges against them—"directing" the corporate conversion and acts and decisions with respect to her role and termination—all fall squarely within the scope of their authority and constitute actions of the company, itself.

Florida and Delaware law prohibit claims like these for tortious interference against corporate agents acting within the scope of their authority, as their acts are imputed to the company, which cannot "interfere" with its own contracts and relations. *See, e.g.*, *M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1339–40 (11th Cir. 2020) ("a person with 'any beneficial or economic interest in, or control over,' a contractual relationship is not considered a 'stranger' to the contract and therefore has a 'privilege to interfere' in that relationship"); *Core Distribution v. World Trade Corp.*, 2026 WL 1251628, at *7 (S.D. Fla. May 7, 2026) (dismissing tortious interference claim against COO); *In re CVR Ref., LP Unitholder Litig.*, 2020 WL 506680, at *18 (Del. Ch. Jan. 31, 2020) (dismissing tortious interference claim against directors).[36]

[36] *See SIG, Inc. v. AT & T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1199 (S.D. Fla. 2013) (dismissing tortious interference claim against officers whom plaintiff failed to aver exceeded their authority or harmed company interests by executing corporate transaction); *Bridge Fin., Inc. v. J. Fischer & Assocs., Inc.*, 310

Plaintiff's conclusory allegations that Ferro and Dearborn acted with improper intent do not plausibly establish that their actions were "divorced from any legitimate competitive economic interest." *See Core*, 2026 WL 1251628, at *8; Am. Compl.¶ 454. Plaintiff does not attribute a single "discriminatory" remark to Dearborn.[37] With respect to Ferro, these allegations are inadequate to establish any discriminatory animus, as explained *supra* pp. 11-13.

### B. Plaintiff Has No Underlying Contract that was Breached.

Count XXV fails for the additional reasons that Plaintiff cannot establish the existence of a contract, or an underlying breach, for the reasons discussed *supra* (pp. 23-25). *See In re CVR*, 2020 WL 506680, at *16; *see also M & M*, 982 F.3d at 1340–41 (holding that, where plaintiff could not prove trust breached its contract, it could not hold trustee liable for tortious interference).

### C. Plaintiff Pleads No Legitimate Expectancy of the CEO Role or Continued Employment.

Plaintiff was an at-will employee with no reasonable expectancy of being promoted to CEO or remaining employed within the post-Conversion entity. *See* Ex. 1 ¶¶ 1, 9. She alleges no facts tending to suggest that she would have been elevated to the CEO role or remained employed in the absence of alleged interference. Therefore, Count XXIV fails for the additional reason that there was no "'understanding between the parties [that] would have been contemplated had the defendant not interfered.'" *See Commodores Ent. Corp. v. McClary*, 324 F. Supp. 3d 1245, 1256 (M.D. Fla. 2018), *aff'd,* 822 F. App'x 904 (11th Cir. 2020).

---

So. 3d 45, 50 (Fla. 4th DCA 2020) (affirming judgment on pleadings in favor of partial owner of company on tortious interference claim); *Dieckman v. Regency GP LP*, 2018 WL 1006558, at *5 (Del. Ch. 2018) (Directors only tortiously interfere with their company's agreements by exceeding their scope of authority).

[37] Plaintiff's attempts to commingle and conflate the distinct acts of Ferro, Dearborn, and eMed are improper; she must plead actionable conduct by each individual Defendant to proceed against him. *See, e.g.*, *Bentley v. Bank of Am., N.A.*, 773 F. Supp. 2d 1367, 1373 (S.D. Fla. 2011).

## IX. PLAINTIFF FAILS TO STATE A CIVIL CONSPIRACY CLAIM (COUNT XXVI).[38]

### A. Plaintiff Pleads No Underlying Wrong or Unlawful Act.

It is black-letter law that conspiracy is "not a freestanding tort." *SFM Holdings Ltd. v. Banc of Am. Secs., LLC*, 764 F.3d 1327, 1339 (11th Cir. 2014); *Lorillard Tobacco Co. v. Alexander*, 123 So.3d 67, 80 (Fla. 3d DCA 2013). Where "there is no underlying 'unlawful act' or 'lawful act done by unlawful means'" a civil conspiracy claim must be dismissed. *Hercules Cap., Inc. v. Gittleman,* 2018 WL 395489, at *24 (S.D. Fla. Jan. 12, 2018). Plaintiff fails to identify any recognized tort that was the object of the alleged conspiracy. Instead, she alleges that Defendants "use[d] [her] industry credibility and executive relationships to secure institutional investment" and execute the corporate conversion before she received bonus payments under the Draft Plan. Compl. ¶¶ 473. By way of underlying acts: Plaintiff alleges that Defendants: 1) executed the corporate conversion; 2) issued the Change of Position letter; 3) retained a forensic expert; and 4) terminated her. *Id.* ¶ 474. None of this conduct is unlawful, and Plaintiff had no entitlement to compensation under the Draft Plan for the reasons described *supra* (pp. 23-25). *See Crawley-Kitzman v. Hernandez*, 324 So. 3d 968, 977 (Fla. 3d DCA 2021) (dismissing civil conspiracy claim alleging that employer conducted sale transaction in a manner to circumvent employee's agreement and deprive her of contractual compensation). In any event, "a breach of contract is not a wrong or unlawful act cognizable under civil conspiracy." *Francois v. Hatami*, 565 F. Supp. 3d 1259, 1269 (S.D. Fla. 2021).[39]

Further, Plaintiff fails to allege "when the agreement was entered into, the identity and role

---

[38] This Count, simply labeled "Civil Conspiracy," references no underlying cause of action.

[39] *See also Debose v. Univ. of S. Fla.*, 178 F. Supp. 3d 1258, 1272 n.4 (M.D. Fla. 2016) (conspiracy claim based on wrongful termination required the plaintiff to show she was employed for a definite term); *Martinez v. Goodwill Indus. of S. Fla., Inc.*, 2011 WL 13217232, at *5 (S.D. Fla. Apr. 1, 2011) (dismissing civil conspiracy claim because underlying FPWA claim failed).

of each participant, and the capacity in which each participant acted[,]" further requiring dismissal of this claim. *Morrison v. Univ. of Miami*, 2016 WL 3129490, at *10 (S.D. Fla. Jan. 20, 2016).

**B. The Intra-Corporate Conspiracy Doctrine Bars Plaintiff's Conspiracy Claims.**

Under the intra-corporate conspiracy doctrine, a company cannot conspire with its own employees and agents, as they comprise a single legal entity. *See Hogan v. City of Fort Walton Beach*, 817 F. App'x 717, 723 (11th Cir. 2020); *Carey v. Kirk*, 2026 WL 836688, at *3 (11th Cir. Mar. 26, 2026). Mr. Ferro is the founder and controlling equity holder of eMed, LLC, and Mr. Dearborn is its Executive Chairman. Am. Compl. ¶¶ 13-17. Plaintiff alleges that both held supervisory authority over her, and that Mr. Ferro's "actions and directives represented the actions of the organization itself." *Id*. ¶¶ 14-15. They therefore could not have conspired with eMed.

Plaintiff's conclusory allegations that the individual Defendants were personally motivated are too conclusory to invoke the narrow personal interest exception to this doctrine. *See Mancinelli v. Davis*, 217 So. 3d 1034, 1037-38 (Fla. 4th DCA 2017) (rejecting conclusory allegations regarding CEO's personal animus because benefits to him were incidental to the company's gain). Any financial benefits to them from the Conversion were merely incidental to financial benefits to eMed, and their relevant acts were plainly undertaken for corporate purposes (Plaintiff separately attributes these to eMed, in other Counts). Further, as argued *supra* (pp. 11-13), Plaintiff's allegations do not plausibly establish any sexual or retaliatory animus, much less that Ferro or Dearborn had any personal stake in eMed's medical decision-making or termination decisions. *See supra* (pp. 18-21); *Santillana v. Fla. State Ct. Sys.*, 2010 WL 271433, at *14 (M.D. Fla. Jan. 15, 2010) (dismissing civil conspiracy claim because court, not its agents, terminated court employee).

## CONCLUSION

WHEREFORE, Defendants respectfully request that the Court dismiss Plaintiff's Complaint with prejudice and award any other such relief as it deems just and proper.

## **REQUEST FOR HEARING**

The Counts alleged in Plaintiff's Amended Complaint and the questions of law presented by them are numerous, and even the enlarged page limits authorized by the Court necessarily cabin the scope and depth of discussion that is possible within this briefing. Pursuant to Local Rule 7.1(b)(2), Defendants respectfully requests that this Court enter an Order specially setting a ninety-minute hearing on Defendants' Omnibus Motion to Dismiss the Amended Complaint, to provide the parties the opportunity to further distill these claims, elaborate upon the dispositive arguments and legal authorities presented herein as beneficial and appropriate, and address any of the Court's questions.

Dated: August 20, 2026

Respectfully submitted,

/s/ *Olga Vieira*
Olga M. Vieira
Fla. Bar No. 29783
Shalia Sakona
Fla. Bar No. 107398
Quinn, Emanuel, Urquhart & Sullivan LLP
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
Tel.: (305) 402-4880

*Counsel for Defendants eMed LLC, eMed Population Health, Inc., Michael Ferro, and Justin Dearborn*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of August 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Olga Vieira*
Olga M. Vieira
Fla. Bar No. 29783
Quinn, Emanuel, Urquhart & Sullivan LLP
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
Tel.: (305) 402-4880