# EXHIBIT 5

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: ☐ FEPA ☒ EEOC

Agency(ies) Charge No(s):

Florida Commission on Human Relations,the Delaware Department of Labor's Office of Anti-Discrimination, & the Miami-Dade Commission on Human Rights, and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Ms. Wendi Mader (email: wendi.s.mader@gmail.com) | (913) 575-3684 | 04/14/1979 |

Street Address / City, State and ZIP Code

5928 SW 69th Ave, Miami, FL, 33143

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| EMED, LLC | 15+ | (312) 994-9480 |

Street Address / City, State and ZIP Code

990 Biscayne Blvd, Suite 1501, Miami FL 33132

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

Street Address / City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN

☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION

☒ OTHER *(Specify)* **SEXUAL HARASSMENT, HOSTILE WORK ENVIRONMENT, RETALIATORY HOSTILE WORK ENVIORNMENT**

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| 08/08/24 | 07/28/25 |

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Claimant, WENDI MADER, alleges that Respondent, EMED, LLC, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"), the Delaware Discrimination in Employment Act, Del. Code tit. 19, § 710 *et seq.*, ("DDEA"), and the Miami-Dade County Human Rights Ordinance, ch. 11A, art. IV, § 11A–26 *et seq.* ("MDHRO").

SEE STATEMENT OF THE PARTICULARS AND SWORN AND SIGNED VERIFICATION BY CLAIMANT ATTACHED HERETO AND FULLY INCORPORATED BY REFERENCE.

NOTE: Jeffrey Schumm, Esq., is a point of contact for Respondent. He can be contacted via electronic mail at jeff@emed.com.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

09/11/25 — [signature] Wendi Mader (Sep 11, 2025 13:45:03 EDT)

*Date* — *Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(*month, day, year*)

ML | MacDonald Law PLLC

**MacDonald Law, PLLC**
420 SW 7th Street, Suite 1118, Miami, Florida 33130
786.500.9675 | kyle@macdonaldemploymentlaw.com

**VIA EEOC E-FILE FOR ATTORNEYS PORTAL**
U.S. Equal Employment Opportunity Commission
Miami District Office
100 SE 2nd Street, Suite 1500
Miami, FL 33131

**Re:** ***Wendi Mader v. eMed, LLC***[1]

Dear Investigator:

Our firm represents the Charging Party, Ms. Wendi Mader, in connection with her claims arising from her employment with eMed, LLC.

Ms. Mader's claims against Respondent eMed, LLC, include those arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"), the Delaware Discrimination in Employment Act, Del. Code tit. 19, § 710 *et seq.*, ("DDEA"), and the Miami-Dade County Human Rights Ordinance, ch. 11A, art. IV, § 11A–26 *et seq.* ("MDHRO"). Ms. Mader's theories of discrimination include disparate treatment, sex/gender discrimination, sexual harassment, hostile work environment, retaliation, and retaliatory hostile work environment.

Please dual-file Ms. Mader's Charge with the Florida Commission on Human Relations, the Delaware Department of Labor's Office of Anti-Discrimination, and the Miami-Dade County Commission on Human Rights.

| **CHARGING PARTY** | **RESPONDENT** |
|---|---|
| Ms. Wendi Mader<br>*Via Charging Party's Counsel*<br>c/o MacDonald Law, PLLC<br>420 SW 7th Street Suite 1118<br>T: (786) 500-9675<br>E: kyle@macdonaldemploymentlaw.com | eMed, LLC<br>c/o Jeffrey Schumm, Esq.<br>990 Biscayne Blvd, Suite 1501<br>Miami, FL 33132<br>T: (214) 578-4565<br>E: jeff@emed.com |

[1] Ms. Mader demands Respondents preserve all physical and electronic information pertaining in any way to Ms. Mader's employment, to Ms. Mader's potential claims including damages, to any defenses to same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in any subsequent litigation to the Commission's investigation.

***Upon information and belief, Charging Party alleges as follows:***

1. Charging Party, Wendi Mader ("Charging Party" or "Ms. Mader"), is an individual female residing in Miami-Dade County, Florida.

2. Respondents, eMed, LLC, eMed Weight Loss, LLC, eMed Population Health, Inc., and eMed Population Health, LLC (collectively, "Respondents" or "eMed"), are related corporate entities that were at all material times Ms. Mader's joint and/or single employer.

3. Respondent eMed, LLC, is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

4. Respondent eMed Weight Loss, LLC, is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

5. Respondent eMed Population Health, Inc., is a Delaware corporation conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

6. Respondent eMed Population Health, LLC is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

7. At all times material, Respondents operated as a single, integrated enterprise and/or joint employer with respect to Ms. Mader's employment, and their operations were functionally and financially intertwined. By means of example and not intended to be an exhaustive list: (a) interrelated operations, demonstrated by Ms. Mader being hired by one entity (eMed Weight Loss, LLC), but later being issued a revised offer letter and demoted by another (eMed Population

Health, Inc.); (b) common management, with Michael Ferro and Justin Dearborn exercising authority across all entities; (c) centralized control of labor relations through a single Human Resources department led by Ken Finneran that handled hiring, termination, and benefits for all entities; and (d) common ownership or financial control, with Michael Ferro acting as the ultimate controlling principal of the entire eMed corporate family.

8. At all times material, Michael Ferro ("Ferro"), an individual male, was the Founder and a principal stakeholder of eMed, LLC, eMed Weight Loss, LLC, and eMed Population Health, Inc. Ferro held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Ferro's actions are attributable to Respondents under a theory of direct or vicarious liability.

9. At all times material, Justin Dearborn ("Dearborn"), an individual male, was the Chairman and principal executive of eMed, LLC, eMed Weight Loss, LLC, and eMed Population Health, Inc. Dearborn held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Dearborn's actions are attributable to Respondents under a theory of direct or vicarious liability.

10. At all times material, Ken Finneran ("Finneran"), an individual male, was the Vice President of Human Resources and Chief Human Resources Officer for eMed. Mr. Finneran held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Mr. Finneran's actions are attributable to Respondents under a theory of direct or vicarious liability.

11. At all times material, Dr. Patrice Harris ("Dr. Harris"), an individual female, was the Co-founder and CEO of eMed and a principal stakeholder.

# MATERIAL FACTS

## I. The Inducement and Ms. Mader's Extraordinary Performance

12. At all times material, Ms. Mader was a protected class member on the basis of her sex.

13. On August 8, 2024, eMed extended a formal offer of employment to Ms. Mader for the position of Chief Executive Officer (CEO), eMed Weight Loss, LLC. As a key inducement, the offer included a contractual ten percent (10%) Participation Percentage in the eMed Weight Loss, LLC Transaction Bonus Plan.

14. Within approximately 120 days of her August 2024 start date, Ms. Mader demonstrated exceptional leadership by successfully designing and launching eMed's new weight loss business line with its first commercial customer in January 2025.

15. Ms. Mader's expertise and credibility within the industry were the direct and proximate cause of eMed securing a monumental $100,000,000.00 investment from Aon Investments Holdco LLC ("Aon"), which resulted in a $2 billion enterprise valuation for her business unit upon the deal's closing on or about April 30, 2025.

## II. The Severe and Pervasive Hostile Work Environment Based on Sex

16. While Ms. Mader was generating this unprecedented success, the Founder, Michael Ferro, subjected her to a hostile, abusive, and misogynistic work environment designed to undermine her as a female leader.

17. Ferro consistently used profanity and demeaning language towards staff, creating an atmosphere of fear. On information and belief, Ferro also used the word "**CUNT**" to demean women in workplace meetings and made sexist, misogynistic remarks on a routine basis.

18. Ferro also made vulgar, sexually harassing, and misogynistic comments about Ms. Mader's physical appearance. In a conversation shortly after she was hired as CEO, Ferro told her she **"wasn't hot or pretty but not too ugly to sell to prospects and work with customers."** This unsolicited and demeaning assessment of her sexual attractiveness was a gross abuse of power, intended to degrade her and reduce her role as CEO to a crude valuation of her physical appearance.

19. This was part of a pattern of Ferro making inappropriate comments about female employees' appearances. He told Ms. Mader he had heard from friends that eMed was hiring "**ugly middle-aged people**" and commented on another female sales representative's appearance, stating she "**just doesn't look as good anymore**."

20. On multiple occasions, Ferro told Ms. Mader that she needed to be "**MORE OF A BITCH**", a blatant, offensive, and gender-based stereotype aimed at attacking her leadership style simply because she is a woman.

21. On another occasion while Ms. Mader was absent, Ferro publicly demeaned her during a team standup meeting, an act so egregious that two employees later expressed their concern to her about the profound disrespect he had shown.

22. Upon information and belief, Ferro's hostile and demeaning conduct towards Ms. Mader is part of a broader, documented pattern of predatory behavior towards female professionals.

23. In 2018, it was widely reported that another female executive, Hagan Kappler, alleged that Ferro cornered her in his hotel suite under the pretense of a business dinner and groped

her breast.[2] In the same report, Kathryn Minshew, the founder of a career-advice startup, alleged that Ferro lured her to a corporate apartment where he forcefully pulled her in for an unwanted kiss.

24. In 2018, it was also reported that Ferro had privately settled a dispute for making discriminatory, antisemitic remarks regarding Judaism, referring to a "Jewish cabal" in the publishing industry.[3]

25. The hostile environment extended to a complete disregard for Ms. Mader's executive authority. As CEO, Ms. Mader's requests for essential resources, including marketing budgets, employee raises and bonuses, and sales incentive plan approvals, were consistently ignored and stonewalled by Ferro, making sustainable leadership impossible.

### III. Ms. Mader's Opposition to Unlawful Practices

26. Beyond the pervasive discrimination she endured, Ms. Mader was repeatedly directed by Ferro and Dearborn to assist them in an unlawful scheme to procure potent GLP-1 prescription drugs for personal friends and high-profile associates by deliberately subverting the mandatory standard of care required under state and federal law.

27. This pattern of corporate malfeasance is starkly illustrated by the directive from Ferro concerning Linda Yaccarino, who was the incoming, and not yet publicly announced, Chief Executive Officer of eMed. Ferro explicitly ordered Ms. Mader to bypass the necessary clinical

---

[2] *See, e.g.*, Michal Lev-Ram, Michael Ferro, Chairman of Tronc, Accused of Inappropriate Advances by Two Women, FORTUNE (Mar. 19, 2018), https://fortune.com/2018/03/19/tronc-chairman-michael-ferro-allegations/; *see also* Sydney Ember, Michael Ferro Resigns as Chairman of Tronc, N.Y. TIMES (Mar. 19, 2018), https://www.nytimes.com/2018/03/19/business/media/michael-ferro-tronc-resignation.html.

[3] *See* Joe Concha, Tribune Publishing Paid $2.5 Million to Avert Lawsuit Alleging Anti-Semitic Comments by Ex-Chairman, THE HILL (Dec. 7, 2018), https://thehill.com/homenews/media/421099-tribune-publishing-paid-25-million-to-avert-lawsuit-alleging-anti-semitic-comments-by/.

protocols to fast-track the prescription medication for Ms. Yaccarino, despite the fact she had not yet undergone the required medical diagnostics or been deemed clinically eligible.

28. This placed Ms. Mader in the untenable position of having to choose between her job and participating in an illegal and dangerous scheme that exposed both the company and its incoming CEO to significant legal and medical liability. Ultimately, Ms. Mader's refusal to violate the law constituted legally protected activity, placing her in direct opposition to Ferro's unlawful directives.

29. Ms. Mader's refusal to violate the law and clinical protocols constituted legally protected activity, placing her in direct opposition to Ferro's unlawful directives.

## IV. Respondents' Discriminatory Bait-and-Switch Demotion

30. Immediately after the $100 million Aon investment closed, eMed executed its scheme to strip Ms. Mader of her executive status and the lucrative bonus she had earned.

31. On July 9, 2025, eMed sent Ms. Mader a "Change of Position and Entity Offer Letter," which constituted a severe and retaliatory adverse employment action. The new offer was a clear demotion, stripping her of the CEO title and making her "President," reporting to the soon-to-be CEO, Dr. Patrice Harris. Most egregiously, the offer explicitly eliminated her contractual 10% Transaction Bonus, a bonus worth tens of millions of dollars, and attempted to replace it with a speculative grant of stock options.

32. Respondents deliberately targeted Ms. Mader on the basis of her sex by subjecting her to demotion, a changed reporting structure, and the deliberate extinguishment of her vested contractual rights, among others.

33. Respondents' proffered justification for the adverse employment actions is false and pretextual. No similarly situated male executives were subjected to the same bad faith conduct Ms. Mader was subjected to during her employment.

34. On July 10, 2025, Ms. Mader engaged in protected activity by formally objecting to the discriminatory changes in an email to Ken Finneran, rightfully noting that the change was a "material downgrade in responsibility and authority".

35. Respondents' response was not to negotiate, but to retaliate. In a subsequent conversation, Ferro confronted Ms. Mader, questioned her qualifications, and concluded with a clear threat, reminding her of his power to fire her at any time and demanding she decide if she was "in or out."

**V. <u>Respondent's Unlawful Retaliation Against Ms. Mader</u>**

36. After Ms. Mader retained legal counsel to protect her rights, eMed's campaign of unlawful retaliation only escalated.

37. On the evening of July 21, 2025, immediately after her counsel submitted her legal claims, Michael Ferro made an unsolicited call to Ms. Mader's personal phone, extremely upset at the news of Ms. Mader's protected opposition. Ferro explicitly asked why Ms. Mader had hired legal counsel and in a blatant act of retaliation directly threatened her job, stating that "he can fire her whenever he wants".

38. On July 22, 2025, Ms. Mader's counsel sent formal correspondence to Respondents, putting them on direct and unequivocal notice that Ferro's threatening contact constituted unlawful retaliation for Ms. Mader asserting her legally protected rights.

39. On or about July 28, 2025, just six days after Ms. Mader's counsel formally identified Ferro's threats as unlawful retaliation, Respondents terminated Ms. Mader's employment "for cause," effective immediately.

40. In a blatantly pretextual termination letter, Respondents asserted a series of fabricated and defamatory allegations against Ms. Mader, including material underperformance, leadership dysfunction, misrepresentation of her corporate title, and violation of IT policies, allegations never raised prior to her engaging in protected activity.

41. Respondents' fabricated reasons for termination are further evidenced by the fact that just two days prior to sending the termination letter, on July 26, 2025, Dearborn and other company agents were actively urging Ms. Mader to remain in her role with eMed.

42. Respondents unlawfully discriminated against Ms. Mader because of her sex by, among other things, demoting her from her role as CEO, stripping her of her earned contractual bonus, and replacing her with a new CEO, under circumstances where her performance was not only satisfactory but exceptional.

43. Respondents subjected Ms. Mader to a severe and pervasive hostile work environment based on her sex. This hostile environment was created and maintained by the Founder, Michael Ferro, whose conduct included public slander, misogynistic insults (e.g., demanding she be "**MORE OF A BITCH**"), the use of vulgar slurs (e.g., "**CUNT**"), and a documented pattern of predatory behavior towards women. This conduct was sufficiently severe and pervasive to alter the conditions of Ms. Mader's employment and create an abusive working environment.

44. Respondents unlawfully retaliated against Ms. Mader after she engaged in multiple instances of legally protected activity. Specifically, after Ms. Mader opposed the discriminatory

demotion and bonus elimination on July 10, 2025, and after her counsel asserted her legal rights on July 21, 2025, Respondents retaliated by threatening her employment and ultimately terminating her on July 28, 2025. Furthermore, Respondents retaliated against her for her opposition to Ferro's unlawful directives to bypass clinical and legal protocols.

45. The events described above are just some of the examples of unlawful discrimination and retaliation that Respondents subjected Ms. Mader to on a continuous and ongoing basis throughout her employment.

46. Respondents violated Title VII of the Civil Rights Act of 1964, the Florida Civil Rights Act, the Delaware Discrimination in Employment Act, and the Miami-Dade County Human Rights Ordinance, by subjecting Ms. Mader to unlawful sexual harassment, sex/gender discrimination, hostile work environment, retaliation, and retaliatory hostile work environment.

47. Respondents exhibited a continuous practice of discrimination, and Ms. Mader therefore makes all claims herein under the continuing violations doctrine.

48. As a result of the acts and conduct complained herein, Ms. Mader has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Ms. Mader has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Ms. Mader has further experienced severe emotional and physical distress.

49. As a result of Respondents' actions, Ms. Mader felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

50. Respondents are liable for violating Ms. Mader's personal dignity, and depriving Ms. Mader of her civil right to pursue an equal employment opportunity.

Please contact me if you have any questions or require additional information. Thank you for your courtesy and cooperation in the matter.

Respectfully submitted,

*/s/ Kyle T. MacDonald*
Kyle T. MacDonald, Esq.

**MACDONALD LAW, PLLC**
420 SW 7th Street, Suite 1118
Miami, FL 33130
T: (786) 500-9675
E: kyle@macdonaldemploymentlaw.com

**VERIFICATION PURSUANT TO 28 U.S.C. § 1746**

I, WENDI MADER, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 09/11/25

Wendi Mader (Sep 11, 2025 13:45:03 EDT)
WENDI MADER

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

☐ FEPA
☒ EEOC

Florida Commission on Human Relations,the Delaware Department of Labor's Office of Anti-Discrimination, & the Miami-Dade Commission on Human Rights, and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Ms. Wendi Mader (email: wendi.s.mader@gmail.com) | (913) 575-3684 | 04/14/1979 |

Street Address City, State and ZIP Code

5928 SW 69th Ave, Miami, FL, 33143

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| EMED POPULATION HEALTH, INC. | 15+ | (312) 994-9480 |

Street Address City, State and ZIP Code

990 Biscayne Blvd, Suite 1501, Miami FL 33132

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

Street Address City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☒ OTHER *(Specify)* **SEXUAL HARASSMENT, HOSTILE WORK ENVIRONMENT, RETALIATORY HOSTILE WORK ENVIORNMENT**

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| 08/08/24 | 07/28/25 |

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Claimant, WENDI MADER, alleges that Respondent, EMED POPULATION HEALTH, INC., violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"), the Delaware Discrimination in Employment Act, Del. Code tit. 19, § 710 *et seq.*, ("DDEA"), and the Miami- Dade County Human Rights Ordinance, ch. 11A, art. IV, § 11A–26 *et seq.* ("MDHRO").

SEE STATEMENT OF THE PARTICULARS AND SWORN AND SIGNED VERIFICATION BY CLAIMANT ATTACHED HERETO AND FULLY INCORPORATED BY REFERENCE.

NOTE: Jeffrey Schumm, Esq., is a point of contact for Respondent. He can be contacted via electronic mail at jeff@emed.com.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

09/11/25 [signature] Wendi Mader (Sep 11, 2025 13:46:21 EDT)

*Date* *Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*

MacDonald Law PLLC

**MacDonald Law, PLLC**
420 SW 7th Street, Suite 1118, Miami, Florida 33130
786.500.9675 | kyle@macdonaldemploymentlaw.com

**VIA EEOC E-FILE FOR ATTORNEYS PORTAL**
U.S. Equal Employment Opportunity Commission
Miami District Office
100 SE 2nd Street, Suite 1500
Miami, FL 33131

**Re:** ***Wendi Mader v. eMed Population Health, Inc.***[1]

Dear Investigator:

Our firm represents the Charging Party, Ms. Wendi Mader, in connection with her claims arising from her employment with eMed Population Health, Inc.

Ms. Mader's claims against Respondent eMed Population Health, Inc., include those arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"), the Delaware Discrimination in Employment Act, Del. Code tit. 19, § 710 *et seq.*, ("DDEA"), and the Miami-Dade County Human Rights Ordinance, ch. 11A, art. IV, § 11A–26 *et seq.* ("MDHRO"). Ms. Mader's theories of discrimination include disparate treatment, sex/gender discrimination, sexual harassment, hostile work environment, retaliation, and retaliatory hostile work environment.

Please dual-file Ms. Mader's Charge with the Florida Commission on Human Relations, the Delaware Department of Labor's Office of Anti-Discrimination, and the Miami-Dade County Commission on Human Rights.

| **CHARGING PARTY** | **RESPONDENT** |
| --- | --- |
| Ms. Wendi Mader<br>*Via Charging Party's Counsel*<br>c/o MacDonald Law, PLLC<br>420 SW 7th Street Suite 1118<br>T: (786) 500-9675<br>E: kyle@macdonaldemploymentlaw.com | eMed Population Health, Inc.<br>c/o Jeffrey Schumm, Esq.<br>990 Biscayne Blvd, Suite 1501<br>Miami, FL 33132<br>T: (214) 578-4565<br>E: jeff@emed.com |

[1] Ms. Mader demands Respondents preserve all physical and electronic information pertaining in any way to Ms. Mader's employment, to Ms. Mader's potential claims including damages, to any defenses to same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in any subsequent litigation to the Commission's investigation.

***<u>Upon information and belief, Charging Party alleges as follows:</u>***

1. Charging Party, Wendi Mader ("Charging Party" or "Ms. Mader"), is an individual female residing in Miami-Dade County, Florida.

2. Respondents, eMed, LLC, eMed Weight Loss, LLC, eMed Population Health, Inc., and eMed Population Health, LLC (collectively, "Respondents" or "eMed"), are related corporate entities that were at all material times Ms. Mader's joint and/or single employer.

3. Respondent eMed, LLC, is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

4. Respondent eMed Weight Loss, LLC, is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

5. Respondent eMed Population Health, Inc., is a Delaware corporation conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

6. Respondent eMed Population Health, LLC is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

7. At all times material, Respondents operated as a single, integrated enterprise and/or joint employer with respect to Ms. Mader's employment, and their operations were functionally and financially intertwined. By means of example and not intended to be an exhaustive list: (a) interrelated operations, demonstrated by Ms. Mader being hired by one entity (eMed Weight Loss, LLC), but later being issued a revised offer letter and demoted by another (eMed Population

Health, Inc.); (b) common management, with Michael Ferro and Justin Dearborn exercising authority across all entities; (c) centralized control of labor relations through a single Human Resources department led by Ken Finneran that handled hiring, termination, and benefits for all entities; and (d) common ownership or financial control, with Michael Ferro acting as the ultimate controlling principal of the entire eMed corporate family.

8. At all times material, Michael Ferro ("Ferro"), an individual male, was the Founder and a principal stakeholder of eMed, LLC, eMed Weight Loss, LLC, and eMed Population Health, Inc. Ferro held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Ferro's actions are attributable to Respondents under a theory of direct or vicarious liability.

9. At all times material, Justin Dearborn ("Dearborn"), an individual male, was the Chairman and principal executive of eMed, LLC, eMed Weight Loss, LLC, and eMed Population Health, Inc. Dearborn held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Dearborn's actions are attributable to Respondents under a theory of direct or vicarious liability.

10. At all times material, Ken Finneran ("Finneran"), an individual male, was the Vice President of Human Resources and Chief Human Resources Officer for eMed. Mr. Finneran held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Mr. Finneran's actions are attributable to Respondents under a theory of direct or vicarious liability.

11. At all times material, Dr. Patrice Harris ("Dr. Harris"), an individual female, was the Co-founder and CEO of eMed and a principal stakeholder.

## MATERIAL FACTS

### I. The Inducement and Ms. Mader's Extraordinary Performance

12. At all times material, Ms. Mader was a protected class member on the basis of her sex.

13. On August 8, 2024, eMed extended a formal offer of employment to Ms. Mader for the position of Chief Executive Officer (CEO), eMed Weight Loss, LLC. As a key inducement, the offer included a contractual ten percent (10%) Participation Percentage in the eMed Weight Loss, LLC Transaction Bonus Plan.

14. Within approximately 120 days of her August 2024 start date, Ms. Mader demonstrated exceptional leadership by successfully designing and launching eMed's new weight loss business line with its first commercial customer in January 2025.

15. Ms. Mader's expertise and credibility within the industry were the direct and proximate cause of eMed securing a monumental $100,000,000.00 investment from Aon Investments Holdco LLC (“Aon”), which resulted in a $2 billion enterprise valuation for her business unit upon the deal's closing on or about April 30, 2025.

### II. The Severe and Pervasive Hostile Work Environment Based on Sex

16. While Ms. Mader was generating this unprecedented success, the Founder, Michael Ferro, subjected her to a hostile, abusive, and misogynistic work environment designed to undermine her as a female leader.

17. Ferro consistently used profanity and demeaning language towards staff, creating an atmosphere of fear. On information and belief, Ferro also used the word “**CUNT**” to demean women in workplace meetings and made sexist, misogynistic remarks on a routine basis.

18. Ferro also made vulgar, sexually harassing, and misogynistic comments about Ms. Mader's physical appearance. In a conversation shortly after she was hired as CEO, Ferro told her she **"wasn't hot or pretty but not too ugly to sell to prospects and work with customers."** This unsolicited and demeaning assessment of her sexual attractiveness was a gross abuse of power, intended to degrade her and reduce her role as CEO to a crude valuation of her physical appearance.

19. This was part of a pattern of Ferro making inappropriate comments about female employees' appearances. He told Ms. Mader he had heard from friends that eMed was hiring "**ugly middle-aged people**" and commented on another female sales representative's appearance, stating she "**just doesn't look as good anymore**."

20. On multiple occasions, Ferro told Ms. Mader that she needed to be "**MORE OF A BITCH**", a blatant, offensive, and gender-based stereotype aimed at attacking her leadership style simply because she is a woman.

21. On another occasion while Ms. Mader was absent, Ferro publicly demeaned her during a team standup meeting, an act so egregious that two employees later expressed their concern to her about the profound disrespect he had shown.

22. Upon information and belief, Ferro's hostile and demeaning conduct towards Ms. Mader is part of a broader, documented pattern of predatory behavior towards female professionals.

23. In 2018, it was widely reported that another female executive, Hagan Kappler, alleged that Ferro cornered her in his hotel suite under the pretense of a business dinner and groped

her breast.[2] In the same report, Kathryn Minshew, the founder of a career-advice startup, alleged that Ferro lured her to a corporate apartment where he forcefully pulled her in for an unwanted kiss.

24. In 2018, it was also reported that Ferro had privately settled a dispute for making discriminatory, antisemitic remarks regarding Judaism, referring to a "Jewish cabal" in the publishing industry.[3]

25. The hostile environment extended to a complete disregard for Ms. Mader's executive authority. As CEO, Ms. Mader's requests for essential resources, including marketing budgets, employee raises and bonuses, and sales incentive plan approvals, were consistently ignored and stonewalled by Ferro, making sustainable leadership impossible.

### III. Ms. Mader's Opposition to Unlawful Practices

26. Beyond the pervasive discrimination she endured, Ms. Mader was repeatedly directed by Ferro and Dearborn to assist them in an unlawful scheme to procure potent GLP-1 prescription drugs for personal friends and high-profile associates by deliberately subverting the mandatory standard of care required under state and federal law.

27. This pattern of corporate malfeasance is starkly illustrated by the directive from Ferro concerning Linda Yaccarino, who was the incoming, and not yet publicly announced, Chief Executive Officer of eMed. Ferro explicitly ordered Ms. Mader to bypass the necessary clinical

---

[2] *See, e.g.*, Michal Lev-Ram, Michael Ferro, Chairman of Tronc, Accused of Inappropriate Advances by Two Women, FORTUNE (Mar. 19, 2018), https://fortune.com/2018/03/19/tronc-chairman-michael-ferro-allegations/; *see also* Sydney Ember, Michael Ferro Resigns as Chairman of Tronc, N.Y. TIMES (Mar. 19, 2018), https://www.nytimes.com/2018/03/19/business/media/michael-ferro-tronc-resignation.html.

[3] *See* Joe Concha, Tribune Publishing Paid $2.5 Million to Avert Lawsuit Alleging Anti-Semitic Comments by Ex-Chairman, THE HILL (Dec. 7, 2018), https://thehill.com/homenews/media/421099-tribune-publishing-paid-25-million-to-avert-lawsuit-alleging-anti-semitic-comments-by/.

protocols to fast-track the prescription medication for Ms. Yaccarino, despite the fact she had not yet undergone the required medical diagnostics or been deemed clinically eligible.

28. This placed Ms. Mader in the untenable position of having to choose between her job and participating in an illegal and dangerous scheme that exposed both the company and its incoming CEO to significant legal and medical liability. Ultimately, Ms. Mader's refusal to violate the law constituted legally protected activity, placing her in direct opposition to Ferro's unlawful directives.

29. Ms. Mader's refusal to violate the law and clinical protocols constituted legally protected activity, placing her in direct opposition to Ferro's unlawful directives.

**IV. <u>Respondents' Discriminatory Bait-and-Switch Demotion</u>**

30. Immediately after the $100 million Aon investment closed, eMed executed its scheme to strip Ms. Mader of her executive status and the lucrative bonus she had earned.

31. On July 9, 2025, eMed sent Ms. Mader a "Change of Position and Entity Offer Letter," which constituted a severe and retaliatory adverse employment action. The new offer was a clear demotion, stripping her of the CEO title and making her "President," reporting to the soon-to-be CEO, Dr. Patrice Harris. Most egregiously, the offer explicitly eliminated her contractual 10% Transaction Bonus, a bonus worth tens of millions of dollars, and attempted to replace it with a speculative grant of stock options.

32. Respondents deliberately targeted Ms. Mader on the basis of her sex by subjecting her to demotion, a changed reporting structure, and the deliberate extinguishment of her vested contractual rights, among others.

33. Respondents' proffered justification for the adverse employment actions is false and pretextual. No similarly situated male executives were subjected to the same bad faith conduct Ms. Mader was subjected to during her employment.

34. On July 10, 2025, Ms. Mader engaged in protected activity by formally objecting to the discriminatory changes in an email to Ken Finneran, rightfully noting that the change was a "material downgrade in responsibility and authority".

35. Respondents' response was not to negotiate, but to retaliate. In a subsequent conversation, Ferro confronted Ms. Mader, questioned her qualifications, and concluded with a clear threat, reminding her of his power to fire her at any time and demanding she decide if she was "in or out."

**V. <u>Respondent's Unlawful Retaliation Against Ms. Mader</u>**

36. After Ms. Mader retained legal counsel to protect her rights, eMed's campaign of unlawful retaliation only escalated.

37. On the evening of July 21, 2025, immediately after her counsel submitted her legal claims, Michael Ferro made an unsolicited call to Ms. Mader's personal phone, extremely upset at the news of Ms. Mader's protected opposition. Ferro explicitly asked why Ms. Mader had hired legal counsel and in a blatant act of retaliation directly threatened her job, stating that "he can fire her whenever he wants".

38. On July 22, 2025, Ms. Mader's counsel sent formal correspondence to Respondents, putting them on direct and unequivocal notice that Ferro's threatening contact constituted unlawful retaliation for Ms. Mader asserting her legally protected rights.

39. On or about July 28, 2025, just six days after Ms. Mader's counsel formally identified Ferro's threats as unlawful retaliation, Respondents terminated Ms. Mader's employment "for cause," effective immediately.

40. In a blatantly pretextual termination letter, Respondents asserted a series of fabricated and defamatory allegations against Ms. Mader, including material underperformance, leadership dysfunction, misrepresentation of her corporate title, and violation of IT policies, allegations never raised prior to her engaging in protected activity.

41. Respondents' fabricated reasons for termination are further evidenced by the fact that just two days prior to sending the termination letter, on July 26, 2025, Dearborn and other company agents were actively urging Ms. Mader to remain in her role with eMed.

42. Respondents unlawfully discriminated against Ms. Mader because of her sex by, among other things, demoting her from her role as CEO, stripping her of her earned contractual bonus, and replacing her with a new CEO, under circumstances where her performance was not only satisfactory but exceptional.

43. Respondents subjected Ms. Mader to a severe and pervasive hostile work environment based on her sex. This hostile environment was created and maintained by the Founder, Michael Ferro, whose conduct included public slander, misogynistic insults (e.g., demanding she be "**MORE OF A BITCH**"), the use of vulgar slurs (e.g., "**CUNT**"), and a documented pattern of predatory behavior towards women. This conduct was sufficiently severe and pervasive to alter the conditions of Ms. Mader's employment and create an abusive working environment.

44. Respondents unlawfully retaliated against Ms. Mader after she engaged in multiple instances of legally protected activity. Specifically, after Ms. Mader opposed the discriminatory

demotion and bonus elimination on July 10, 2025, and after her counsel asserted her legal rights on July 21, 2025, Respondents retaliated by threatening her employment and ultimately terminating her on July 28, 2025. Furthermore, Respondents retaliated against her for her opposition to Ferro's unlawful directives to bypass clinical and legal protocols.

45. The events described above are just some of the examples of unlawful discrimination and retaliation that Respondents subjected Ms. Mader to on a continuous and ongoing basis throughout her employment.

46. Respondents violated Title VII of the Civil Rights Act of 1964, the Florida Civil Rights Act, the Delaware Discrimination in Employment Act, and the Miami-Dade County Human Rights Ordinance, by subjecting Ms. Mader to unlawful sexual harassment, sex/gender discrimination, hostile work environment, retaliation, and retaliatory hostile work environment.

47. Respondents exhibited a continuous practice of discrimination, and Ms. Mader therefore makes all claims herein under the continuing violations doctrine.

48. As a result of the acts and conduct complained herein, Ms. Mader has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Ms. Mader has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Ms. Mader has further experienced severe emotional and physical distress.

49. As a result of Respondents' actions, Ms. Mader felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

50. Respondents are liable for violating Ms. Mader's personal dignity, and depriving Ms. Mader of her civil right to pursue an equal employment opportunity.

Please contact me if you have any questions or require additional information. Thank you for your courtesy and cooperation in the matter.

Respectfully submitted,

*/s/ Kyle T. MacDonald*
Kyle T. MacDonald, Esq.

**MACDONALD LAW, PLLC**
420 SW 7th Street, Suite 1118
Miami, FL 33130
T: (786) 500-9675
E: kyle@macdonaldemploymentlaw.com

**VERIFICATION PURSUANT TO 28 U.S.C. § 1746**

I, WENDI MADER, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 09/11/25

Wendi Mader (Sep 11, 2025 13:46:21 EDT)
WENDI MADER

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

☐ FEPA
☒ EEOC

Florida Commission on Human Relations,the Delaware Department of Labor's Office of Anti-Discrimination, & the Miami-Dade Commission on Human Rights, and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Ms. Wendi Mader (email: wendi.s.mader@gmail.com) | (913) 575-3684 | 04/14/1979 |

Street Address / City, State and ZIP Code

5928 SW 69th Ave, Miami, FL, 33143

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| EMED POPULATION HEALTH, LLC | 15+ | (312) 994-9480 |

Street Address / City, State and ZIP Code

990 Biscayne Blvd, Suite 1501, Miami FL 33132

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

Street Address / City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☒ OTHER *(Specify)* **SEXUAL HARASSMENT, HOSTILE WORK ENVIRONMENT, RETALIATORY HOSTILE WORK ENVIORNMENT**

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| 08/08/24 | 07/28/25 |

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Claimant, WENDI MADER, alleges that Respondent, EMED POPULATION HEALTH, LLC, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"), the Delaware Discrimination in Employment Act, Del. Code tit. 19, § 710 *et seq.*, ("DDEA"), and the Miami-Dade County Human Rights Ordinance, ch. 11A, art. IV, § 11A–26 *et seq.* ("MDHRO").

SEE STATEMENT OF THE PARTICULARS AND SWORN AND SIGNED VERIFICATION BY CLAIMANT ATTACHED HERETO AND FULLY INCORPORATED BY REFERENCE.

NOTE: Jeffrey Schumm, Esq., is a point of contact for Respondent. He can be contacted via electronic mail at jeff@emed.com.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

09/11/25 [signature] Wendi Mader (Sep 11, 2025 13:47:14 EDT)

*Date* *Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*

ML | MacDonald Law PLLC

**MacDonald Law, PLLC**
420 SW 7th Street, Suite 1118, Miami, Florida 33130
786.500.9675 | kyle@macdonaldemploymentlaw.com

**VIA EEOC E-FILE FOR ATTORNEYS PORTAL**
U.S. Equal Employment Opportunity Commission
Miami District Office
100 SE 2nd Street, Suite 1500
Miami, FL 33131

**Re:** ***Wendi Mader v. eMed Population Health, LLC***[1]

Dear Investigator:

Our firm represents the Charging Party, Ms. Wendi Mader, in connection with her claims arising from her employment with eMed Population Health, LLC.

Ms. Mader's claims against Respondent eMed Population Health, LLC, include those arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"), the Delaware Discrimination in Employment Act, Del. Code tit. 19, § 710 *et seq.*, ("DDEA"), and the Miami-Dade County Human Rights Ordinance, ch. 11A, art. IV, § 11A–26 *et seq.* ("MDHRO"). Ms. Mader's theories of discrimination include disparate treatment, sex/gender discrimination, sexual harassment, hostile work environment, retaliation, and retaliatory hostile work environment.

Please dual-file Ms. Mader's Charge with the Florida Commission on Human Relations, the Delaware Department of Labor's Office of Anti-Discrimination, and the Miami-Dade County Commission on Human Rights.

| **CHARGING PARTY** | **RESPONDENT** |
| --- | --- |
| Ms. Wendi Mader<br>*Via Charging Party's Counsel*<br>c/o MacDonald Law, PLLC<br>420 SW 7th Street Suite 1118<br>T: (786) 500-9675<br>E: kyle@macdonaldemploymentlaw.com | eMed Population Health, LLC<br>c/o Jeffrey Schumm, Esq.<br>990 Biscayne Blvd, Suite 1501<br>Miami, FL 33132<br>T: (214) 578-4565<br>E: jeff@emed.com |

[1] Ms. Mader demands Respondents preserve all physical and electronic information pertaining in any way to Ms. Mader's employment, to Ms. Mader's potential claims including damages, to any defenses to same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in any subsequent litigation to the Commission's investigation.

***<u>Upon information and belief, Charging Party alleges as follows:</u>***

1. Charging Party, Wendi Mader ("Charging Party" or "Ms. Mader"), is an individual female residing in Miami-Dade County, Florida.

2. Respondents, eMed, LLC, eMed Weight Loss, LLC, eMed Population Health, Inc., and eMed Population Health, LLC (collectively, "Respondents" or "eMed"), are related corporate entities that were at all material times Ms. Mader's joint and/or single employer.

3. Respondent eMed, LLC, is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

4. Respondent eMed Weight Loss, LLC, is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

5. Respondent eMed Population Health, Inc., is a Delaware corporation conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

6. Respondent eMed Population Health, LLC is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

7. At all times material, Respondents operated as a single, integrated enterprise and/or joint employer with respect to Ms. Mader's employment, and their operations were functionally and financially intertwined. By means of example and not intended to be an exhaustive list: (a) interrelated operations, demonstrated by Ms. Mader being hired by one entity (eMed Weight Loss, LLC), but later being issued a revised offer letter and demoted by another (eMed Population

Health, Inc.); (b) common management, with Michael Ferro and Justin Dearborn exercising authority across all entities; (c) centralized control of labor relations through a single Human Resources department led by Ken Finneran that handled hiring, termination, and benefits for all entities; and (d) common ownership or financial control, with Michael Ferro acting as the ultimate controlling principal of the entire eMed corporate family.

8. At all times material, Michael Ferro ("Ferro"), an individual male, was the Founder and a principal stakeholder of eMed, LLC, eMed Weight Loss, LLC, and eMed Population Health, Inc. Ferro held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Ferro's actions are attributable to Respondents under a theory of direct or vicarious liability.

9. At all times material, Justin Dearborn ("Dearborn"), an individual male, was the Chairman and principal executive of eMed, LLC, eMed Weight Loss, LLC, and eMed Population Health, Inc. Dearborn held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Dearborn's actions are attributable to Respondents under a theory of direct or vicarious liability.

10. At all times material, Ken Finneran ("Finneran"), an individual male, was the Vice President of Human Resources and Chief Human Resources Officer for eMed. Mr. Finneran held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Mr. Finneran's actions are attributable to Respondents under a theory of direct or vicarious liability.

11. At all times material, Dr. Patrice Harris ("Dr. Harris"), an individual female, was the Co-founder and CEO of eMed and a principal stakeholder.

## MATERIAL FACTS

### I. The Inducement and Ms. Mader's Extraordinary Performance

12. At all times material, Ms. Mader was a protected class member on the basis of her sex.

13. On August 8, 2024, eMed extended a formal offer of employment to Ms. Mader for the position of Chief Executive Officer (CEO), eMed Weight Loss, LLC. As a key inducement, the offer included a contractual ten percent (10%) Participation Percentage in the eMed Weight Loss, LLC Transaction Bonus Plan.

14. Within approximately 120 days of her August 2024 start date, Ms. Mader demonstrated exceptional leadership by successfully designing and launching eMed's new weight loss business line with its first commercial customer in January 2025.

15. Ms. Mader's expertise and credibility within the industry were the direct and proximate cause of eMed securing a monumental $100,000,000.00 investment from Aon Investments Holdco LLC ("Aon"), which resulted in a $2 billion enterprise valuation for her business unit upon the deal's closing on or about April 30, 2025.

### II. The Severe and Pervasive Hostile Work Environment Based on Sex

16. While Ms. Mader was generating this unprecedented success, the Founder, Michael Ferro, subjected her to a hostile, abusive, and misogynistic work environment designed to undermine her as a female leader.

17. Ferro consistently used profanity and demeaning language towards staff, creating an atmosphere of fear. On information and belief, Ferro also used the word "**CUNT**" to demean women in workplace meetings and made sexist, misogynistic remarks on a routine basis.

18. Ferro also made vulgar, sexually harassing, and misogynistic comments about Ms. Mader's physical appearance. In a conversation shortly after she was hired as CEO, Ferro told her she **"wasn't hot or pretty but not too ugly to sell to prospects and work with customers."** This unsolicited and demeaning assessment of her sexual attractiveness was a gross abuse of power, intended to degrade her and reduce her role as CEO to a crude valuation of her physical appearance.

19. This was part of a pattern of Ferro making inappropriate comments about female employees' appearances. He told Ms. Mader he had heard from friends that eMed was hiring "**ugly middle-aged people**" and commented on another female sales representative's appearance, stating she "**just doesn't look as good anymore**."

20. On multiple occasions, Ferro told Ms. Mader that she needed to be "**MORE OF A BITCH**", a blatant, offensive, and gender-based stereotype aimed at attacking her leadership style simply because she is a woman.

21. On another occasion while Ms. Mader was absent, Ferro publicly demeaned her during a team standup meeting, an act so egregious that two employees later expressed their concern to her about the profound disrespect he had shown.

22. Upon information and belief, Ferro's hostile and demeaning conduct towards Ms. Mader is part of a broader, documented pattern of predatory behavior towards female professionals.

23. In 2018, it was widely reported that another female executive, Hagan Kappler, alleged that Ferro cornered her in his hotel suite under the pretense of a business dinner and groped

her breast.[2] In the same report, Kathryn Minshew, the founder of a career-advice startup, alleged that Ferro lured her to a corporate apartment where he forcefully pulled her in for an unwanted kiss.

24. In 2018, it was also reported that Ferro had privately settled a dispute for making discriminatory, antisemitic remarks regarding Judaism, referring to a "Jewish cabal" in the publishing industry.[3]

25. The hostile environment extended to a complete disregard for Ms. Mader's executive authority. As CEO, Ms. Mader's requests for essential resources, including marketing budgets, employee raises and bonuses, and sales incentive plan approvals, were consistently ignored and stonewalled by Ferro, making sustainable leadership impossible.

## III. Ms. Mader's Opposition to Unlawful Practices

26. Beyond the pervasive discrimination she endured, Ms. Mader was repeatedly directed by Ferro and Dearborn to assist them in an unlawful scheme to procure potent GLP-1 prescription drugs for personal friends and high-profile associates by deliberately subverting the mandatory standard of care required under state and federal law.

27. This pattern of corporate malfeasance is starkly illustrated by the directive from Ferro concerning Linda Yaccarino, who was the incoming, and not yet publicly announced, Chief Executive Officer of eMed. Ferro explicitly ordered Ms. Mader to bypass the necessary clinical

---

[2] *See, e.g.*, Michal Lev-Ram, Michael Ferro, Chairman of Tronc, Accused of Inappropriate Advances by Two Women, FORTUNE (Mar. 19, 2018), https://fortune.com/2018/03/19/tronc-chairman-michael-ferro-allegations/; *see also* Sydney Ember, Michael Ferro Resigns as Chairman of Tronc, N.Y. TIMES (Mar. 19, 2018), https://www.nytimes.com/2018/03/19/business/media/michael-ferro-tronc-resignation.html.

[3] *See* Joe Concha, Tribune Publishing Paid $2.5 Million to Avert Lawsuit Alleging Anti-Semitic Comments by Ex-Chairman, THE HILL (Dec. 7, 2018), https://thehill.com/homenews/media/421099-tribune-publishing-paid-25-million-to-avert-lawsuit-alleging-anti-semitic-comments-by/.

protocols to fast-track the prescription medication for Ms. Yaccarino, despite the fact she had not yet undergone the required medical diagnostics or been deemed clinically eligible.

28. This placed Ms. Mader in the untenable position of having to choose between her job and participating in an illegal and dangerous scheme that exposed both the company and its incoming CEO to significant legal and medical liability. Ultimately, Ms. Mader's refusal to violate the law constituted legally protected activity, placing her in direct opposition to Ferro's unlawful directives.

29. Ms. Mader's refusal to violate the law and clinical protocols constituted legally protected activity, placing her in direct opposition to Ferro's unlawful directives.

**IV. <u>Respondents' Discriminatory Bait-and-Switch Demotion</u>**

30. Immediately after the $100 million Aon investment closed, eMed executed its scheme to strip Ms. Mader of her executive status and the lucrative bonus she had earned.

31. On July 9, 2025, eMed sent Ms. Mader a "Change of Position and Entity Offer Letter," which constituted a severe and retaliatory adverse employment action. The new offer was a clear demotion, stripping her of the CEO title and making her "President," reporting to the soon-to-be CEO, Dr. Patrice Harris. Most egregiously, the offer explicitly eliminated her contractual 10% Transaction Bonus, a bonus worth tens of millions of dollars, and attempted to replace it with a speculative grant of stock options.

32. Respondents deliberately targeted Ms. Mader on the basis of her sex by subjecting her to demotion, a changed reporting structure, and the deliberate extinguishment of her vested contractual rights, among others.

33. Respondents' proffered justification for the adverse employment actions is false and pretextual. No similarly situated male executives were subjected to the same bad faith conduct Ms. Mader was subjected to during her employment.

34. On July 10, 2025, Ms. Mader engaged in protected activity by formally objecting to the discriminatory changes in an email to Ken Finneran, rightfully noting that the change was a "material downgrade in responsibility and authority".

35. Respondents' response was not to negotiate, but to retaliate. In a subsequent conversation, Ferro confronted Ms. Mader, questioned her qualifications, and concluded with a clear threat, reminding her of his power to fire her at any time and demanding she decide if she was "in or out."

## V. <u>Respondent's Unlawful Retaliation Against Ms. Mader</u>

36. After Ms. Mader retained legal counsel to protect her rights, eMed's campaign of unlawful retaliation only escalated.

37. On the evening of July 21, 2025, immediately after her counsel submitted her legal claims, Michael Ferro made an unsolicited call to Ms. Mader's personal phone, extremely upset at the news of Ms. Mader's protected opposition. Ferro explicitly asked why Ms. Mader had hired legal counsel and in a blatant act of retaliation directly threatened her job, stating that "he can fire her whenever he wants".

38. On July 22, 2025, Ms. Mader's counsel sent formal correspondence to Respondents, putting them on direct and unequivocal notice that Ferro's threatening contact constituted unlawful retaliation for Ms. Mader asserting her legally protected rights.

39. On or about July 28, 2025, just six days after Ms. Mader's counsel formally identified Ferro's threats as unlawful retaliation, Respondents terminated Ms. Mader's employment "for cause," effective immediately.

40. In a blatantly pretextual termination letter, Respondents asserted a series of fabricated and defamatory allegations against Ms. Mader, including material underperformance, leadership dysfunction, misrepresentation of her corporate title, and violation of IT policies, allegations never raised prior to her engaging in protected activity.

41. Respondents' fabricated reasons for termination are further evidenced by the fact that just two days prior to sending the termination letter, on July 26, 2025, Dearborn and other company agents were actively urging Ms. Mader to remain in her role with eMed.

42. Respondents unlawfully discriminated against Ms. Mader because of her sex by, among other things, demoting her from her role as CEO, stripping her of her earned contractual bonus, and replacing her with a new CEO, under circumstances where her performance was not only satisfactory but exceptional.

43. Respondents subjected Ms. Mader to a severe and pervasive hostile work environment based on her sex. This hostile environment was created and maintained by the Founder, Michael Ferro, whose conduct included public slander, misogynistic insults (e.g., demanding she be "**MORE OF A BITCH**"), the use of vulgar slurs (e.g., "**CUNT**"), and a documented pattern of predatory behavior towards women. This conduct was sufficiently severe and pervasive to alter the conditions of Ms. Mader's employment and create an abusive working environment.

44. Respondents unlawfully retaliated against Ms. Mader after she engaged in multiple instances of legally protected activity. Specifically, after Ms. Mader opposed the discriminatory

demotion and bonus elimination on July 10, 2025, and after her counsel asserted her legal rights on July 21, 2025, Respondents retaliated by threatening her employment and ultimately terminating her on July 28, 2025. Furthermore, Respondents retaliated against her for her opposition to Ferro's unlawful directives to bypass clinical and legal protocols.

45. The events described above are just some of the examples of unlawful discrimination and retaliation that Respondents subjected Ms. Mader to on a continuous and ongoing basis throughout her employment.

46. Respondents violated Title VII of the Civil Rights Act of 1964, the Florida Civil Rights Act, the Delaware Discrimination in Employment Act, and the Miami-Dade County Human Rights Ordinance, by subjecting Ms. Mader to unlawful sexual harassment, sex/gender discrimination, hostile work environment, retaliation, and retaliatory hostile work environment.

47. Respondents exhibited a continuous practice of discrimination, and Ms. Mader therefore makes all claims herein under the continuing violations doctrine.

48. As a result of the acts and conduct complained herein, Ms. Mader has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Ms. Mader has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Ms. Mader has further experienced severe emotional and physical distress.

49. As a result of Respondents' actions, Ms. Mader felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

50. Respondents are liable for violating Ms. Mader's personal dignity, and depriving Ms. Mader of her civil right to pursue an equal employment opportunity.

Please contact me if you have any questions or require additional information. Thank you for your courtesy and cooperation in the matter.

Respectfully submitted,

*/s/ Kyle T. MacDonald*
Kyle T. MacDonald, Esq.

**MACDONALD LAW, PLLC**
420 SW 7th Street, Suite 1118
Miami, FL 33130
T: (786) 500-9675
E: kyle@macdonaldemploymentlaw.com

**VERIFICATION PURSUANT TO 28 U.S.C. § 1746**

I, WENDI MADER, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 09/11/25

Wendi Mader (Sep 11, 2025 13:47:14 EDT)
WENDI MADER

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: ☐ FEPA ☒ EEOC

Agency(ies) Charge No(s):

Florida Commission on Human Relations,the Delaware Department of Labor's Office of Anti-Discrimination, & the Miami-Dade Commission on Human Rights, and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Ms. Wendi Mader (email: wendi.s.mader@gmail.com) | (913) 575-3684 | 04/14/1979 |

Street Address / City, State and ZIP Code

5928 SW 69th Ave, Miami, FL, 33143

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| EMED WEIGHT LOSS, LLC | 15+ | (312) 994-9480 |

Street Address / City, State and ZIP Code

990 Biscayne Blvd, Suite 1501, Miami FL 33132

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

Street Address / City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN

☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION

☒ OTHER *(Specify)* **SEXUAL HARASSMENT, HOSTILE WORK ENVIRONMENT, RETALIATORY HOSTILE WORK ENVIORNMENT**

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| 08/08/24 | 07/28/25 |

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Claimant, WENDI MADER, alleges that Respondent, EMED WEIGHT LOSS, LLC, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"), the Delaware Discrimination in Employment Act, Del. Code tit. 19, § 710 *et seq.*, ("DDEA"), and the Miami-Dade County Human Rights Ordinance, ch. 11A, art. IV, § 11A–26 *et seq.* ("MDHRO").

SEE STATEMENT OF THE PARTICULARS AND SWORN AND SIGNED VERIFICATION BY CLAIMANT ATTACHED HERETO AND FULLY INCORPORATED BY REFERENCE.

NOTE: Jeffrey Schumm, Esq., is a point of contact for Respondent. He can be contacted via electronic mail at jeff@emed.com.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

09/11/25 — [signature] Wendi Mader (Sep 11, 2025 13:48:08 EDT)

*Date* — *Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*)

MacDonald Law PLLC

**MacDonald Law, PLLC**
420 SW 7th Street, Suite 1118, Miami, Florida 33130
786.500.9675 | kyle@macdonaldemploymentlaw.com

**VIA EEOC E-FILE FOR ATTORNEYS PORTAL**
U.S. Equal Employment Opportunity Commission
Miami District Office
100 SE 2nd Street, Suite 1500
Miami, FL 33131

**Re:** ***Wendi Mader v. eMed Weight Loss, LLC***[1]

Dear Investigator:

Our firm represents the Charging Party, Ms. Wendi Mader, in connection with her claims arising from her employment with eMed Weight Loss, LLC.

Ms. Mader's claims against Respondent eMed Weight Loss, LLC, include those arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.* ("FCRA"), the Delaware Discrimination in Employment Act, Del. Code tit. 19, § 710 *et seq.*, ("DDEA"), and the Miami-Dade County Human Rights Ordinance, ch. 11A, art. IV, § 11A–26 *et seq.* ("MDHRO"). Ms. Mader's theories of discrimination include disparate treatment, sex/gender discrimination, sexual harassment, hostile work environment, retaliation, and retaliatory hostile work environment.

Please dual-file Ms. Mader's Charge with the Florida Commission on Human Relations, the Delaware Department of Labor's Office of Anti-Discrimination, and the Miami-Dade County Commission on Human Rights.

| **CHARGING PARTY** | **RESPONDENT** |
| --- | --- |
| Ms. Wendi Mader<br>*Via Charging Party's Counsel*<br>c/o MacDonald Law, PLLC<br>420 SW 7th Street Suite 1118<br>T: (786) 500-9675<br>E: kyle@macdonaldemploymentlaw.com | eMed Weight Loss, LLC<br>c/o Jeffrey Schumm, Esq.<br>990 Biscayne Blvd, Suite 1501<br>Miami, FL 33132<br>T: (214) 578-4565<br>E: jeff@emed.com |

[1] Ms. Mader demands Respondents preserve all physical and electronic information pertaining in any way to Ms. Mader's employment, to Ms. Mader's potential claims including damages, to any defenses to same, including, but not limited to electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in any subsequent litigation to the Commission's investigation.

***Upon information and belief, Charging Party alleges as follows:***

1. Charging Party, Wendi Mader ("Charging Party" or "Ms. Mader"), is an individual female residing in Miami-Dade County, Florida.

2. Respondents, eMed, LLC, eMed Weight Loss, LLC, eMed Population Health, Inc., and eMed Population Health, LLC (collectively, "Respondents" or "eMed"), are related corporate entities that were at all material times Ms. Mader's joint and/or single employer.

3. Respondent eMed, LLC, is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

4. Respondent eMed Weight Loss, LLC, is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

5. Respondent eMed Population Health, Inc., is a Delaware corporation conducting business in the State of Florida, with its principal place of business located at 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

6. Respondent eMed Population Health, LLC is a Delaware limited liability company conducting business in the State of Florida, with its principal place of business located 990 Biscayne Blvd, Suite 1501, Miami, Florida 33132.

7. At all times material, Respondents operated as a single, integrated enterprise and/or joint employer with respect to Ms. Mader's employment, and their operations were functionally and financially intertwined. By means of example and not intended to be an exhaustive list: (a) interrelated operations, demonstrated by Ms. Mader being hired by one entity (eMed Weight Loss, LLC), but later being issued a revised offer letter and demoted by another (eMed Population

Health, Inc.); (b) common management, with Michael Ferro and Justin Dearborn exercising authority across all entities; (c) centralized control of labor relations through a single Human Resources department led by Ken Finneran that handled hiring, termination, and benefits for all entities; and (d) common ownership or financial control, with Michael Ferro acting as the ultimate controlling principal of the entire eMed corporate family.

8. At all times material, Michael Ferro ("Ferro"), an individual male, was the Founder and a principal stakeholder of eMed, LLC, eMed Weight Loss, LLC, and eMed Population Health, Inc. Ferro held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Ferro's actions are attributable to Respondents under a theory of direct or vicarious liability.

9. At all times material, Justin Dearborn ("Dearborn"), an individual male, was the Chairman and principal executive of eMed, LLC, eMed Weight Loss, LLC, and eMed Population Health, Inc. Dearborn held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Dearborn's actions are attributable to Respondents under a theory of direct or vicarious liability.

10. At all times material, Ken Finneran ("Finneran"), an individual male, was the Vice President of Human Resources and Chief Human Resources Officer for eMed. Mr. Finneran held supervisory authority over Ms. Mader, including the power to direct her work, control her client interactions, and effectuate her termination. Mr. Finneran's actions are attributable to Respondents under a theory of direct or vicarious liability.

11. At all times material, Dr. Patrice Harris ("Dr. Harris"), an individual female, was the Co-founder and CEO of eMed and a principal stakeholder.

## MATERIAL FACTS

### I. The Inducement and Ms. Mader's Extraordinary Performance

12. At all times material, Ms. Mader was a protected class member on the basis of her sex.

13. On August 8, 2024, eMed extended a formal offer of employment to Ms. Mader for the position of Chief Executive Officer (CEO), eMed Weight Loss, LLC. As a key inducement, the offer included a contractual ten percent (10%) Participation Percentage in the eMed Weight Loss, LLC Transaction Bonus Plan.

14. Within approximately 120 days of her August 2024 start date, Ms. Mader demonstrated exceptional leadership by successfully designing and launching eMed's new weight loss business line with its first commercial customer in January 2025.

15. Ms. Mader's expertise and credibility within the industry were the direct and proximate cause of eMed securing a monumental $100,000,000.00 investment from Aon Investments Holdco LLC ("Aon"), which resulted in a $2 billion enterprise valuation for her business unit upon the deal's closing on or about April 30, 2025.

### II. The Severe and Pervasive Hostile Work Environment Based on Sex

16. While Ms. Mader was generating this unprecedented success, the Founder, Michael Ferro, subjected her to a hostile, abusive, and misogynistic work environment designed to undermine her as a female leader.

17. Ferro consistently used profanity and demeaning language towards staff, creating an atmosphere of fear. On information and belief, Ferro also used the word "**CUNT**" to demean women in workplace meetings and made sexist, misogynistic remarks on a routine basis.

18. Ferro also made vulgar, sexually harassing, and misogynistic comments about Ms. Mader's physical appearance. In a conversation shortly after she was hired as CEO, Ferro told her she **"wasn't hot or pretty but not too ugly to sell to prospects and work with customers."** This unsolicited and demeaning assessment of her sexual attractiveness was a gross abuse of power, intended to degrade her and reduce her role as CEO to a crude valuation of her physical appearance.

19. This was part of a pattern of Ferro making inappropriate comments about female employees' appearances. He told Ms. Mader he had heard from friends that eMed was hiring "**ugly middle-aged people**" and commented on another female sales representative's appearance, stating she "**just doesn't look as good anymore**."

20. On multiple occasions, Ferro told Ms. Mader that she needed to be "**MORE OF A BITCH**", a blatant, offensive, and gender-based stereotype aimed at attacking her leadership style simply because she is a woman.

21. On another occasion while Ms. Mader was absent, Ferro publicly demeaned her during a team standup meeting, an act so egregious that two employees later expressed their concern to her about the profound disrespect he had shown.

22. Upon information and belief, Ferro's hostile and demeaning conduct towards Ms. Mader is part of a broader, documented pattern of predatory behavior towards female professionals.

23. In 2018, it was widely reported that another female executive, Hagan Kappler, alleged that Ferro cornered her in his hotel suite under the pretense of a business dinner and groped

her breast.[2] In the same report, Kathryn Minshew, the founder of a career-advice startup, alleged that Ferro lured her to a corporate apartment where he forcefully pulled her in for an unwanted kiss.

24. In 2018, it was also reported that Ferro had privately settled a dispute for making discriminatory, antisemitic remarks regarding Judaism, referring to a "Jewish cabal" in the publishing industry.[3]

25. The hostile environment extended to a complete disregard for Ms. Mader's executive authority. As CEO, Ms. Mader's requests for essential resources, including marketing budgets, employee raises and bonuses, and sales incentive plan approvals, were consistently ignored and stonewalled by Ferro, making sustainable leadership impossible.

### III. <u>Ms. Mader's Opposition to Unlawful Practices</u>

26. Beyond the pervasive discrimination she endured, Ms. Mader was repeatedly directed by Ferro and Dearborn to assist them in an unlawful scheme to procure potent GLP-1 prescription drugs for personal friends and high-profile associates by deliberately subverting the mandatory standard of care required under state and federal law.

27. This pattern of corporate malfeasance is starkly illustrated by the directive from Ferro concerning Linda Yaccarino, who was the incoming, and not yet publicly announced, Chief Executive Officer of eMed. Ferro explicitly ordered Ms. Mader to bypass the necessary clinical

---

[2] *See, e.g.*, Michal Lev-Ram, Michael Ferro, Chairman of Tronc, Accused of Inappropriate Advances by Two Women, FORTUNE (Mar. 19, 2018), https://fortune.com/2018/03/19/tronc-chairman-michael-ferro-allegations/; *see also* Sydney Ember, Michael Ferro Resigns as Chairman of Tronc, N.Y. TIMES (Mar. 19, 2018), https://www.nytimes.com/2018/03/19/business/media/michael-ferro-tronc-resignation.html.

[3] *See* Joe Concha, Tribune Publishing Paid $2.5 Million to Avert Lawsuit Alleging Anti-Semitic Comments by Ex-Chairman, THE HILL (Dec. 7, 2018), https://thehill.com/homenews/media/421099-tribune-publishing-paid-25-million-to-avert-lawsuit-alleging-anti-semitic-comments-by/.

protocols to fast-track the prescription medication for Ms. Yaccarino, despite the fact she had not yet undergone the required medical diagnostics or been deemed clinically eligible.

28. This placed Ms. Mader in the untenable position of having to choose between her job and participating in an illegal and dangerous scheme that exposed both the company and its incoming CEO to significant legal and medical liability. Ultimately, Ms. Mader's refusal to violate the law constituted legally protected activity, placing her in direct opposition to Ferro's unlawful directives.

29. Ms. Mader's refusal to violate the law and clinical protocols constituted legally protected activity, placing her in direct opposition to Ferro's unlawful directives.

**IV. <u>Respondents' Discriminatory Bait-and-Switch Demotion</u>**

30. Immediately after the $100 million Aon investment closed, eMed executed its scheme to strip Ms. Mader of her executive status and the lucrative bonus she had earned.

31. On July 9, 2025, eMed sent Ms. Mader a "Change of Position and Entity Offer Letter," which constituted a severe and retaliatory adverse employment action. The new offer was a clear demotion, stripping her of the CEO title and making her "President," reporting to the soon-to-be CEO, Dr. Patrice Harris. Most egregiously, the offer explicitly eliminated her contractual 10% Transaction Bonus, a bonus worth tens of millions of dollars, and attempted to replace it with a speculative grant of stock options.

32. Respondents deliberately targeted Ms. Mader on the basis of her sex by subjecting her to demotion, a changed reporting structure, and the deliberate extinguishment of her vested contractual rights, among others.

33. Respondents' proffered justification for the adverse employment actions is false and pretextual. No similarly situated male executives were subjected to the same bad faith conduct Ms. Mader was subjected to during her employment.

34. On July 10, 2025, Ms. Mader engaged in protected activity by formally objecting to the discriminatory changes in an email to Ken Finneran, rightfully noting that the change was a "material downgrade in responsibility and authority".

35. Respondents' response was not to negotiate, but to retaliate. In a subsequent conversation, Ferro confronted Ms. Mader, questioned her qualifications, and concluded with a clear threat, reminding her of his power to fire her at any time and demanding she decide if she was "in or out."

**V. <u>Respondent's Unlawful Retaliation Against Ms. Mader</u>**

36. After Ms. Mader retained legal counsel to protect her rights, eMed's campaign of unlawful retaliation only escalated.

37. On the evening of July 21, 2025, immediately after her counsel submitted her legal claims, Michael Ferro made an unsolicited call to Ms. Mader's personal phone, extremely upset at the news of Ms. Mader's protected opposition. Ferro explicitly asked why Ms. Mader had hired legal counsel and in a blatant act of retaliation directly threatened her job, stating that "he can fire her whenever he wants".

38. On July 22, 2025, Ms. Mader's counsel sent formal correspondence to Respondents, putting them on direct and unequivocal notice that Ferro's threatening contact constituted unlawful retaliation for Ms. Mader asserting her legally protected rights.

39. On or about July 28, 2025, just six days after Ms. Mader's counsel formally identified Ferro's threats as unlawful retaliation, Respondents terminated Ms. Mader's employment "for cause," effective immediately.

40. In a blatantly pretextual termination letter, Respondents asserted a series of fabricated and defamatory allegations against Ms. Mader, including material underperformance, leadership dysfunction, misrepresentation of her corporate title, and violation of IT policies, allegations never raised prior to her engaging in protected activity.

41. Respondents' fabricated reasons for termination are further evidenced by the fact that just two days prior to sending the termination letter, on July 26, 2025, Dearborn and other company agents were actively urging Ms. Mader to remain in her role with eMed.

42. Respondents unlawfully discriminated against Ms. Mader because of her sex by, among other things, demoting her from her role as CEO, stripping her of her earned contractual bonus, and replacing her with a new CEO, under circumstances where her performance was not only satisfactory but exceptional.

43. Respondents subjected Ms. Mader to a severe and pervasive hostile work environment based on her sex. This hostile environment was created and maintained by the Founder, Michael Ferro, whose conduct included public slander, misogynistic insults (e.g., demanding she be "**MORE OF A BITCH**"), the use of vulgar slurs (e.g., "**CUNT**"), and a documented pattern of predatory behavior towards women. This conduct was sufficiently severe and pervasive to alter the conditions of Ms. Mader's employment and create an abusive working environment.

44. Respondents unlawfully retaliated against Ms. Mader after she engaged in multiple instances of legally protected activity. Specifically, after Ms. Mader opposed the discriminatory

demotion and bonus elimination on July 10, 2025, and after her counsel asserted her legal rights on July 21, 2025, Respondents retaliated by threatening her employment and ultimately terminating her on July 28, 2025. Furthermore, Respondents retaliated against her for her opposition to Ferro's unlawful directives to bypass clinical and legal protocols.

45. The events described above are just some of the examples of unlawful discrimination and retaliation that Respondents subjected Ms. Mader to on a continuous and ongoing basis throughout her employment.

46. Respondents violated Title VII of the Civil Rights Act of 1964, the Florida Civil Rights Act, the Delaware Discrimination in Employment Act, and the Miami-Dade County Human Rights Ordinance, by subjecting Ms. Mader to unlawful sexual harassment, sex/gender discrimination, hostile work environment, retaliation, and retaliatory hostile work environment.

47. Respondents exhibited a continuous practice of discrimination, and Ms. Mader therefore makes all claims herein under the continuing violations doctrine.

48. As a result of the acts and conduct complained herein, Ms. Mader has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Ms. Mader has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Ms. Mader has further experienced severe emotional and physical distress.

49. As a result of Respondents' actions, Ms. Mader felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

50. Respondents are liable for violating Ms. Mader's personal dignity, and depriving Ms. Mader of her civil right to pursue an equal employment opportunity.

Please contact me if you have any questions or require additional information. Thank you for your courtesy and cooperation in the matter.

Respectfully submitted,

*/s/ Kyle T. MacDonald*
Kyle T. MacDonald, Esq.

**MACDONALD LAW, PLLC**
420 SW 7th Street, Suite 1118
Miami, FL 33130
T: (786) 500-9675
E: kyle@macdonaldemploymentlaw.com

**VERIFICATION PURSUANT TO 28 U.S.C. § 1746**

I, WENDI MADER, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 09/11/25

Wendi Mader (Sep 11, 2025 13:48:08 EDT)
WENDI MADER