**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

WENDI MADER,

Plaintiff, CASE NO.: 1:26-CV-23258-JTK

v.

EMED, LLC,
EMED POPULATION HEALTH, INC.,
f/k/a EMED POPULATION HEALTH, LLC,
f/k/a EMED WEIGHT LOSS, LLC,
MICHAEL FERRO, and
JUSTIN DEARBORN,

Defendants.
_______________________________________/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO DISMISS AMENDED COMPLAINT**

Plaintiff, WENDI MADER ("Plaintiff" or "Ms. Mader"), by and through her undersigned counsel, hereby files her Response in Opposition to the Omnibus Motion to Dismiss Amended Complaint [D.E. 23], filed by Defendants, EMED, LLC, EMED POPULATION HEALTH, INC., f/k/a EMED POPULATION HEALTH, LLC, f/k/a EMED WEIGHT LOSS, LLC (collectively, the "eMed Defendants" or the "Company"), MICHAEL FERRO ("Ferro"), and JUSTIN DEARBORN ("Dearborn") (collectively, "Defendants"), and in support, states as follows:

## INTRODUCTION

Defendants' Motion misapprehends both the substance of Ms. Mader's claims and the legal standard governing their sufficiency, and accordingly must be denied. The Amended Complaint sets forth, with extensive factual detail, plausible claims for relief against each Defendant for unlawful discriminatory and retaliatory conduct under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"); the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 ("FCRA"); the Miami-Dade County Human Rights Ordinance, Miami-Dade County Code ch. 11A, art. IV ("MDHRO"); the Florida Private Sector Whistleblower Act, Fla. Stat. § 448.101; and Florida and Delaware common law.[1]

Ms. Mader, a female healthcare executive, was recruited by Defendants to serve as Chief Executive Officer of their weight management subsidiary and to relocate her life and career to Miami-Dade County, Florida. Am. Compl. ¶¶ 42, 49, 53. She launched the division's first product and secured a $100 million institutional investment that drove a $2 billion enterprise valuation. Am. Compl. ¶¶ 57–58. In return, Defendants subjected her to a sustained campaign of sex-based discrimination and retaliation, culminating in a retaliatory demotion, the bad-faith elimination of her contractual compensation, and her ultimate termination within days of asserting her legal rights. Am. Compl. ¶¶ 60–79, 95–96, 98, 110, 114.

Defendants' Motion trivializes these allegations, asking this Court to accept the routine use of "cunt" to demean women, repeated demands that Ms. Mader "be more of a bitch," the stripping of her title and position, and her termination for opposing Defendants' conduct, as nothing more than "a handful of off-color remarks" and a "gripe." Am. Compl. ¶¶ 61, 66, 96, 114; Defs.' Mot.

[1] The Amended Complaint omits Counts XVI, XVII, XXI, and XXIII, which were not repleaded from the original Complaint. All references to count numbers in this Response correspond to the Amended Complaint as filed.

at 1. Defendants' Motion improperly attempts to dismantle these claims by questioning the veracity of the Amended Complaint's allegations and asking this Court to resolve factual disputes not properly before it. Defs.' Mot. at 10–13, 15–16. For these reasons and those set forth below, Plaintiff respectfully requests that this Court deny Defendants' Motion in its entirety.

## STANDARD OF REVIEW

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim possesses facial plausibility when the pleaded "factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In its review, the Court must "assume [the] veracity" of all well-pleaded allegations, construe all "reasonable inference[s]" in the plaintiff's favor, and apply its "judicial experience and common sense" in a "context-specific" analysis. *Iqbal*, 556 U.S. at 678–79. The complaint need only provide "fair notice of what the... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted).[2]

## ARGUMENT

### I. MS. MADER'S AMENDED COMPLAINT ESTABLISHES CLAIMS FOR SEX DISCRIMINATION, HOSTILE WORK ENVIRONMENT, AND RETALIATION (COUNTS I–IX, XI–XIII)

The Amended Complaint establishes claims against Defendants under Title VII, the FCRA, and the MDHRO for sex discrimination (Counts I through III), hostile work environment (Counts

[2] Defendants attached five exhibits to their Motion, invoking the principle that "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997); Defs.' Mot. at 3 n.10. To ensure the Court has the complete record of the documents on which the Amended Complaint relies, Ms. Mader submits Defendants' July 28, 2025, correspondence terminating her employment as Plaintiff's Exhibit A and the Proprietary Interests Protection Agreement as Plaintiff's Exhibit B.

IV through VI), retaliation (Counts VII through IX), and retaliatory hostile work environment (Counts XI through XIII).[3]

### A. Defendants Discriminated Against Ms. Mader on the Basis of Her Sex (Counts I–III)

A plaintiff may bring a Title VII discrimination claim as either a single-motive or a mixed-motive claim. *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). Mixed-motive claims can be established by showing that illegal bias, such as bias based on sex, "was a motivating factor for" an adverse employment action, "even though other factors also motivated" the action. *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e-2(m)). A mixed-motive claim requires only that the plaintiff show that (1) the defendant took an adverse employment action against her, and (2) a protected characteristic was a motivating factor for that action. *Id.* at 1239.

The Eleventh Circuit Court of Appeals has held that "it is error for a district court to apply the *McDonnell Douglas* standard at the motion to dismiss stage." *Teger v. Enablon N. Am. Corp.*, No. 25-80814-CIV, 2025 U.S. Dist. LEXIS 196993, at *4–5 (S.D. Fla. Sept. 30, 2025) (quoting *Hernandez v. Careersource Palm Beach Cnty., Inc.*, No. 23-12285, 2025 U.S. App. LEXIS 13212, at *11 (11th Cir. May 30, 2025)); *see also Davis v. Miami-Dade Cnty.*, No. 23-12480, 2024 U.S. App. LEXIS 22527, at *8 (11th Cir. Sept. 5, 2024) ("[W]e've squarely held that *McDonnell Douglas* is the wrong legal standard to apply at the pleading stage and have reversed district court dismissals for using it to assess the sufficiency of a complaint.") (cleaned up). Although a plaintiff asserting employment discrimination claims is not required to plead specific facts establishing a prima facie case under either framework, the Amended Complaint satisfies the elements of both. *See Buchanan v. Delta Air Lines, Inc.*, 727 F. App'x 639, 641 (11th Cir. 2018).

Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). A plaintiff need not show a "significant" or "serious" change in those terms, conditions, or privileges; it is enough that the employer's action "brought about some 'disadvantageous' change in an employment term or condition," leaving the employee "worse off," even if not "significantly so." *Muldrow v. City of St. Louis*, 601 U.S. 346, 350, 354, 359 (2024). The Eleventh Circuit evaluates the adverse

---

[3] The FCRA and the MDHRO are patterned after Title VII and are analyzed under the same framework. *Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

employment action element under that standard. *See W. v. Butler Cnty. Bd. of Educ.*, No. 23-10186, 2024 U.S. App. LEXIS 12591, at *5 (11th Cir. May 24, 2024); *Davis v. Orange Cnty.*, No. 23-12759, 2024 U.S. App. LEXIS 17964, at *9 (11th Cir. July 23, 2024).

Here, Ms. Mader has satisfied each element of her sex discrimination claims. As to the first element, the Amended Complaint establishes that Defendants subjected Ms. Mader to multiple actionable adverse employment actions, including: (1) her demotion from Chief Executive Officer; (2) the stripping of her title and job responsibilities; (3) the denial of the resources, budget approvals, and staffing decisions necessary to execute her duties; (4) the extinguishment of her contractual compensation, including her ten percent participation interest in the Transaction Bonus Plan; and (5) her unlawful termination on the basis of her sex. Am. Compl. ¶¶ 135, 138. Each of these actions independently constitutes a "disadvantageous" change in the terms and conditions of Ms. Mader's employment, satisfying the *Muldrow* standard. 601 U.S. at 354, 359.

As to the second element, the Amended Complaint further alleges specific facts demonstrating that Ms. Mader's sex was a motivating factor in these adverse actions. Defendants' decisionmakers, including Defendant Ferro, evaluated Ms. Mader's executive worth by her sexual attractiveness, telling her that she looked "like a soccer mom," that she was "always too buttoned up," and that she "wasn't hot or pretty but not too ugly to sell." Am. Compl. ¶¶ 15, 135. Defendants also discriminated against Ms. Mader on the basis of her nonconformity to gender stereotypes of how they believed a female executive should look, act, and behave, instructing her to "be more of a bitch" while simultaneously disparaging her as "too nice" and as lacking "a spine," and regularly subjecting her to degrading, gender-based humiliation in front of her own subordinates. *Id.* No similarly situated male executive was subjected to comments regarding his sexual attractiveness, nor was any penalized for nonconformity to male gender stereotypes. Am. Compl. ¶ 137. Defendants further illustrated that disparity by expanding incentive compensation exclusively for male executives during the same period in which they extinguished Ms. Mader's contractual compensation rights, which formed part of the terms and conditions of her employment. *Id.*

The Eleventh Circuit explicitly recognizes that gender-specific slurs and derogatory language establish gender-based animus under Title VII. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (en banc) (holding that referring to women as "bitches" and "cunts" demonstrates that women are viewed in a humiliating and degrading manner). Defendants' routine deployment of gender-based slurs intended to degrade women in the workplace

independently exposed Ms. Mader to disadvantageous terms and conditions of employment. Am. Compl. ¶¶ 15, 61; *see Anderson v. City of Fort Pierce*, No. 14-14095-CIV, 2015 U.S. Dist. LEXIS 178144, at *14–16 (S.D. Fla. July 29, 2015).

These allegations plausibly suggest intentional discrimination, satisfying the pleading standard. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015). At a minimum, they establish that Ms. Mader's sex was a motivating factor in Defendants' adverse actions, rendering dismissal improper. Am. Compl. ¶ 140; *Quigg*, 814 F.3d at 1239. Accordingly, Ms. Mader has satisfied each element of her sex discrimination claims, and Defendants' Motion must be denied as to Counts I through III.

Defendants raise three challenges to these claims, none of which withstands scrutiny. Defs.' Mot. at 8–10.[4] Defendants' contention that another woman's appointment as Chief Executive Officer defeats any inference of discrimination mischaracterizes Ms. Mader's claims and misapprehends the pleading burden under Title VII. As an initial matter, Ms. Mader pleads a mixed-motive gender discrimination claim, which requires no comparator whatsoever and asks only whether sex was a motivating factor in Defendants' adverse actions. Am. Compl. ¶ 140; *Quigg*, 814 F.3d at 1239. More fundamentally, Defendants attempt to focus Ms. Mader's claims on her eventual successor and ignore the several adverse employment actions that Ms. Mader's claims are premised on, which include: (1) stripping her of her title; (2) denying her necessary resources; (3) extinguishing her contractually earned compensation; and (4) terminating her employment. Am. Compl. ¶¶ 135, 138. As discussed *supra*, Defendants' pervasive sex-based commentary demonstrates that these adverse actions were motivated by Ms. Mader's sex. Am. Compl. ¶ 135. The subsequent hiring of a female executive does not retroactively cure or negate the targeted, sex-based hostility, demotion, and termination inflicted upon Ms. Mader. Furthermore, the Eleventh Circuit expressly prohibits demanding comparator evidence at the pleading stage. *See Hernandez*, 2025 U.S. App. LEXIS 13212, at *11. Even assuming *arguendo* that Ms. Mader were required to plead comparators, the Amended Complaint nonetheless

[4] Defendants cite *Griffith* for the sweeping proposition that Ms. Mader's claim "fails as a matter of law." Defs.' Mot. at 8. Defendants' argument, however, finds no support in *Griffith*, because the decision cited was an order granting a stay of discovery in which the court expressly ruled "without commenting on the merits of the motion to dismiss." *Griffith v. Ga. Cyber Acad.*, No. 1:23-CV-4956-MLB-CCB, 2026 U.S. Dist. LEXIS 114492, at *4–5 (N.D. Ga. Jan. 30, 2026).

identifies male comparators by name and title, including Doug Mee, Justin Dearborn, and Kenneth Finneran, none of whom faced equivalent mistreatment. Am. Compl. ¶¶ 79, 137.

Defendants' assertion that the retention bonus allegations are too vague to identify a comparator and were never exhausted before the EEOC is belied by the pleading itself. The Amended Complaint specifically alleges the date the bonus recommendations were circulated, identifies the male executives by name and title, and pleads that Defendants pursued those bonuses during the same period in which they extinguished Ms. Mader's contractual compensation. Am. Compl. ¶¶ 79, 93, 137. As to exhaustion, the proper inquiry is simply whether the claim "is like or related to, or grew out of, the allegations contained in the relevant charge." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004). A judicial complaint may appropriately "amplify, clarify, or more clearly focus earlier EEOC complaints." *Ray v. Freeman*, 626 F.2d 439, 443 (5th Cir. 1980). Here, Ms. Mader's Charges of Discrimination easily satisfy this standard. In her Charges, Ms. Mader expressly averred that Defendants stripped her of "the lucrative bonus she had earned," that the July 9, 2025, Change of Position "explicitly eliminated her contractual 10% Transaction Bonus," and that "[n]o similarly situated male executives were subjected to the same bad faith conduct." Defs.' Composite Ex. 5, Charges ¶¶ 30, 31, 33. Those averments are more than sufficient to establish that Ms. Mader's allegations concerning the June 2025 male retention bonuses grew out of the disparate treatment and compensation claims she properly exhausted. Even if Ms. Mader's factual allegations in the Charges were somehow deemed insufficient, "the failure to make specific factual allegations in a charge does not necessarily preclude judicial review of those allegations," *Kelly v. Dun & Bradstreet, Inc.*, 557 F. App'x 896, 899 (11th Cir. 2014), as "[t]he scope of an EEOC complaint should not be strictly interpreted," and courts are "extremely reluctant" to allow procedural technicalities to bar discrimination claims, *Gregory*, 355 F.3d at 1280.

Defendants' argument that the Conversion extinguished every participation interest asks this Court to decide a factual dispute on a motion to dismiss, contrary to the standard Rule 12(b)(6) requires. The Amended Complaint specifically alleges that Defendants targeted and extinguished her negotiated compensation rights on the basis of her sex, while simultaneously expanding incentive compensation exclusively for male executives. Am. Compl. ¶¶ 135, 137. Ms. Mader's well-pleaded allegations cannot be refuted by an unsupported and conclusory assertion in Defendants' Motion that other unidentified "hypothetical" interests were also extinguished.

Accordingly, Defendants fail to establish any meaningful pleading deficiency in Ms. Mader's discrimination claims and their Motion must be denied.

### B. Defendants Subjected Ms. Mader to a Sex-Based Hostile Work Environment (Counts IV–VI)

To establish a claim for hostile work environment, a plaintiff must show (1) that she belonged to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

In evaluating whether the alleged conduct was sufficiently severe or pervasive, courts consider (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the employee's job performance. *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1247 (11th Cir. 2004). The severe-or-pervasive inquiry is not subject to "mathematical precision," but instead turns on the totality of the circumstances. *Melton v. I-10 Truck Ctr., Inc.*, 166 F.4th 905, 918–19 (11th Cir. 2026) (citing *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). This evaluation requires consideration of "the social context in which particular behavior occurs and is experienced." *Id.* at 81.

The Amended Complaint satisfies each element and establishes a work environment rife with demeaning and humiliating sex discrimination. Ms. Mader was an individual female, and the harassment directed at her was unwelcome and explicitly based on her sex. Am. Compl. ¶¶ 185, 186, 187. Defendant Ferro regularly weaponized the word "cunt" to demean women during professional meetings, and when confronted, dismissed the concern by claiming his language was balanced because he also used the word "dick" as an insult, demonstrating an explicit awareness that his slur targeted women. Am. Compl. ¶¶ 61, 62. He evaluated Ms. Mader's executive worth entirely through the lens of her physical desirability, telling her she "wasn't hot or pretty, but not too ugly to sell to prospects," while persistently scrutinizing her appearance by claiming she looked "like a soccer mom" and was "always too buttoned up." Am. Compl. ¶¶ 63, 64. Defendant Ferro

further demanded that she conform to demeaning gender stereotypes, repeatedly instructing her to "be more of a bitch," disparaging her as "too nice," and stating that she lacked "a spine." Am. Compl. ¶¶ 66, 67. The Eleventh Circuit has held that gender-specific slurs of this character establish that women are viewed "in a humiliating or degrading way," and that such language is actionable even where the harasser does not "close the circle with reference to the plaintiff specifically." *Reeves*, 594 F.3d at 811 (reversing summary judgment where the gender-derogatory language was never directed at the plaintiff). Furthermore, penalizing an employee for failing to conform to gender stereotypes independently constitutes sex-based discrimination. *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011).

Assessed in its proper context, namely the controlling owner of an enterprise subjecting the female Chief Executive Officer he installed to relentless misogyny, the harassment easily satisfies the severity and pervasiveness factors. *Oncale*, 523 U.S. at 81. The conduct was frequent, humiliating, and deliberately destructive, spanning Ms. Mader's entire tenure from August 2024 through July 2025. Am. Compl. ¶ 61. Defendant Ferro made those demands in front of Ms. Mader's colleagues on multiple occasions, evaluated female executives by their perceived willingness to perform sexual acts for business, and degraded Ms. Mader before her own subordinates in her absence. Am. Compl. ¶¶ 61, 63, 66, 69, 71, 106. This targeted abuse negatively impacted both Ms. Mader's professional life and her personal life, leaving her isolated, demeaned, embarrassed, and ashamed. Am. Compl. ¶ 193. Defendants leveraged that hostility to sabotage her ability to function as Chief Executive Officer by categorically denying necessary budget approvals, publicly stripping her of authority over the $100 million account she had personally originated and built, monitoring her calendar, inserting Defendant Ferro into client meetings from which clients had expressly asked that he be excluded, and empowering subordinates to bypass her chain of command. Am. Compl. ¶¶ 70, 71, 72.

Finally, the eMed Defendants are liable for this discriminatorily abusive environment because Defendant Ferro, as the founder and controlling equity holder, functioned as the organization's alter ego with unquestioned authority to bind the company in all material respects. Am. Compl. ¶ 192; *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 421 (11th Cir. 1999). Counts IV through VI accordingly state plausible claims for relief.

Defendants attempt to minimize these allegations and to analyze each event in isolation. Defendants characterize a year of sexualized commentary and gender-based slurs as "mere

offensive utterances," recast Defendant Ferro's use of a slur reserved for women as generic profanity, dismiss his demands that Ms. Mader conform to gender stereotypes as isolated and untimely, defend his threat to terminate her as contractually accurate, and assert that Ms. Mader never complained at all. Defs.' Mot. at 2, 6, 10–14. Each of these positions asks the Court to credit Defendants' account over the factual allegations it is required to accept as true. *See Pierre v. Aston Healthcare, LLC*, No. 6:25-cv-284-JSS-LHP, 2026 U.S. Dist. LEXIS 120445, at *16 (M.D. Fla. June 1, 2026) (denying motion to dismiss because "what Defendants are really challenging is the veracity of Plaintiff's allegations, and the inferences that can be drawn from them," which "is not the proper standard at the motion to dismiss stage").

Defendants' reliance on authority addressing "the sporadic use of abusive language, gender-related jokes, and occasional teasing" is misplaced. Defs.' Mot. at 10–12; *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). That framework is divorced from the Amended Complaint. Ms. Mader does not allege occasional jokes; she alleges that the founder and controlling owner of her employer explicitly evaluated her executive worth based on her sexual attractiveness, relentlessly scrutinized her physical appearance, and deployed a gender-specific slur reserved exclusively for women in the meetings she was required to attend. Am. Compl. ¶¶ 61, 63, 64. At best, whether this campaign was severe or pervasive turns on the totality of the circumstances, an inquiry that cannot be resolved against Ms. Mader on the pleadings. *Melton*, 166 F.4th at 918–19.

Defendants next argue that Defendant Ferro's use of the word "cunt" amounts to general profanity rather than gender-based harassment, and that his demand that Ms. Mader "be more of a bitch" cannot "even be construed to relate to her gender." Defs.' Mot. at 12. This argument is foreclosed by the very case Defendants cite. While Defendants quote *Reeves* for the proposition that Title VII does not prohibit profanity alone, they conspicuously omit the Eleventh Circuit's explicit holding that gender-specific slurs remain actionable even in a workplace "rife with generally indiscriminate vulgar conduct," and that "[t]he harasser need not close the circle with reference to the plaintiff specifically." *Reeves*, 594 F.3d at 809, 810–11. Furthermore, Defendants ignore the factual allegations in Ms. Mader's Amended Complaint. Ms. Mader alleges that Defendant Ferro deployed the slur "as a term of absolute contempt directed exclusively at women," and that he explicitly acknowledged its gendered nature by defending his language as balanced because he also used the word "dick." Am. Compl. ¶¶ 61, 62, 189.

Defendants assert that the remarks concerning Ms. Mader's appearance and demeanor were isolated and that the demand to "be more of a bitch" occurred when her employment was ending. Defs.' Mot. at 12–13. Both assertions are untethered from the factual allegations contained in the pleading. Ms. Mader alleges regular commentary regarding her physical appearance and sexual attractiveness, and repeated demands that she alter her appearance and personality to conform to gender stereotypes. Am. Compl. ¶¶ 63, 64, 66, 67. Defendants' assertion that the July 22, 2025, remark could not have interfered with her employment because it was "at an end" is irrelevant even if true. Ms. Mader remained employed by Defendants on that date and was not terminated until July 28, 2025, and Defendant Ferro repeated the demand multiple times in front of colleagues during that meeting. Am. Compl. ¶¶ 106, 114.

Defendants' remaining arguments similarly demand that the Court resolve factual inferences in their favor. Defendants claim that labeling Ms. Mader "too nice" or lacking "a spine" bears no relation to her sex, disregarding the explicit allegation that these statements perpetuated demeaning stereotypes of female executives. Defs.' Mot. at 13–14; Am. Compl. ¶ 67; *Glenn*, 663 F.3d at 1316. In a footnote, Defendants argue that Defendant Ferro's threat to terminate Ms. Mader was non-actionable because it was contractually "true." Defs.' Mot. at 14 n.20. Whether Defendant Ferro possessed the contractual right to terminate Ms. Mader is irrelevant. The question is whether the conduct was threatening or humiliating rather than a mere offensive utterance, and Ms. Mader alleges that Defendant Ferro threatened her employment while mocking her professional background and qualifications. Am. Compl. ¶ 108.

Finally, Defendants' characterization of Ms. Mader's discrimination allegations as "post-hoc" is rebutted by the pleading. Ms. Mader had no realistic avenue for internal complaint given that the individual harassing her owned and controlled the eMed Defendants. Am. Compl. ¶ 77. In any event, Ms. Mader raised her claims during her employment and prior to her termination, including through counsel, and Defendants' own termination letter acknowledged those claims. Am. Compl. ¶¶ 104, 107, 110, 115. Accordingly, Defendants' Motion must be denied as to Counts IV through VI.

### C. **<u>Defendants Retaliated Against Ms. Mader for Opposing Their Unlawful Conduct (Counts VII–IX, XI–XIII)</u>**

To establish a claim for retaliation under Title VII, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3)

there is a causal connection between the protected activity and the adverse action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Protected activities under Title VII encompass both formal and informal complaints. *See Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (recognizing that Title VII's protection from retaliation "is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures"); *see also Zwick v. Univ. of S. Fla. Bd. of Trs.*, 505 F. Supp. 3d 1317, 1341 (M.D. Fla. 2020).

An action is materially adverse when it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Even where an individual incident is insufficient to constitute a materially adverse action, "the cumulative weight of numerous individual incidents can be considered in determining whether the employee experienced materially adverse action." *Putman v. Sec'y, Dep't of Veterans Affs.*, 510 F. App'x 827, 831 (11th Cir. 2013) (citing *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)); *see also Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).

A plaintiff establishes a causal connection by demonstrating that the relevant decisionmaker was aware of the protected conduct at the time of the adverse employment action. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010); *see also Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013). A plaintiff may also establish causation through close temporal proximity between the protected conduct and the adverse employment action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007); *Brungart v. BellSouth Telecomm.'s, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

The Amended Complaint establishes each element of Ms. Mader's retaliation claims. Ms. Mader engaged in multiple instances of protected activity in the weeks preceding her discharge, including but not limited to: (1) her express objection on July 10, 2025, to the demotion that stripped her of her title, reporting authority, and negotiated compensation; (2) her notification to Defendants through counsel on July 22, 2025, that she was asserting her legal rights; and (3) her explicit identification of her sex discrimination, hostile work environment, and retaliation claims during communications with Defendant Dearborn and Defendants' General Counsel over the weekend of July 26 and 27, 2025. Am. Compl. ¶¶ 104, 107, 109, 110, 112. These communications constitute protected opposition as a matter of law. "[W]hen an employee communicates to her

employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (cleaned up); *see Rollins*, 868 F.2d at 400.

Defendants terminated Ms. Mader on July 28, 2025, a single day after she explicitly identified her Title VII and FCRA claims. Am. Compl. ¶¶ 110, 114. This close temporal proximity independently establishes the requisite causal connection at the pleading stage. *See Thomas*, 506 F.3d at 1364. Beyond temporal proximity, Defendants' own words establish their knowledge. In the document executing her discharge, Defendants explicitly wrote that "the suggestion that the role change was retaliatory or motivated by discriminatory animus is categorically false, defamatory, and unsupported by any contemporaneous record." Am. Compl. ¶ 115. Defendants cannot expressly rebut Ms. Mader's discrimination claims in their termination letter while simultaneously maintaining they were unaware she had raised them.

The Amended Complaint further alleges that Defendants' stated basis for the termination was entirely manufactured. The sequence of events lays bare the pretextual nature of Defendants' actions. On July 22, 2025, Ms. Mader asserted her rights through counsel. The very next day, Defendants covertly commissioned a forensic analysis of her email account to construct a post hoc justification for her removal. Am. Compl. ¶¶ 107, 116. Yet even while secretly manufacturing this pretext, Defendants implored Ms. Mader over the subsequent weekend to remain in her executive role, raising no allegation of misconduct or policy violation. Am. Compl. ¶¶ 109, 119. It was only after Ms. Mader stood firm on her claims that Defendants abruptly terminated her, invoking an "Acceptable Use Policy" from a United Kingdom affiliate that did not even apply to United States employees. Am. Compl. ¶ 117. Defendants cannot plausibly accuse Ms. Mader of a "pattern of disloyal, harmful and contract-breaching behavior" mere days after begging her to stay. These well-pleaded facts satisfy the elements of retaliation, and Counts VII through IX accordingly state plausible claims for relief.

To establish a claim for retaliatory hostile work environment, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her engaging in the protected activity; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment. *See Kelly v. Dun & Bradstreet, Inc.*, 641 F. App'x 922, 923 (11th Cir. 2016) (citing *Gowski v. Peake*, 682 F.3d

1299, 1312 (11th Cir. 2012)). The allegedly harassing acts must be considered "in context, not as isolated acts." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

The Amended Complaint independently establishes that Defendants subjected Ms. Mader to a retaliatory hostile work environment designed to penalize her for asserting her civil rights. Mere hours after Ms. Mader's counsel contacted the company on July 22, 2025, Defendant Ferro called her personal cellular telephone and berated her for thirty-nine minutes, interrogating her regarding her legal claims and retention of counsel, mocking her professional background and qualifications, threatening to terminate her employment, and demanding that she decide whether she was "in or out." Am. Compl. ¶¶ 107, 108. Rather than address her underlying discrimination complaints, the eMed Defendants escalated the hostility by secretly commissioning a forensic investigation into her email account the following day and terminating her employment six days later. Am. Compl. ¶¶ 105, 114, 116. Assessed in context rather than as isolated acts, subjecting a female executive to an abusive interrogation and launching a covert forensic audit into her communications because she opposed sex-based discrimination altered the conditions of her employment. *Mendoza*, 195 F.3d at 1246; *see Gowski*, 682 F.3d at 1312. Any reasonable employee in Ms. Mader's position would be dissuaded from opposing discriminatory conduct if she knew the consequence would be a targeted campaign of intimidation and a manufactured investigation. Am. Compl. ¶ 242. Counts XI through XIII accordingly state plausible claims for relief.

Each of Defendants' challenges to these claims fails. Defendants initially challenge the protected activity element by analyzing Ms. Mader's communications in isolation. Defs.' Mot. at 14. This approach ignores the comprehensive factual record set forth in the Amended Complaint, which quotes the July 10 communication directly and refutes Defendants' premise that Ms. Mader does not allege the substance of those communications. Am. Compl. ¶ 104. By the weekend of July 26 and 27, 2025, Defendants were indisputably on notice of Ms. Mader's specific claims for sex discrimination and retaliation through direct discussions with her legal counsel. Federal courts deem it "wholly irrelevant" whether an employee or her attorney communicates a complaint of discrimination. *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001); *Moakler v. Furkids, Inc.*, 374 F. Supp. 3d 1306, 1316 (N.D. Ga. 2019). Indeed, Defendants engaged in direct discussions regarding Ms. Mader's discrimination claims over the weekend, explicitly referenced those exact claims in the July 28 termination letter by declaring that "the suggestion that the role change was retaliatory or motivated by discriminatory animus is categorically false,"

and now urge the Court to ignore the causal connection between the two events. Am. Compl. ¶ 115.

Defendants next attempt to defeat causation by asserting that the alleged adverse actions occurred prior to any protected activity. Defs.' Mot. at 15–16, 17. That argument contradicts the explicit sequence alleged in the pleading. Hours after receiving the July 22 communication from Ms. Mader's counsel, Defendant Ferro subjected Ms. Mader to a thirty-nine-minute threatening phone call. The following day, Defendants commissioned a covert forensic investigation of her email. On July 28, a single day after explicit discussions regarding her discrimination claims, Defendants terminated her employment. Am. Compl. ¶¶ 108, 110, 114, 116. That same sequence answers Defendants' assertions that Ms. Mader alleges no materially adverse treatment in the six days following the July 22 letter and could not have experienced a retaliatory hostile work environment over a weekend. Defs.' Mot. at 17–18.

Defendants' corollary arguments fare no better. Defendants contend that this Court need not accept Ms. Mader's characterization of the presidency offer as an adverse action or a demotion. Defs.' Mot. at 16 n.21. Defendants' correspondence stripping a female executive of her title and her job responsibilities plainly altered the terms and conditions of Ms. Mader's employment, and whether the entity employing her was later converted has no bearing on whether that action, when taken, was adverse. Am. Compl. ¶ 96. Defendants further note that Defendant Ferro's telephone call may not by itself constitute an adverse employment action. That framing disregards the correct inquiry, which is whether the cumulative weight of Defendants' retaliatory conduct, including that call, might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68; *Putman*, 510 F. App'x at 831. Taken as a whole, the demotion, the threat to Ms. Mader's employment, the covert forensic audit of her email account, and her termination six days later easily clear that threshold.

Defendants also incorrectly claim that Ms. Mader failed to raise the forensic review of her email account before the EEOC. Defs.' Mot. at 16. In reality, Ms. Mader's Charges of Discrimination specifically allege that Defendants' termination letter asserted "a series of fabricated and defamatory allegations against Ms. Mader, including material underperformance, leadership dysfunction, misrepresentation of her corporate title, and violation of IT policies, allegations never raised prior to her engaging in protected activity." Defs.' Composite Ex. 5, Charges ¶ 40. Even if Ms. Mader had omitted that specific factual event, which she did not, the

proper inquiry is whether her judicial claim "is like or related to, or grew out of, the allegations contained in the relevant charge." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004). Ms. Mader's retaliation claims grew directly out of the pretextual termination her Charges describe.

Defendants close by offering three alternative explanations for the termination and labeling Ms. Mader's pretext allegations conclusory. Defs.' Mot. at 16–17.[5] A motion to dismiss is not the mechanism for crediting an employer's alternative factual defenses over the detailed allegations of pretext set forth above, nor for accepting Defendants' characterization of the forensic investigation as a "prudent corporate response," each of which would require this Court to draw inferences in Defendants' favor. *See St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002).

Far from being conclusory, the pleading identifies the "Acceptable Use Policy" Defendants invoked as "BAB.POL.042," a Babylon Health policy that by its own terms applied exclusively to United Kingdom staff rather than to Defendants' United States employees. Am. Compl. ¶ 117. If Ms. Mader were genuinely being terminated for any of the reasons Defendants offer, they would not have spent the subsequent weekend imploring her to remain in her executive role while simultaneously engineering a covert basis for her discharge. Am. Compl. ¶¶ 103, 109, 119. Defendants' remaining contention, that Ms. Mader's objections regarding medical directives are unrelated to her sex, misapprehends a pleading that advances those objections as protected activity under the Florida Private Whistleblower Act, addressed in Part II, and as one component of the broader retaliatory motive. Defs.' Mot. at 17; Am. Compl. ¶ 119. Accordingly, Defendants' Motion must be denied as to Counts VII through IX and XI through XIII.

## II. DEFENDANTS RETALIATED AGAINST MS. MADER FOR OBJECTING TO THEIR UNLAWFUL PRESCRIBING PRACTICES (COUNT X)

The Florida Private Whistleblower Act prohibits an employer from retaliating against an employee who "[o]bjected to, or refused to participate in, any activity, policy, or practice of the

[5] Defendants' reliance on *Schmidt v. Disney Parks, Experiences & Prods., Inc.*, 721 F. Supp. 3d 1314 (M.D. Fla. 2024), is misplaced. *Schmidt* rejected a retaliation claim premised on an objection to a vaccine mandate, holding that no violation of Title VII had been adequately alleged. The opinion never addresses pretext, and the word does not appear in the decision. *Schmidt* was dismissed for failure to plead protected activity.

employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3). To state a claim under section 448.103 alleging a violation of section 448.102(3), a plaintiff must establish that: (1) she objected to, or refused to participate in, an activity, policy, or practice of the employer; (2) the activity, policy, or practice constitutes a violation of a law, rule, or regulation; and (3) the employer took retaliatory action against her because of her objection or refusal. *See Gessner v. S. Co.*, 435 So. 3d 8, 2026 Fla. LEXIS 835, at *8 (Fla. May 28, 2026).

The statute does not require that the employer's violation be completed or adjudicated before the employee may seek its protection. *Id.* at *14–15. Nor does the statute require the employee to demonstrate a subjective belief in the employer's violation; it requires that the employer's conduct is, by definition, in violation of law. *Id.* at *16. A plaintiff must plead ultimate facts about the employer's activity, policy, or practice that, if proven, would constitute a violation of law. *Id.* at *17.

The Amended Complaint establishes each element of Ms. Mader's claim under the Florida Private Whistleblower Act. As to the first element, Ms. Mader repeatedly objected to Defendants' unlawful clinical practices. Defendants Ferro and Dearborn repeatedly directed Ms. Mader to procure GLP-1 prescription medications for personal associates and high-profile individuals who had not completed the required clinical intake process and were not medically eligible to receive them. Am. Compl. ¶ 81. In response, Ms. Mader raised her concerns directly to Defendant Ferro regarding an individual whose body mass index fell below the minimum eligibility threshold.[6] She subsequently renewed her objections during the week of May 5, 2025, in a meeting with Defendant Dearborn and Defendants' Head of Product, both of whom agreed that the directive could not lawfully be carried out. Am. Compl. ¶¶ 83, 86. Despite these direct objections, Defendant Dearborn advised Ms. Mader days later that an ineligible individual still wanted the medication and that the company needed to "figure out how to prescribe them," eventually confirming that employees were "working to solve the Linda problem." Am. Compl. ¶ 87. Defendants' contentions that Ms. Mader identifies no manner in which she was pressured, that Defendant Dearborn's statements cannot be conflated with a directive, and that she never objected to those statements are

[6] The Amended Complaint contains a scrivener's error at Paragraph 83, which references "February 2024" rather than February 2025. Ms. Mader did not commence employment until June 26, 2024, as Defendants themselves acknowledge, and every surrounding allegation describes events in 2025. Am. Compl. ¶¶ 43, 86–88; Defs.' Mot. at 19.

each answered by the pleading itself. Defs.' Mot. at 19–20. The pressure was the repeated directive from the founder who controlled the company and its Executive Chairman, and it continued after Ms. Mader objected and after Defendant Dearborn had agreed the directive was unlawful. Am. Compl. ¶¶ 81, 86, 87. Under Florida law, an employee is protected when she objects to her employer's unlawful activity, and she need not have been directed to participate in it herself. *Gessner*, 2026 Fla. LEXIS 835, at *14.

As to the second element, the practice Ms. Mader opposed directly contravened Florida and federal law. The Amended Complaint identifies the exact provisions Defendants violated by bypassing clinical evaluations and medical necessity determinations, including section 456.47, Florida Administrative Code Rule 64B8-9.012, section 458.331(1)(q), and the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331(a), 353(b)(1). Am. Compl. ¶¶ 82, 278, 279. Defendants urge dismissal by arguing that Ms. Mader must prove an adjudicated violation of law and possess an independent private cause of action under the cited statutes. Defs.' Mot. at 18 n.23, 20–21. The Florida Supreme Court expressly rejected this framework in *Gessner*, holding that at the pleading stage an employee need only "plead ultimate facts about the employer's activity, policy, or practice that, if proven, would be in violation of law." *Gessner*, 2026 Fla. LEXIS 835, at *17. Moreover, nothing in the Whistleblower Act requires the predicate statute to supply a private cause of action, and the Florida Supreme Court has treated section 458.331(1) as precisely such a predicate. *Gessner*, 2026 Fla. LEXIS 835, at *15.[7]

Defendants' remaining attacks on each individual provision quarrel with the sufficiency of the facts alleged rather than with the legal standard governing them, and each is answered by *Gessner*. Defs.' Mot. at 20–21. Ms. Mader need prevail on only one predicate provision, and the Amended Complaint identifies several. Defendants contend that Ms. Mader needed medical credentials in order to identify a violation of the law, a requirement that finds no support in the statute and that Florida courts have squarely rejected. Defs.' Mot. at 20. An employee requires no medical credentials to recognize that her employer is dispensing prescription drugs without

---

[7] Defendants' own authorities confirm the distinction rather than close it. *Peter R. Brown* addressed whether an administrative rule exceeded an agency's delegated rulemaking authority under Fla. Stat. § 120.56, and *Lingle* held only that Fla. Stat. § 458.331 does not provide a cause of action to patients injured by a physician's conduct. *State, Dep't of Fin. Servs. v. Peter R. Brown Constr., Inc.*, 108 So. 3d 723, 726 (Fla. 1st DCA 2013); *Lingle v. Dion*, 776 So. 2d 1073, 1077 (Fla. 4th DCA 2001).

mandatory clinical intake protocols. *See Taylor v. Mem'l Health Sys., Inc.*, 770 So. 2d 752, 754 (Fla. 5th DCA 2000) (hospital employee who was not a physician stated a whistleblower claim by objecting to a physician's unlawful examinations of patients); *accord Gessner*, 2026 Fla. LEXIS 835, at *14. Defendants' own personnel reached the same conclusion, as a senior eMed employee reported internally that an Aon stakeholder had been prescribed a GLP-1 medication in circumstances where she should not have been, prompting Defendant Dearborn to respond that the situation was "about as bad as it gets." Am. Compl. ¶¶ 88, 89. Defendants also fault Ms. Mader for not lodging fresh objections to the subsequent improper prescriptions for Douglas Mee and an Aon stakeholder. Defs.' Mot. at 20. That contention disregards the statutory text, which protects an employee's objection to an employer's overarching practice rather than requiring a separate objection to every downstream application of the illegality. *Gessner*, 2026 Fla. LEXIS 835, at *12–13.

As to the third element, Defendants retaliated against Ms. Mader directly because of her opposition. Defendants Ferro and Dearborn, the same individuals who received her objections and directed the unlawful conduct, are the decisionmakers who subsequently stripped Ms. Mader of her Chief Executive Officer title, eliminated her participation in the Transaction Bonus Plan, threatened her employment, and ultimately terminated her. Am. Compl. ¶¶ 284, 285. Defendants' contention that the Amended Complaint says nothing of Defendant Ferro's reaction to her objection mistakes what but-for causation requires at the pleading stage for what it requires at trial. Defs.' Mot. at 18–19; *Lapham v. Walgreen Co.*, 88 F.4th 879, 893 (11th Cir. 2023). Defendants further attempt to defeat causation by offering their internal forensic email audit as a legitimate reason for termination. Defs.' Mot. at 19 n.24. A proffered legitimate reason is an evidentiary defense that follows discovery, not a pleading requirement a plaintiff must negate in her complaint, and it is not a proper basis for dismissal for the reasons set forth in Part I.C. Even evaluated at this early stage, the Amended Complaint pleads facts demonstrating this defense is entirely pretextual. Defendants purportedly discovered the forwarded emails on July 23, 2025, yet they spent the following weekend imploring Ms. Mader to remain in her role without once suggesting she had engaged in misconduct. Am. Compl. ¶¶ 109, 288. To execute the termination, Defendants relied on the inapplicable United Kingdom policy described in Part I.C. Am. Compl. ¶ 117. Ms. Mader

has therefore satisfied each element of her claim under the Florida Private Whistleblower Act, and Defendants' Motion to Dismiss Count X and their alternative motion to strike must be denied.[8]

## III. DEFENDANTS BREACHED THEIR CONTRACTUAL COMPENSATION OBLIGATIONS TO MS. MADER (COUNTS XIV, XV, XVIII, XIX)

Ms. Mader's contractual claims arise directly from her employment in Miami-Dade County, Florida, and are properly before this Court. The Proprietary Interests Protection Agreement, which Defendants mandated as a condition of her employment, designates Florida law and exclusive venue in the state or federal courts of Miami-Dade County, Florida. Crucially, the PIPA is the exact agreement Defendants invoked to justify terminating Ms. Mader for cause. Defendants' forum argument, by its own terms, only becomes relevant if the Transaction Bonus Plan is an enforceable agreement. It is, and Ms. Mader has stated valid claims for its breach and for breach of the implied covenant of good faith and fair dealing.

### A. Defendants' Proprietary Interests Protection Agreement Governs Ms. Mader's Employment-Related and Contractual Claims

On June 26, 2024, Defendants required Ms. Mader to execute the PIPA as a condition of employment. Am. Compl. ¶ 45; Pl.'s Ex. B at 6–7. The PIPA mandates that its validity and enforceability be determined "strictly in accordance with the laws of the State of Florida without applying its conflicts of laws principles." Pl.'s Ex. B at 4. It further dictates that "[a]ny and all lawsuits, legal actions or proceedings against either party arising out of this Agreement will be brought in Florida state court located in Miami Dade County, Florida or the federal court of competent jurisdiction sitting in Miami Dade County, Florida." *Id.* at 5. The agreement includes an irrevocable waiver of any venue objection. *Id.*

The Plan directly incorporates the PIPA to govern the dispositive contractual issue in this case. Specifically, the Plan defines "Cause" for termination to include a Participant's "violation of any applicable confidentiality, non-competition, non-solicitation, non-hire or similar restrictive covenants to which the Participant is a party with the Company Group," and "any violation or

[8] Defendants alternatively move to strike Ms. Mader's statutory and regulatory citations under Rule 12(f), a drastic remedy available only where the challenged material bears no possible relation to the controversy. *Williams v. Delray Auto Mall, Inc.*, 289 F.R.D. 697, 699–700 (S.D. Fla. 2013). The statutes Ms. Mader cites are the predicate violations Fla. Stat. § 448.102(3) requires her to plead, and the motion to strike should be denied.

breach by a Participant of the terms or conditions of this Plan, the Award Agreement or any other agreement currently or hereafter in effect between the Company Group and the Participant." Defs.' Ex. 2 § 2.8(iv), (vi). The PIPA is such an agreement.

More importantly, Defendants deliberately anchored their termination decision to the PIPA. In their July 28, 2025, termination letter, Defendants attached the PIPA, quoted its section 3(a), and asserted that Ms. Mader's conduct "amount[s] to breach of contract, breach of fiduciary duty, and potential misappropriation claims under Florida's trade secret laws." Pl.'s Ex. A at 7–8; Am. Compl. ¶ 47. They demanded that she "comply with the terms of the PIPA," concluding that "any associated breaches of confidentiality, fiduciary duties, or obligations under the PIPA, constitute independent and sufficient grounds for the immediate termination of Ms. Mader for cause." Pl.'s Ex. A at 8. Defendants subsequently relied on that same for-cause designation to demand repayment of $75,000 in relocation assistance and cited the exact same provisions to the Equal Employment Opportunity Commission. Pl.'s Ex. A at 8; Am. Compl. ¶ 48.

The resolution of Ms. Mader's compensation rights under the Plan hinges on whether she breached the PIPA, because that is the basis on which Defendants terminated her for cause. Adjudicating those rights therefore requires construing the PIPA itself, and the parties contractually agreed that any proceeding arising out of that agreement belongs in Miami-Dade County. This is not a scenario involving two unrelated instruments where a specific contractual clause overrides a general one. Defs.' Mot. at 22–23. Rather, the Plan itself makes the PIPA the operative measure of the very termination decision Defendants executed. Ms. Mader therefore properly pleads that Florida law governs her employment relationship and compensation rights. Counts XV and XIX are appropriately pled in the alternative under Federal Rule of Civil Procedure 8(d)(2), should this Court determine that Delaware law applies. Am. Compl. ¶ 360.

### B. <u>Defendants Cannot Disclaim the Transaction Bonus Plan and Simultaneously Enforce Its Forum Selection Clause</u>

Defendants attempt to enforce the Plan's Delaware forum-selection clause, Article 5.11, while spending the next three pages denying the contract's existence. Defendants argue the Plan was "an unexecuted, unadopted draft agreement" and "simply part of a negotiation," yet ask this Court to enforce its venue provision "should the Court find that Plaintiff has plausibly established that the Draft Plan constitutes an enforceable agreement." Defs.' Mot. at 21, 23. Defendants' position is legally untenable. A forum-selection clause is a contractual provision, and its

enforcement "presupposes a contractually valid forum-selection clause." *P&S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003); *Atl. Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 64 n.5 (2013). Before enforcing such a clause, a court must first resolve whether the parties actually entered into a valid contract. *Hackett v. St. Jude Med. S.C., Inc.*, No. 8:15-cv-1971, 2015 U.S. Dist. LEXIS 136602, at *7 (M.D. Fla. Oct. 6, 2015); *Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1381 (S.D. Fla. 2014). The Eleventh Circuit expressly recognizes "validity issues implicating the formation of a forum-selection clause" as an inquiry distinct from enforceability. *Declan Flight, Inc. v. Textron eAviation, Inc.*, 177 F.4th 1110, 1125 n.3 (11th Cir. 2026). Defendants have squarely placed formation at issue, and Article 5.11 cannot be enforced unless and until that threshold question is resolved in Ms. Mader's favor.

Even if the Plan is deemed formed, Defendants' own authority establishes the strict limits of the clause they invoke. In *Whirlpool*, a court construed a forum-selection clause with language identical to Article 5.11, covering "[a]ny suit, action or proceeding with respect to the Plan or any Award Agreement," and held it did not reach claims arising under separate agreements. *Whirlpool Corp. v. Cabri*, No. 21-cv-00979, 2022 U.S. Dist. LEXIS 81545, at *39 (D. Del. May 5, 2022). Consenting to such a clause "does not consent to jurisdiction over 'every possible breach of duty that could occur between the parties,'" and the clause "can extend only so far as the series of obligations set forth in the underlying agreement." *Id.* at *42 (quoting *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 156 (Del. 2002)). Ms. Mader's claims arise independently from the PIPA and her Employment Letter, and Article 5.11 cannot unilaterally subsume claims rooted in those distinct instruments.

Defendants' remaining authorities address the breadth of forum-selection clauses rather than the antecedent formation question presented here. Defs.' Mot. at 22. Finally, Defendants concede that "[t]he substantive law of Florida and Delaware are materially the same for purposes of the dispositive arguments Defendants raise in this Motion." Defs.' Mot. at 24 n.28. By their own admission, there is no substantive justification to uproot these claims to Delaware.

### C. Ms. Mader Has Properly Stated Claims for Breach of the Transaction Bonus Plan, Which Is a Binding and Enforceable Agreement (Counts XIV, XV)

Under Florida law, a party's good faith cooperation is an implied condition precedent to the performance of a contract. *Brickell Bay Club Condo. Ass'n v. Hernstadt*, 512 So. 2d 994, 997 (Fla. 3d DCA 1987). When a party prevents the performance of a contractual condition precedent

through its own acts, it cannot take advantage of its own wrong by claiming damages or asserting non-performance by the other party. *Id.* The prevention or hindrance of any occurrence or performance requisite under a contract for the creation or continuance of a right, or the discharge of a duty, constitutes a breach of contract. *Cement Roofing Indus., Inc. v. Morgan Constr. Co.*, 276 So. 2d 57, 57 (Fla. 2d DCA 1973) (citing Restatement of Contracts § 315(1)).

On August 8, 2024, Defendants extended a superseding offer of employment elevating Ms. Mader to Chief Executive Officer. That offer explicitly incorporated the eMed Weight Loss, LLC Transaction Bonus Plan as a material term of her compensation. Am. Compl. ¶¶ 49, 50, 329. The offer letter fixed her participation, providing that "[t]he Participation Percentage for your Award . . . will be ten percent (10%)." Defs.' Ex. 1 ¶ 6. Ms. Mader accepted the offer and served as Chief Executive Officer for the twelve months that followed. Am. Compl. ¶¶ 49, 53.

Defendants thereafter treated the Plan as fully operative. Two days after extending the offer, they obtained execution of a Spousal Consent under the Plan, which identifies Ms. Mader as "Participant," bears the date August 10, 2024, and recites that the "Covered Agreements provide for the forfeiture of my spouse's rights and interests." Defs.' Ex. 2 at 14. Defendants further represented to Aon that employee equity obligations were reflected in the company's records and circulated no revised version of the Plan during the subsequent twelve months. Am. Compl. ¶ 52.

Defendants ultimately repudiated the agreement. On June 28, 2025, days after the Aon investment established an approximate $2 billion enterprise valuation, Defendants converted the employing entity. On July 9, 2025, they unilaterally eliminated Ms. Mader's ten percent participation interest in the Bonus Pool and substituted undefined stock options under a plan that did not yet exist. Am. Compl. ¶¶ 94, 96, 336. Defendants thereby renounced their contractual duty before the time fixed for performance, and a breach by anticipatory repudiation "allows the nonbreaching party to terminate his own performance and bring litigation for damages." *Se. Integrated Med., P.L. v. N. Fla. Women's Physicians, P.A.*, 50 So. 3d 21, 23 (Fla. 1st DCA 2010) (quoting *Aberdeen Golf & Country Club v. Bliss Constr., Inc.*, 932 So. 2d 235, 240 (Fla. 4th DCA 2005)); Am. Compl. ¶¶ 337, 366. Independent of the timing of any qualifying Sale Event, Defendants' unilateral elimination of that interest was itself a material breach. Am. Compl. ¶ 337. Accordingly, Ms. Mader has pled a binding agreement and Defendants' breach of it, and Counts XIV and XV state claims upon which relief may be granted.

Defendants contend that Ms. Mader's contract claims fail because the Plan was never formed and, even if formed, was never breached. Both contentions are refuted by Defendants' own exhibits. Defendants first contend that the Plan was "an unexecuted, unadopted draft agreement" and "simply part of a negotiation." Defs.' Mot. at 23. Under Florida law, however, neither the absence of signatures nor the word "draft" defeats contract formation on these facts. "Except where a signed contract is required by statute, or where the parties intend that the contract shall not be binding until it is signed, parties may become bound by contract even though they do not sign it," and an unsigned agreement remains enforceable where both parties acted as if its provisions were in force. *James Register Constr. Co. v. Bobby Hancock Acoustics*, 535 So. 2d 339, 340 (Fla. 1st DCA 1988). Defendants acted as if the Plan's provisions were in force in each of the respects described above. Defs.' Ex. 2 at 14; Am. Compl. ¶ 52. Any premise that the terms remained under negotiation fails, as the offer letter conclusively set the Participation Percentage at ten percent. Defs.' Ex. 1 ¶ 6.

Defendants next assert the Plan "would not become effective until its 'adoption by the Compensation Committee,'" a committee they claim was never constituted. Defs.' Mot. at 24. The Plan's own text anticipates this exact circumstance. Article 2.1 dictates that if no committee has been appointed, "the Administrator shall mean the Board." Defs.' Ex. 2 § 2.1. The body empowered to act thus existed throughout Ms. Mader's employment, leaving Defendants in exclusive control over whether the Plan was formally adopted. Am. Compl. ¶ 102. Defendants may not invoke the non-occurrence of a condition their own inaction produced. *Brickell Bay*, 512 So. 2d at 997; *Cement Roofing*, 276 So. 2d at 57.

Defendants contend that ratification is unavailable because the doctrine presupposes a principal ratifying the act of an agent who lacked authority, and that Ms. Mader alleges no such agent. Defs.' Mot. at 24. Ms. Mader does not allege that anyone at eMed exceeded their authority in transmitting the Plan but rather that Defendants manifested their assent to it through their own conduct, and Florida law binds parties to an unsigned agreement where both acted as if its provisions were in force, without regard to any question of agency. *James Register*, 535 So. 2d at 340; Am. Compl. ¶¶ 52, 333, 341.

In a further attempt to discount the Spousal Consent and the Aon representation, Defendants argue these documents do not "change the contingent and non-effective nature of the Draft Plan," and that the Administrator never selected Ms. Mader to participate. Defs.' Mot. at 25

& n.29. The Spousal Consent is Defendants' own instrument, executed on the Plan's terms. It identifies Ms. Mader as "Participant" while reciting the forfeiture of her rights under the Covered Agreements. Defs.' Ex. 2 at 14. Defendants fail to explain why they would obtain a waiver of marital property rights for an award they claim was never granted, under a plan they claim never took effect, for a participant they claim was never selected.

Defendants further contend no Sale Event occurred because Article 2.24 excludes transactions effected "solely to change the form of organization or organizational structure without changing ownership." Defs.' Mot. at 25. The Conversion was one component of an integrated transaction that included a Series A Preferred Stock Purchase Agreement and a $100 million investment. Am. Compl. ¶¶ 335, 349. More fundamentally, Defendants mischaracterize the claim. Ms. Mader does not contend that Defendants failed to pay upon a consummated Sale Event. Defendants eliminated her participation interest on July 9, 2025, before any qualifying transaction could occur, which is an anticipatory repudiation. *Se. Integrated Med.*, 50 So. 3d at 23; Am. Compl. ¶¶ 336, 337, 366. Defendants state only that they "dispute" Ms. Mader's role in the Conversion and in attracting the Aon investment, which is a reason to deny this Motion rather than to grant it. Defs.' Mot. at 5 n.13.

Defendants incorrectly contend that Ms. Mader's allegation that the Conversion constituted a Sale Event contradicts her original pleading and her own theory that Defendants engineered the Conversion to escape the Plan. Defs.' Mot. at 25 n.30. In reality, the original Complaint alleged that "Defendants invoke the Transaction Bonus Plan's definitional carve-out for internal restructurings to declare that the conversion of the employing entity did not constitute a Sale Event, thereby extinguishing Ms. Mader's participation interest," which is entirely consistent with the Amended Complaint, and any alternative theories are pled in accordance with Rule 8(d). Compl. ¶ 89; Am. Compl. ¶¶ 101, 337; Fed. R. Civ. P. 8(d)(2)–(3).

Defendants' invocation of Article 5.10's Delaware choice-of-law provision fares no better, because Article 5.10 is a provision of the same instrument Defendants insist never became effective, and Ms. Mader's employment relationship is governed by Florida law under the PIPA for the reasons set forth in Part III.A. Count XV secures the same relief should this Court conclude otherwise. Defs.' Mot. at 26; Am. Compl. ¶ 360. Accordingly, Defendants' Motion must be denied as to Counts XIV and XV.

**D. Defendants Breached the Implied Covenant of Good Faith and Fair Dealing (Counts XVIII, XIX)**

Under Florida law, when a contract invests one party with discretion in its performance, the implied covenant of good faith and fair dealing limits that party's ability to exercise its discretion in an arbitrary, capricious, or commercially unreasonable manner. *Speedway SuperAmerica, LLC v. Tropic Enters.*, 966 So. 2d 1, 3 (Fla. 2d DCA 2007); *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097–98 (Fla. 1st DCA 1999). The covenant attaches to the performance of express contractual obligations. *Flagship Resort Dev. Corp. v. Interval Int'l, Inc.*, 28 So. 3d 915, 924 (Fla. 3d DCA 2010).

The Amended Complaint identifies the express provisions to which the covenant attaches. The Plan vested the Administrator with discretion to select participants, determine Bonus Amounts, and amend or terminate the Plan under section 5.4. Separately, the August 8, 2024, offer of employment vested Defendants with discretion to determine whether Ms. Mader's termination was "for cause," a determination controlling her obligation to repay a $75,000 relocation allowance. Am. Compl. ¶¶ 389, 390.

Defendants exercised this first grant of discretion in bad faith by engineering a corporate restructuring to evade the Sale Event classification and extinguish Ms. Mader's compensation rights. They concentrated the full economic value of the enterprise into the entity holding her participation interest, only to unilaterally eliminate that interest days after the investment closed. Am. Compl. ¶¶ 393, 394, 406. Defendants' invocation of the Plan's internal restructuring carve-out cannot be reconciled with their simultaneous representation to regulators that the converting entities operate as "one legal entity." Am. Compl. ¶ 405.

Defendants similarly abused their discretion regarding the relocation allowance. They manufactured a pretextual for-cause termination specifically to trigger the $75,000 clawback in Ms. Mader's offer letter. This demand served no legitimate business purpose and was calculated to inflict financial harm in retaliation for her assertion of protected legal rights. Am. Compl. ¶ 398. Accordingly, Ms. Mader has pled an express contract, the discretionary provisions to which the covenant attaches, and Defendants' bad-faith exercise of that discretion, and Counts XVIII and XIX state claims upon which relief may be granted.

Defendants first contend the claim requires a valid contract and the breach of an express term. Defs.' Mot. at 26. Both are pleaded, and each is identified above. Defendants next assert that

a claim "premised on the failure of defendants to pay money due under the contract . . . must fail because the express terms of the contract will control such a claim." Defs.' Mot. at 26–27. This argument misconstrues the pleading. Ms. Mader does not ask this Court to rewrite the Sale Event definition or to disregard the forfeiture provision in order to extract a payment. She pleads that Defendants exercised the discretion those exact provisions conferred in an arbitrary, bad-faith, and commercially unreasonable manner. That abuse of discretion is the precise circumstance in which the implied covenant operates. *Speedway SuperAmerica*, 966 So. 2d at 3.

Defendants' argument that Delaware law requires dismissal of Count XVIII as duplicative fails for the reasons set forth in Part III.C. Defs.' Mot. at 27; Am. Compl. ¶ 360.[9] Finally, their contention that Ms. Mader lacks damages because she has not yet repaid the relocation allowance addresses only one of two independent bases for the claim, omitting the extinguishment of her participation interest in an enterprise Defendants themselves valued at approximately $2 billion. Defs.' Mot. at 27; Am. Compl. ¶¶ 336, 395. Accordingly, Defendants' Motion must be denied as to Counts XVIII and XIX.

## IV. **DEFENDANTS ARE INDEPENDENTLY LIABLE IN EQUITY AND TORT (COUNTS XX, XXII, XXIV–XXVI)**

### A. **Ms. Mader States a Claim for Promissory Estoppel (Count XX)**

Under Florida law, promissory estoppel operates as an equitable remedy when the requisites of a formal contract are unmet, yet a promise should be enforced to avoid injustice. *Advanced Mktg. Sys. Corp. v. Zk Yacht Sales*, 830 So. 2d 924, 928 (Fla. 4th DCA 2002). To state a claim, a plaintiff must plead a promise that the promisor should reasonably expect to induce action or forbearance, actual action or forbearance by the promisee in reasonable reliance on that promise, and an injustice that can be avoided only by enforcement of the promise. *Ocwen Loan Servicing, LLC v. Delvar*, 180 So. 3d 1190, 1194 (Fla. 4th DCA 2015); *Crown Life Ins. Co. v. McBride*, 517 So. 2d 660, 662 (Fla. 1987). The promise itself must be definite as to both terms and time. *W.R. Grace & Co. v. Geodata Services, Inc.*, 547 So. 2d 919, 924 (Fla. 1989).

[9] Defendants also assert that Ms. Mader improperly combines her relocation allowance and transaction bonus theories. Defs.' Mot. at 27. This characterization is inaccurate, as the Amended Complaint separately identifies each agreement, the discretionary act, and the relevant legal theory. Am. Compl. ¶¶ 389, 390, 398.

As set forth in Part III.C, Defendants presented Ms. Mader with a written offer of employment fixing her Participation Percentage under the Transaction Bonus Plan at ten percent, identified the triggering event, and established the method for calculating her Bonus Amount. Am. Compl. ¶ 417; Defs.' Ex. 1 ¶ 6; Defs.' Ex. 2 §§ 2.6, 2.7, 2.24. A promise identifying the participation percentage, the triggering event, and the method of calculation is legally definite as to both terms and time. *W.R. Grace & Co.*, 547 So. 2d at 924. Defendants knew how to draft contingent compensation terms, describing Ms. Mader's Annual Discretionary Bonus in the same offer as "[u]p to 100% of your eligible salary," yet deliberately chose definitive, mandatory language for the Plan. Defs.' Ex. 1 ¶¶ 5(b), 6.

Defendants established the ten percent participation interest as a material compensation term for the express purpose of inducing Ms. Mader to accept the Chief Executive Officer role, uproot her career and relocate to Miami-Dade County, and build Defendants' weight management division from the ground up. Am. Compl. ¶¶ 420, 432. Defendant Ferro personally directed the issuance of the offer and authorized the inclusion of the Plan, knowing that the participation interest was the term that would induce Ms. Mader's acceptance. Am. Compl. ¶ 431. Relying on this written promise, Ms. Mader accepted the role, relocated her life, and devoted more than twelve months of executive performance to the enterprise. Am. Compl. ¶¶ 420, 432. Her reliance was inherently reasonable given that the promise appeared directly in Defendants' formal offer alongside her base salary and standard benefits. Defs.' Ex. 1 ¶¶ 5, 6, 7.

The resulting injustice can be avoided only by enforcing the promise. Defendants unilaterally extinguished Ms. Mader's participation interest on July 9, 2025, before the triggering condition could formally be satisfied, and only after her executive performance generated the exact enterprise value that made her interest worth tens of millions of dollars. Am. Compl. ¶¶ 419, 421. Defendants retained every benefit of the bargain used to recruit her while delivering nothing in exchange for the specific term that induced her acceptance. Am. Compl. ¶¶ 419, 422. Promissory estoppel is the precise equitable remedy Florida law supplies for this circumstance, and Rule 8(d) permits Ms. Mader to plead it alongside her breach of contract claims. *Advanced Mktg. Sys. Corp.*, 830 So. 2d at 928; Am. Compl. ¶ 413. Accordingly, Ms. Mader has pled a definite promise, action taken in reasonable reliance upon it, and an injustice that only enforcement can avoid, and Count XX states a claim upon which relief may be granted.

Defendants urge dismissal on three grounds: (1) that the Plan promised nothing definite because participation depended on the Administrator's discretion, continued employment, and a qualifying Sale Event, and because the Plan could be amended or terminated; (2) that promissory estoppel cannot circumvent the Plan's express terms; and (3) that the Plan's conditional nature rendered Ms. Mader's reliance objectively unreasonable. Defs.' Mot. at 27-29. Each demands an improper factual inference or misapplies the governing equitable principles.

By focusing on the ultimate satisfaction of various conditions, Defendants fundamentally misapprehend the definiteness requirement. Definiteness is measured by whether a promise identifies its material terms. *W.R. Grace*, 547 So. 2d at 924.[10] Ms. Mader's promise is written, appears in the offer Defendants themselves drafted, and states a fixed percentage. Defs.' Ex. 1 ¶ 6. Defendants do not contend that the ten percent Participation Percentage was ambiguous, that the Bonus Amount defied calculation, or that the triggering event was undefined. Defs.' Mot. at 27-28. They instead fault Ms. Mader for the non-occurrence of conditions that Defendants themselves actively prevented. Under Florida law, a party who prevents the occurrence of a condition through its own acts may not take advantage of its own wrong by asserting that the condition went unsatisfied. *Brickell Bay*, 512 So. 2d at 997. The remaining conditionality arguments, including the absence of a Compensation Committee and the amendment power conferred by Article 5.4, are answered by the formation and performance analysis set forth in Part III.C.

Defendants' second ground is incompatible with their own primary defense. Promissory estoppel is available precisely when the requisites of a formal contract are not met, *Advanced Mktg.*, 830 So. 2d at 928, and Defendants maintain those requisites were never met, calling the Plan an unadopted draft and noting that their Employment Letter "does not constitute an employment agreement." Defs.' Mot. at 23; Defs.' Ex. 1 ¶ 9. Defendants cannot characterize the Plan as a draft that formed no contract while invoking that same document's express terms to defeat an equitable claim.

[10] In *W.R. Grace*, the Florida Supreme Court rejected promissory estoppel where the asserted promises were oral assurances given after a written contract was executed, stating only that the promisee would have work for an indefinite period. 547 So. 2d at 925. That holding has no application here, where the promise on which Ms. Mader relies is a written term specifying a fixed percentage, a defined triggering event, and a calculable amount, appearing in Defendants' own offer of employment. Defs.' Ex. 1 ¶ 6.

Defendants' third ground fails as well. Defendants prepared the offer of employment, elected to attach the Plan, and expressly stated that Ms. Mader's Participation Percentage would be ten percent. Defs.' Ex. 1 ¶ 6. An employer that places a specific compensation term in a written offer to induce an executive's acceptance cannot subsequently claim that her reliance on that exact term was objectively unreasonable. Accordingly, Defendants' Motion must be denied as to Count XX.

### B. Defendants Fraudulently Induced Ms. Mader to Accept the Chief Executive Officer Role (Count XXII)

To state a claim for fraudulent inducement under Florida law, a plaintiff must allege: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) resulting injury sustained by the party acting in reliance on the representation. *Garcia v. Chile, S.A.*, 405 So. 3d 497, 500 (Fla. 3d DCA 2025); *Geico Gen. Ins. Co. v. Hoy*, 136 So. 3d 647, 651 (Fla. 2d DCA 2013).

A promise of future action can constitute a fraudulent representation where the person making the promise did so with no intention of performing, or with a positive intention not to perform. *Garcia*, 405 So. 3d at 500; *Gemini Investors III, L.P. v. Nunez*, 78 So. 3d 94, 97 (Fla. 3d DCA 2012). A recipient of a fraudulent misrepresentation may rely on its truth even if an investigation would have revealed its falsity, unless the recipient knows the representation to be false or its falsity is obvious. *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

The Amended Complaint satisfies each element of a claim for fraudulent inducement. As set forth in Part III.C, Defendants' August 8, 2024, offer of employment fixed Ms. Mader's Participation Percentage at ten percent, extending this promise as a material inducement to accept the Chief Executive Officer role. Am. Compl. ¶¶ 50, 51; Defs.' Ex. 1 ¶ 6. Throughout the recruitment period from 2023 through August 2024, Defendants represented that her participation interest was a significant, valuable component of her compensation that they intended to honor. Am. Compl. ¶ 433. Defendant Ferro personally directed the issuance of this offer and formally authorized the Plan's inclusion. Am. Compl. ¶ 431.

Defendants knew these representations were false when made. Specifically, Defendant Ferro made the compensation promises with no intention of honoring them; his intent was to leverage Ms. Mader's industry credibility to secure institutional investment and subsequently strip

her of the very compensation that investment would trigger. Am. Compl. ¶¶ 91, 434. Defendants' subsequent conduct confirms this fraudulent intent: they represented to Aon that all equity incentive offers made to corporate officers were accurately reflected in the Company's board records, only to characterize the exact same Plan as an unadopted draft when Ms. Mader sought to enforce it. Am. Compl. ¶ 442. Defendants simultaneously expanded incentive compensation for male executives and replaced Ms. Mader's defined ten percent interest with an undefined grant of options under a non-existent plan, completing the entire sequence within ninety days of the Aon investment. Am. Compl. ¶¶ 93, 98, 438, 439.

Defendants intended these representations to induce Ms. Mader's reliance. Absent the promise of the Transaction Bonus Plan, she would not have accepted the Chief Executive Officer position, relocated to Miami-Dade County, or surrendered her prior professional commitments. Am. Compl. ¶ 53. Ms. Mader accepted the role and devoted more than twelve months of executive performance to the enterprise. Her resulting reliance damages, including relocation costs and the loss of alternative professional opportunities, remain strictly separate and distinct from any damages arising from a breach of the Plan. Am. Compl. ¶ 440. Accordingly, by pleading a false statement of material fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance, and resulting distinct injury, the fraudulent inducement claim states a cause of action upon which relief may be granted.

Defendants contend that Ms. Mader identifies no false representation, that the Plan's draft label defeats falsity, and that promises of future action cannot support fraud. Defs.' Mot. at 29-31. Each argument mischaracterizes the fraud claim. Ms. Mader does not allege that the Plan document itself misstated its contents; rather, she alleges Defendants affirmatively promised her a ten percent participation interest with the specific intent never to honor it. Am. Compl. ¶ 434. Florida law recognizes such a deceptive promise as actionable fraud. *Garcia*, 405 So. 3d at 500. The offer letter's reference to the attached document as a draft does not insulate Defendants, as the letter itself conclusively set her Participation Percentage at ten percent and conferred a binding right to participate. Am. Compl. ¶ 52; Defs.' Ex. 1 ¶ 6. To the extent Defendants maintain that the Plan's Sale Event definition was drawn so narrowly that no transaction in the ordinary course of business would qualify, that structure only further confirms the representations were fraudulent from their inception. Am. Compl. ¶ 441.

Defendants argue the pleading fails Rule 9(b)'s heightened particularity standard. Defs.' Mot. at 30. The Amended Complaint identifies the speaker, the content, the time, and the place of each representation. It alleges a written offer presented on August 8, 2024, in Miami-Dade County through Defendants' Chief Human Resources Officer at Defendant Ferro's direction, alongside oral representations made from 2023 through August 2024. Am. Compl. ¶¶ 431, 433. As to Defendant Dearborn, the pleading alleges he adopted and furthered those representations upon joining Defendants in September 2024 knowing they would not be honored, personally drafted the 2025 Annual Incentive Plan expanding compensation for other executives during the same period, and participated in engineering both the conversion and the July 9, 2025, letter that extinguished Ms. Mader's rights. Am. Compl. ¶¶ 93, 435.

Defendants' argument that Ms. Mader's reliance was unreasonable as a matter of law disregards the rule that the recipient of a misrepresentation may rely on its truth unless its falsity is obvious. *Butler*, 44 So. 3d at 105. Defendants identify nothing that would have made their undisclosed fraudulent intent obvious. The Plan's theoretical amendability is immaterial, as the representation Ms. Mader relied upon was Defendants' fundamental intent to honor her interest, not that the Plan itself was immutable. Am. Compl. ¶ 433.

Finally, Defendants invoke the independent tort doctrine to bar claims they characterize as recasting a breach of contract. Defs.' Mot. at 23, 31. That invocation cannot be squared with their primary defense that no contract was ever formed. Regardless, the conduct and the damages remain legally distinct, as the fraud claim targets the deceptive inducement that caused Ms. Mader to accept the role in the first instance, and the Amended Complaint pleads reliance damages entirely separate from any expectation damages arising from a breach of the Plan. Am. Compl. ¶ 440. Accordingly, Defendants' Motion must be denied as to Count XXII.

### C. **Defendant Ferro and Defendant Dearborn Tortiously Interfered with Ms. Mader's Contractual and Business Relationships (Counts XXIV–XXV)**

To state a claim for tortious interference with a business relationship under Florida law, a plaintiff must establish (1) a business relationship, (2) the defendant's knowledge of it, (3) intentional and unjustified interference, and (4) resulting damage; the relationship need not be evidenced by an enforceable contract. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994); *Gossard v. Adia Servs., Inc.*, 723 So. 2d 182, 184 (Fla. 1998). Tortious interference with a contract requires the same showing as to an existing contract, together with the

defendant's intentional procurement of its breach and the absence of justification or privilege. *McKinney-Green, Inc. v. Davis*, 606 So. 2d 393, 397–98 (Fla. 1st DCA 1992); *Farah v. Canada*, 740 So. 2d 560, 561 (Fla. 5th DCA 1999). Under either theory the defendant must be outside the relationship, which ordinarily shields a corporate officer who interferes with his own company's contracts, but that shield is a privilege rather than an immunity, destroyed where the officer acted solely with ulterior purposes and without an honest belief that his actions would benefit the contracting party. *Volvo Aero Leasing, LLC v. VAS Aero Servs., LLC*, 268 So. 3d 785, 787 (Fla. 4th DCA 2019); *Sifaco Grp., S.A. v. Margioukla*, 2026 Fla. App. LEXIS 5406, at *16 (Fla. 4th DCA July 15, 2026).

The Amended Complaint pleads facts satisfying each element of both claims. Ms. Mader maintained an employment and compensation relationship governed by the August 8, 2024, offer of employment, which fixed her participation interest in the Transaction Bonus Plan at ten percent and made that interest worth tens of millions of dollars following the Aon investment. Am. Compl. ¶ 451. Defendants Ferro and Dearborn knew its material terms, having directed her recruitment and controlled the compensation decisions governing her employment. Am. Compl. ¶ 452. They interfered through five acts pled individually against them: directing the corporate conversion used to extinguish the Plan; issuing the July 9, 2025, letter stripping her of her title and participation interest; calling her on July 22, 2025, to threaten her employment after she asserted her legal rights; approving the retention of a forensic expert the following day; and approving the fabricated for-cause termination of July 28, 2025. Am. Compl. ¶ 453. Ms. Mader lost the participation interest those acts were designed to eliminate. Am. Compl. ¶¶ 454, 462.

Defendants contest only whether that interference was unjustified, arguing that Defendants Ferro and Dearborn acted as officers and therefore cannot have interfered at all. Defs.' Mot. at 32. The privilege they invoke exists to protect officers acting for the company, and it is destroyed where the officer acts solely for ulterior purposes and without an honest belief that his conduct will benefit the contracting party. *Sifaco*, 2026 Fla. App. LEXIS 5406, at *16. An officer serving himself against the company's interests is not acting as the company at all. Ms. Mader pleads that Defendants Ferro and Dearborn were driven by personal malice, sex-based animus, retaliation for her opposition to unlawful prescription directives, and a personal financial interest in eliminating the Transaction Bonus Plan obligation, which increased the equity pool available to them

following the conversion. Am. Compl. ¶¶ 454, 455, 477. Whether they served themselves or the company is a question of intent this Court must resolve in Ms. Mader's favor at this stage.[11]

Defendants' remaining objections reach no element of either claim. Defendants' contention that no discriminatory remark is attributed to Defendant Dearborn is immaterial, because the tort requires interference divorced from legitimate corporate interest rather than an overt discriminatory statement, and Defendant Dearborn drafted the 2025 Annual Incentive Plan expanding compensation for male executives while Defendants prepared to eliminate Ms. Mader's Plan. Am. Compl. ¶¶ 93, 435, 478. Their assertion that Ms. Mader lacked a legitimate expectancy misstates the element, as the relationship need not be evidenced by an enforceable contract and Ms. Mader pleads an existing one rather than a merely prospective one. *Ethan Allen*, 647 So. 2d at 814; Am. Compl. ¶ 451. Their contention that Count XXV fails for want of an underlying contract recycles the formation arguments answered in Part III.C, and Count XXV, pled under Delaware law, is pled in the alternative under Federal Rule of Civil Procedure 8(d)(2) should this Court determine that Delaware law applies. Am. Compl. ¶¶ 462, 464. Counts XXIV and XXV accordingly state claims upon which relief may be granted.

### D. <u>Defendant Ferro and Defendant Dearborn Engaged in a Civil Conspiracy (Count XXVI)</u>

Under Florida law, a civil conspiracy requires an agreement to commit an unlawful act, an overt act in furtherance, and resulting damage, and because a conspiracy claim is not an independent tort, it requires an actionable underlying wrong. *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006); *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. 3d DCA 2019). While the intra-corporate conspiracy doctrine ordinarily precludes a corporation and its officers from conspiring with one another, Florida courts recognize an exception where a corporate agent holds a personal stake separate and distinct from the corporation's interest. *Mancinelli v. Davis*, 217 So. 3d 1034, 1037 (Fla. 4th DCA 2017).

---

[11] The authority Defendants cite is inapposite. In *M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, the Eleventh Circuit affirmed summary judgment for a trustee only after finding his acts were "not actions taken out of malice alone, or solely for ulterior purposes." 982 F.3d 1333, 1339 (11th Cir. 2020). Ms. Mader pleads precisely the allegations the court found absent there. Am. Compl. ¶¶ 454, 455, 477.

Defendants attack Ms. Mader's civil conspiracy claim on two grounds: (1) that the claim identifies no underlying cause of action, and (2) that the intra-corporate conspiracy doctrine bars it. Defs.' Mot. at 34. Neither ground supports dismissal. The Amended Complaint expressly identifies the predicate wrongs. Defendants Ferro and Dearborn accomplished the object of the conspiracy through independently actionable unlawful means, including the fraudulent inducement pled in Count XXII and the retaliatory termination claims pled in Counts VII through X under Title VII, the FCRA, the MDHRO, and the FPWA. Am. Compl. ¶ 475. Because those claims sound in tort or arise under statute rather than in breach of contract, they fall outside the rule Defendants invoke, and the tortious interference claims pled in Counts XXIV and XXV are themselves recognized predicates. *Walters*, 931 So. 2d at 140; *Weisman v. Southern Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 652 (Fla. 4th DCA 2020).[12]

The details Defendants describe as missing are pled with specificity. The Amended Complaint alleges that prior to or contemporaneously with the July 2025 restructuring, Defendants Ferro and Dearborn agreed to use Ms. Mader's industry credibility to secure institutional investment and then eliminate her contractual compensation before she could collect it. Am. Compl. ¶ 473. It identifies five overt acts by actor and date, including the acts of interference described in Part IV.C, as well as the July 26 and 27, 2025 communications urging Ms. Mader to withdraw her claims. Am. Compl. ¶ 474.[13]

The intra-corporate conspiracy doctrine does not bar the claim, because each Defendant held a personal stake separate and distinct from the corporation's. *Mancinelli*, 217 So. 3d at 1037. That exception failed in *Mancinelli* because the plaintiff alleged only incidental benefits such as increased general compensation. Here, Ms. Mader pleads that Defendant Ferro, the controlling equity holder, increased the equity pool available to him individually by extinguishing the specific

[12] Defendants label as "facially implausible" the suggestion that they engineered a transaction to deprive Ms. Mader of a bonus. Defs.' Mot. at 4. Yet the Amended Complaint explicitly pleads that Defendants structured the conversion with the specific intent of extinguishing her Plan before its value materialized. Am. Compl. ¶¶ 95, 453.

[13] Defendants' reliance on *Crawley-Kitzman* is misplaced. Unlike the third-party purchasers there, whose sole connection to the dispute was mere knowledge of an agreement, Defendants Ferro and Dearborn personally made the promises at issue here. The claims against the party who made the promise in that case, including breach of contract, fraud in the inducement, and unpaid wages, remained pending. *Crawley-Kitzman v. Hernandez*, 324 So. 3d 968, 973 n.5, 977 (Fla. 3d DCA 2021).

obligation owed to her, and acted to remove her because she opposed the unlawful procurement of prescription medications for his personal associates. Am. Compl. ¶¶ 476, 480. She further pleads that Defendant Dearborn held a corresponding financial interest and personally participated in inducing her employment through compensation representations he knew Defendants did not intend to honor. Am. Compl. ¶ 478. Those interests conflicted directly with the corporate interest in preserving the contractual commitments upon which the company's business relationships depend. *Id.* at 1037-38; Am. Compl. ¶¶ 477, 479. Count XXVI accordingly states a claim upon which relief may be granted.[14]

## **CONCLUSION**

For these reasons and those set forth above, Plaintiff, WENDI MADER, respectfully requests that this Honorable Court deny Defendants' Omnibus Motion to Dismiss the Amended Complaint in its entirety and grant any such other relief this Court deems just and proper. Should this Court find dismissal warranted as to any count, Ms. Mader respectfully requests leave to amend. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (quoting Fed. R. Civ. P. 15(a)(2)) (holding that a court's discretion to dismiss without leave to amend is "severely restricted" by Rule 15(a), which directs that leave "shall be freely given when justice so requires.").

[14] Defendants' reliance on *Santillana* is misplaced. That court dismissed a conspiracy claim for lack of an actionable underlying tort and declined to apply the intra-corporate conspiracy doctrine at that stage of the proceedings, finding the pleadings unclear as to whether the defendants acted within the scope of their employment. *Santillana v. Fla. State Court Sys.*, No. 6:09-cv-2095-Orl-19KRS, 2010 U.S. Dist. LEXIS 3049, at *44-46 (M.D. Fla. Jan. 14, 2010). Ms. Mader does not invoke the "force of numbers" exception rejected there.

Respectfully submitted,

*<u>/s/ Kyle T. MacDonald</u>*
Kyle T. MacDonald, Esq.
Florida Bar No.: 1038749

**MACDONALD LAW, PLLC**
420 SW 7th Street, Suite 1118
Miami, FL 33130
Tel: (786) 500-9675
Email: kyle@macdonaldemploymentlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 3rd day of September, 2026, a true and correct copy of the foregoing document was served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: *<u>/s/ Kyle T. MacDonald</u>*
Kyle T. MacDonald, Esq.