# EXHIBIT A

eMed®

990 Biscayne Blvd, Suite 1501 Miami, FL 33132

July 28, 2025

Via email: kyle@macdonaldemploymentlaw.com

Kyle T. MacDonald, Esq.
MacDonald Law, PLLC
420 SW 7th St, Suite 1118
Miami, FL 33130

Dear Mr. MacDonald:

eMed Weight Loss, LLC (the "Company") categorically rejects each and every claim asserted by Ms. Wendi Mader ("Ms. Mader") in your letter dated July 22, 2025. These claims are not only without merit, they are fundamentally misleading, legally unsupportable, and strategically timed to interfere with the Company's financing and growth efforts. The Company reserves all rights to pursue legal recourse in response to this campaign of distortion and demand.

**1. Transaction Bonus Demand – No Entitlement, No Trigger, No Merit**

The Company rejects in the strongest possible terms Ms. Mader's demand for a $10 million "transaction bonus" tied to a draft bonus plan that was neither adopted nor applicable under the present facts. The claim is not only legally and contractually baseless, it is commercially illogical and fundamentally inconsistent with the purpose of the contemplated plan.

***A. No Adopted Plan, No Award, No Legal Right***

Ms. Mader's offer letter referenced potential eligibility to participate in a then-draft transaction bonus plan. That plan was never adopted or approved, and no award was ever granted to her or to any other person. The draft clearly stated that participation was limited to individuals selected by the Administrator, and that no right to participate or receive a payment could be inferred from eligibility alone.

The draft plan further reserved unrestricted discretion for the Board or Compensation Committee to amend or terminate the plan at any time, specifically:

*"The Compensation Committee of the Board reserves the right to amend or terminate, in whole or in part, any or all of the provisions of the Plan... at any time." (Section 5.4)*

*"No person shall have any claim to be granted any Award under the Plan..."* (*Section 4.1*)

Put simply, Ms. Mader held no vested right, no granted award, and no enforceable claim. The notion that eligibility language in an offer letter equates to a $10 million windfall is legally unsound and wholly unsupported by any contractual instrument.

Ms. Mader's assertion that she had a *vested right* to 10% of a transaction bonus payout is not only factually false and contractually unfounded, it reflects a fundamental misrepresentation of what "eligibility" in an unsigned, draft plan means.

***B. No Sale Event – No Triggering Condition***

Even assuming, arguendo, the plan had been implemented, it required a Sale Event, defined narrowly as the sale of controlling equity or substantially all assets to an Independent Third Party. No such Sale Event has occurred. The Company merely underwent an internal restructuring and capital investment from an important strategic partner, actions that do not qualify under the plan's core triggering mechanism. The absence of a Sale Event alone would preclude any bonus payment, even under an active and implemented plan, which this was not.

The draft plan was structured to reward employees for value created through a bona fide liquidity event, such as the sale of control or assets to a third party. This investment did not involve a transfer of control, did not involve the sale of substantially all assets, and nor was not structured to trigger any payout under any version of the draft plan. Indeed, private equity-style Series A investments like Aon's $100 million investment by any third party – public, private, strategic or otherwise - is not a qualifying Sale Event to trigger payment under this type of plan.

The company's valuation uplift, which Mader references to assert a $10 million claim, was entirely the result of assets and entities contributed by the parent company developed and acquired by the parent holding company and subsidiary companies apart eMed Weight Loss. These entities and developed and acquired assets included, among other things, global companies and subsidiaries of third parties formerly unaffiliated with eMed, physical medical clinics, international contracts and licensed physicians, proprietary technology, 50+ issued US patents and many more pending applications, a broad international trademark portfolio, strategic vendor relationships, customer contracts, and existing employees, and all prior to any formation of eMed Weight Loss, LLC. None of this value was attributable to Ms. Mader's performance as CEO of eMed Weight Loss.

***C. The Plan Was Intended to Reward Market-Driven Value Creation, Not Internal Reorganization***

The stated purpose of the draft Transaction Bonus Plan was to reward employees for creating real, realized value in the marketplace, specifically through successful sales, growth, and a bona fide liquidity event. The plan was not, and never could have been, intended to reward individuals for paper valuations driven by internal asset transfers, especially where those assets were developed and acquired entirely outside the Ms. Mader's influence, control or contribution.

Ms. Mader's assertion of entitlement to $10 million is not just unsupported; it is commercially indefensible. The increase in the Company's valuation is the direct result of asset transfers, intellectual property, subsidiaries, and key personnel provided by the parent company, almost all of which existed before the formation of eMed Weight Loss, LLC. These contributions were neither created nor meaningfully enhanced by Ms. Mader.

To characterize those gains as the product of Ms. Mader's performance or as a trigger for a massive payout defies both the intent and logic of the Draft Plan. A transaction bonus tied to an internal infusion of value from

the parent company, value that would exist regardless of the employee's role, is incoherent on its face.

***D. Ms. Mader's Performance Did Not Justify Any Form of Windfall Compensation***

Since assuming the CEO role in August 2024, Ms. Mader failed to generate any meaningful revenue, commercial traction for the business, or strategic partnerships beyond that of Aon (the latter of which undisputedly arose from the company founder's reputation as a successful health tech entrepreneur to Aon executive leadership). Indeed, Ms. Mader and the eMed team she was part of failed to qualify the company for GLP-1 services in Aon's RFP process. In fact, the opportunity had been lost entirely until the company's founder intervened in August 2024 and personally revived it after discovering that Ms. Mader's team had been eliminated from consideration.

No sales success, customer growth, or external market impact can be credibly attributed to her leadership as CEO of eMed Weight Loss. Under any objective performance framework, no bonus, much less a $10 million dollar one, could be justified in connection with her tenure. To demand compensation based on value that was wholly generated independently of the employee's role, while failing to deliver results as CEO, further illustrates the opportunistic and unsupportable nature of the claim.

From her August 2024 start date until the July 2025 restructuring, Ms. Mader:

- Generated only $1.2 million in revenue, and all primarily from the revived opportunity driven by the founder, not by her or her team;
- Oversaw a sales organization that closed no new material business;
- Managed a team with extensive turnover and which failed to deliver meaningful results;
- Expended over $2.6 million in marketing other sales expenses amounting to over $1.5M; yet yielded negligible ROI;
- Routinely cancelled weekly sales update meetings, leaving functional teams in the dark as to sales pipeline and execution plans; and
- Failed to meet even basic expectations for building revenue, partnerships, or sustainable pipelines.

She was provided with full autonomy in hiring and go-to-market strategy yet failed to achieve any meaningful marketplace positioning or revenue traction. The notion that she is now entitled to a payout equivalent to 0.5% of a $2.3 billion valuation, when the uplift was driven almost exclusively by non-operating asset consolidation from the parent, is not only commercially absurd, but also inconsistent with any principle of transactional bonus compensation or pay-for-performance alignment.

***E. Equity Incentive Plan Offered in Good Faith as Successor Program***

Following the Company's C-corp conversion and strategic capitalization, the Company will shortly implement its board-approved Equity Incentive Plan consistent with best practices and market standards, as required by its investment agreements with Aon. Ms. Mader was generously offered a significant participation in this plan (arguably at a future upside valuation many more times than could have ever been realized through a bonus transaction plan before the company's restructuring). Unfortunately , however, Ms. Maders refused to engage with the Company in good faith on this point to further understand that this avenue represented a significant long term incentive opportunity for her.

In conclusion, there is no plan, no award, no Sale Event, and no performance outcome that would support Ms. Mader's claim regarding the bonus transaction plan. Should litigation arise regarding the bonus transaction plan,

it will be governed by Delaware law, with jurisdiction exclusively in the courts of Delaware, where prevailing party attorneys' fees apply. eMed will vigorously defend its position and pursue all available legal remedies to enforce its rights and recover costs.

**2. The July 2025 Change Was Not a Termination, Demotion, or Repudiation**

The July 9, 2025 Change of Position Letter was issued in the ordinary and strategic course of a broader corporate restructuring, following the conversion of eMed Population Health, LLC into a Delaware C-Corporation to support a $300 million equity raise and consolidate assets across US and international-affiliated eMed entities. The changes reflected necessary structural alignment, not adverse action.

Importantly, Ms. Mader's base salary of $400,000 and bonus eligibility remained unchanged; she was offered a significant new equity grant of 500,000 stock options under a soon to be formalized post-investment equity plan; and she was given the title of President, a leadership role consistent with her actual scope of duties given the expanded CEO/Board leadership lift needed to manage the expanded US and international operating entity of eMed Population Health, Inc. The Company's proposal was effectively a lateral reassignment with equal compensation and enhanced equity, made in good faith and entirely consistent with her ongoing role. No reasonable and fair arbiter would have construe such as an impermissible termination, demotion, or repudiation.

Moreover, Ms. Mader's August 2024 offer letter unambiguously stated that her employment was "at-will." This means, without equivocation, the Company was legally permitted to adjust her title, duties, or reporting structure to align with legitimate business needs, without triggering any legal liability or constructive discharge theory; she had no contractual right to permanent employment, any specific title, or future bonus entitlement; and her refusal to accept the continued role does not convert a restructuring into a termination, especially when the position was materially equivalent. Further, the suggestion that the role change was retaliatory or motivated by discriminatory animus is categorically false, defamatory, and unsupported by any contemporaneous record.

In short, the allegation of constructive termination is a legal fiction. Ms. Mader remained employed and was extended an offer consistent with her prior compensation. The mere change of entity and title, particularly when driven by capital restructuring, does not rise to a legal breach. If anything, it would be Ms. Mader who effected her own constructive voluntary termination by failing to fulfill certain duties in the days subsequent to sending her demand letter to the company by refusing to engage in business-related discussions (related specifically to her job responsibilities) with the company's founder and other senior leadership at the company.

**3. Company's Grounds to Terminate Mader for Cause**

The Company has substantial and multiple grounds to terminate Ms. Mader for cause, arising from her misconduct, material underperformance, violation of Company policies, bad faith assertions of fabricated claims, and disloyal conduct in connection with ongoing Company operations.

Under any reasonable interpretation of "cause" for termination, whether based on breach of duty, failure to perform, willful misconduct, reputational harm, or policy violation, Ms. Mader's actions individually and collectively justify immediate termination with cause.

### *A. Material Underperformance and Failure to Deliver Commercial Results*

During her tenure as CEO of eMed Population Health, LLC (Aug. 2024 – Jul. 2025), Ms. Mader failed to achieve even minimal performance standards expected of a senior executive, despite substantial resources and latitude.

- Generated only $1.2 million in revenue, primarily from a pre-existing account revived by the Company's founder.
- Failed to close a single new customer of material significance despite spending over $2.5 million in marketing and sales support.
- Oversaw a dysfunctional and ineffective sales organization, which produced no scalable pipeline or viable GTM strategy.
- Did not produce any material revenue contracts, partnerships, or customer conversions, despite the Company's unique position and tools in a growing market segment.

This level of output constitutes gross failure to perform basic job duties, a textbook basis for cause under any executive employment standard.

### *B. Leadership Dysfunction and Team Attrition*

As CEO of the business unit, Ms. Mader was entrusted with executive hiring and team formation. The individuals she recruited either resigned or failed to generate measurable results:

- Erin Page (Chief Growth Officer): Resigned within months, citing lack of alignment and strategic clarity with Ms Maders.
- Chelsea Brodsky (Sales Executive): Departed the Company, citing inadequate leadership support and unclear go-to-market execution.
- Lori Burkhart (Operations): Departed company, citing strategic dissonance and ineffective management by Ms. Maders.
- Erica McGuire (Partnerships Lead): Failed to create any traction or new opportunities under Ms. Mader's oversight.
- Jeff Gasperoni, VP-level sales role; yielded no results; and resigned after less than a year of service.
- Victoria Payne was terminated for underperformance after three months at the organization.
- Shannan Morris, Head of Marketing hand-selected and hired by Ms. Mader, also departed in July 2025.

Ms. Mader's inability to effectively lead her team has resulted in high turnover across different functional areas in the organization. Specifically, 5 out 7 of Ms. Mader's marketing hires resigned or were terminated within Ms. Mader's time at the organization. In addition, Ms. Mader's increased friction with eMed's Product and Engineering teams also lead to the exit of critical talent including:

- Sarah Davidson (VP, Engineering & Product) citing lack of collaboration and scapegoating from Ms. Mader.
- Sierra Parker (Sr. Director, Deployment) raised concerns about misrepresentations made to clients by Ms Mader and her team.
- From the sales support side, key roles and promising talent like John Permenter (TAM/Product Manager) and Alvin Rafailov (Director of Commercial Excellence) exited while disillusioned under Ms. Mader's management.
- Senior and important legacy talent including Ian Dunmore, Igor Rodriguez, and Tug Goc all have exited or noticed same in the past 6 months.

Indeed, Ms. Mader's inability to assemble and retain a motivated leadership and operating team directly undermined the Company's execution and led to significant losses in the form of recruiting fees, onboarding expenses, and outplacement costs. Her leadership resulted in repeated turnover, misaligned hires, and stalled commercial traction, causing both operational disruption and material financial waste. This level of turnover under one executive's watch, especially in a start-up environment, reflects a breach of core executive responsibility and is indicative of failed leadership and managerial incompetence, independently supporting a termination for cause.

***C. Misrepresentation of Corporate Title and Role***

Ms. Mader has repeatedly presented herself as the "CEO of eMed", including in email signatures; external and internal meetings, external communications; and during customer meetings and conference appearances.

This is categorically false. Ms. Mader is NOT the "CEO of eMed." Rather, Ms. Mader was appointed CEO of eMed Weight Loss, LLC, a single entity subsidiary among many in the holding and parent company structure of eMed LLC. Moreover, Ms. Mader is fully aware that the "CEO of eMed" is in fact Dr. Patrice Harris, MD (the former President of the American Medical Association), selected by the founder to become "the CEO of eMed) in October 2020 – and ever since. This unauthorized self-misrepresentation by Ms. Mader violated Company policies on public statements, misled stakeholders, and exposed the Company to reputational and legal risk. This constitutes willful misrepresentation and misuse of corporate authority, also independently justifying an immediate termination for cause.

***D. Violation of IT Policies and Confidentiality Obligations***

Perhaps most egregiously, however, on July 10, 2025, one day after receiving the Change of Entity Offer Letter, Ms. Mader began forwarding company emails, confidential information, and communications/documentation belonging to eMed from her eMed company email account to her personal email account in violation of company policy. Specifically on July 10, 2025, Ms. Mader sent two email threads containing information related to meetings with potential clients and internal pricing information from her eMed email account to her personal email account. Three days later on by July 13, 2025, Ms. Mader s had forwarded an additional fourteen (14) email threads containing confidential eMed information compiled over a nine-month period, including confidential employee compensation and bonus information, company revenue goals, product pricing and strategic discussion information, and sensitive communications between company principals and senior executives at third parties, including Gallagher, among others.

These actions constitute clear violations of eMed's Acceptable Use Policy ("AUP"), attached hereto as Exhibit A. Specifically, under Section 3.4.1.1 of the AUP, eMed employees are prohibited from engaging in "unauthorized copying, downloading, transferring, photographing of eMed data and information assets […]." The AUP also forbids eMed employees from forwarding communications to external destinations without authorization and encryption. This is precisely the type of conduct Ms. Mader engaged in when she, without eMed's consent, forwarded eMed confidential business information to her personal email account – and at a time where she was undoubtedly considering her options to move on from the company.

Further, under Section 3(a) of the Proprietary Interests Protection Agreement ("PIPA"), which executed by Ms. Mader upon her initial employment with eMed in June 2024 (attached hereto as Exhibit B), Ms. Mader agreed to not "without the Company's prior written permission, directly or indirectly, utilize or disclose any Confidential Information for any purpose other than for a legitimate Company business purpose either during or after Employee's employment […]." Similarly, Section 3.8.4 of the AUP bars employees from sending "highly

confidential or restricted information to unverified and unauthorized third parties or accounts." To the extent Ms. Mader has already shared, or intends to share, any of this information with third parties, including legal counsel, she remains in violation of company policy and her PIPA agreement with the company.

Ms. Mader's violations of the AUP and PIPA constitute grounds for immediate termination and also amount to breach of contract, breach of fiduciary duty, and potential misappropriation claims under Florida's trade secret laws. Her actions have resulted in creating significant risk of commercial and other harm to eMed by compromising the confidentiality of eMed competitive sensitive and proprietary information, none of which belongs personally to Ms. Mader. Accordingly, we demand that Ms. Mader immediately return and/or permanently delete all emails and communications she improperly sent to her personal email account from her eMed email account, including the sixteen (16) items identified to date and any others that have yet to be discovered by the company. We also request she immediately confirm the identify and contact information of all third parties to whom she provided this misappropriated confidential information belonging to eMed. Last, we insist Ms. Mader immediately cease and desist from committing any further violations of the Company's AUP policy, and demand at all times she comply with the terms of the PIPA.

The violations of company policy, together with any associated breaches of confidentiality, fiduciary duties, or obligations under the PIPA, constitute independent and sufficient grounds for the immediate termination of Ms. Mader for cause. eMed reserves all rights to enforce its remedies in response to these serious infractions, including pursuing appropriate legal action.

**Conclusion**

This is not exhaustive, and among other possible claims, Ms. Mader's gross underperformance, failure to execute her executive duties, misuse of a corporate title, and violation of company use policies, and misappropriation of confidential data, represent a pattern of disloyal, harmful, and contract-breaching behavior that no Company can tolerate from a senior executive. Each of these disloyal, harmful, and contract-breaching acts independently justifies Ms. Mader's immediate termination for cause, and taken together, they constitute an indisputable basis for such termination. Accordingly, Ms. Mader's employment is hereby deemed terminated for cause, effective Monday, July 28, 2025.

Furthermore, pursuant to Section 10 of Ms. Mader's August 8, 2024 Offer Letter (ie, Relocation Assistance), which states, "If you voluntarily terminate or are terminated for cause from the Company within eighteen (18) months after accepting this offer, you agree to repay the Company the full amount of Relocation Assistance provided to you." Accordingly, the Company hereby demands immediate repayment of the full $75,000 relocation assistance, no later than seven (7) business days from the date of this letter. Failure to comply may result in, among other actions, legal action for repayment, with interest, attorneys' fees, and court costs.

The Company will not acquiesce to speculative or opportunistic claims. If Ms. Mader elects to pursue formal action, the Company will defend itself vigorously and pursue appropriate remedies, including for reputational harm caused by misrepresentations about her role, performance, and alleged entitlements. Having said that, we are happy to meet to discuss the allegations raised in your July 22 letter and are prepared to address them directly and constructively.

eMed reserves all rights including, but not limited to, pursuing declaratory relief; enforcing repayment of the relocation assistance; seeking damages for reputational and financial harm; and initiating legal action for breach of duty, confidentiality, and contract.

Finally, you are hereby directed to preserve all documents, communications, and electronically stored information that may be relevant to this matter. This preservation obligation extends to all physical and electronic records within your possession, custody, or control.

Sincerely,

DocuSigned by:
Jeffrey M. Schumm
3AD2B63E710B49F...
Jeffrey M. Schumm, Esq.
General Counsel

eMed®

990 Biscayne Blvd, Suite 1501 Miami, FL 33132

July 28, 2025

Via email: wendi.s.mader@gmail.com

Wendi Mader
5928 SW 69th Ave
Miami, FL 33143

Dear Wendi,

This letter serves as a confirmation of your for cause termination from the Company effective today, July 28, 2025. That date will be listed in Namely as your termination date.

You will be paid up through your date of termination on the upcoming payroll.

Sisco acts as our COBRA provider and will be sending you information within 10 days about your ability to continue your benefits through COBRA, should you elect to do so. Your benefits will terminate at the end of the month in accordance with our benefits plan.

Furthermore, if you are enrolled in the Company's 401(k), you will receive a separate letter from Human Interest advising you of your options for the funds invested there.

Attached to this letter, you will also find a FedEx label, with which you can return your laptop and key fob.

Please reach out to me should you have any questions or concerns.

Best regards,

DocuSigned by:
Kenneth Finneran
E8EB61AD70D849C...

Ken Finneran
CHRO
eMed
Cell: 305 216-2815
Email: ken@emed.com