**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

WENDI MADER,

Plaintiff,

v.

EMED, LLC
EMED POPULATION HEALTH, INC.,
f/k/a EMED POPULATION HEALTH,
LLC, f/k/a EMED WEIGHT LOSS, LLC;
MICHAEL FERRO; and
JUSTIN DEARBORN,

Defendants.

Case No.: 1:26-CV-23258-JTK

---

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR OMNIBUS MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**


I. PLAINTIFF HAS NOT PLAUSIBLY ALLEGED SEX DISCRIMINATION, HOSTILE WORK ENVIRONMENT, OR RETALIATION. ....1

II. PLAINTIFF HAS NOT ADEQUATELY ALLEGED ANY ILLEGAL ACTIVITY, POLICY, OR PRACTICE UNDER THE FPWA, OR THAT ANY RELATED OBJECTION CAUSED HER TERMINATION. ....5

III. ALL CLAIMS "WITH RESPECT TO" THE DRAFT PLAN MUST BE LITIGATED IN DELAWARE, IF THE COURT HOLDS PLAINTIFF HAS ADEQUATELY ESTABLISHED THE EXISTENCE OF AN ENFORCEABLE AGREEMENT. ....7

- A. The Draft Plan is not a Contract. ....7
- B. If Effective, Claims Related to the Draft Plan Must be Brought in Delaware. ....9

IV. NO SALE EVENT OCCURRED, SO THE DRAFT PLAN COULD NOT HAVE BEEN BREACHED (COUNTS XIV, XV). ....10

V. THE GOOD FAITH AND FAIR DEALING CLAIM FAILS BECAUSE THE DRAFT PLAN IS NOT A CONTRACT, AND THE COVENANT CANNOT BE USED TO VARY THE DRAFT PLAN'S EXPRESS TERMS (COUNTS XVIII, XIX). ....11

VI. PLAINTIFF FAILS TO STATE A CLAIM FOR PROMISSORY ESTOPPEL. ....12

VII. THE ONLY STATEMENTS PLAINTIFF HAS ALLEGED ARE THE TERMS OF THE ALLEGED AGREEMENTS, THEMSELVES, WHICH CANNOT SUPPORT FRAUDULENT INDUCEMENT. ....13

VIII. FERRO AND DEARBORN ARE AGENTS OF EMED, WHO ACTED FOR ITS BENEFIT (COUNTS XXIV-XXV). ....14

IX. FERRO AND DEARBORN CANNOT CONSPIRE WITH EMED, LLC, AND THERE WAS NO UNDERLYING WRONG (COUNT XXVI). ....16

CONCLUSION ....17

# TABLE OF AUTHORITIES

**Page**

## Cases

*Advanced Mktg. Sys. Corp. v. ZK Yacht Sales*,
830 So. 2d 924 (Fla. 4th DCA 2002) ........................................................................12

*Alff v. Emory Univ.*,
2025 WL 5240758 (N.D. Ga. Oct. 31, 2025) ...........................................................1

*ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.*,
2011 WL 4552508 (Del. Ch. Sept. 14, 2011)) ..........................................................9

*Bardelas v. City of Doral*,
2021 WL 12313738 (S.D. Fla. Aug. 23, 2021) ..........................................................3, 4

*Brickell Bay Club Condo. Ass'n, Inc. v. Hernstadt*,
512 So. 2d 994 (Fla. 3d DCA 1987) ...........................................................................8

*Brutsman v. Raytheon Tech. Corp.*,
2026 WL 2445639 (11th Cir. Aug. 20, 2026) ..............................................................6

*Casey v. Bank of Am., N.A.*,
2014 WL 12580515 (S.D. Fla. Mar. 12, 2014) ............................................................12

*Cement Roofing Indus., Inc. v. Morgan Constr. Co. of Tampa*,
276 So. 2d 57 (Fla. 2d DCA 1973) .............................................................................8

*Clear Marine Ventures, Ltd. v. Brunswick Corp.*,
2009 WL 10667205 (S.D. Fla. Apr. 6, 2009) ..............................................................14

*Core Distribution v. World Trade Corp.*,
2026 WL 1251628 (S.D. Fla. May 7, 2026) ................................................................14

*Ellison-Mosley v. Sofie Co.*,
2026 WL 2069948 (M.D. Fla. July 17, 2026) ..............................................................1

*Escarra v. Regions Bank*,
353 F. App'x 401 (11th Cir. 2009) ...............................................................................13

*Figas v. Princess Cruise Lines, Ltd.*,
2025 WL 2694802 (S.D. Fla. Sept. 22, 2025) ..............................................................12

*Gessner v. S. Co.*,
435 So. 3d 8 (Fla. 2026) ...............................................................................................5

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ....................................................................................3

*Hercules Cap., Inc. v. Gittleman*,
2018 WL 395489 (S.D. Fla. Jan. 12, 2018) ....................................................................17

*HRCC, Ltd. v. Hard Rock Café Int'l (USA), Inc.*,
2016 WL 6603792 (M.D. Fla. Sept. 13, 2016) ...............................................................16

*Hvide v. Holt Fin. Ltd.*,
2021 WL 8154846 (S.D. Fla. Sept. 13, 2021) ..........................................................15, 16

*Inspirations Nevada LLC v. Med Pro Billing, Inc.*,
2021 WL 2156677 (S.D. Fla. May 26, 2021) ..................................................................14

*James Register Constr. Co. v. Bobby Hancock Acoustics* ,
535 So. 2d 339, 340 (Fla. 1st DCA 1988) .........................................................................

*JI-EE Indus. Co. v. Paragon Metals, Inc.*,
2010 WL 1141103 (S.D. Fla. Mar. 23, 2010)...................................................................12

*Kanen v. BBQ Holdings, Inc.*,
2024 WL 5508197 (S.D. Fla. Nov. 8, 2024).....................................................................13

*Kennedy v. Deschenes*,
2017 WL 2223050 (S.D. Fla. May 19, 2017) ...................................................................11

*Lezhava v. Am. Home Mortg. Servicing, Inc.*,
2009 WL 10666352 (N.D. Ga. May 15, 2009) .................................................................11

*Llanso v. SHEDDF2-FL3, LLC*,
346 So. 3d 1221 (Fla. 3d DCA 2022) ...............................................................................7

*M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*,
982 F.3d 1333 (11th Cir. 2020) ......................................................................................16

*Mancinelli v. Davis*,
217 So. 3d 1034 (Fla. 4th DCA 2017) .............................................................................16

*Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*,
761 So. 2d 306 (Fla. 2000)...............................................................................................10

*MCM Ent., Inc. v. Diaz World Trade Grp., Inc.*,
2024 WL 2833649 (S.D. Fla. Jan. 30, 2024) ....................................................................13

*Melton v. I-10 Truck Ctr. Inc*,
166 F.4th 905 (11th Cir. 2026) ..........................................................................................3

*Mulas v. Westchester Surplus Lines Ins. Co.*,
2026 WL 100711 (M.D. Fla. Jan. 14, 2026) ....................10

*Myers v. 3073 Horseshoe Drive, LLC*,
2024 WL 4040834 (M.D. Fla. Sept. 4, 2024) ....................12

*Naraine v. City of Hollywood*,
2021 WL 2651767 (S.D. Fla. June 3, 2021) ....................2

*Nevins v. DCH Health Sys.*,
2026 WL 1103517 (11th Cir. Apr. 23, 2026) ....................1

*Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*,
13 So. 3d 1090 (Fla. 4th DCA 2009) ....................15

*Pappillion v. Hyosung Motors Am., Inc.*,
2008 WL 11333228 (N.D. Ga. July 15, 2008) ....................3

*Ponte Vedra Gifts & Accessories Co., LLC v. APL Logistics Ltd*,
2016 WL 2854207 (M.D. Fla. May 16, 2016) ....................9

*Publix Super Markets, Inc. v. Wilder Corp. of Del.*,
876 So.2d 652 (Fla. 2d DCA 2004) ....................11

*Richard Bertram, Inc. v. Sterling Bank & Tr.*,
820 So. 2d 963 (Fla. 4th DCA 2002) ....................16

*Roth v. Sotera Health Co.*,
2024 WL 4260649 (Del. Ch. Sept. 23, 2024) ....................7

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*,
742 So. 2d 381 (Fla. 4th 1999) ....................15

*Santillana v. Fla. State Ct. Sys.*,
2010 WL 271433 (M.D. Fla. Jan. 15, 2010) ....................17

*Senter v. JPMorgan Chase Bank, N.A.*,
810 F. Supp. 2d 1339 (S.D. Fla. 2011) ....................11

*Sifaco Grp., S.A. v. Margioukla*,
2026 WL 2035452 (Fla. 4th DCA July 15, 2026) ....................15

*Speedway SuperAmerica, LLC v. Tropic Enters., Inc.*,
966 So. 2d 1 (Fla. 2d DCA 2007) ....................11

*Stevenson v. City of Sunrise*,
2020 WL 13612727 (S.D. Fla. May 13, 2020),
*aff'd*, 2021 WL 4806722 (11th Cir. Oct. 15, 2021) ....................1

*Stump-Wolfe v. Wal-Mart Stores, Inc.*,
2019 WL 5102275 (S.D. Fla. Oct. 11, 2019)....................3

*Taylor v. Mem'l Health Sys., Inc.*,
770 So. 2d 752 (Fla. 5th DCA 2000)....................5, 6

*Terry v. Carnival Corp.*,
2014 WL 11804563 (S.D. Fla. Feb. 12, 2014)....................14

*Thomas v. Cooper Lighting, Inc.*,
506 F.3d 1361 (11th Cir. 2007)....................6

*Thompson v. City of Miami Beach, Fla.*,
990 F. Supp. 2d 1335 (S.D. Fla. 2014)....................3

*Tucker v. Fla. Dep't of Transportation*,
678 F. App'x 893 (11th Cir. 2017)....................4

*Uppal v. Hosp. Corp. of Am.*,
482 F. App'x 394 (11th Cir. 2012)....................1

*Verna v. Pub. Health Tr. of Miami-Dade Cnty.*,
539 F. Supp. 2d 1340 (S.D. Fla. 2008)....................4

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000)....................3

*Whirlpool Corp. v. Cabri*,
2022 WL 1421126 (D. Del. May 5, 2022)....................9

*Williams v. Fla. Atl. Univ.*,
2017 WL 1881676 (S.D. Fla. May 9, 2017),
*aff'd*, 728 F. App'x 996 (11th Cir. 2018)....................1

*Wooden v. Dolgencorp, LLC*,
2022 WL 1750048 (N.D. Fla. May 11, 2022)....................1

*Worthy v. Meink, Sec. of U.S. Air Force*,
2026 WL 2497541 (M.D. Ga. Aug. 25, 2026)....................4

**Rules**

Fed. R. Civ. P. 9(b)....................13

## I. PLAINTIFF HAS NOT PLAUSIBLY ALLEGED SEX DISCRIMINATION, HOSTILE WORK ENVIRONMENT, OR RETALIATION.

Plaintiff alleges no facts suggesting that her gender played a role in any adverse treatment. Instead, she alleges that a ~$300 million corporate conversion (the "Conversion") extinguished an unadopted draft Transaction Bonus Plan (the "Draft Plan") in lieu of a new equity incentive plan; another woman was named CEO in the new corporation; Plaintiff refused to accept and perform the President role offered to her in that entity; and her at-will employment was subsequently terminated, after a forensic investigation into her use of her corporate email account, *none* of which bears any plausible relation to her sex. Amended Complaint ("FAC") ¶¶ 94-100, 240, 296.

Plaintiff's attempt to recast her sex discrimination claims as "mixed motive" does not relieve her of the burden to plausibly allege that sex was at least *a* motivating factor for the purportedly adverse actions.[1] *See Ellison-Mosley v. Sofie Co.*, 2026 WL 2069948, at *7 (M.D. Fla. July 17, 2026) (dismissing complaint because plaintiff's conclusory allegations did not provide a reasonable basis for the court to infer that sex discrimination was the "true reason for Plaintiff's termination[.]"); *Wooden v. Dolgencorp, LLC*, 2022 WL 1750048, at *5 (N.D. Fla. May 11, 2022) (dismissing disparate treatment claim because plaintiff failed to plausibly allege that his race was a motivating factor for adverse actions). "Mixed-motive" is merely a different theory of causation, not a "distinct claim type[ ]", and Plaintiff's failure to allege a valid comparator is fatal under either theory. *See Nevins v. DCH Health Sys.*, 2026 WL 1103517, at *2 (11th Cir. Apr. 23, 2026); *Uppal v. Hosp. Corp. of Am.*, 482 F. App'x 394, 396 (11th Cir. 2012) (affirming dismissal in the absence of factual details concerning comparators); *Alff v. Emory Univ.*, 2025 WL 5240758, at *13 (N.D.

---

[1] A "mixed-motive analysis is inappropriate" where, as here, the plaintiff alleges the defendants' sole motivation was discriminatory. *Williams v. Fla. Atl. Univ.*, 2017 WL 1881676, at *8 (S.D. Fla. May 9, 2017), *aff'd*, 728 F. App'x 996 (11th Cir. 2018); *accord Stevenson v. City of Sunrise*, 2020 WL 13612727, at *4 (S.D. Fla. May 13, 2020), *aff'd*, 2021 WL 4806722 (11th Cir. Oct. 15, 2021).

Ga. Oct. 31, 2025) (holding that mixed motive theory failed for want of similarly-situated comparator and because plaintiff was replaced by someone of the same race). Plaintiff alleges that she was passed over for the CEO role in eMed Population Health, Inc. for another woman, and her reporting structure was changed to report to another woman, which fails to satisfy the comparator requirement, and generally renders implausible her allegation that her change of position (or any other treatment she experienced) was discriminatory. FAC ¶¶ 1, 96; *see Naraine v. City of Hollywood*, 2021 WL 2651767, at *7 (S.D. Fla. June 3, 2021), *R&R adopted* 2021 WL 2646404 (June 28, 2021), (recommending dismissal of discrimination claim because plaintiff was replaced by employees of her same national origin).

Plaintiff's conclusory assertion that the Chief Financial Officer, Executive Chairman, and Chief Human Resources Officer were treated differently also does not satisfy the comparator requirement. FAC ¶ 79. She pleads no details concerning how these men were otherwise similarly situated to her; her sparse allegations reveal that they held different roles with different responsibilities. *Id.* Moreover, they did not become CEO, either—a woman did—and Plaintiff has not alleged that they received a transaction bonus or held participation interests in the Draft Plan (which was "extinguish[ed]") post-Conversion, so to the extent they could reasonably be compared, their treatment was materially similar, anyway. *Id.* ¶¶ 95, 101.

Plaintiff's allegations in her EEOC charge that she was deprived of a transaction bonus are wholly distinct from her conclusory allegation here regarding undefined retention bonuses for unidentified male employees, so she failed to exhaust her administrative remedies as to that undeveloped issue. *See* Opp. at 7 (citing D.E. 23-5 ¶¶ 30-33); Mot. at 10. Further, this allegation is devoid of any supporting facts that would allow the court to plausibly infer disparate treatment.

*See Stump-Wolfe v. Wal-Mart Stores, Inc.*, 2019 WL 5102275, at *3 (S.D. Fla. Oct. 11, 2019).[2]

Plaintiff fails to plausibly tie the handful of off-color statements she relies on to support her hostile work environment claim to any adverse treatment, and the court should reject her attempt to combine and conflate her distinct discrimination claims. *See Pappillion v. Hyosung Motors Am., Inc.*, 2008 WL 11333228, at *20 n. 33 (N.D. Ga. July 15, 2008). Moreover, the sporadic remarks she alleges (*e.g.*, she was "too nice" and "looked like 'a soccer mom'", FAC ¶ 152) cannot reasonably be construed to have "altered the terms and conditions of employment and create[d] a discriminatorily abusive working environment," despite Plaintiff's use of inflammatory adjectives to describe them. *See Thompson v. City of Miami Beach, Fla.*, 990 F. Supp. 2d 1335, 1341 (S.D. Fla. 2014) (dismissing hostile work environment claim based on infrequency and lack of severity of remarks and the absence of physically threatening conduct or evidence that the remarks unreasonably interfered with job performance); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44 (2d Cir. 2000) (rejecting allegations that employer's description of plaintiff as "nice" and "nurturing" supported gender stereotyping or discriminatory intent). Plaintiff fails to cite a single case in which comparable remarks, alone, were held to be sufficiently severe and pervasive to state a claim for hostile work environment.[3] As Defendants' cases show (Mot. at 11-13), courts routinely dismiss hostile work environment claims based on similarly (or more) offensive statements. *See, e.g.*, *Bardelas v. City of Doral*, 2021 WL 12313738, at *9 (S.D. Fla. Aug. 23, 2021).

---

[2] *E.g.*, who were the bonus candidates, and what were their titles, qualifications and contributions? What were the terms of the retention bonuses, and how did they compare to the compensation Plaintiff rejected when she refused the President role? Were the bonuses actually awarded? *See* FAC ¶¶ 98, 137.

[3] For example, Plaintiff cites *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (Opp. at 9), but this was not a hostile work environment claim, and the supervisor's statements there were much more overt, anyway: *e.g.*, that he found a transgender employee's appearance and transition "unsettling," "unnatural," "disruptive," "uncomfortable" and potentially "immoral." *Melton v. I-10 Truck Ctr. Inc,* 166 F.4th 905, 910, 919 (11th Cir. 2026) (Opp. at 8, 10) involved routine use of racial slurs and stereotypes towards minority customers and refusal to service them.

With respect to her retaliation claims, Plaintiff baselessly continues to rely upon her July 10th and July 22nd communications as protected activity, despite the fact that neither made any reference to sex discrimination. D.E. 23-4, D.E. 23-3. Plaintiff's Opposition fails to explain how either communication expressed a belief that eMed was engaged in discrimination or harassment (they did not). *See id.*; *Verna v. Pub. Health Tr. of Miami-Dade Cnty.*, 539 F. Supp. 2d 1340, 1357–58 (S.D. Fla. 2008). Thus, in alleging retaliation and retaliatory hostile work environment, Plaintiff is limited to conduct that occurred *after* her July 26th and July 27th telephone calls with eMed, the first time that she made any allegations of discrimination. Mot. at 14-15. The only subsequent event was her termination for cause on July 28, 2026, but her allegations show that the termination was already contemplated by the time of the July 26-27th discussions. Specifically, she alleges that the forensic investigation into her corporate email account (which revealed that she had emailed herself confidential and proprietary information) was initiated on July 23, 2025. FAC ¶ 116. It is the findings of this investigation that eMed Defendants cited as the cause for her termination. Further, Plaintiff had already rejected and refused to perform the President role, and in her July 22, 2025 letter, sought to "negotiate a comprehensive separation agreement." *Id.* ¶ 107; D.E. 23-3 at 3. Plaintiff further alleges that Ferro asked her in their call on July 22nd (which was silent as to any accusations of discrimination) if she was "in or out." FAC ¶ 108. In other words, the question of Plaintiff's continued employment was already underway and was what prompted the July 26th-27th phone calls, when she first alleged discrimination.

"Temporal proximity between the protected activity and the adverse action alone generally cannot show causation when the employer has contemplated the adverse action before the protected activity takes place." *Tucker v. Fla. Dep't of Transportation*, 678 F. App'x 893, 896 (11th Cir. 2017); *accord Worthy v. Meink, Sec. of U.S. Air Force*, 2026 WL 2497541, at *9 (M.D.

Ga. Aug. 25, 2026) (dismissing retaliation claim where complaint made clear that her supervisors contemplated the alleged adverse action before they had knowledge of the protected activity). Accordingly, Plaintiff cannot rely on the timing of her termination, alone, to establish causation, and she cites no other facts supporting any discriminatory animus. Further, Plaintiff cannot rely on any "adverse" treatment prior to July 26th and 27th, which necessarily defeats her retaliatory hostile work environment claim, since she was fired a day later.

## II. PLAINTIFF HAS NOT ADEQUATELY ALLEGED ANY ILLEGAL ACTIVITY, POLICY, OR PRACTICE UNDER THE FPWA, OR THAT ANY RELATED OBJECTION CAUSED HER TERMINATION.

eMed Defendants' argument in support of dismissal of Count X is not that Plaintiff objected prior to the allegedly ineligible individual actually receiving a prescription, or that she failed to object in other instances; rather, Plaintiff's FPWA claim fails because her allegations do not establish that eMed Defendants had any policy or practice of unlawfully prescribing medication, or that any medication was ever unlawfully procured (for that individual, or any other). *See Gessner v. S. Co.*, 435 So. 3d 8, 12-13 (Fla. 2026). Plaintiff's vague and conclusory allegation of "repeated" directives is supported by only a single incident. FAC ¶¶ 81, 84-87.[4] Those allegations establish only that eMed was working to find a way to *lawfully* prescribe for that individual, not that eMed Defendants directed Plaintiff or anyone else to illegally disregard clinical protocols or applicable legal requirements to procure the medication for her. *Id.* ¶¶ 86-87.

Plaintiff's allegations that three "not medically eligible" individuals ultimately received GLP-1 prescriptions "in violation of prescribing standards" are conclusory.[5] Plaintiff cites *Taylor*

---

[4] Plaintiff's allegations that Mee and an unspecified Aon stakeholder were not "medically eligible" are conclusory, and she does not allege that she objected to the procurement of medication for them. Her alleged objections occurred several months later, in the context of another individual. FAC ¶¶ 86, 88.

[5] Plaintiff does not allege that she objected to or refused to participate in the procurement of medication for two of these three. FAC ¶¶ 86, 88.

*v. Mem'l Health Sys., Inc.*, 770 So. 2d 752 (Fla. 5th DCA 2000), Opp. at 18-19, to try to support her lay ability to challenge these prescription decisions without supporting facts or medical qualifications, but there, the plaintiff filed a DPR complaint and lodged verbal and written complaints[6] that a physician was molesting female patients, non-medical conduct apparent to a layperson. *Taylor*, 770 So. 2d at 754.

Plaintiff's allegations also fail to establish that her purported objections were the but-for cause of the elimination of the Draft Plan, the decision not to name her CEO, or her termination. *See Brutsman v. Raytheon Tech. Corp.*, 2026 WL 2445639, at *3 (11th Cir. Aug. 20, 2026) ("The ultimate inquiry in an FWA case is whether 'the desire to retaliate was the but-for cause of the challenged employment action,' meaning 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'"). Rather, Plaintiff alleges that her prospective "participation" in the Draft Plan was extinguished by the Conversion, a ~$300 million corporate transaction, which was plainly not retaliatory. FAC ¶¶ 94-95. Meanwhile, if eMed Defendants meant to retaliate against Plaintiff, it makes no sense that they would offer her the role of President on July 10, 2025, and then "implore[ ] her to remain with the company and continue in her role" on July 26 and 27, 2025, instead of simply terminating her at-will employment after she raised her purported "objections" to Dearborn and Permenter on May 5, 2025. *Id.* ¶¶ 86, 109.[7] The more than two months that passed in the interim is too long to establish causation based on temporal proximity, alone, and Plaintiff pleads no other facts to support causation. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that passage of three months between plaintiff complaining of sexual harassment and her

---

[6] In contrast, plaintiff does not allege any documented complaint or written objection.

[7] Plaintiff does not allege that there was any discussion of the issues relevant to her FPWA claim during her July 22, 2026 phone call with Ferro to support an inference of causation. *See* FAC ¶ 285.

termination "without more, does not rise to the level of 'very close.'").

## III. ALL CLAIMS "WITH RESPECT TO" THE DRAFT PLAN MUST BE LITIGATED IN DELAWARE, IF THE COURT HOLDS PLAINTIFF HAS ADEQUATELY ESTABLISHED THE EXISTENCE OF AN ENFORCEABLE AGREEMENT.

There is no inconsistency in Defendants' tiered arguments that: (1) as a matter of law, the Draft Plan never took effect, and therefore all claims that depend upon the existence of an express agreement (breach of contract, good faith and fair dealing, and tortious interference with contract, Counts XIV, XV, XVIII, XIX, and XXV) should be dismissed with prejudice; ***but*** (2) if the Court holds that Plaintiff's allegations suffice to establish that the Draft Plan was a contract, all claims "with respect to the Plan or any Award Agreement" (*i.e.*, all claims that seek relief pursuant and related to the Draft Plan) must be dismissed pursuant to its mandatory forum selection clause, D.E. 23-2 at 11-12 , which requires such claims to be litigated in Delaware. In other words, if the Draft Plan is not a contract, its forum selection clause is unenforceable, but all claims asserted thereunder necessarily fail. On the other hand, if the Court construes the Draft Plan as a contract at this juncture, it must also enforce its specific forum selection clause.

### A. The Draft Plan is not a Contract.

The Draft Plan expressly provided that it became effective only upon "adoption by the Compensation Committee of the Board[.]" D.E. 23-2 at 1. Plaintiff concedes that no such committee was ever formed and that none ever adopted the Draft Plan (FAC ¶¶ 344, 373), which alone disposes of all her claims thereunder. *See Roth v. Sotera Health Co.*, 2024 WL 4260649, at *10 (Del. Ch. Sept. 23, 2024); *Llanso v. SHEDDF2-FL3, LLC*, 346 So. 3d 1221, 1221 (Fla. 3d DCA 2022). The plain meaning of Article 2.1's definition of "Administrator"[8] is simply that, if

[8] Art. 2.1 "'Administrator' means the individual(s) appointed by the Compensation Committee of the Board from time to time to administer the Plan and to perform the functions set forth herein, provided that if no such committee has been appointed then the Administrator shall mean the Board." D.E. 23-3 at 2.

the Compensation Committee of the Board fails to appoint an administrator, then the Board of Directors administers the plan. This definition cannot be converted to a de facto adoption, and the Board of Directors *also* never adopted the Draft Plan, by conduct or otherwise. *See* Opp. at 24.

Plaintiff erroneously conflates the non-adoption of the plan with the doctrine that a party "who prevents the performance of a contractual condition precedent cannot avail himself of his own wrong by claiming damages owing to the other party's failure to perform as promised." *Brickell Bay Club Condo. Ass'n, Inc. v. Hernstadt*, 512 So. 2d 994, 997 (Fla. 3d DCA 1987) (holding that condo owners could not seek damages based on their condo association's failure to amend their condo declaration to allow subdivision of their unit, where their own refusal to cooperate with the association prevented the amendment) (cited in Opp. at 24).[9] This prevention doctrine requires the existence of an enforceable agreement, and it is invoked against the party seeking enforcement; it does not allow a Plaintiff to enforce a draft contract by claiming that the defendant prevented the contract from ever taking effect. *See Brickell Bay*, 512 So. 2d at 997.

It is the non-adoption of the Draft Plan, rather than the lack of a signature, that prevents Plaintiff from enforcing it, and eMed Defendants never "acted as if its provisions were in force."[10] Opp. at 24. Prospectively obtaining Plaintiff's husband's forfeiture of any rights and interests that may ultimately accrue to her under the Draft Plan, if and when adopted, cannot reasonably be construed as an acknowledgment that the Draft Plan was already effective, or supplant or vary the requirement for adoption in the manner specified therein. Opp. at 23. Neither can the alleged

[9] *See also Cement Roofing Indus., Inc. v. Morgan Constr. Co. of Tampa*, 276 So. 2d 57, 57 (Fla. 2d DCA 1973) (denying damages to subcontractor whose failure to timely perform caused denial of building permit) (cited Opp. at 24).

[10] *James Register Constr. Co. v. Bobby Hancock Acoustics* (cited Opp. at 24) holds that an unsigned contract cannot bind the parties where they expressly "intend that the contract shall not be binding until it is signed. " 535 So. 2d 339, 340 (Fla. 1st DCA 1988). It does not suggests that a contract may be effected in a manner contrary to that specified and intended by the drafting party.

representation to Aon that "all equity incentive offers made to corporate officers were accurately reflected in and consistent with the Company's board of directors records." FAC ¶ 376. An "***offer***" is not the same as an agreement, or a vested equity award, so this statement (which apparently did not even reference the Draft Plan) has no bearing on the present dispute. *Id*.

**B. If Effective, Claims Related to the Draft Plan Must be Brought in Delaware.**

If the Court credits Plaintiff's allegations that the Draft Plan was a contract, then she is bound by its mandatory forum selection clause and must litigate all claims "with respect to the Plan or any Award Agreement" in Delaware; she cannot maintain them here. D.E. 23-2 at 10-11. Plaintiff does not seek relief under the *separate* Proprietary Interests Protection Agreement ("PIPA"), and its forum selection clause is irrelevant to her claims concerning the Draft Plan; rather, the Draft Plan's own specific forum selection clause controls. *See Ponte Vedra Gifts & Accessories Co., LLC v. APL Logistics Ltd*, 2016 WL 2854207, at *3-4 (M.D. Fla. May 16, 2016) (enforcing forum selection clause in specific agreement under which dispute arose, rather than distinct forum selection clause in agreement establishing the parties' relationship); Mot. at 22.

The Draft Plan does not "incorporate" the PIPA, and the cause of Plaintiff's termination is immaterial to her claims under the Draft Plan, so these are not valid arguments for applying the PIPA's forum selection clause over that of the Draft Plan. *See* Opp. at 20-21. Plaintiff does not allege that she was denied a transaction bonus because Defendants terminated her for cause; rather, she alleges that Defendants prevented a triggering Sale Event and extinguished the Draft Plan through the Conversion. FAC ¶¶ 95, 101. In any event, the PIPA does not define "Cause" for termination, so the Draft Plan's own definition would control, to the extent that issue were material to her claims for relief under the Draft Plan (but it is not). *See generally* D.E. 24-2; D.E. 23-2.

The Draft Plan's broad forum selection clause "covers more types of claims relating to the [ ] Plan than contract claims alone;" *i.e.*, "'any issues that touch on contract rights or contract

performance.'" *See Whirlpool Corp. v. Cabri*, 2022 WL 1421126, at *14 (D. Del. May 5, 2022) (construing identical forum selection clause and quoting *ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.*, 2011 WL 4552508, at *5 (Del. Ch. Sept. 14, 2011)). In addition to Plaintiff's contract claims thereunder, the Draft Plan forms the basis for her promissory estoppel, tortious interference, and fraudulent inducement claims, and they, too, can only be litigated in Delaware (if at all).

Finally, the fact that Delaware law is consistent with Florida law on the dispositive issues in no way undermines enforcement of the Draft Plan's forum selection clause. *See* Opp. at 22. Consistency between two forums' laws is a factor that militates in favor of *enforcing* a choice of *law* clause, not *against* enforcing a forum selection clause. *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311-312 (Fla. 2000).

## IV. NO SALE EVENT OCCURRED, SO THE DRAFT PLAN COULD NOT HAVE BEEN BREACHED (COUNTS XIV, XV).

Even if the Draft Plan had been adopted, eMed Defendants had no contractual obligation to pay a transaction bonus in the absence of a Sale Event, as defined, which Plaintiff's Opposition concedes never occurred. *See* FAC ¶¶ 101-102; Opp. at 25 ("**Ms. Mader does not contend that Defendants failed to pay upon a consummated Sale Event**.") (emphasis added).[11] The undisputed non-occurrence of a Sale Event cannot support a claim of anticipatory repudiation, which requires words or acts evincing an absolute and unqualified intention to refuse performance of the contract in the future. *Mulas v. Westchester Surplus Lines Ins. Co.*, 2026 WL 100711, at *1 (M.D. Fla. Jan. 14, 2026) (dismissing contract claim because insurer's non-response to insurance

[11] Plaintiff refused to accept and perform the President role offered to her in the post-Conversion entity, and was subsequently terminated, which would have resulted in a forfeiture of any potential future Award to her under the Draft Plan, even if it had survived the Conversion. D.E. 23-2 at 6; FAC ¶¶ 103-104, 114.

claim did not evince an absolute intention to refuse payment in the future). eMed Defendants never evinced an intent to refuse to pay a transaction bonus upon the occurrence of a future Sale Event; a Sale Event just never occurred, and the Draft Plan was abandoned after the Conversion. FAC ¶¶ 95, 102; *cf. Lezhava v. Am. Home Mortg. Servicing, Inc.*, 2009 WL 10666352, at *5 n.3 (N.D. Ga. May 15, 2009) (rejecting allegations that lender repudiated contract by announcing that assumption was unavailable and refusing to consider borrower's request that subject loan be assumed, because lender had no contractual obligation to allow such assumption); *cf. Kennedy v. Deschenes*, 2017 WL 2223050, at *5 (S.D. Fla. May 19, 2017) ("[A]nticipatory repudiation of a contract alone does not entitle the nonbreaching party to damages.").

## V. THE GOOD FAITH AND FAIR DEALING CLAIM FAILS BECAUSE THE DRAFT PLAN IS NOT A CONTRACT, AND THE COVENANT CANNOT BE USED TO VARY THE DRAFT PLAN'S EXPRESS TERMS (COUNTS XVIII, XIX).

As it pertains to the Draft Plan, Plaintiff's claim for breach of the implied covenant fails at the outset because the Draft Plan was never adopted. *Senter v. JPMorgan Chase Bank, N.A.*, 810 F. Supp. 2d 1339, 1361-62 (S.D. Fla. 2011). Further, the implied covenant is merely a "'gap-filling default rule,' which comes into play 'when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards.'" *Speedway SuperAmerica, LLC v. Tropic Enters., Inc.*, 966 So. 2d 1, 3 (Fla. 2d DCA 2007) (quoting *Publix Super Markets, Inc. v. Wilder Corp. of Del*., 876 So.2d 652, 654 (Fla. 2d DCA 2004)) (cited Opp. at 27). The harm Plaintiff alleges is that she was not paid a transaction bonus, and there was no "gap" to fill in the Draft Plan's terms for when a bonus must be paid. Rather, the Draft Plan is clear that a transaction bonus would only be paid upon a Sale Event, which Plaintiff concedes never occurred. FAC ¶¶ 101, 335-336; Opp. at 25. The Draft Plan clearly defines a "Sale Event;" it does not leave this determination to eMed Defendants' discretion. FAC ¶ 335; D.E. 23-2 at 5. Meanwhile, Plaintiff cannot establish that the "Administrator" abused its discretion to select plan

participants, or determine bonus amounts, or amend or terminate the Plan because none of these events ever occurred (indeed, there never even was an "Administrator"). FAC ¶ 390.

Plaintiff's Opposition raises no argument or authority that would allow her to establish damages based on the mere demand for the relocation bonus, which she never repaid, so her claim for breach of the implied covenant based on the employment agreement also fails. *See Casey v. Bank of Am., N.A.*, 2014 WL 12580515, at *2 (S.D. Fla. Mar. 12, 2014); *see also Figas v. Princess Cruise Lines, Ltd.*, 2025 WL 2694802, at *3 (S.D. Fla. Sept. 22, 2025) ("failure by a plaintiff to respond to a motion to dismiss argument constitutes an abandonment of that claim.").

## VI. PLAINTIFF FAILS TO STATE A CLAIM FOR PROMISSORY ESTOPPEL.

In trying to establish a definite promise, Plaintiff confirms that her promissory estoppel claim is based solely on the express terms of her employment agreement and the Draft Plan, which is improper. Opp. at 27-28. "[A] complaint cannot allege an express agreement in a claim for [ ] promissory estoppel." *JI-EE Indus. Co. v. Paragon Metals, Inc.*, 2010 WL 1141103, at *1 (S.D. Fla. Mar. 23, 2010). Alternative pleading does not cure this problem, since the promissory estoppel claim depends solely upon the written agreement, itself, to establish the promise. *See id.; Myers v. 3073 Horseshoe Drive, LLC,* 2024 WL 4040834, at *2 (M.D. Fla. Sept. 4, 2024).[12]

Moreover, the alleged "promise" to pay a transaction bonus expressly hinged upon numerous contingencies, most notably, the occurrence of a Sale Event. FAC ¶ 417. Plaintiff never had any assurance that a Sale Event would occur, and she concedes it never did. *Id.* at ¶ 102, 419; Opp. at 25. As a result, plaintiff cannot establish that she reasonably relied on the promise, or that

---

[12] For example, Plaintiff cites to *Advanced Mktg. Sys. Corp. v. ZK Yacht Sales*, 830 So. 2d 924 (Fla. 4th DCA 2002), Opp. at 28, which held that promissory estoppel was unavailable because a written contract between the parties covered the relevant transaction, and promissory estoppel does not give a party "a second bite at the apple in the event it fails to prove breach of contract." *Id*. at 928 (cleaned up).

injustice will be avoided through its enforcement. *See Escarra v. Regions Bank*, 353 F. App'x 401, 403 (11th Cir. 2009). Plaintiff's requested relief—that the court award her "the value of the 10% bonus pool"—is inconsistent with the contingent nature of the promise she alleges, "that she would receive a ten percent participation interest in the Net Proceeds ***of a qualifying Sale Event***[.]" FAC ¶¶ 417, 422. Because there was no Sale Event, enforcing the promise would have no effect; Plaintiff would receive a 10% participation interest in nothing.

## VII. THE ONLY STATEMENTS PLAINTIFF HAS ALLEGED ARE THE TERMS OF THE ALLEGED AGREEMENTS, THEMSELVES, WHICH CANNOT SUPPORT FRAUDULENT INDUCEMENT.

Plaintiff's attempt to avoid the express terms of the Draft Plan through her claim for fraudulent inducement also fails. Plaintiff refers to paragraphs 431 and 433 of the FAC to try to establish a misrepresentation, but these paragraphs merely allege that: 1) eMed transmitted the Draft Plan, at Ferro's direction; and 2) Defendants "reinforced" the "written representations" contained in the Draft Plan through unspecified "oral communications" at unspecified times in 2023-2024. Her Opposition (pp. 30-32), like her FAC, fails to identify a single statement by Dearborn, and as to Ferro, fails to plead any details to satisfy Rule 9(b) or establish any falsehood. FAC ¶ 433; *see Kanen v. BBQ Holdings, Inc.*, 2024 WL 5508197, at *16 (S.D. Fla. Nov. 8, 2024). Even accepting her vague allegations that "Defendants" represented that the Draft Plan "was a significant and valuable component of her compensation and that Defendants intended to honor it," her allegations do not show this to be false. FAC ¶ 433. Potential future bonus eligibility is not valueless at the time such eligibility is conferred simply because it is contingent and because the triggering event may never come to fruition. Plaintiff has not alleged any facts to show that eMed Defendants did not intend to honor the Draft Plan, ***if*** adopted, ***if*** participation interests were awarded, and ***if*** a Sale Event occurred, further undermining any purported misrepresentation based upon predictions of future events. *MCM Ent., Inc. v. Diaz World Trade Grp., Inc.*, 2024 WL

2833649, at *9 (S.D. Fla. Jan. 30, 2024) ("a vague statement about [ ] expected future value [ ] can hardly be considered actionable fraud."). Additionally, statements about compensation and potential future transaction bonuses concern the employment agreement and Draft Plan, so the independent tort doctrine applies to bar this claim. *Inspirations Nevada LLC v. Med Pro Billing, Inc.*, 2021 WL 2156677, at *7 (S.D. Fla. May 26, 2021) (dismissing fraudulent inducement claim where allegations mirrored contract allegations and concerned the heart of the agreement).

Moreover, any purported misrepresentations concerning the value of the Draft Plan and the conditions under which it would be honored and a bonus would be received were obvious on the face of the Draft Plan and the employment letter, so Plaintiff cannot establish reasonable reliance. *See, e.g., Terry v. Carnival Corp.*, 2014 WL 11804563, at *2 (S.D. Fla. Feb. 12, 2014); *Clear Marine Ventures, Ltd. v. Brunswick Corp.*, 2009 WL 10667205, at *2 (S.D. Fla. Apr. 6, 2009). Plaintiff is a sophisticated businesswoman—indeed, she complains that she should have become eMed Population Health, Inc.'s CEO. She is and was perfectly capable of reading and understanding the terms of her employment and compensation and the actual and draft agreements presented to her. She cannot discharge her responsibility for her own employment decisions and avoid the express terms of her employment agreement based on precontractual negotiations.

## VIII. FERRO AND DEARBORN ARE AGENTS OF EMED, WHO ACTED FOR ITS BENEFIT (COUNTS XXIV-XXV).

As corporate executives or equity holders of "eMed-related entities," (collectively, "eMed") engaging in authorized corporate acts, the individual Defendants are not strangers to eMed's contractual and business relationships and could not have interfered with them. FAC ¶¶ 13, 15, 17; *see Core Distribution v. World Trade Corp.*, 2026 WL 1251628, at *7 (S.D. Fla. May 7, 2026) (dismissing tortious interference claim against corporate officer). Each act of alleged "interference," Opp. at 33, was plainly performed on behalf of eMed, and fell within the scope of

Ferro and Dearborn's legitimate supervisory and financial interests. FAC ¶¶ 13, 15, 17; *Hvide v. Holt Fin. Ltd.*, 2021 WL 8154846, at *13-14 (S.D. Fla. Sept. 13, 2021). Plaintiff cannot overcome this reality through conclusory allegations that Ferro or Dearborn "may have harbored some 'personal malice or ill-will'" toward her. *Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009). She pleads no facts to plausibly infer that they lacked an honest belief that their decisions regarding the Conversion and her employment would benefit eMed, or that those decisions were not in eMed's best interests; instead, her allegations reveal obvious corporate motivations and benefits related to these acts. *See Sifaco Grp., S.A. v. Margioukla*, 2026 WL 2035452, at *7 (Fla. 4th DCA July 15, 2026) (dismissing tortious interference claim against corporate officers). For example, Plaintiff alleges that the Conversion and related decisions resulted in an equity infusion of $100 million and an enterprise valuation of approximately $2 billion, and that an experienced businesswoman became CEO of the new entity. FAC ¶¶ 56, 1.[13]

Florida courts routinely reject conclusory assertions of ulterior motives when dismissing tortious interference claims against corporate agents, and the Court should do so here. *See, e.g.*, *Hvide,* 2021 WL 8154846, at *14; *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th 1999). For example, in *Hvide*, this Court rejected the plaintiff's conclusory allegations that corporate agents acted without justification in inducing their companies to terminate plaintiff's employment relationship. 2021 WL 8154846, at *14. Though the plaintiff alleged that the individual defendants interfered "with ulterior purposes, namely their own personal enrichment or to secure their own positions[ ] without an honest belief that their actions would

[13] Plaintiff also does not deny that she forwarded herself confidential and proprietary information, Defendants' stated cause for terminating her at-will employment. FAC ¶ 227.

benefit the entities for which they worked," the complaint "fail[ed] to plead sufficient facts to support a reasonable inference that [defendants] were operating outside the scope of their employment or against their companies' interests." *Id.* The same is true here.

Further, Plaintiff cannot establish any entitlement to a transaction bonus, the CEO role, or continued employment, so Defendants could not have interfered to deprive her of such benefits, regardless of intent. *See* Mot. at 33; *M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1341 (11th Cir. 2020) (dismissing tortious interference claim against trustee, as imposing liability on him would "hold actions tortious that did not even amount to a breach.").

## IX. FERRO AND DEARBORN CANNOT CONSPIRE WITH EMED, LLC, AND THERE WAS NO UNDERLYING WRONG (COUNT XXVI).

Plaintiff's civil conspiracy claim fails for similar reasons as her tortious interference claims. The acts alleged against Ferro and Dearborn (*e.g.*, securing institutional investment, modifying compensation, and terminating plaintiff's employment, Opp. at 35) can only be construed as acts of the company, which cannot conspire with itself. Mot. at 35. Plaintiff's allegations do not establish that either individual had a personal stake in these activities wholly separate from eMed, LLC's interest. *Mancinelli v. Davis*, 217 So. 3d 1034, 1037 (Fla. 4th DCA 2017). To invoke this narrow exception to the intra-corporate conspiracy doctrine, the requisite "'personal stake' must be more than just personal animosity on the part of the agent[,]" and "the benefit to the agent must be more than 'incidental' to the benefit to the principal." *Id.* (quoting *Richard Bertram, Inc. v. Sterling Bank & Tr.*, 820 So. 2d 963, 966 (Fla. 4th DCA 2002) and *HRCC, Ltd. v. Hard Rock Café Int'l (USA), Inc.*, 2016 WL 6603792, at *5 (M.D. Fla. Sept. 13, 2016)). Plaintiff's allegations that Dearborn and Ferro had a "corresponding financial interest" and financially benefitted from the conversion and elimination of the Draft Plan support only incidental financial benefits flowing from financial benefits to the company, not a wholly separate personal

stake that could support a conspiracy. Opp. at 35-36. For example, Plaintiff cites Ferro's status as an equity holder, but equity value corresponds directly to company value, so financial benefits to members are necessarily incidental. As explained *supra* (pp. 5-6), Plaintiff's allegations fail to plausibly establish that she was terminated because she opposed prescriptions for eMed Population Health, Inc.'s now-CEO, and to the extent Plaintiff alleges that this was the objective of the "conspiracy," then eMed, LLC's purported interest in her termination would be the same as Ferro's.[14]

Finally, Plaintiff alleges no wrongful acts or unlawful means. *See Hercules Cap., Inc. v. Gittleman*, 2018 WL 395489, at *24 (S.D. Fla. Jan. 12, 2018); *see also supra* at pp. 1-6, 13-15. Rather, eMed's execution of the Conversion, abandonment of the Draft Plan, staffing decisions, and termination of Plaintiff's at-will employment were privileged business decisions, and Plaintiff alleges no facts demonstrating otherwise.

## **CONCLUSION**

WHEREFORE, Defendants respectfully request that the Court dismiss Plaintiff's Amended Complaint with prejudice and award any other such relief as it deems just and proper.

[14] For example, in *Santillana v. Fla. State Ct. Sys.*, the court dismissed a court employee's civil conspiracy claim against her superiors, which alleged discrimination and termination in retaliation for her reporting of a subordinate's inaccurate reporting of mediation statistics, which caused more cases to be assigned to mediators who were friendly with two of the defendants. 2010 WL 271433 (M.D. Fla. Jan. 15, 2010) at *2, *13. The court held that the plaintiff failed to allege facts suggesting that any of the defendants possessed "economic power that was not derived from their positions" with the court. *Id*.

Dated: September 18, 2026

Respectfully submitted,

/s/ *Olga Vieira*
Olga M. Vieira
Fla. Bar No. 29783
Shalia Sakona
Fla. Bar No. 107398
Quinn, Emanuel, Urquhart & Sullivan LLP
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
Tel.: (305) 402-4880

*Counsel for Defendants eMed LLC, eMed Population Health, Inc., Michael Ferro, and Justin Dearborn*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of September 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Olga Vieira*
Olga M. Vieira
Fla. Bar No. 29783
Quinn, Emanuel, Urquhart & Sullivan LLP
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
Tel.: (305) 402-4880